IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| TONY BARKSDALE, | ) | |
| AIS No. 0000z611, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:08-CV-327-WKW |
| | ) | [WO] |
| JEFFERSON S. DUNN, | ) | |
| Commissioner, Alabama Department | ) | |
| of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Tony Barksdale filed this federal habeas corpus action pursuant to

28 U.S.C. § 2254 challenging his November 1996 Tallapoosa County conviction for

capital murder and sentence of death. For the reasons set forth below, Petitioner is

not entitled to either habeas corpus relief or a Certificate of Appealability.[1]

---

[1] The undersigned took assignment of this case on July 19, 2016. Doc. # 52. Death penalty litigation languishes in courts for many reasons, not all of which are related to the activities of the parties and counsel. The court accepts no small measure of responsibility in this particular case. But in fairness, and as a primmer for the uninitiated, *see* note 61 for a taste of what state and federal courts encounter when a judge peeks into a death penalty case file for the first time.

# I. BACKGROUND

## A. The Offense and Aftermath

Late on the afternoon of December 1, 1995, Petitioner Tony Barksdale fatally

shot 19-year-old Julie Rhodes twice - one in the face and once in the back. That fact

has never been in genuine dispute. The circumstances under which Petitioner twice

shot his victim, however, were actively contested and litigated fully during

Petitioner's November 1996 capital murder trial.

The Alabama Court of Criminal Appeals' opinion affirming Petitioner's

conviction and sentence of death includes the following description of the relevant

circumstances surrounding Petitioner's fatal shooting of Julie Rhodes, which quotes

extensively from the trial court's Sentencing Order[2]:

> On Thursday night [November 30, 1995], [Tony] Barksdale,
> [Jonathan David] Garrison, and [Kevin] Hilburn were together in the
> Guntersville area. Barksdale wanted to go to Alexander City, so very
> early Friday morning they stole a car in Guntersville and headed for
> Alexander City. About seven o'clock in the morning they wrecked the
> car near Sylacauga, but were able to obtain a ride from someone in the
> neighborhood, who took them to Alexander City.[3] Throughout most of

---

[2] Circuit Court Judge Lewis H. Hamner issued his Sentencing Order January 14, 1997. Complete copies of Judge Hamner's Sentencing Order appear among the State Court Record ("SCR") submitted to this court at 4 SCR 786-801, 15 SCR 92-108, and 23 SCR (Tab R-52).

[3] At trial, prosecution witness Darryl Davis testified that around seven AM on December 1, 1995, he heard screeching tires outside his home near Sylacauga. He looked out a window and saw that someone had run a car into a neighbor's yard. When he exited his home, three men -- one black and two white -- asked him for a ride to Sylacauga. The three men got in his truck. When he stopped for gas, the black man -- Petitioner -- asked him to drive them to Alexander City and he agreed. He dropped the three men off at a white house near a church and Petitioner said

the day, they visited or came in contact with persons with whom Barksdale was acquainted, and asked several of them to take them to Guntersville.[4] No one would. During that afternoon, they made many attempts to flag down vehicles belonging to strangers, but few would stop.[5] Finally one person gave them a ride as far as a local shopping center.[6] They approached several people without success. One acquaintance testified that Barksdale said he would "jack" somebody to get back to Guntersville.[7] Several others testified to seeing him with

<hr>

that if anyone asked, he should not tell them he gave them a ride. Statement of Facts from Petitioner's capital murder trial (hereafter "S.F. Trial"), testimony of Darryl Davis, 9 SCR 742-51.

[4] Multiple witnesses who resided in the Alexander City area testified they turned down requests from Petitioner and his companions for a ride. S.F. Trial, testimony of Jamie Lambert, 9 SCR 752-67; testimony of Charles Goodson, 9 SCR 768-802; testimony of Gretchen Young, 9 SCR 803-11; testimony of Djuna K. Gates, 9 SCR 852-57. Prosecution witness Gates testified that she knew Petitioner as a friend of her sister but still refused Petitioner's demands for a ride after she saw that Petitioner was carrying a gun. *Id.*, testimony of Djuna K. Gates, 9 SCR 853-56. Ms. Gates also testified that later she saw Petitioner walking along the side of the road as Gates drove her daughter to a store. Petitioner jumped out into the path of Gates's vehicle and attempted to flag Gates down but Ms. Gates drove around Petitioner to the store, where Julie Rhodes waited on Gates and her daughter. *Id.*, testimony of Djuna K. Gates, 9 SCR 856-57.

[5] Multiple witnesses testified to the brazenly dangerous efforts of Petitioner and his companions to secure a ride, including leaping into the path of on-coming vehicles. S.F. Trial, testimony of Djuna K. Gates, 9 SCR 856-57; testimony of Christy Causey Meadows, 9 SCR 858-62; testimony of Laura Sharp, 9 SCR 863-65; testimony of Billy Tease, 9 SCR 877-92. Ms. Sharp testified that she encountered Petitioner and his two companions around five-thirty in the evening when she spotted them standing in the middle of the road and she had to drive in the grass to avoid hitting them. *Id.*, testimony of Laura Sharp, 9 SCR 864-65.

[6] In fact, after spotting Petitioner and his companions standing in the middle of the road, a young couple gave Petitioner and his companions a ride to a shopping center parking lot but refused to take them further because a parade had closed nearby streets. S.F. Trial, testimony of Kelli Simpson, 9 SCR 866-72; testimony of Jason Sims, 9 SCR 872-77.

[7] S.F. Trial, testimony of Charles Goodson, 9 SCR 790, 802. Goodson testified that he was acquainted with Petitioner. Goodson arrived at the home of Annie Pearl Gaddis in Alexander City on the day in question to find Petitioner there with two white males. He spent several hours that afternoon with Petitioner and Petitioner's two companions, during which time they visited several mutual acquaintances of Goodson and Petitioner. After Goodson cashed his paycheck, Petitioner asked for money but Goodson refused to give him any. During one of their stops that afternoon, Goodson watched Petitioner clean his gun. Goodson left that location when all the others fell asleep. After securing a ride from his father, Goodson returned to the residence of Annie Pearl Gaddis. When he saw Petitioner and the others walking up the road toward Ms. Gaddis' home, Goodson locked the door and hid in a back bedroom. Ms. Gaddis let Petitioner and his companions

a gun.[8]  Barksdale had the gun when the three left Guntersville, and he was the only one armed.  Barksdale told the other two that he would shoot someone in order to get a ride back to Guntersville, and he would rather shoot one than two.[9]

  The victim, 19-year-old Julie Rhodes, worked at a store in the shopping center.  As she was returning in her old Maxima automobile from her supper break to the parking area, Barksdale flagged her down and the three of them got in the car with the victim.[10]  Barksdale was

into her home and Petitioner informed Ms. Gaddis, "Tell him [Goodson] when you see him this will cost him."  Petitioner and his companions left the Gaddis home and walked up the hill toward a store but later returned.  When Ms. Gaddis again let them in her home, Goodson (still hiding in another room) overheard Petitioner state that he was going to "jack" someone to get back to Guntersville.  When Petitioner and his companions left, walking again toward the store, Goodson fled the Gaddis residence in another direction toward a friend's home.  At his friend's house, Goodson telephoned his father, who picked him up and took him home.  Goodson showered and prepared to leave with his family to attend the town's Christmas parade,.  On the drive to the parade, Goodson saw Petitioner and his companions attempting to flag down their vehicle. Goodson ducked down in an attempt to avoid being seen.  Petitioner and his companions frightened Goodson's mother.  Petitioner carried his gun in a shoulder holster under his jacket.  *Id.*, testimony of Charles Goodson, 9 SCR 768-95.

  [8] S.F. Trial, testimony of Charles Goodson, 9 SCR 780-81, 795; testimony of Randy Jackson, 9 SCR 816-17, 820; testimony of Rodney Wyckoff, 9 SCR 826-27, 829.  Witness Jackson testified Petitioner, Goodson, and two white male companions passed by Jackson's apartment window on the day in question, and he hollered at Petitioner.  Petitioner, Goodson, and the two white males came into Jackson's apartment.  Petitioner had a gun - a black 9 mm pistol, which Petitioner carried in a holster inside his jacket.  There was a bullet in the chamber of Petitioner's gun.  Petitioner was talking about drugs and said he had wrecked his car.  Jackson told Petitioner he had to leave and about half the time Petitioner was there, Petitioner was playing with his gun. *Id.*, testimony of Randy Jackson, 9 SCR 812-20.
  Witness Wyckoff testified that Petitioner, Goodson, and two white males spent time at Wyckoff's apartment on the day in question.  Goodson interrupted Wyckoff's sleep around 9:30-10 a.m. to say he was leaving.  Petitioner was "messing" with his gun, which Petitioner carried in a holster, at Wyckoff's kitchen table, tapping the gun on the glass table top.  When Wyckoff told Petitioner to put the gun away, Petitioner did so.  *Id.*, testimony of Rodney Wyckoff, 9 SCR 821-29.

  [9] S.F. Trial, testimony of Jonathan David Garrison, 11 SCR 1268-69.

  [10] A law enforcement officer testified that he saw a black man flag down a gray Nissan Maxima in front of a Winn-Dixie in the shopping center.  S.F. Trial, testimony of Darrell Armour, 9 SCR 882-87.  Two friends of the victim testified they witnessed a black man and two white men get into the victim's vehicle in the shopping center parking lot; one testified she believed the victim looked scared and the other testified that it appeared to her that the victim looked like something

seated in the backseat. He gave Julie directions to drive in the neighborhood, and to turn into a "dead-end" street and stop.[11] Garrison and Hilburn got out and ran behind a nearby shed.[12] The Maxima moved along the street past several houses, turned into a driveway, backed out, and came back down the street.[13] Two shots were fired by Barksdale and the car stopped.[14] Barksdale pushed Julie out of the car and told Garrison and Hilburn to get in.[15] They went to some place in Alexander City and disposed of somethings that were in the car and then drove back to Guntersville.[16] Barksdale still had the gun and

---

was wrong. S.F. Trial, testimony of Angela Jones, 9 SCR 887-94; testimony of Ginny Jones, 9 SCR 894-99.

[11] Petitioner's co-defendant Garrison testified at trial that the victim gave them a ride. Petitioner directed her to drive to a residential neighborhood and stop in front of a house. When the victim did so, the three passengers all opened their doors, and (4) then Petitioner reached for his gun. S.F. Trial, testimony of Jonathan David Garrison, 11 SCR 1270-72.

[12] Garrison also testified that when Petitioner reached for his gun, he and Hilburn exited the vehicle and ran behind a shed behind a house. As they ran, they heard the victim yell "Please don't, don't shoot me," and heard the victim mash down on the gas pedal. The victim pulled into a driveway and dogs ran up to the car barking,. He heard Petitioner yell "Bitch, you ain't going to let me out right here." The victim put the car into reverse and backed out of the driveway on to the road. He heard two shots and saw two flashes through the vehicle's tinted windows, as the car was still rolling. He heard the emergency brake being pulled and tires squealing. He saw Petitioner get out of the vehicle and push the victim in the back as she was getting out of the vehicle. The victim ran down the street, crying. Petitioner pointed the gun at them and ordered them to get back into the car. When they did so, he saw blood inside the car and a bullet hole in the front driver's side window. They drove back to a white house where they unloaded items from inside the car. Petitioner told an older woman he had just shot a girl and he did not know if she was dead. On their drive back to Guntersville, Petitioner told them to keep their mouths shut and not to tell anyone. S.F. Trial, testimony of Jonathan David Garrison, 11 SCR 1269-78. Garrison also testified that when they arrived back in Guntersville and went to the apartment of an acquaintance, Petitioner told everyone there that he shot the girl by accident. *Id.*, 11 SCR 1282. Prior to that, however, Garrison testified Petitioner never told him the shooting was accidental. *Id.*, 11 SCR 1283.

[13] *Id.*

[14] *Id.,* 11 SCR 1274.

[15] *Id.*

[16] *Id.*, 11 SCR 1276-77. At trial, a law enforcement officer testified regarding the recovery of a number of burned items from the yard of Annie Pearl Gaddis, which items were linked to Julie

displayed it to several people.  All of them were arrested several days later and the automobile and pistol were recovered.[17]

Desperately seeking help and trying to escape, Julie managed to get to some nearby houses.[18]  Someone heard her screams and she was discovered lying in the yard of a house, bleeding profusely.[19]  Medics were called and she was transported to a local hospital for emergency treatment and then transported by helicopter to Birmingham[20]  She was

---

Rhodes and included a letter and catalogue bearing her name.  *Id.*, testimony of Keith Jones, 8 SCR 687-92, 11 SCR 1226-28.

[17] Law enforcement officers testified at trial regarding the arrest of the three suspects, as well as the recovery of the victim's vehicle and the recovery of the murder weapon.  S.F. Trial, testimony of L.C. Gill, 11 SCR 112-36; testimony of Phil Sims, 11 SCR 1136-52; testimony of Grady Baugh, 10 SCR 1084-88.

A pair of eyewitnesses to the arrests of Petitioner and Kevin Hilburn testified at trial that when a law enforcement officer knocked on the front door of the residence where they were staying on December 3, 1995, Petitioner and Hilburn attempted to flee through the house and exit the rear of the house.  Law enforcement officers arrested Hilburn outside the rear of the house and Petitioner inside the house.  *Id.*, testimony of Jeffery Lynn Avery, 10 SCR 1100-16; testimony of Lawrence Havis, 10 SCR 1116, 11 SCR 1117-21.

Law enforcement officers also testified regarding the circumstances of Petitioner's, Hilburn's, and Garrison's arrests during a pretrial hearing on Petitioner's motion to suppress held August 19, 1996.  S.F. Trial, testimony of Sonny Riddle, 5 SCR 23-36, 51-66; testimony of L.C. Gill, 5 SCR 36-51, 92-116, 6 SCR 117-24; testimony of Phil Sims, 6 SCR 124-41.

[18] At trial, a married couple testified they were driving in the neighborhood of the shooting on the evening in question when they heard a lady screaming "Help me."  They drove toward the source of the screams and saw a woman kneeling on the front porch of a house holding the screen door open and pounding on the wood door.  The lady appeared to be bleeding from the chin and back and said she had been shot.  The wife called 911 while the husband attempted to get help from the occupants of another house, and when the ambulance arrived, the lady was lying at the edge of the porch.  S.F. Trial, testimony of Billy Alexander, 8 SCR 533-40; testimony of Lynn Alexander, 8 SCR 540-46.

[19] A different married couple, who lived on the residential street where the shooting took place, testified they observed the victim, bleeding from the face, chest, and back, rolling around in leaves, half-on and half-off a porch.  S.F. Trial, testimony of Ricky Price, 8 SCR 571-76; testimony of Debra Price, 8 SCR 578-81.  The wife testified that she heard the victim state "A black man shot me," "I have got to get away from him," and "I'm going to die, aren't I?" *Id.*, testimony of Debra Price, 8 SCR 579.

[20] Both of the paramedics who arrived at the scene testified without contradiction at trial that the victim stated she had been shot in the back by a black man.  S.F. Trial, testimony of Jeff Mosley, 8 SCR 585; testimony of Randall Wiggins, 8 SCR 591-92.  One of the paramedics also testified that the victim appeared to be choking on her own blood,  The victim's wounds appeared

dead on arrival in Birmingham.[21]  She was shot once in the face and once in the back.  She was bleeding to death and went into shock.[22]  She was fearful and was trying to escape her assailant and expressed several times to various people, including medical personnel, that she was going to die.[23]  She was correct.

---

to be consistent with gunshot wounds.  There were holes in her upper right jaw, her shoulder, the outer part of her shoulder, the middle of her back, upper abdominal area, and in her leg,  The victim appeared to be going into shock as they left the scene for the hospital.  As a result, they were unsuccessful in attempting to get an IV into her hand, and he did not see any gun powder burns on the victim.  *Id.*, testimony of Jeff Mosely, 8 SCR 583-88.

The other paramedic testified that he observed entrance wounds in the victim's back, right lower chin, the latter of which appeared to have exited the lower side of the neck and entered the left shoulder and then exited the left shoulder.  He observed an exit wound in the left lower abdominal area and an entrance wound in the left femur, and while en route to the hospital, the victim stated that she was dying - that she thought she was going to die.  *Id.*, testimony of Randall Wiggins, 8 SCR 590-93.

[21] The surgical resident who accompanied the victim on her helicopter flight from the hospital in Alexander City to Birmingham testified without contradiction that the victim was on a respirator throughout the flight to Birmingham and five minutes after the helicopter took off with the victim, her blood pressure dropped and CPR was started.  S.F. Trial, testimony of Shauna Krishnan, 8 SCR 600-04.

The surgeon at the hospital in Birmingham who treated the victim upon her arrival there testified without contradiction that the victim was undergoing CPR upon her arrival at the hospital.  When she arrived, she had no pulse and her pupils were fixed and dilated, and she was pronounced dead four minutes after her arrival.  *Id.*, testimony of Diane Winters Richards, 8 SCR 643-47.  The Birmingham emergency room physician who pronounced the victim dead testified she had lost her pulse and blood pressure shortly after takeoff.  *Id.*, testimony of Russell Wagner, 8 SCR 647-51.

[22] One of the paramedics who treated the victim at the scene testified without contradiction that she was going into shock as they left for the hospital in Alexander City.  S.F. Trial, testimony of Jeff Mosley, 8 SCR 586.

The emergency room physician who treated the victim at the Alexander City hospital testified without contradiction that she suffered bullet wounds to the lower face, left side of her neck, left shoulder, right upper back, upper abdomen, and left thigh.  In the emergency room, she was intubated, *i.e.*, a chest tube was installed to drain blood, and several IV's were started to furnish fluids.  She was then taken to surgery.  *Id.*, testimony of Allen Stinson, 8 SCR 594-98.

[23] S.F. Trial, testimony of Debra Price, 8 SCR 579; testimony of Randall Wiggins, 8 SCR 592-93.

*Barksdale v. State*, 788 So. 2d 898, 901-02 (Ala. Crim. App. 2000), *cert. denied*, 788 So. 2d 915 (Ala. 2000), *cert. denied*, 532 U.S. 1055 (2001) (Footnotes added).

## B. Indictment

On February 9, 1996, a Tallapoosa County grand jury indicted Petitioner and David Garrison on three counts of capital murder, *i.e.*, three different theories concerning the fatal shooting of Julie Rhodes.[24]

## C. The Fate of Petitioner's Co-Defendants

Although arrested with Petitioner and Garrison, by the time of Petitioner's capital murder trial Kevin Hilburn was deceased.[25] Shortly before the start of their joint capital murder trial, Petitioner's co-defendant Garrison accepted a plea bargain, entered a guilty plea to a lesser charge of murder, and received a life sentence with

---

[24] Multiple copies of the Indictment against Petitioner appear in the state court record at 1 SCR 13-14, 1 SCR 167-68, and 2 SCR 331-32. More specifically, the grand jury charged Petitioner and Garrison with having (1) intentionally caused the death of Julia Kathryn Rhodes by shooting her with a pistol during a time when Petitioner and Garrison were in the course of committing the theft of a 1985 Nissan Maxima by the use of force against Rhodes with the intent to overcome her physical resistance while Petitioner was armed with a deadly weapon, to wit, a pistol, (2) intentionally caused the death of Julia Kathryn Rhodes by and through the use of a deadly weapon, to wit, a pistol, while she was in a vehicle, and (3) intentionally caused the death of Julia Kathryn Rhodes by and through the use of a deadly weapon, to wit, a pistol, fired or otherwise used by Petitioner and Garrison while within or from a vehicle.

[25] 4 SCR 788; 23 SCR (Tab R-52), at p. 788.

the possibility of parole.[26]  As part of his plea bargain, Garrison agreed to testify against Petitioner.[27]

## D. Guilt-Innocence Phase of Trial

Jury selection in Petitioner's capital murder trial commenced on November 11, 1996.[28]  The guilt-innocence phase of Petitioner's capital murder trial began November 20, 1996.[29]

### 1. Prosecution's Evidence

In addition to the testimony summarized above in Section I.A., the prosecution presented and the jury heard testimony from (1) Julie's co-workers and grandmother about the events of the evening in question,[30] (2) a person who saw her vehicle driving erratically just prior to the fatal shooting,[31] (3) two people who were

---

[26] S.F. Trial, testimony of Jonathan David Garrison, 11 SCR 1257, 1284-85.

[27] *Id.*, testimony of Jonathan David Garrison, 11 SCR 1285.

[28] S.F. Trial, 6 SCR 219-22.

[29] S.F. Trial, 7 SCR 508.

[30] The manager of the Dollar General store in Alexander City testified that when she left the store on December 1, 1995 around five in the evening , two of her employees, *i.e.*, Julie Rhodes and Mike McGuire, were working.  S.F. Trial, testimony of Danielle McDaniel, 8 SCR 520-23.  Julie Rhodes's co-worker testified that Julie left Dollar General around 5:55 pm in her Maxima and never returned.  *Id.*, testimony of Mike McGuire, 8 SCR 523-29.
    Julie's grandmother testified that Julie called her around 5:45 pm that evening.  Julie arrived at her apartment around six pm for her dinner break.  Julie left to return to work in her Silver Nissan at 6:30 pm.  *Id.*, testimony of Dora Catherine Rhodes, 8 SCR 530-32.

[31] An Auburn University student who lived in Alexander City and had gone to school with Julie Rhodes testified that on December 1, 1995 around 6:35 pm he saw Julie Rhodes's vehicle with its distinctive bluish front license plate with a bright yellow smiley face traveling toward him

in the neighborhood where Julie was shot who heard gunfire,[32] (4) the law enforcement officer who took custody of Julie's bloody clothing at the hospital in Alexander City where she was initially treated,[33] (5) forensic scientists who examined the physical evidence recovered during the investigation of Julie's fatal

---

as he drove down a road toward Walmart. Julie's vehicle was traveling fast and was partly on his side of the road as it drove past him. Because of her vehicle's tinted windows, he was unable to see who was driving her vehicle. S.F. Trial, testimony of Douglas Jeremy Duerr, 8 SCR 553-59.

[32] A man who lived in the residential area near where Julie was shot testified that he arrived home between 6:30 and 6:45 the evening of December 1, 1995. While he was outside unloading his car, he heard a single gunshot. About a minute to ninety seconds after he heard the gunshot, he saw a little gray Nissan with tinted windows drive by. He went inside his home, and about ten minutes later he heard sirens. S.F. Trial, testimony of Hancle Cheatham, 8 SCR 546-51.

A woman who was driving into the same residential neighborhood toward her mother's home on the evening of December 1, 1995 testified that she heard two gunshots seconds apart - "not real fast together." When she arrived at her mother's home they saw dogs running loose down the street, barking like crazy, and minutes after she heard the gunshots, in the interval between the two gunshots, an ambulance arrived. *Id.*, testimony of Jackie Mobley, 8 SCR 560-64.

[33] An Alexander City Police Lieutenant testified that he followed the ambulance carrying Julie Rhodes to the hospital and collected the clothing removed or cut from her body by hospital personnel in the emergency room. S.F. Trial, testimony of Jimmy Cleveland, 8 SCR 610-12. Lieutenant Cleveland also identified numerous photographs of Julie Rhodes's clothing. *Id.*, testimony of Jimmy Cleveland, 8 SCR 613-15. For unknown reasons, those photographs were never admitted into evidence.

shooting,[34] including the weapon that fired the fatal shots,[35] (6) law enforcement

officers who examined, photographed, and recovered a spent bullet and multiple

[34] A trace evidence specialist with the Alabama Department of Forensic Sciences testified that he examined Julie Rhodes's gray Nissan Maxima. He took samples of stains he observed on left rear seat and the upper right portion of the driver's seat and turned those samples over to the lab for analysis. He found no hairs of significance inside the vehicle, He found two hairs inside a toboggan delivered to his lab on December 6, 1995. He returned the toboggan to Detective Keith Jones. He turned over a bag containing a seat belt to another analyst for examination. He received a number of other items of physical evidence, including blood swabs and other items, from Detective Jones and forwarded them to other analysts for examination, including a handgun, magazines, and envelopes with cartridges, and the only trace evidence found on the victim's clothing consisted of bloodstains. S.F. Trial, testimony of Craig Bailey, 9 SCR 903-17.

The supervisor of the Alabama Bureau of Investigation's latent fingerprint unit testified that she received a large number of items for examination in connection with the case and she was able to identify two latent fingerprints lifted from the driver's side rear window of Julie Rhodes's Nissan to the right ring finger and right index finger of David Garrison. *Id.*, testimony of Carol Curlee, 11 SCR 1166-73.

A forensic biologist with the Alabama Department of Forensic Sciences testified that there was insufficient blood contained in most of the blood samples taken from the interior of Julie Rhodes's vehicle and the location where she was discovered that were submitted to his office to permit DNA analysis of those samples and the samples that did contain sufficient blood were submitted to Deborah Dodd for analysis. *Id.*, testimony of William Landrum, 11 SCR 1183-93.

A forensic scientist with the Alabama Department of Forensic Sciences testified that all of the blood samples submitted to her for analysis, including the samples taken from the seat belt recovered inside Julie Rhodes's vehicle, a white jacket, and eleven different locations near where Julie Rhodes was discovered bleeding, were from a female and matched the DNA of Julie Rhodes. *Id.*, testimony of Deborah Dodd, 11 SCR 1195-1202.

[35] A forensic scientist with the Alabama Department of Forensic Sciences testified that he examined a Chinese-made 9 mm semi-automatic pistol, along with unfired Remington and Winchester cartridges and a single spent bullet found at the scene near where Julie Rhodes was found bleeding. After test-firing the pistol, he concluded the pistol fired the spent bullet recovered from the crime scene. No shell casings were found inside Julie Rhodes's vehicle. He received a maroon pullover sweater with a denim collar from Detective Jones that contained bloodstains and several holes. The sweater contained holes in the right rear shoulder, left front shoulder, left front sleeve, right side of the front collar, and central front. There was a heavy deposit of gunpowder particles in the hole in the right rear shoulder. Gunpowder was also found in the left front and middle front holes. Based on the presence of bloodstains on the seat belt and driver's side front of the vehicle, he believed the victim was in the car at the time she was shot at least once. The weapon he examined appeared to be operating normally until he test-fired it, at which time, the slide would not come back and the gun jammed. It was necessary for him to manually remove the spent cartridge from the chamber by forcibly moving the slide backward. The gun did not jam every time he test-fired it. The trigger pull on the gun was six pounds. It was possible to manually

bloodstains from the area near the intersection in Alexander City where Julie's fatal

shooting took place,[36] and (7) a number of Petitioner's acquaintances with whom

Petitioner had conversations about his gun and the fatal shooting in Alexander

City,[37] including the young man to whom Petitioner gave the gun Petitioner used to

---

unload the weapon by repeatedly pulling the slide back to eject cartridges. When the gun jammed, a shell was left in the chamber. When he test-fired the gun, a spent shell remained in the chamber. If no round is in the chamber, before this gun can be fired, a round must first be chambered. When he examined Julie Rhodes's vehicle, he found no bullet holes in the seat, roof, or floor of the vehicle. When the slide is pulled back in the pistol in question, a round is chambered and the gun cocks. He was present when the gun was test-fired by the defense's expert and the gun jammed on that occasion as well. S.F. Trial, testimony of Joe Saloom, 11 SCR 1202-19.

[36] An Alexander City Police Detective testified that he followed an ambulance to the area near Charlotte Lane off the Sixth Street Extension on December 1, 1995. When he arrived, paramedics were working on Julie Rhodes. The victim's missing vehicle was identified. He took photographs of the crime scene. He went to the hospital and arrived there around 10:30 pm just before the helicopter took off. He received the victim's clothing from Lieutenant Cleveland and turned it over to Craig Bailey in the Forensic Lab. A fired bullet found at the crime scene was turned over to the lab, as was a section of bloodstained seat belt recovered from inside Julie' Rhodes's vehicle after the vehicle was located in the Guntersville area. Numerous bloodstains were recovered from the area near where Julie Rhodes was found bleeding. Swabs were also taken from inside Julie Rhodes's vehicle. Numerous items were recovered from the inside and yard of the home of Annie Pearl Gaddis, including two piles of burnt trash. S.F. Trial, testimony of Keith Jones, 8 SCR 616-32, 667-710, 11 SCR 1224-31. Detective Jones identified more than two dozen photographs of the crime scene. *Id.*, testimony of Keith Jones, 8 SCR 623-29. Detective Jones also identified numerous photographs of (1) the burnt trash found in the front yard of Annie Pearl Gaddis's home, (2) the residence in Guntersville where Petitioner and Kevin Hilburn were apprehended, (3) the location where the murder weapon was recovered, (4) the residence where Garrison was apprehended, (5) various locations in the Guntersville area where Petitioner visited after the fatal shooting of Julie Rhodes, and (6) the location in Guntersville where Petitioner, Garrison, and Hilburn were seen in Julie Rhodes's vehicle just hours after her murder. *Id.*, testimony of Kevin Jones, 8 SCR 687, 696-707. For unknown reasons, these photographs were not admitted into evidence.

Another Alexander City Police Detective testified that he discovered blood at several different locations on the roadway near the location where Julie Rhodes was found bleeding. He canvassed the neighborhood, and prepared a diagram of the area. *Id.*, testimony of Randy Wynn Walters, 8 SCR 653-66.

[37] An acquaintance of Petitioner named Antoine Harris testified that he knew Petitioner for about three months prior to December 1995. Petitioner lived in Alexander City for several months

with a person named Josh Rhea, who left the area in October 1995.  After that, Petitioner stayed with someone named Riley Jackson for three or four days and then moved in with Harris and his mother (Margaret Madden) for about a week.  Harris's mother then bought Petitioner a bus ticket to return to Virginia and visit his mother.  He saw Petitioner and two white people in his mother's car in Alexander City about three-fifteen in the afternoon on December 1, 1995.  After Petitioner was arrested for Julie Rhodes's murder, Petitioner telephoned Harris.  When Harris asked Petitioner why he did it, Petitioner replied "Toine, that ain't me.  I didn't mean to do that.  I don't know what happened."  Petitioner told Harris it was a mistake.  Petitioner said he was trying to unload the gun and it went off.  When Harris asked how Petitioner had shot the victim twice, Petitioner said he did not know.  When Harris asked why Petitioner and his two companions had not simply pulled the victim out of the car, Petitioner said he did not know.  When Harris asked why he had not carried the wounded victim to the hospital, Petitioner responded that he was scared.  Petitioner said he wanted the car to get to Guntersville.  Petitioner said his shooting of the victim was an accident.  S.F. Trial, testimony of Antoine Harris, 9 SCR 836-51.

Another acquaintance of petitioner named Jason Scott Mitchell testified that on the Saturday morning after the fatal shooting he returned home with John Wesley Marks to the apartment in Albertville Mitchell shared with Candace Talley and Nikisha Pieborn to find Petitioner, Garrison, Hilburn, Neysa Johnson, Janelle Jiggs, Tara Dean Hunter, Willie Havis, and Brian Hampton asleep inside the apartment.  Petitioner took Mitchell outside and showed off his "new car" - a gold/brown Maxima with the driver's side window missing.  Petitioner said he got the vehicle as is after putting down a down payment.  Mitchell did not look at the car very hard.  Petitioner then took Mitchell into a bathroom and showed Mitchell a black 9 mm pistol Petitioner said he had gotten from some friends.  Mitchell, Petitioner, and Brian Hampton rode in the vehicle to Hampton's parents' home in Guntersville.  Mitchell noticed nothing unusual during the drive.  Later that same Saturday, as several people played cards in Mitchell's apartment, Petitioner sat on the couch and played with his gun - taking out the clip, removing the bullet, and then putting the clip back in the gun.  Petitioner appeared to be fascinated with the gun.  Meanwhile everyone else was scared.  Talley and Pieborn asked Mitchell to ask Petitioner to put up the gun.  When Mitchell asked Petitioner to put the gun in his car, Petitioner protested that it had no window.  After additional discussion, Petitioner took the gun down and put it in the glove box of the car.  Everyone in the apartment was talking about the incident the evening before in Alexander City.  When Mitchell asked Petitioner about the incident in Alexander City, Petitioner began crying and said "Man, I didn't mean to do it, "I was trying to scare her," "I was shaking the gun in her face trying to get her out of the car so we could get back home and the gun went off," and "Jason, I swear to you I didn't mean to shoot the girl."  Petitioner repeated that it was an accident but never explained to Mitchell how Petitioner ended up in Guntersville after "accidentally" shooting the girl in Alexander City.  Petitioner did say that he was trying to find a way back to Guntersville.  Petitioner and Mitchell later played basketball at a Rec Center.  After basketball, Mitchell noticed bloodstains on the seat belt and front windshield of the car.  Petitioner drove Mitchel home to Albertville on Sunday.  Mitchell told Petitioner to get his gun and leave Mitchell's apartment.  *Id.*, testimony of Jason Scott Mitchell, 10 SCR 965-81.

Yet another acquaintance of Petitioner named Willie Havis testified that he saw Petitioner, Garrison, and Hilburn on the evening of November 30, 1995 at Candace Talley's apartment in Albertville in Hilburn's car.  When Petitioner invited Havis to accompany them to Alexander City, Havis declined.  He next saw Petitioner, Garrison, and Hilburn in a brown Maxima at the Pier.

fatally shoot Julie Rhodes.[38]  Numerous witnesses in the Guntersville and Albertville areas testified they observed Petitioner, Garrison, and Hilburn in Julie Rhodes's Nissan Maxima and heard Petitioner and his companions claim ownership of the vehicle in the hours and days after her fatal shooting.[39]

---

Petitioner told Havis "check out my car." Petitioner said he had been making payments on the car. Petitioner had a 9 mm in a case. The driver's side window in the car was broken. They all left the Pier and slept that night at Candace Talley's apartment. Saturday morning, Petitioner and Garrison left but then returned. At one point, Petitioner and Jason Mitchell went into the bathroom. Petitioner then went outside and came back in. In the afternoon, Petitioner polished his gun and bullets. On Sunday afternoon, Havis spoke with Garrison at Candace Talley's apartment. Havis last saw Petitioner on Sunday near midnight at a McDonalds. Havis went there with Neysha Hampton Dabbs and Brian Hampton to deliver Petitioner's clothes to him. Havis did not see the Maxima. Petitioner said that he was going to blow up the car or drop it in the river. Petitioner asked Brian Hampton to hide his gun for him. When Hampton said "no," Petitioner pointed the gun at Hampton and threatened to shoot him. Hampton hid the gun below the hill at his home. *Id.*, testimony of Willie Havis, 10 SCR 1012-35.

[38] Seventeen-year-old Brian Hampton testified that he had known petitioner only a couple days prior to December 1, 1995, when he went to the Kiwanis Pier with several other people around 10-10:30 p.m. Petitioner, Garrison, and Hilburn arrived in a Maxima with a sunroof. Petitioner said he made a down payment on the car earlier in the day. Hampton went to Candace Talley's apartment later that night. Petitioner and Garrison were there. The next morning, Petitioner and Jason Mitchell took Hampton to his house and ran some errands. When they returned to Talley's apartment, Garrison told Hampton something and Hampton went outside to look at bloodstains in the Petitioner's car on the seat belt and head rest. Hampton spent Saturday night at Talley's apartment. Petitioner was playing with his gun in the living room - chambering bullets and popping them out. Petitioner was also pointing the gun at everyone else in the apartment. Petitioner, Garrison, and Hilburn returned to Talley's apartment on Sunday morning. Sunday night, Petitioner called and asked Hampton's sister Neysa Hampton Dabbs to bring Petitioner his backpack. Dabbs did not want to go alone. Hampton and Willie Havis went with Dabbs to the McDonalds. Petitioner called Hilburn to come ditch the car in the lake. Petitioner asked Hampton to hide his gun for him. When Hampton said he did not want to, Petitioner held the gun to Hampton's face and said "Are you going to hide it now?" or words to that effect,. Hampton took the gun from Petitioner and hid it in a toboggan, along with clips, in his yard. Hampton went to Talley's apartment in Albertville. When law enforcement officers came by and asked about the location of the gun, Hampton said nothing but later called the police and led them to the location where he had hidden the gun. S.F. Trial, testimony of Brian Hampton, 10 SCR 1042-59.

[39] In addition to the testimony of Jason Mitchell and Willie Havis summarized above, Candace Talley testified that she saw Petitioner, Garrison, and Hilburn in a Nissan Maxima on the

night of December 1, 1995. There was a hole in one window and the remaining window glass was shattered. Garrison joked that the car belonged to "Baldy," a local drug unit agent. Garrison later told her the car was "Jamie's old car." The following day, Talley and Dabbs took a ride with petitioner in the car. During their drive, they discussed the need to get rid of the vehicle. Petitioner suggested shooting the gas tank. S.F. Trial, testimony of Candace Talley, 10 SCR 921-24, 935-37.

Talley's roommate Nikisha Pieborn testified that she saw Petitioner, Garrison, and Hilburn in a Maxima on December 1, 1995 at a red light. The driver's side window had holes in it. There appeared to be three gunshot holes in the window. She later saw Petitioner and other two at the Kiwanis Pier. Hilburn did not spend the night at her apartment. On Saturday, Petitioner had a weapon - a black gun. Petitioner was cleaning the bullets, putting them back in, and then pointing the gun at people in the kitchen. She informed Petitioner that she was pregnant and asked him to put the gun away. Petitioner ignored her. She later left for her mother's home and did not return until Saturday evening. Petitioner, Garrison, and Hilburn were in an out of the apartment after she returned. Petitioner and Garrison were in and out of the apartment Sunday but not Hilburn. *Id.*, testimony of Nikisha Pieborn, 10 SCR 945-55.

A roommate of Talley and Pieborn testified that she also saw Petitioner, Garrison, and Hilburn in a Nissan at a red light in Guntersville on December 1, 1995. There was a bullet hole in the Maxima's driver's side window and the remaining window glass was shattered. Petitioner and Garrison spent that night at the apartment she shared with Talley and Pieborn. The following morning, Saturday, she rode in the Maxima and again noticed the bullet hole in the window. *Id.*, testimony of Tara Dean Hunter, 10 SCR 955-61.

An acquaintance of Petitioner testified that he saw Petitioner on Friday night of the weekend in question at a Chevron station in a vehicle with Garrison and Hilburn. Garrison said the car belonged to Petitioner. The vehicle had a front license plate with a big yellow smiley face and the name "Julie" on it. There was a bullet hole in the driver's window and bloodstains on the seat. Garrison said the blood came from them fighting. Saturday morning, he and Jason Mitchell arrived at Mitchell's apartment to find everyone except Petitioner asleep. Petitioner was strapping on his gun - putting on his holster. *Id.*, testimony of John Wesley Marks, 10 SCR 981-97.

Another recent acquaintance of petitioner, who dated Petitioner for about a week, testified that she went to the Kiwanis Pier on December 1, 1995 where she saw Petitioner, Garrison, and Hilburn in a Nissan Maxima. The driver's side window in the Maxima was shattered and had a bullet hole in it. Petitioner said the car was theirs but he had put a down payment on it. Petitioner said he had been playing with his gun and it went off. Petitioner had the gun in his pants. *Id.*, testimony of Neysa Hampton Dabbs, 10 SCR 998-1012.

A teenager who was present at the Kiwanis Pier on the night of December 1, 1995 testified that she saw Petitioner driving a light blue Maxima with the driver's side window shattered. Garrison and Hilburn were riding as passengers in the vehicle. She saw what appeared to be blood on the driver's side headrest and the back seat. Petitioner said it was his car. When she asked Petitioner about the gun in his lap, he said it was his. *Id.*, testimony of Brooke Buchannon, 10 SCR 1036-42.

A surgeon who treated Julie in the emergency room and operated on her at the hospital in Alexander City testified regarding her injuries and his surgical team's efforts to stabilize her prior to her transport to Birmingham.[40] The forensic pathologist who conducted Julie's autopsy testified regarding the nature of her wounds and her cause of death.[41]

---

[40] The surgeon who treated Julie Rhodes in the emergency room at the hospital in Alexander City testified that Julie was in "profound shock" when she was brought into the hospital due to massive blood loss. Essentially Julie was bleeding to death, pale, and not using her head well. Despite that, prior to her being intubated, Julie stated that she expected to die. He cut down Julie's ankle in order to get to an ankle vein and get blood into her. He put a chest tube into her right side to drain off blood from the lung. Another doctor put a tube into her left side. As soon as they managed to put some IV fluids into her, they pushed her to the Operating Room ("OR"). Once in the OR, his primary concern was to stop the major bleeding just below the xiphoid. When they opened her abdomen, they found a lot of blood in her belly and lower rib cage. They found entry wounds in her liver and lung, as well as outside her body. One bullet penetrated the left lobe of her liver and exited the right lobe, causing a shock wave burst in the right lobe of her liver with massive bleeding. He clipped and clamped the remaining fragments of her liver in an effort to stop the bleeding. There was bleeding from the left side of the neck. He tied off several large neck vessels. The local blood bank emptied its stock during her surgery. They were able to stabilize Julie for flight to Birmingham. While she was being treated Julie's body temperature dropped to a dangerously low level, which he described as "a very hopeless situation." S.F. Trial, testimony of Daniel Lowe, 8 SCR 633-41.

[41] More specifically, the forensic pathologist testified that Julie suffered gunshot wounds to the face, shoulder, back of the chest, and left leg. The pathway of the bullet that struck her face was as follows: it (1) entered near the corner of her mouth (fracturing the right side of her mandible and knocked out her front teeth), (2) went down her neck, (3) struck her larynx (tearing part of the voice box), (4) hit structures in the left side of the neck, including the jugular vein (which caused a tear in the jugular vein resulting in a huge hematoma on the left side of the neck), (5) exited her lower neck on the left side, (6) struck and entered her left upper shoulder, and (8) exited the side of her deltoid. The pathway of the bullet that entered her back was as follows: it (1) entered the back of her chest on the right side of her back, (2) penetrated her abdomen, (3) hit the liver, (4) tore up the midsection of the liver (causing a stellate - star-shaped - injury), (5) created extensive bleeding, and (6) exited her front through the midline of the abdomen just above the belly button. Julie also suffered bullet wounds to the left thigh and left calf. A bullet was removed from her left calf. Internal examination showed one bullet entered her back, broke one rib, entered her abdominal cavity, perforated the liver and abdominal wall, and exited her belly button. He found no evidence of stripling or gunpowder residue in either the jaw gunshot wound or the back gunshot wound. He was unable to reach any definitive conclusions regarding the exact position

A previous owner of the pistol Petitioner used to fatally shoot Julie Rhodes testified that he bought the gun new and it jammed the first time he fired it. He had repeated problems with the mechanism that pulls the spent shell casing out of the chamber after firing. The clip that holds the retainer on the side would slide out and also cause the gun to jam, The gun's safety also moved back and forth when the gun was fired repeatedly. He traded the gun in to a dealer in 1992. He had no idea what had happened to the gun in the intervening years but, after examining it on the stand at Petitioner's trial, it was apparent that "someone has done extensive work on it." The gun now had a new grip. The gun was a single action semi-automatic that had to be cocked the first time before it would fire, *i.e.*, if you fire it twice, you have to pull the trigger twice. He told police he had never experienced any type of accidental discharge of the weapon.[42]

---

of Julie's body at the time of the shooting. He did admit, however, that her back and leg wounds were consistent with her having been in a sitting position when that shot was fired. The cause of Julie's death was multiple gunshot wounds to the face, chest, shoulder, back and left leg. The general direction of the gunshot wound to Julie's back was right to left and downward. The general direction of the gunshot wound to her jaw was right to left and downward, with the bullet exiting the left side of her neck and entering her left shoulder. S.F. Trial, testimony of Alfredo Paredes, 9 SCR 721-40. Dr. Paredes identified a number of photographs taken during Julie's autopsy as well as photographs of the bullet removed from her left leg. *Id.*, testimony of Alfredo Paredes, 9 SCR 730-31,739-40. For unknown reasons, those photographs were not admitted into evidence.

[42] S.F. Trial, testimony of Edward Ross Peterman, 10 SCR 1091-1100. Mr. Peterman identified the gun at trial as a 9 mm pistol "made in China by North China Industries." *Id.*, testimony of Edward Ross Peterman, 10 SCR 1093. A forensic scientist with the Alabama Department of Forensic Science identified the same gun as a "Chinese manufactured semi-automatic pistol, nine millimeter caliber." *Id.*, testimony of Joe Saloom, 11 SCR 1204.

The law enforcement officer who interviewed Petitioner on December 4, 1995 identified an audio tape recording of that interview that was played in open court for the jury as part of the prosecution's case-in-chief.[43]   As recorded by the court reporter, Petitioner's recorded statement included the following exchanges:

> INVESTIGATOR RIDDLE:  What can you tell me about that? In your own words, explain to me what happened, okay?
> MR. BARKSDALE:  Well, we was stuck up at a mall.  They was having a parade.  She had pulled up.  I asked her if she could give us a ride to one of my friend's houses.  And while we was driving, she said she had to be at work.  I said that she could drop us off close to where my friend's house was at.  I had already had the gun on me.  One of my friends had gave me a gun earlier that day.  I didn't want her to be scared.  I didn't want to be walking down the street with a loaded pistol.
> INVESTIGATOR RIDDLE:  Un, huh.
> MR. BARKSDALE:  I was trying to empty the chamber.  As I went to empty the chamber, it got stuck.  The gun went off.  It went off twice.  It went boom.  I did it the first time.  I did it like this and it went boom.
> INVESTIGATOR RIDDLE:  Did you know you hit her the first time?
> MR. BARKSDALE:  The first time when it went off, I heard her screaming.  Then when it went off the second time, that is when she looked back at me.  I saw blood in her mouth.  I went into shock myself.  I thought naw, naw I couldn't have done this.  This couldn't be happening.  I got out of the car.  I jumped out of the driver's seat . . . .  I mean, I jumped out of the passenger's seat and got in the driver's seat.  I pulled around the corner where Kevin and Dave was at.  They had

---

[43] The Marshall County Sheriff's Department Investigator who interviewed Petitioner on December 4, 1995 identified a number of photographs and a transcription of his audiotaped interview of Petitioner.  S.F. Trial, testimony of Sonny Riddle, 11 SCR 1231-54.  For unknown reasons neither those photographs nor the transcription of Petitioner's interview were admitted into evidence.  Investigator Riddle testified that (1) Petitioner was advised of his Miranda rights, (2) Petitioner said he understood his rights and signed a waiver form, and (3) no promises, threats, or other coercion were employed to get Petitioner to make his recorded statement.  *Id.*, testimony of Sonny Riddle, 11 SCR 1243-45.

already got out of the car.  Before I got out of the car, I wanted to make sure it was unloaded and that there wouldn't none in the chamber.  That was my first time really ever having an automatic pistol.  So, it got jammed and went off.  When it went off the first time, I don't know how it went off the second time.  It just went boom, boom.

INVESTIGATOR RIDDLE:  Yes, uh, what happened after you shot her?  What happened then?

MR. BARKSDALE:  I drove . . . I got in the car.

INVESTIGATOR RIDDLE:  What did you do with her?

MR. BARKSDALE:  Nothing.

INVESTIGATOR RIDDLE:  Where did you leave her?

MR. BARKSDALE:  I don't remember the road.

INVESTIGATOR RIDDLE:  I mean, did you leave her on the road or what?  When you shot her, did she get out of the car or did she stay in the car?

MR. BARKSDALE:  Yea, she got out of the car.  She got out of the car.  I didn't force her out or nothing like that.  She opened the door and got out.

INVESTIGATOR RIDDLE:  Was she screaming when she got out?

MR. BARKSDALE:  Yea.

INVESTIGATOR RIDDLE:  You knew you had shot her?

MR. BARKSDALE:  I knew I had shot her. But I didn't think I had hit her somewhere where it could have been fatal.

INVESTIGATOR RIDDLE:  You do know that she did die?

MR. BARKSDALE:  Yea.

INVESTIGATOR RIDDLE:  Okay, after she got out of the car what happened?

MR. BARKSDALE:  I am not sure.  I blacked out.  All I saw . . . I didn't see nothing around me.  All I saw was the car and it felt like I was running in slow motion trying to get her out of the passenger side around to the car to the driver's side.

INVESTIGATOR RIDDLE:  Yes, okay, did you drive the car off?

MR. BARKSDALE:  Yes, I had drove it for a little bit.  Then David drove.

INVESTIGATOR RIDDLE:  Ya'll brought it to Guntersville.  Is that correct?

MR. BARKSDALE:  Yea.[44]

The prosecution concluded its case by calling Petitioner's co-defendant Garrison to testify that he, Hilburn, and Petitioner stole a Taurus they found unlocked and drove the stolen Taurus to Alexander City.  Near Sylacauga they totaled the car, *i.e.*, drove off the road, ran over a fence, and ran into a dirt bank.  A nearby homeowner agreed to drive them to Alexander City.  The man dropped them off at a white house.  Later they got a ride from a black guy into Alexander City to the Knollwood apartments.  Later still they tried to flag down rides as they walked along the road.  When it got dark, a white couple in a black truck picked them up and drove them to the Alexander City shopping center, from which they watched some of the Christmas parade.  They looked for someone who would drive them back to Guntersville.  Petitioner said if he had to, he would shoot someone to get a ride and preferred to shoot one person rather than two.  Petitioner spoke with the female driver of a gray Maxima who agreed to give them a ride.  Petitioner gave the driver directions and directed her to turn up the rap music to which she was listening.  Petitioner directed her to drive into a neighborhood and to stop,  The driver did as Petitioner directed.  All three passengers opened their doors to get out of the car.  Garrison set the Christmas packages he had been holding on the seat and saw

---

[44] S.F. Trial, 11 SCR 1247-50.

Petitioner reach for his gun.  Garrison slammed his door closed as he exited the vehicle and ran behind a shed behind a house.  Hilburn followed Garrison.  As they ran, they heard the female driver yell "Please don't, don't shoot me."  The female driver mashed on the gas pedal and pulled into a driveway.  Dogs ran up to the car barking.  Garrison heard Petitioner yell "Bitch, you ain't going to let me out right here."  The female driver backed the car out of the driveway into the road facing the opposite direction she had been moving.[45]

Garrison testified he then heard two gunshots.  He could see flashes of light through the tinted windows of the car as the car was still rolling.  Garrison heard the emergency brake being pulled and tires squealing.  He saw the female driver get out and Petitioner push her in the back away from the car.  The female driver ran down the street.  Garrison could hear her crying.  Petitioner could see Garrison and Hilburn behind the shed, pointed the gun at them, and told them to get back in the car.  Garrison and Hilburn got back in the car.  Petitioner was wearing jeans and a stolen white jacket.  They drove back to the white house.  There was blood inside the car and a hole in the front driver's side window.  They went to an older woman's house and took everything from inside the car into her house.  Petitioner told the older woman he had just shot a girl but didn't know if she was dead.  They got back in the

[45] S.F. Trial, testimony of Jonathan David Garrison, 11 SCR 1255-74.

car and drove to Guntersville.  On the drive back to Guntersville, Petitioner told them to keep their mouths shut and not tell anyone what had happened.  In Gunterville, they went to a place near the Kiwanis Pier where teenagers hang out.  Later they went to Candace Talley's apartment.  Petitioner still had his gun.  They threw the Tallapoosa County license plate and smiley face front license plates off the stolen car into the lake.  Petitioner told everyone at Candace Talley's apartment that he shot the girl by accident, but Petitioner never told Garrison that he shot her by accident.[46] On cross-examination, Garrison testified he had pleaded guilty to a charge of murder and received a life sentence as part of a plea agreement that required him to testify against Petitioner.[47]  On re-direct, Garrison testified his plea agreement required him to testify truthfully.[48]

## 2.  The Defense's Evidence

The defense presented a single witness at the guilt-innocence phase of trial, a firearms expert, who testified that (1) he had examined the 9 mm pistol identified as State Exhibit 76A in October 1996, (2) all the safeties worked according to design, (3) inserting the magazine in the unloaded weapon caused the safety to move from safe position to fire position, (4) inserting the magazine caused the slide release hold

---

[46] *Id.*, testimony of Jonathan David Garrison, 11 SCR 1274-95.

[47] *Id.*, testimony of Jonathan David Garrison, 11 SCR 1284-85.

[48] *Id.*, testimony of Jonathan David Garrison, 11 SCR 1298-99.

to disconnect itself, chambering a round, (5) while laying on its side, the gun's slide release disconnected, allowing the slide to move forward without anyone touching the gun, (6) once while he test-fired the gun, it jammed and he had to forcibly open the slide to extract the spent shell casing from the chamber of the weapon, (7) when he tried to unload the gun by cycling the slide, *i.e.*, by putting each round in the chamber and ejecting it without firing, the first magazine went okay but the second magazine jammed, (8) the overall condition of the weapon was bad - it had been abused substantially, and (9) employing photographs of the gun, he was able to identify numerous marks and indentations on the gun.[49]  On cross-examination, the defense expert testified that during all of his testing, the gun twice jammed but never misfired and, based upon his review of the relevant documents and his testing of the weapon, he believed the weapon was physically located above the points of entry into Julie Rhodes's body at the time both shots were fired.[50]

### 3.  Guilt-Innocence Phase Charge Conference

During the guilt-innocence phase jury charge conference the trial judge expressed grave reservations with the viability of the third count of the indictment

---

[49] S.F. Trial, testimony of Joe W. Shirey, 11 SCR 1305-10.

[50] *Id.*, testimony of Joe W. Shirey, 11 SCR 1310-11.  On re-direct, Mr. Shirey testified that he had been trained to avoid accidentally firing a weapon.  *Id.*, 11 SCR 1311.

against Petitioner under the evidence presented.[51] The trial judge subsequently granted the defense's motion for acquittal on count three.[52]

### 4. The Verdict

On November 24, 1996, following closing jury argument,[53] the jury returned its verdict at the guilt-innocence phase of Petitioner's capital murder trial, unanimously finding Petitioner guilty beyond a reasonable doubt of the offenses charged in both count one and count two of the indictment.[54]

## E. Punishment Phase of Trial

The punishment phase of Petitioner's capital murder trial commenced the same date. Both parties waived opening argument. Other than re-offering all of the

---

[51] 12 SCR 1319-30.

[52] 12 SCR 1375-83. Count one of the Petitioner's indictment charged him and Jonathan David Garrison with intentionally causing the death of Julie Kathryn Rhodes by shooting her with a pistol during the course of robbing her of her vehicle. Count two charged him and Garrison with intentionally causing Julie Rhodes' death by and through the use of a pistol while she was in a vehicle. Count three charged him and Garrison with intentionally causing the death of Julie Kathryn Rhodes by and through the use of a pistol, fired or otherwise used "while within or from a vehicle." 1 SCR 13. Thus, Petitioner's indictment charged him with a single capital offense allegedly committed through three distinct factual theories. Count two of the indictment focused on the physical location of the *victim* at the time the pistol was fired. Count three focused on the location of the *weapon* when fired. The trial judge granted the defense's motion to strike count three. Given the overwhelming evidence at trial showing Julie Rhodes was shot while she was inside her vehicle by a weapon fired inside her vehicle, there was no logical reason for the state trial court to strike either count two or count three.

[53] The Circuit Court's jury instructions at the guilt-innocence phase of Petitioner's capital murder appear at 12 SCR 1330-31, 1371-73, 1375-85, 1383-1410. The prosecution's closing guilt-innocence phase argument appears at 12 SCR 1331-42, 1361-71. The defense's closing guilt-innocence phase jury argument appears at 12 SCR 1342-61.

[54] 12 SCR 1411-14. Petitioner's guilt-innocence phase verdict form appears at 4 SCR 692.

evidence previously introduced and admitted, the prosecution presented only a redacted version of a certified copy of Petitioner's judgment of conviction from Virginia on a charge of robbery, which exhibit the trial court admitted without objection; then the prosecution rested.[55] The defense likewise offered a single document, a certified copy of Petitioner's birth certificate, which the Circuit Court also admitted without objection.[56] Following closing jury argument,[57] the jury returned its verdict, recommending the imposition of a sentence of death by a vote of eleven to one on each of the two counts.[58]

## F. Sentencing Hearing

At Petitioner's sentencing hearing on December 17, 1996, both parties informed the trial court they had no additional evidence to present and focused their

---

[55] 12 SCR 1421-22. While admitted into evidence during the punishment phase of Petitioner's capital murder trial as State Exhibit 132, for unknown reasons, this document does not appear in the state court record transmitted to this court by Respondent. For reasons not apparent from the record, none of the exhibits admitted into evidence during Petitioner's capital murder trial or admitted into evidence during the evidentiary hearing held in Petitioner's Rule 32 proceeding appear in the record now before this court.

[56] 12 SCR 1423.

[57] The Circuit Court's jury instructions at the punishment phase of Petitioner's capital murder trial appear at 12 SCR 1423-26, 1436-43, 1447-48. The prosecution's closing jury argument at the punishment phase of Petitioner's trial appears at 12 SCR 1426-30, 1433-35. The defense's closing jury argument at the punishment phase of trial appears at 12 SCR 1430-33. In his closing jury argument, Petitioner's trial counsel argued Petitioner was born on May 2, 1977, which made Petitioner eighteen years of age on the date Petitioner fatally shot Julie Rhodes. 12 SCR 1430.

[58] 12 SCR 1448-52. Petitioner's punishment phase verdict forms appear at 4 SCR 690-91.

arguments primarily on whether Petitioner's offense qualified as "heinous, atrocious, and cruel."[59]  On January 14, 1997, the trial court issued its Sentencing Order adopting the jury's sentencing recommendation and imposed a sentence of death.[60]

## G.  Direct Appeal

Petitioner appealed his conviction and sentence.[61]  In an opinion issued March 31, 2000, the Alabama Court of Criminal Appeals affirmed Petitioner's conviction and sentence.  *Barksdale v. State*, 788 So. 2d 898 (Ala. Crim. App. 2000).  The Alabama Supreme Court denied certiorari on December 15, 2000.  *Ex parte Tony Barksdale*, 788 So. 2d 915 (Ala. 2000).  The United States Supreme Court denied certiorari May 29, 2001.  *Barksdale v. Alabama*, 532 U. S. 1055 (2001).

## H.  Rule 32 Proceeding

---

[59] 12 SCR 1456-69.

[60] 12 SCR 1470-72.  Copies of the Circuit Court's Sentencing Order appear at 4 SCR 786-801, 15 SCR 92-108, and 23 SCR (Tab R-52).

[61] Attorney Mark Allen Treadwell, III, filed Petitioner's appellant's brief on July 25, 1997 and asserted ten arguments: (1) the trial court erred in failing to suppress Petitioner's statements, (2) the trial court erred in refusing to give a jury instruction on "accident," (3) the trial court erred in finding the "heinous, atrocious, or cruel" aggravating factor applicable at the punishment phase of trial, (4) the trial court erred in failing to treat Petitioner's age as a mitigating factor at the punishment phase of trial, (5) the Alabama death penalty scheme violates the Eighth Amendment, (6) Petitioner's indictment was duplicitous and multiplicitous in that it alleged multiple theories of the same offense, (7) the prosecution engaged in improper jury argument at the guilt-innocence phase of trial, (8) the trial court improperly double-counted both counts of the indictment as aggravating factors, (9) execution of the nineteen-year-old Petitioner is disproportionate to Petitioner's offense, and (10) state law requires reversal of Petitioner's sentence.  13 SCR (Tab R-31).

On May 22, 2002, Petitioner filed his petition for relief from judgment

pursuant to Rule 32, asserting nineteen multifaceted claims for relief.[62] In an Order

---

[62] Attorney Sonya M. Rudenstine filed Petitioner's Rule 32 petition on May 22, 2002 and asserted claims that (1) Petitioner's trial counsel rendered ineffective assistance by (a) virtue of the inadequate compensation available to said counsel, (b) virtue of the meager funds available for expert assistance, (c) failing to challenge the system of jury selection in Tallapoosa County as racially discriminatory and failing to raise *Batson* challenges to the prosecution's use of its peremptory challenges against black members of the jury venire, (d) failing to challenge the prosecution's use of its peremptory challenges to strike female members of the jury venire, (e) failing to adequately investigate the case against Petitioner and present exculpatory evidence showing (i) the fatal discharge of the handgun was accidental, (ii) Petitioner lost consciousness during the offense, and (iii) the victim's voice box was so badly damaged it was impossible for her to have said that a black man had shot her or that she knew she was dying, (f) failing to request a competency hearing for Petitioner, (g) failing to adequately investigate Petitioner's background and present mitigating evidence at the punishment phase of trial, more specifically by (i) failing to gather unidentified information regarding Petitioner's family, social history, educational history, medical history, mental health history, correctional history, and community and cultural influences, (ii) failing to talk with Petitioner's parents at length about Petitioner's family history and failing to meet with them in person, (iii) failing to talk with Petitioner's godfather Max Johnson, (iv) failing to discover and develop evidence showing Petitioner was shuffled between his parents following their separation, (v) failing to investigate Petitioner's use of marijuana and alcohol from his early teen years, (vi) failing to hire experts to examine Petitioner for neurological and organic abnormalities, (vii) failing to hire a mental health expert to examine Petitioner for mental health problems, (viii) failing to present educational records showing Petitioner earned his GED while incarcerated and was trained to repair small engines, and (ix) waiving opening argument, (h) failing to object to the trial court's erroneous jury instructions at the punishment phase of trial regarding (i) the burden of proof on mitigating evidence and (ii) the manner in which the jury was required to weigh the aggravating and mitigating evidence, (i) failing to object to the trial court's refusal to instruct on the meaning of "life without parole," (j) failing to object to other constitutional errors at trial, including emotional displays by the victim's family in front of the jury, (k) failing to object to prosecutorial misconduct in the form of improper jury argument (i) comparing and contrasting Petitioner's age with the age of the victim, (ii) mimicking and mocking the Petitioner, (iii) demonizing the Petitioner, (iv) bolstering the testimony of law enforcement officers, (v) failing to employ Rule 9.3 to exclude the testimony of the witnesses who discovered the victim at the crime scene, (vi) failing to object to the State's presentation of cumulative evidence, and (vii) failing to object to the prosecution's improper jury argument at the punishment phase of trial regarding aggravating factors, and (l) failing to object to imposition of the death penalty based on a pattern of racial bias in Alabama capital murder cases, (2) the prosecution improperly employed its peremptory challenges to remove female members of the jury venire, (3) Tallapoosa County's method of jury selection is racially discriminatory, (4) the trial court erred in failing to instruct the jury regarding the meaning of "life without parole," (5) the trial court erred in failing to exclude the victim's father from the counsel table and allowing emotional displays by the victim's family in front of the jury, (6) the trial court erred in its punishment phase jury

issued January 6, 2003, the Circuit Court summarily dismissed and denied all but two of Petitioner's claims for relief, finding (1) Petitioner procedurally defaulted on most of his substantive claims by failing to present them on direct appeal, (2) Petitioner's remaining substantive claims were without merit, and (3) Petitioner failed to allege sufficient facts in support of the vast majority of his ineffective

---

instructions by (a) improperly shifting the burden of proof on mitigating evidence and (b) instructing the jury that factual findings on mitigating circumstances must be unanimous, (7) the Alabama statute setting compensation for attorneys in capital trials is unconstitutional, (8) Alabama's adoption of a new rule making the state Supreme Court's review of capital murder cases discretionary violated Due Process and Equal Protection principles, (9) Petitioner was entitled to the assistance of two attorneys at trial, each with at least five years of criminal trial experience, (10) Alabama's application of its death penalty statute has been racially discriminatory, (11) the trial court erred in failing to consider Petitioner's age as a mitigating factor, (12) the trial court erred in finding Petitioner's offense heinous, atrocious, or cruel, (13) it was unconstitutional for the trial court to consider Petitioner's robbery of the victim as an aggravating factor when that same factor was used to elevate the charge against Petitioner to capital murder, (14) an unidentified member of the jury venire failed to disclose unspecified information during voir dire, (15) the trial court erred in failing to suppress Petitioner's statements to law enforcement officers on December 4 and 5, 1995 because (a) there was no probable cause to arrest Petitioner and (b) officers failed to cease interrogation after he requested counsel, (16) the prosecution engaged in improper jury argument (a) at the guilt-innocence phase of trial by comparing Petitioner to a Nazi and (b) at the punishment phase of trial by (i) arguing unidentified facts not in evidence, (ii) bolstering its own witnesses, and (iii) making characterizations designed to inflame the jury, (17) Petitioner's appellate counsel rendered ineffective assistance by failing to (a) raise claims 2-10, 13, 16, & 17 in his Rule 32 Petition as part of his direct appeal and (b) raise a complaint of gender discrimination by the prosecution during jury selection, (18) the prosecution withheld unidentified exculpatory evidence and unidentified favorable evidence from the defense, and (19) Alabama's death penalty statute violates the Supreme Court's holdings in *Apprendi v. New Jersy*, *Ring v. Arizona*, and *Harrod v. Arizona* in that it allows for judicial override, aggravating factors such as "heinous, atrocious, or cruel" are not charged in the indictment, and the jury is not instructed that aggravating circumstances must outweigh the mitigating circumstances. 15 SCR (Tab R-39) at pp. 4-70.

assistance claims, in violation of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure.[63]

The Circuit Court held an evidentiary hearing on Petitioner's surviving claims on June 23-24, 2005, during which it heard testimony from Petitioner's mother, Petitioner's former trial counsel, a retired Marine Lieutenant Colonel, and a North Carolina trial attorney. In an Order issued October 4, 2005, the Circuit denied relief on Petitioner's remaining claims, concluding Petitioner's ineffective assistance claim addressing his trial counsel's alleged failure to investigate and present mitigating evidence failed to satisfy the prejudice prong of the *Strickland* standard and Petitioner failed to present any evidence whatsoever in support of his complaint about alleged emotional displays by the victim's family before the jury.[64]

Petitioner appealed the trial court's denial of his Rule 32 petition.[65] On August 24, 2007, the Alabama Court of Criminal Appeals issued a memorandum

---

[63] Copies of the Circuit Court's Order of January 6, 2003 dismissing and denying most of Petitioner's Rule 32 claims appear at 15 SCR 147-99 and 23 SCR (Tab R-56).

[64] Copies of the Circuit Court's Order of October 4, 2005 appear at 16 SCR 323-57 and 23 SCR (Tab R-57).

[65] On February 7, 2006, attorneys Steven M Schneebaum, Willa B. Perlmutter, and Wilson Myers, the same three attorneys who represented Petitioner during the evidentiary hearing in Petitioner's Rule 32 proceeding, filed a Corrected Appellate Brief for petitioner with the Alabama Court of Criminal Appeals challenging the Circuit Court's denial of Petitioner's Rule 32 petition. 20 SCR (Tab R-46). The state filed a brief in response on March 6, 2006. 21 SCR (Tab R-47). Petitioner then filed a reply brief on March 27, 2006. 21 SCR (Tab R-48).

affirming the trial court's denial of Rule 32 relief.[66]  Petitioner filed an application

for rehearing and brief in support in the Alabama Court of Criminal Appeals and,

---

[66] The Alabama Court of Criminal Appeals' Memorandum dated August 24, 2007 affirming the trial court's denial of Petitioner's Rule 32 petition appears both as Attachment B to 22 SCR (Tab R-51) and at 23 SCR (Tab R-58).  The Alabama Court of Criminal Appeals concluded (1) Petitioner failed to allege sufficient facts to support his complaints of alleged racial and gender discrimination by the prosecution during jury selection, *i.e.*, Petitioner's *Batson* and *J.E.B.* claims, (2) petitioner failed to allege sufficient facts to support his alleged Fair Cross-Section claim, (3) most of Petitioner's assertions of ineffective assistance by either Petitioner's trial counsel or appellate counsel were unsupported by any specific facts sufficient to satisfy the prejudice prong of the *Strickland* analysis, (4) Petitioner failed to include in his Rule 32 petition any recognizable complaint about his trial counsel's alleged failure to challenge the aggravating circumstances offered by the prosecution at the punishment phase of trial and Petitioner never requested permission to amend his Rule 32 petition to include this claim, (5) most of Petitioner's complaints about his trial counsel's alleged failure to investigate Petitioner's background and present mitigating evidence failed to satisfy the prejudice prong of the *Strickland* analysis because Petitioner alleged no facts and presented no evidence showing what additional mitigating evidence would have been discovered had his trial counsel engaged in a more thorough investigation of Petitioner's background, (6) Petitioner's complaint about his trial counsel's waiver of opening statement at the punishment phase of trial failed to satisfy the prejudice prong of the *Strickland* analysis because Petitioner failed to allege what statements his trial counsel should have made in his opening statement at that phase of trial, (7) Petitioner's *Wiggins* claim, *i.e.*, Petitioner's complaint about his trial counsel's failure to investigate and present mitigating evidence, also failed because Petitioner failed to present evidence showing any of the witnesses identified by Petitioner who could have furnished additional mitigating evidence were available to testify at the time of Petitioner's capital murder trial and could have offered testimony about mitigating factors based upon their personal knowledge, (8) the scope of the investigation for mitigating evidence undertaken by Petitioner's trial counsel was objectively reasonable given the failure of Petitioner to furnish information identifying Maxwell Johnson and the refusal of Petitioner's mother to cooperate with Petitioner's trial counsel, (9) Petitioner's complaints about the failure of his trial counsel to secure Petitioner's educational, medical, mental health, and correctional records fail to satisfy the prejudice prong of the *Strickland* analysis because Petitioner failed to present any such records to the Circuit Court during his Rule 32 proceeding, (10) Petitioner's *Wiggins* claim also failed to satisfy the prejudice prong of the *Strickland* analysis because the instances of abuse to which Petitioner's mother testified were isolated and limited in number, (11) any error in the trial court's jury instructions at the punishment phase of trial had no impact on the jury's recommendation, (12) Petitioner's trial counsel's decision not to request a jury instruction regarding the meaning of life without parole was objectively reasonable given the trial court's insistence upon including a legally erroneous provision in the instruction and, in view of the trial court's remaining jury instructions, that decision did not prejudice Petitioner within the meaning of *Strickland*, (13) the Circuit Court correctly rejected many of Petitioner's ineffective assistance claims because those claims were unsupported by any facts showing Petitioner was prejudiced by the identified alleged defects in the performance of Petitioner's trial or appellate counsel, (14)

subsequently, a petition for writ of certiorari in the Alabama Supreme Court.[67]  In a

Certificate of Judgment issued April 26, 2008, the Alabama Supreme Court denied

Petitioner's petition for writ of certiorari.[68]

## I. Proceedings in this Court

On May 2, 2008, Petitioner filed his original federal habeas corpus petition,

asserting three extremely broad categories of claims for relief (Doc. # 1).[69]

---

Petitioner waived a number of claims he presented in his Rule 32 petition which were rejected by the Circuit Court by not urging those same claims on appeal, (15) the Circuit Court properly excluded testimony proffered by Petitioner at the evidentiary hearing held in his Rule 32 proceeding because that testimony related to claims the Circuit Court had already summarily dismissed, (16) Petitioner's complaint about his trial counsel's alleged failure to adequately investigate the defense of accident was not raised in Petitioner's Rule 32 petition, (17) the Circuit Court properly refused to admit documents offered by Petitioner at the evidentiary hearing in his Rule 32 proceeding after Petitioner had rested and which documents had not been included in any of the Petitioner's proffers made before Petitioner rested, (18) Petitioner did not move to supplement the record to include any of these same documents, and (19) the additional facts Petitioner alleged in support of his ineffective assistance claims for the first time in his appellate briefs were not properly before the state appellate court and would not be considered. Ala. Crim. App. Memo. 53 SCR (Tab R-58), at pp. 11, 13-16, 19, 21, 26, 28-31, 36-42, 44-47, 49-51, 54-60, 62 n.9, 63-64, 66, 70-76.

[67] Attorneys Schneebaum, Perlmutter, and Myers filed an application for rehearing and brief in support on September 7, 2007. 21 SCR (Tabs R-49 & R-50). They filed Petitioner's petition for writ of certiorari with the Alabama Supreme Court on October 19, 2007. 22 SCR (Tab R-51).

[68] 22 SCR (Tab R-59).

[69] As grounds for relief, Petitioner argues that (1) his state trial and appellate counsel rendered ineffective assistance by failing to (a) investigate the case against Petitioner and present evidence showing the fatal shooting of Julie Rhodes was an accident, (b) adequately cross-examine prosecution witness Jonathan David Garrison, (c) move for a continuance and seek a new defense investigator after Garrison accepted a plea bargain on the eve of trial, (d) investigate Petitioner's background and present available mitigating evidence at the punishment phase of trial, (e) challenge the prosecution's argument (and the trial court's finding) that Petitioner's offense was "heinous, atrocious, and cruel," (f) undermine the aggravating evidence showing Petitioner had a prior conviction for armed robbery as a teenager, (g) raise a *Batson* challenge to the prosecution's use of its peremptory challenges to strike black members of the jury venire, *i.e.*, the prosecution's

Respondent filed an answer on September 4, 2008 (Doc. # 22). Respondent filed a

brief regarding procedurally defaulted claims on October 14, 2009 (Doc. # 41). On

November 16, 2009, Petitioner filed a brief responding to Respondent's procedural

---

striking of two of the six black on the jury venire, (h) raise a challenge to the prosecution's use of its peremptory challenges to strike female members of the jury venire, *i.e.*, the prosecution's use of sixteen of its twenty-one peremptory strikes against women, (i) raise a fair cross-section challenge to Tallapoosa County's method of choosing prospective jurors, *i.e.*, only eleven percent of Petitioner's jury venire was black while thirty-six percent of Tallapoosa County residents were black, (j) object to the prosecution's improper comparison of the Petitioner's age to the victim's age during closing jury argument at the punishment phase of trial, (k) object to the trial court's erroneous jury instructions which failed to properly instruct the jury regarding (i) the burden of proof for establishing the existence of mitigating circumstances, (ii) the jury's duty to recommend a life sentence if the mitigating and aggravating circumstances were equally balanced, (iii) the fact the jury did not need to unanimously find the existence of a particular mitigating circumstances before weighing that mitigating circumstance against the aggravating factors, and (iv) the meaning of the term "life without parole," as used in the punishment phase jury instructions, and (l) raise grounds for relief on direct appeal challenging the prosecution's improper use of its peremptory challenges to discriminate against members of the jury venire based upon their race and gender, (2) the state trial and appellate courts committed error during the course of Petitioner's Rule 32 proceeding by (a) construing the Alabama Rules of Criminal Procedure as justifying summary dismissal of most of Petitioner's claims for failure to allege specific facts in support of Petitioner's claims, (b) limiting the scope of Petitioner's discovery, (c) excluding evidence of ineffective assistance by Petitioner's trial counsel during the evidentiary hearing, (d) applying a narrow definition of the term "mitigating evidence" when evaluating the performance of Petitioner's trial counsel, (e) adopting verbatim the proposed findings of fact and conclusions of law submitted by the State, (f) excluding Petitioner's proffered exhibits during the evidentiary hearing, (g) failing to address in its findings and conclusions testimony and exhibits introduced by the Petitioner during the evidentiary hearing, and (h) dismissing Petitioner's *Apprendi* claim, and (3) the trial court committed constitutional errors in (a) failing to instruct the jury regarding the defensive theory of accident, (b) giving a confusing jury instruction at the punishment phase of trial regarding the burden of proof applicable to mitigating evidence, (c) finding Petitioner's capital offense "heinous, atrocious, and cruel," (d) failing to consider Petitioner's age to be a mitigating factor, (e) failing to declare the method of execution employed in Alabama a violation of the Eighth Amendment, (f) failing to declare, both on its face and as applied, the Alabama capital sentencing scheme a violation of the Equal Protection Clause, (g) failing to hold the Petitioner's convictions on multiple theories of capital murder violated Double Jeopardy and Due Process principles, (h) failing to hold the prosecution engaged in improper jury argument at the guilt-innocence phase of trial when it compared Petitioner to a Nazi, and (i) failing to hold the sentencing jury's and sentencing court's consideration of Petitioner's convictions on multiple theories of capital murder as multiple aggravating factors violated Double Jeopardy and Due Process principles.

default arguments and addressing the merits of all claims (Doc. # 45). On January 11, 2010, Petitioner filed another brief addressing the merits of his claims (Doc. # 50). After a passage of more than six years, the parties filed additional briefing. More specifically, on August 26, 2016, Petitioner filed a supplementary memorandum "regarding recent authorities" in support of his petition (Doc. #57). On September 26, 2016, Respondent filed a supplemental brief responding to Petitioner's brief on recent authorities (Doc. # 58). On October 6, 2016, Petitioner filed a response to Respondent's supplemental memorandum (Doc. # 59).

## II. AEDPA STANDARD OF REVIEW

The state appellate courts rejected most of Petitioner's claims in this federal habeas corpus proceeding on the merits, either on direct appeal or during Petitioner's Rule 32 proceeding. Because petitioner filed his federal habeas corpus action after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of petitioner's claims for federal habeas corpus relief which were disposed of on the merits by the state courts is governed by the AEDPA. *Penry v. Johnson*, 532 U. S. 782, 792 (2001). Under the AEDPA standard of review, Petitioner is not entitled to federal habeas corpus relief in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U. S. 133, 141 (2005); *Williams v. Taylor*, 529 U. S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d) (1) have independent meanings. *Bell v. Cone*, 535 U. S. 685, 694 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U. S. at 141; *Mitchell v. Esparza*, 540 U. S. 12, 15-16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U. S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton*, 544 U. S. at 141; *Wiggins v. Smith*, 539 U. S. 510, 520 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U. S. 120, 132-33 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of . . . clearly established Federal law,' § 2254(d) (1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins v. Smith*, 539 U. S. at 520-21. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U. S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable -- a substantially higher threshold."); *Wiggins v. Smith*, 539 U. S. at 520; *Price v. Vincent*, 538 U. S. 634, 641 (2003) ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

As the Supreme Court has explained:

Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*Bobby v. Dixon*, 565 U .S. 23, 24 (2011) (quoting *Harrington v. Richter,* 562 U. S. 86, 103 (2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U. S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U. S. 63, 71-72 (2003). Under the AEDPA, what constitutes "clearly established federal law" is determined through review of the decisions of the United States Supreme Court, not the precedent of the federal Circuit Courts. *See Lopez v. Smith*, 135 S. Ct. 1, 2 (2014) (holding the AEDPA prohibits the federal courts of appeals from relying on their own precedent to conclude a particular constitutional principle is "clearly established").

The AEDPA also significantly restricts the scope of federal habeas review of state court fact-findings. 28 U.S.C. § 2254(d)(2) provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts

unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, 558 U. S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U. S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood v. Allen*, 558 U. S. at 301; *Rice v. Collins*, 546 U. S. 333, 341-42 (2006).

In addition, § 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U. S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U. S. at 338-39 ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U. S. 231, 240 (2005) ("[W]e presume the Texas court's factual findings to be sound

unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1). It remains unclear at this juncture whether § 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under § 2254(d)(2). *See Wood v. Allen*, 558 U. S. at 300 (choosing not to resolve the issue of § 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice v. Collins*, 546 U. S. at 339 (likewise refusing to resolve the Circuit split regarding the application of § 2254(e)(1)).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U. S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U. S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

### III. ALLEGED ERRORS DURING RULE 32 PROCEEDING

### A. The Claims

In his second group of claims for federal habeas corpus relief, Petitioner argues the state habeas court committed a litany of errors during his Rule 32 proceeding, including adopting verbatim the State's proposed findings and

conclusions, improperly limiting the scope of his discovery, and erroneously applying state procedural and evidentiary rules.[70]

## B. Clearly Established Federal Law

Federal habeas corpus relief does not lie for errors of state law, including the allegedly erroneous admission of evidence under state evidentiary rules. *Estelle v. McGuire*, 502 U. S. 62, 67 (1991). It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. *Id.*, 502 U. S. at 67-68. State court rulings on matters such as the admissibility of evidence under state evidentiary rules and the interpretation of substantive state case law bind a federal court in habeas corpus proceedings. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Loggins v. Thomas*, 654 F.3d 1204, 1228 (11th Cir. 2011) ("Alabama law is what the Alabama courts hold that it is."); *Hendrix v. Sec'y, Fla. Dep't of Corr.*, 527 F.3d 1149, 1153 (11th Cir.) (state court ruling on issue of recusal under Florida state law bound federal habeas court), *cert. denied*, 555 U. S. 1004 (2008).

---

[70] (Doc. # 1, at pp. 30-54, ¶¶ 104-95).

Furthermore, defects in state collateral proceedings do not provide a basis for federal habeas relief. *See Alston v. Dep't of Corr., Fla.*, 610 F.3d 1318, 1325-26 (11th Cir. 2010) (federal habeas relief is available to remedy defects in a defendant's conviction and sentence but not alleged defects in a collateral proceeding because a challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment), *cert. denied*, 562 U.S. 1113 (2010); *Carroll v. Sec'y, Dep't of Corr.* 74 F.3d 1354, 1365 (11th Cir.) ("a challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment, *i.e.*, the conviction itself-and thus habeas relief is not an appropriate remedy"), *cert. denied*, 558 U.S. 995 (2009); *Quince v. Crosby*, 360 F.3d 1259, 1261-62 (11th Cir.) ("an alleged defect in a collateral proceeding does not state a basis for habeas relief"), *cert. denied*, 543 U.S. 960 (2004). Furthermore, such challenges often involve issues of state law, and a state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief since no question of a constitutional nature is involved. *Alston v. Dep't of Corr., Fla.*, 610 F.3d at 1326.

## C. Conclusions

Petitioner's complaints of alleged error committed by the state trial court during Petitioner's Rule 32 proceeding, *i.e.*, the arguments contained in paragraphs 104 through 195 of Petitioner's federal habeas corpus petition, do not furnish an arguable basis for federal habeas corpus relief. In light of the Supreme Court's

holdings in *Bradshaw v. Richey* and *Estelle v. McGuire*, these voluminous complaints are without arguable legal basis and potentially a violation of *Rule 11(b)(1) & 11(b)(2), Fed.R.Civ.P.*

## IV.  ALLEGED TRIAL COURT ERRORS

### A.  Overview of the Claims

In his third group of claims for federal habeas relief, Petitioner argues that the state trial court committed a variety of constitutional errors, including (1) refusing to give Petitioner's requested jury instructions on accident, (2) giving a misleading instruction on the burden of proof regarding mitigation, (3) finding Petitioner's offense was "heinous, atrocious, or cruel," (4) refusing to consider Petitioner's age as a mitigating circumstance, (5) failing to hold the State of Alabama's method of execution (at that time electrocution) was cruel and unusual, (6) failing to hold the Alabama capital sentencing scheme violates equal protection principles by disproportionately resulting in the conviction and capital sentencing of black men, (7) failing to hold Petitioner's indictment under three different theories of capital murder and conviction on two different counts of capital murder violated Double Jeopardy principles, (8) failing to hold the prosecution improperly compared Petitioner to the Nazis and Adolf Hitler during closing jury argument, and (9)

improperly employing Petitioner's convictions on multiple theories of capital murder as separate and independent aggravating circumstances.[71]

## B. Failure to Give Petitioner's Requested Jury Instruction on "Accident"

### 1. State Court Disposition

In his second ground for relief on direct appeal, Petitioner argued the state trial court erred at the guilt-innocence phase of trial in refusing to give Petitioner's requested jury instructions on "accident," citing the Supreme Court's holding in *Beck v. Alabama*, 447 U. S. 625, 627-38 (1980) (a sentence of death may not be constitutionally imposed after a jury verdict of guilt of a capital offense when the jury was not permitted to consider a verdict of guilt of a non-capital offense when the evidence would have supported such a verdict).[72]  The Alabama Court of Criminal Appeals rejected this argument on the merits, concluding the Petitioner's requested jury instructions contained misstatements of state law and the trial court properly refused to give the requested instructions.  *Barksdale v. State*, 788 So. 2d at 905-06.  The Petitioner included the same argument in his petition for certiorari.[73] The Alabama Supreme Court denied certiorari.  *Ex parte Tony Barksdale*, 788 So. 2d at 915.

---

[71] (Doc. # 1, at pp. 55-59, ¶¶ 196-217).

[72] 13 SCR (Tab R-31), at pp. 14-16.

[73] 14 SCR (Tab R-35), at p. 8.

## 2. Clearly Established Federal Law

As noted previously, federal habeas corpus relief does not lie for errors of state law, including the allegedly erroneous admission of evidence under state evidentiary rules. *Estelle v. McGuire*, 502 U. S. at 67. It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. *Id.*, 502 U. S. at 67-68. State court rulings on matters such as the admissibility of evidence under state evidentiary rules and state case law bind a federal court in habeas corpus proceedings. *See Bradshaw v. Richey*, 546 U.S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Loggins v. Thomas*, 654 F.3d at 1228 ("Alabama law is what the Alabama courts hold that it is.").

## 3. AEDPA Analysis

Petitioner's audio-recorded statement to police and the identifying testimony of a law enforcement officer established that, following his arest, Petitioner told police he did not intentionally shoot Julie Rhodes.[74] Through cross-examination, Petitioner's trial counsel elicited testimony from prosecution witnesses Antoine

---

[74] Investigator Riddle testified the Petitioner gave a voluntary statement to him explaining the gun went off twice inside the car as Petitioner was attempting to unload the gun; the audio tape recording of Petitioner's statement to investigator Riddle was played in open court for the jury. S.F. Trial, testimony of Sonny Riddle, 11 SCR 1243-53.

Harris[75] and Jason Scott Mitchell,[76] establishing that Petitioner told each of them his fatal shooting of Julie Rhodes was not an intentional act. Nonetheless, the state trial court's refusal to give Petitioner's requested jury instruction on "accident" did not violate Petitioner's federal constitutional rights. Unlike the capital murder defendant's jury in *Beck*, the state trial court instructed Petitioner's jury on a plethora of lesser-included offenses. Furthermore, the state appellate court concluded Petitioner's requested instruction on "accident" was an erroneous statement of applicable state law. *Barksdale v. State*, 788 So. 2d at 906. That conclusion regarding the nature of state law binds this court's federal habeas corpus review of this claim. *Bradshaw v. Richey*, 546 U.S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). Nothing in the Constitution required the state trial court to give Petitioner's jury an instruction on "accident" that was erroneous under applicable state law.

---

[75] Harris testified that Petitioner told him that he did not mean to shoot the victim. S.F. Trial, testimony of Antoine Harris, 9 SCR 841-42. Harris also testified that when he asked Petitioner why Petitioner and his companions had not simply pulled Julie from the car and why they failed to take her to the hospital after the allegedly accidental shooting, Petitioner did not furnish a rational explanation. *Id.*, 9 SCR 843-46.

[76] Mitchell testified that Petitioner told him that he was trying to scare the girl by "shaking the gun in her face" when it went off and he did not mean to shoot her. S.F. Trial, testimony of Jason Scott Mitchell, 10 SCR 975-76.

The state trial court instructed Petitioner's jury at the guilt-innocence phase of trial that the jury was required to find beyond a reasonable doubt that Petitioner intentionally murdered Julie Rhodes in the course of committing or attempting to commit a robbery before it could return a guilty verdict to count one of the indictment.[77] The trial court also instructed the jury on the lesser-included offenses of theft, robbery, felony murder, manslaughter, and criminally negligent homicide.[78] With regard to the second count, the state trial court instructed the jury that (1) it could convict Petitioner only if the jury concluded beyond a reasonable doubt that the Petitioner intentionally used a deadly weapon to murder Julie Rhodes while she was in a vehicle, and (2) the same lesser-included offenses applied to this charge as well.[79] The jury returned its verdict, finding beyond a reasonable doubt that Petitioner intentionally murdered Julie Rhodes (1) "during robbery" and (2) "during use of deadly weapon - V in vehicle."[80] Thus, the state trial court properly instructed Petitioner's jury on the burden of proof required to convict Petitioner of intentional murder and furnished the jury a vehicle through which it could have found Petitioner guilty of the lesser-included offenses discussed above if the jury had determined

---

[77] S.F. Trial, 12 SCR 1390-91, 1394-98.

[78] S.F. Trial, 12 SCR 1398-1401.

[79] S.F. Trial, 12 SCR 1401-04.

[80] 4 SCR 692. The notation "V in vehicle" apparently refers to the victim inside the vehicle.

Petitioner did not intentionally kill Julie Rhodes. The Constitution requires nothing more. *See Schad v. Arizona*, 501 U.S. 624, 647 (1991) ("'The goal of the *Beck* rule, in other words is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence.'" quoting *Spaziano v.* Florida, 468 U. S. 447, 455 (1984)); *Roberts v. Commn'r, Ala. Dep't of Corr.*, 677 F.3d 1086, 1094-95 (11th Cir. 2012) (the rule in *Beck* was not implicated where the trial court charged the jury on the lesser-included offense of non-capital intentional murder), *cert. denied*, 568 U. S. 1131 (2013); *Powell v. Allen*, 602 F.3d 1263, 1271 (11th Cir. 2010) (the rule in *Beck* was inapplicable where the trial court instructed the capital murder jury on the lesser-included offenses of intentional non-capital murder and manslaughter), *cert. denied*, 562 U. S. 1183 (2011).

The state trial court furnished Petitioner's jury the means to find Petitioner guilty of several different lesser-included offenses, including manslaughter and criminally negligent homicide, had the jury concluded that Petitioner's fatal shooting of Julie Rhodes was not an intentional act. Petitioner does not challenge the sufficiency of the evidence supporting the jury's guilty verdicts at the guilt-innocence phase of trial. The jury's unanimous guilty verdicts, rendered beyond a reasonable doubt, necessarily precluded a finding that Petitioner's fatal shooting of Julie Rhodes was accidental. The state trial court's rejection of Petitioner's

requested jury instructions on "accident" did not violate Petitioner's federal constitutional rights.

### 4. Conclusions

The Alabama appellate court's rejection on the merits during Petitioner's direct appeal of Petitioner's complaint about the state trial court's refusal to give Petitioner's requested jury instruction on "accident" was neither contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and direct appeal proceedings. Paragraphs 199-200 of Petitioner's federal habeas corpus petition do not warrant federal habeas corpus relief.

## C. Jury Instructions on Burden of Proof and Unanimity on Mitigation

### 1. State Court Disposition

At the conclusion of the evidentiary portion of the punishment phase of Petitioner's capital murder trial, *i.e.*, after both parties rested, the trial judge instructed the jury as follows:

> All right. Here is where we are. State has offered matters for your consideration as aggravating circumstances and the defendant has offered matters for your consideration as mitigating circumstances.
> Let me simply tell you that the burden of proof is on the State to prove the aggravating circumstances beyond a reasonable doubt. And,

that's the same definition of reasonable doubt that I gave you during the guilt phase.

Now, the defendant does not have the burden of proving mitigating circumstances beyond a reasonable doubt. The defendant, for you to accept them and consider, only has to offer mitigating circumstances which reasonably satisfy you of the truth of it.

Now, let me make it clear that we are not talking about numbers. We are not talking about how many aggravating circumstances on this side -- has got to be at least one -- or how many mitigating circumstances there are on that side. It is not a matter of numbers. It is a matter of simply your going back there and saying, I, all twelve of you, agree that the State has established this aggravating circumstance beyond a reasonable doubt, and that aggravating circumstance, and that aggravating circumstance beyond a reasonable doubt, if there are that many. There could be more or there could be less. And, then you say, all twelve of you have got to agree, the defendant has reasonably satisfied us by and from the evidence presented during the penalty phase -- defense can use what you heard during the guilt phase also. That they are this mitigating, this mitigating factor, that mitigating factor, that mitigating factor. Numbers don't count.

Once you unanimously agree to consider this aggravating factor or this mitigating factor, then it is your duty to weigh the, weigh them, with a view to determining do the aggravating factors outweigh the mitigating factors? And, if ten of you agree, then you could recommend the death penalty. Unless ten of you agree, you can't. And, then you weigh them and you look at them and you say, well, in my viw the mitigating factors might outweigh the aggravating factors. If seven of you feel that way, then your recommendation ought to be life without parole. Obviously, there could be disagreement. And, I'm going to tell you that you should attempt to resolve it, talk about it, vote on it, and discuss it. You have got the same foreperson that you always had.

So let's talk about aggravating factors and mitigating factors.[81]

---

[81] S.F. Trial, 12 SCR 1423-25.

At that point, a brief side bar conference took place.  The trial judge then continued with his punishment phase jury instructions as follows:

> So, in just a moment I'm going to talk to you about aggravating factors and mitigating factors and give you further instructions as to how you are going to deal with them.
>
> Now, at this time counsel will have an opportunity to make arguments regarding their evidence of aggravating factors and mitigating factors.  As in the trial in chief, the State, because the burden is still on the State regarding the aggravating factors weighing more than the mitigating factors, the State has the right to open and close the argument.  Gentlemen, you may address the jury regarding this phase.[82]

After counsel for both parties completed their closing argument at the punishment phase, the trial judge continued his jury instructions as follows:

> Ladies and gentlemen, I attempted to explain to you before the arguments the context which we were here to consider it [sic], the matter that is being submitted to you at this time.  You have been reminded, perhaps not in this context, that it is real easy sometimes to have abstract views of things.  It is easy, I suppose, to make snap judgments and quick opinions on a lot of things.  But, I think you have been here long enough and you have been reminded of this before, that we are not talking about television, we are not talking about a conversation in the cafe on the street; this is real.  And, we have to treat it as such.  This is a court of law.
>
> It probably is easy also for some people to say, well, heck, anytime there's a serious crime, you ought to shoot them.  Or, anytime there is a serious crime, you ought to lock them up and throw away the key forever.  Well, that is not the way the system works, either.  And, if this was just real simple, we wouldn't be doing it.
>
> Our law, and I'm rather proud of it, has set some standards that have to be met.  And so, in effect, I'm going to ask you to follow those standards.  Your judgment and determination is up to you.  So, I'm going to try to instruct you a little bit further about the issues here of

---

[82] S.F. Trial, 12 SCR 1425-26.

aggravating circumstances and mitigating circumstances and weighing them to decide what your recommendation is going to be. And, I have already told you before that the burden of proof is on the State to prove the aggravating circumstances beyond a reasonable doubt. Any that they don't prove beyond a reasonable doubt, you don't consider. If you are not reasonably satisfied of the existence of mitigating circumstances, you don't consider that either. But, after you have decided what aggravating circumstances exist under those standards, then you have to weigh them as they impact on your recommendation.

So, let's talk just a moment about what the State contends are aggravating circumstances in this case. Well, they say, in effect, that the defendant was previously convicted of armed robbery or robbery up in Virginia, and they have introduced a certified copy of that conviction. And, I will tell you that a previous conviction of a felony involving the use of threat or violence to a person is one of the statutory aggravating circumstances. And, if they have proved it beyond a reasonable doubt, you may consider that.

They have also told you -- they also insist that the defendant committed this capital offense while he was engaged in or was an accomplice in the commission of or attempt to commit the crime of robbery. And, you heard evidence regarding that. And, if they have proven that to you beyond a reasonable doubt, then you may consider that as an aggravating factor.

The State also contends that this offense was especially heinous, atrocious, or cruel as compared to other capital offenses. I think I need to talk with you about that a little bit.

Because they have used some words -- let me go back to robbery. I have already defined it for you. I defined it for you during the guilt phase. This is the same jury. But you remember that I told you a person commits the crime of robbery in first degree if in the course of committing a theft he uses or threaten [sic] to use the imminent use of force against a person, the owner or the person in possession of the property, with the intent to overcome his physical residence [sic] or physical powder [sic] of resistance, causes serious physical injury or death, as in this case, and is armed with a deadly weapon, a pistol. Same thing I told you before. Just simply want to remind you of it.

Now, let's talk about the third aggravating circumstance that the State claims. They say that this capital offense was especially heinous, atrocious, or cruel as compared to other capital offenses.

Now, the term heinous means extremely wicked or shockingly evil.

The term atrocious means outrageously wicked and violent.

The term cruel means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others.

What is intended to be included in this aggravating circumstance are those cases where the actual commission of the capital offense is accompanied by such additional acts, or such additional manifestations on the part of the defendant, to set that crime apart from just the ordinary capital offense.

Now, for a capital offense to be especially cruel it must be conscienceless. Be a conscienceless or pitiless crime, done without conscience, done without pity, which is unnecessarily torturous to the victim. And, I suppose that all of us probably might think that all capital offenses are heinous, atrocious, and cruel to some extend [sic]. Maybe all crimes are cruel. Maybe.

But when we look at this as an aggravating circumstance, what is intended to be covered by these aggravating circumstances are only those cases in which the degree of heinous, atrocious, and cruel exceeds that which would always exist when a capital offense is committed.

Now, as I said torture is the deliberate infliction of pain in a manner calculated to unnecessarily increase the suffering that an individual undergoes. And to constitute torture, the victim must experience and be aware of this magnified pain. It is not enough that the manner of death is despicable. The point is that the victim was deliberately made to undergo, feel, or suffer unconscionable or increased pain.

While it might be said to be cruel, some people might even call it heinous or atrocious, the shot that produced instant death, may be, even if the victim didn't know it was coming, might be less heinous, atrocious, or cruel.

If we did not have those words, every time we had a killing, we would automatically have a death penalty. That's now what the law says. Consider those three.

Consider the fact, if it be a fact, and has been proven by the State, that previously he has been convicted of a crime of violence or that he was engaged in the commission of a robbery when this crime, killing, took place and the cruel heinous and atrocious nature of it.

The State doesn't have to prove all three of them. Any one they don't prove: Don't consider.

Now, let's look over on the other side of the ledger. Most anything, most anything really, should be taken in consideration when it comes to the question of imposing the death penalty. We just do not do it lightly. Death is different.

Certainly, as the defense suggested, you can take into consideration the age of the defendant. You can also take into consideration the fact that, for whatever weight you wish to give it, that he was not the only one involved, if that be a fact and you heard them. You could also, of course, take into consideration the fact of any punishment which the evidence has shown any of the rest of them received. So, most anything could be used or considered by you, if you are reasonably satisfied it is true, with regard to mitigation.

And, then when you get through, you have got to say to yourself what does that mean to me? Don't count the numbers. I have already told you that. Don't count the numbers. See how it weights on you in the scheme of things as to what, considering the very serious nature of the crime and the very serious nature of the punishment, whichever one is imposed, neither one of these are just slaps on the wrist. And, then you weigh it all in the balance and come up with the kind of recommendation that simply puts aside the thoughts that I'm trying to this [sic] for the family, and friends, and the like. That's not the law. Put aside the fact that I'm sort of sympathetic. I don't want to see anybody sit in the electric chair if you consider it. You are not exactly the conscience of this community. You are instrument [sic] of the law, and you have to divorce yourself from the idea that I've got to do what is going to please the District Attorney, or the defense lawyer, or the judge. You don't.

You are the best twelve folks we could find to decide this important issue. Now, we have got two cases here, two counts. You remember count one, murder during a robbery, capital murder; and, count two, another capital murder, murder during use of a deadly weapon with the victim in a vehicle, I'm going to ask you to make a recommendation on both of these counts. You may say that doesn't make a lot of sense. Maybe it doesn't. I'm going to tell you you don't have to make the same recommendation on both of them. You may say that doesn't make sense, either. Be that as it may. I'm going to let you do it. Take these two verdict forms and on each one of them, one and two. And, one of them actually is a recommendation of death and the other is a recommendation of life imprisonment without parole, and it is the same way on both of them.

Now, I have got to once again remind you and so in order to help remind you, all of these forms have only: We the jury by a vote of blank to blank. Every one of them has got that. So, in every instance and each instance -- of course, you can't choose but one on each one of these forms. Whatever you choose, you have got to have the vote to put down there. I'm going to tell you right now, I'm not going to ask you -- I may ask if that's your verdict, like I did the last time. I'm not going to ask you whether this is your verdict. I'm not going to ask any of you how you voted. But if you are going to vote, and you do vote, for the imposition of death, there must be ten of you. Ten to two is the least acceptable number. Eleven to one or twelve to zero would both work. But nothing less than ten to two. And, if you are going to recommend life without parole, you need at least seven. Seven to five would do. Eight to four. And, the fact of the matter is unless you get ten to two for death, you get seven to five for life without parole, that is what your vote [sic]. That is what your verdict should be. But you can discuss it as long as you want to and vote as many times as you want to and consider it as long as you wish until such time as you arrive at the verdict in the manner if you can.

The foreperson, as I have told you before, doesn't have any more vote than anybody else. But, the foreperson, Mr. Pope, is going to get you all started talking about it and at such time as you arrive at verdicts, he can sign to reflect your verdicts, and knock on the door and let my bailiff know that you have reached a verdict, and then I'll bring you in. Just roll it up like you did before and we'll take it.

Now, there's something I have to do. I have to go back here and have just a little word with the attorneys. So, you all sit where you are for a minute, please.[83]

At that point, the trial judge retired to confer with counsel and the following

took place in chambers:

> THE COURT: What says the State to the Court's oral charge?
> MR. CLARK: State is satisfied.
> MR. GOGGANS [sic]: What says the defendant to the court's oral charge?

---

[83] S.F. Trial, 12 SCR 1436-43.

MR. GOGGANS: We have a couple of things we discussed before on the record. We agree to disagree. I bring those matters forward and anticipate the same ruling.

One other thing I believe you told the jury as to mitigating circumstances that they must be unanimous on those also. I don't think the law read from McKoy v. North Carolina, Supreme Court of the United States, held that NC's capital sentencing scheme, which required jury unanimity as to the existence of a particular mitigating circumstance for purposes of determining whether aggravating circumstances outweighed mitigating circumstances and whether aggravating circumstances were sufficiently substantial when considered with mitigating circumstances to call for a death sentence violated the holding in Mills v. Maryland, that the Eighth Amendment forbids limiting the jurors in a capital sentencing proceeding to a consideration of only those mitigating circumstances they unanimously found to exist. That is my understanding of the law. That is from a brief I wrote in another case.

THE COURT: What do you say to that, Mr. Clark?

MR. CLARK: Judge, that is a United States Supreme Court case. Quite frankly I don't recall what exactly the language is you are supposed to use in instructing them.

THE COURT: I thought the scheme was that they had to be unanimous as to what they would consider and then when, with the State having the burden of proof beyond a reasonable doubt and defense only having reasonable satisfaction, then when they decided what mitigating factors they were going to consider, they weighed them. Not quantitatively but equalitatively [sic]. If that's not the law, maybe I ought to tell them differently. I don't know exactly how to tell them.

MR. GOGGANS: Tell them they don't have to be unanimous on mitigating circumstances.

THE COURT: What do they have to do?

MR. GOGGANS: I think each makes their own individual finding on mitigating. Let [sic] assume for purposes of illustration that we put forward twelve mitigating circumstances. You might have twelve and each of them finds one. They may, although twelve of them are convinced beyond a reasonable doubt, any doubt, that one is established but not the other eleven. Okay. And, my understanding of the law is that on mitigating you [sic] unanimity is not required, only statutory -- statutory aggravating.

THE COURT: Aggravating . . . .

MR. CLARK:  Yes, sir.

THE COURT:  Twelve -- aggravating -- if you didn't get twelve on any one of them, you wouldn't have aggravating?

MR. GOGGANS:  That's correct.

THE COURT:  They can consider anything they want to.

MR. GOGGANS:  I'm saying they have to find it.  But in finding, mitigating does not have to be unanimous.

THE COURT:  What does it have to be?

MR. GOGGANS:  That is . . . .

THE COURT:  One?

MR. GOGGANS:  That's my understanding.  I may be wrong, but that is my understanding of the law.

THE COURT:  Surely, it couldn't be one.  You mean each one can decide for himself whether there are mitigating circumstances?

MR. GOGGANS:  I think so.

THE COURT:  And, then everyone weighs the unanimous against his individual ones?

MR. GOGGANS:  That's my understanding.

MR. CLARK:  I am sorry, I can't help you with the language, Judge.

THE COURT:  Well, I really - - I don't think that is the law, but I sure would hate to be wrong about it, and I don't mind charging them differently.  I'm not sure they know the difference anyway.

MR. CLARK:  I do understand this somewhat.  I am sure Mr. Goggans has a better grasp of the instructional language on mitigation because that's not been my area of preparation.  But, I think he's correct in that in general the Court's approach to instructions to the jury on mitigation is basically anything goes.

THE COURT:  All right.  I'l go back and tell them that.

MR. GOGGANS:  You will tell them the mitigating findings do not have to be unanimous?

MR. CLARK:  Still have to go through a weighing process.[84]

The trial judge and counsel then returned to the courtroom, where the following took place:

---

[84] S.F. Trial, 12 SCR 1443-47.

THE COURT: Let me supplement or, perhaps, correct something I said. I don't know whether I said it inadvertently or not. Be that as it may.

I was talking about trying to decide what aggravating and what mitigating factors exist. And, I said, I'm sure, that you needed to be unanimous in your determination about it. I'll stick with that as far as aggravating circumstances are concerned. But I'll retract, if I said or gave the impression, that you all had to unanimously agree on a mitigating circumstance before you could consider it. I would instruct you that each of you can consider what mitigating circumstances that you have heard and you believe are proven to your satisfaction, and you can factor that into the weighing process as it leads to your ultimate determination of what your ultimate recommendation should be.

(WHEREUPON, A SIDE BAR COMMENCES.)

MR. CLARK: Yes, sir.

MR. GOGGANS: Just make clear mitigating doesn't have to be unanimous. We are satisfied with sticking with our other objection.

(WHEREUPON, A SIDE BAR CONCLUDES.)

THE COURT: Let me just make it clear: Mitigating doesn't have to be unanimous.

All right. Gather up the exhibits that are to be submitted in connection with this phase. I believe there were two.

All right. Mr. Bice, take the exhibits and jury verdicts. The alternates may go back to their corner.

MR. CLARK: All other evidence should go back as well.

THE COURT: All right. Retire and reach your verdict.

(JURY RETIRES TO DELIBERATE.)[85]

Petitioner did not include any argument in his brief on direct appeal challenging the trial court's jury instructions at the punishment phase of trial. In his sixth ground for relief in his Rule 32 petition, however, Petitioner argued the trial court's punishment phase jury instructions erroneously imposed a burden on the

---

[85] S.F. Trial, 12 SCR 1447-48.

defense to prove the existence of mitigating circumstances to the point the jury was "reasonably satisfied" of the truth of the mitigating factor and instructed the jury it had to unanimously find a mitigating circumstance existed before that circumstance could be weighed against the aggravating circumstances.[86] In its Order issued January 6, 2003, the state trial court ruled the foregoing arguments procedurally barred under Rules 32.2(a)(3) and 32.2(a)(5) of the Alabama Rules of Criminal Procedure based upon Petitioner's failure to raise these complaints at trial and on direct appeal.[87]

On appeal from the denial of Petitioner's Rule 32 petition, the Alabama Court of Criminal Appeals held (1) the trial court erroneously dismissed Petitioner's complaint about the trial court's unanimity instruction regarding mitigating evidence under Rule 32(a)(3), but (2) the trial court correctly dismissed Petitioner's complaint about the trial court's erroneous unanimity instruction pursuant to Rule 32(a)(5) based on Petitioner's failure to raise that claim on direct appeal, and (3) Petitioner waived his complaint about the trial court's imposition of an erroneous burden of proof on the jury's consideration of mitigating evidence by failing to raise that

---

[86] 15 SCR 38-42.

[87] 15 SCR 188.

complaint in Petitioner's brief appealing the Circuit Court's denial of his Rule 32 petition.[88]

## 2. Clearly Established Federal Law

The Supreme Court has established the constitutional standard for evaluating the propriety of a jury instruction at the punishment phase of a capital murder trial as "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U. S. 370, 380 (1990). The Supreme Court has consistently applied this standard to evaluate challenges to punishment-phase jury instructions. *See Weeks v. Angelone*, 528 U. S. 225, 226 (2000) (emphasizing the *Boyde* test requires a showing of a reasonable likelihood, as opposed to a mere possibility, the jury construed the jury instructions to preclude its consideration of relevant mitigating evidence); *Jones v. United States*, 527 U. S. 373, 390 & n.9 (1999) (holding the same); *Calderon v. Coleman*, 525 U. S. 141, 146  (1998) (holding the same); *Buchanan v. Angelone*, 522 U. S. 269, 276 (1998) (holding the same); *Johnson v. Texas*, 509 U. S. 350, 367 (1993) (holding *Boyde* requires a showing of a reasonable likelihood the jury interpreted the jury instructions so as to preclude it from considering relevant mitigating evidence).

---

[88] 23 SCR (Tab R-58), at pp. 67-68.

This "reasonable likelihood" standard does not require the petitioner to prove the jury "more likely than not" interpreted the challenged instruction in an impermissible way; however, the petitioner must demonstrate more than "only a possibility" of an impermissible interpretation. *Johnson v. Texas*, 509 U. S. at 367; *Boyde v. California*, 494 U. S. at 380. This Court must analyze the challenged language included in the jury charge within the context of the overall jury charge. *Cupp v. Naughten*, 414 U. S. 141, 146-47 (1973). "In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would--with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" *Johnson v. Texas*, 509 U. S. at 368; *Boyde v. California*, 494 U. S. at 381.

### 3. *De Novo* Review

Because the state trial and appellate courts disposed of Petitioner's complaints of allegedly erroneous punishment phase jury instructions on procedural grounds, without addressing the merits of those claims, this court's review of Petitioner's

federal constitutional claims is *de novo*.[89]  *See Porter v. McCollum*, 558 U. S. 30, 39

(2009) (holding *de novo* review of the allegedly deficient performance of petitioner's

---

[89] The Supreme Court has made clear that federal habeas courts may deny writs of habeas corpus by engaging in *de novo* review when it is unclear whether AEDPA deference applies because a federal habeas petitioner will not be entitled to a writ of habeas corpus if his claim is rejected on *de novo* review.  *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).  The Supreme Court has declined to address an issue of procedural default and chosen, instead, to resolve a claim on the merits, holding that an application for habeas corpus may be denied on the merits notwithstanding a petitioner's failure to exhaust in state court.  *See Bell v. Cone*, 543 U. S. 447, 451 n.3 (2005) (citing § 2254(b)(2)).  "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  *Rhines v. Weber*, 544 U. S. 269, 277 (2005) (quoting 28 U.S.C. § 2254(b)(2)).  Writing for four Justices of the United States Supreme Court, Justice Alito explained the rationale underlying a federal habeas court's decision to eschew analysis of a factually and legally convoluted procedural default question in favor of simply addressing the lack of merit in a particular claim as follows:

> In the absence of any legal obligation to consider a preliminary nonmerits issue, a court may choose in some circumstances to bypass the preliminary issue and rest its decision on the merits.  *See, e.g.*, 28 U.S.C. § 2254(b)(2) (federal habeas court may reject claim on merits without reaching question of exhaustion).  Among other things, the court may believe that the merits question is easier, and the court may think that the parties and the public are more likely to be satisfied that justice has been done if the decision is based on the merits instead of what may be viewed as a legal technicality.

*Smith v. Texas*, 550 U. S. 297, 324 (2007) (Justice Alito, with Chief Justice Roberts and Justices Scalia and Thomas, dissenting).  A Supreme Court majority employed this very approach in *Lambrix v. Singletary*, 520 U. S. 518, 520 (1997), where the Supreme Court held as follows:

> We do not mean to suggest that the procedural-bar issue must be resolved first; only that it ordinarily should be.  Judicial economy might counsel giving the *Teague* question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law.

The Eleventh Circuit has likewise approved the adjudication on the merits of arguably procedurally defaulted but meritless claims.  *See Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1318 (11th Cir. 2016) (federal habeas courts may deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review (citing 28 U.S.C. § 2254(a)), *cert. denied*, 137 S. Ct. 2245 (2017); *Conner v. GDCP Warden*, 784 F.3d 752, 767 & n.16 (11th Cir. 2015) ("[B]ecause we conclude that Mr. Conner would not be entitled to habeas relief under *de novo* review, we affirm the District Court's denial of relief under that standard without resolving whether AEDPA deference applies."), *cert. denied*, 136 S. Ct. 1246 (2016); *Muhammad v. Sec'y, Fla. Dep't of Corr.*, 733 F.3d 1065, 1072-73 (11th Cir. 2013) ("The Supreme Court has explained that, when it appears that another issue is more

trial counsel was necessary because the state courts failed to address this prong of the *Strickland* analysis); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005) (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice).

### a. Burden of Proof

The state trial court erred under state law when it failed to instruct the jury at the punishment phase of Petitioner's capital murder trial in a manner consistent with *Alabama Code §13A-5-45(g)*:

---

'easily resolvable against the habeas petitioner, whereas the procedural-bar issue involves complicated issues of state law,' a federal court may avoid the procedural bar issue. Because the procedural bar involves a complicated issue of state law and this petition is more easily resolvable against Muhammad on the merits, we assume without deciding that the procedural bar is inadequate."), *cert. denied*, 571 U. S. 1117 (2014); *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1291 (11th Cir.) ("The Supreme Court has made clear that we are entitled to affirm the denial of habeas relief in this manner: 'a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review.'"), *cert. denied*, 568 U. S. 905 (2012); *Loggins v. Thomas*, 654 F.3d 1204, 1215 (11th Cir. 2011) ("When relief is due to be denied even if claims are not procedurally barred, we can skip over the procedural bar issues, and we have done so in the past." (citing *Valle v. Sec'y, Dep't of Corr.*, 459 F.3d 1206, 1213 (11th Cir. 2006), *cert. denied*, 552 U. S. 920 (2007)); *Thompson v. Sec'y for Dep't of Corr.*, 517 F.3d 1279, 1283 (11th Cir. 2008) ("We may, however, deny Petitioner's petition for habeas relief on the merits regardless of his failure to exhaust the claim in state court."), *cert. denied*, 556 U. S. 1114 (2009); *Henry v. Dep't of Corr.*, 197 F.3d 1361, 1366 n.2 (11th Cir. 1999) ("Judicial economy demands that federal courts attempt to avoid the inefficiency that would result from questioning the procedural dismissal of a facially meritless habeas corpus petition. Indeed, the exercise of this discretion is a practical manifestation of that portion of the *Barefoot* inquiry requiring that the issues raised in the petition be 'adequate to deserve encouragement to proceed further.'" (citing *Barefoot v. Estelle*, 463 U. S. 880, 893 n.4 (1983))).

Thus, this court is authorized to deny relief on unexhausted or procedurally defaulted claims (without first determining whether the claims are unexhausted or procedurally defaulted) when the claims in question lack merit under *de novo* review.

> The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51 and 13A-5-52. When the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence.

It is well-settled, however, that a jury instruction that is defective under state law does not furnish a basis for federal habeas corpus relief unless the alleged errors were so critical or important to the outcome of the trial to render the entire trial fundamentally unfair. *Tejada v. Dugger*, 941 F.2d 1551, 1560 (11th Cir. 1991) (quoting *Carrizales v. Wainwright*, 699 F.2d 1053, 1054 (11th Cir. 1983)), *cert. denied sub nom Tejada v. Singletary*, 502 U. S. 1105 (1992). A jury instruction that was allegedly incorrect under state law is not a basis for habeas relief because federal habeas review is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *Estelle v. McGuire*, 502 U. S. 62, 68-72 (1991); *Jamerson v. Sec'y for Dep't of Corr.*, 410 F.3d 682, 688 (11th Cir. 2009). Unlike state appellate courts, federal courts on habeas review are constrained to determine only whether the challenged instruction, viewed in the context of both the entire charge and the trial record, "so infected the entire trial that the resulting conviction violated due process." *Estelle v. McGuire*, 502 U. S. at 72 (quoting *Cupp v. Naughten*, 414 U. S. 141, 147 (1973)); *Jamerson v. Sec'y for Dep't of Corr.*, 410 F.3d at 688.

The state trial court's erroneous use of the term "reasonably satisfied" to instruct Petitioner's jury on the burden of proof applicable to a mitigating circumstance did not render the punishment phase of Petitioner's capital murder trial fundamentally unfair. There was no factual dispute as to the existence of the mitigating circumstances identified by either the trial court in its punishment phase jury instructions[90] or Petitioner's trial counsel during closing jury argument.[91]

---

[90] The trial judge instructed the jury that it "could take into consideration (1) the age of the defendant, (2) the fact that he was not the only one involved in the capital offense, and (3) the fact of any punishment received by the others involved in Petitioner's capital offense. S.F. Trial, 12 SCR 1440-41.

[91] Petitioner's trial counsel gave the following closing argument at the punishment phase of petitioner's capital murder trial:

> Last February I wrote a letter to the dean at the University of Alabama Law School recommending that they consider accepting an applicant to the freshman class this year. I began the letter by stating that in my line of work often the only thing standing between my clients and death is the law. What I would like to do as best I can right now is talk with you a little bit about why I think the law is standing between Tony Barksdale and death in Alabama's electric chair.

> At this point of the case, there are two options. One is death by electrocution. The other is life imprisonment without the possibility of parole. Life in prison without the possibility of parole. Not six years suspended for the twelve months the State of Virginia added to this case right here. But life without the possibility of parole. Not an inviting proposition: Life without the possibility of parole.

> As you can see from this enlargement of this exhibit Tony Barksdale was born on May 2, 1977. He was eighteen years when this happened. He was young. So was Julie Rhodes. She was young, too. Too young to die. No one should be murdered. It is even more tragic when it is someone that is young.

> Tony Barksdale's age is not an excuse. It is not an excuse. I'm not offering it to you as an excuse. But, what I am offering is that under the law, it is a mitigating factor for what you folks see as appropriate punishment. Death or life in prison without the possibility of parole. It is the law.

> On the street sometimes the law doesn't protect us. We all know that. But inside the bar here, inside this bar, the law rules. Inside that bar the protection of the law must be applied. For an ordered society the laws must be applied equally to everyone regardless of race, color, creed, national origin, or age. The law must be applied to everyone.

During the guilt-innocence phase of Petitioner's trial, a law enforcement officer

testified without contradiction that Petitioner was eighteen years of age on the date

Petitioner gave his post-arrest statement.[92]   Without objection, Petitioner's trial

---

Now, I urge you to consider all the things that Mr. Clark suggested you consider also. But, I also ask you to also consider this right here on May 2, 1977. Tony Barksdale is only eighteen years old. He is only nineteen as he sits here right now. Now at the age of forty-one -- at the age of eighteen, I was thinking I had control of the whole world. I knew everything. But when you hit forty-one, and you have had some more experience, you kind of wish you had half the judgment and sense that you thought you had back then. And. I ask you to consider this under the law, which is under the law, a mitigating circumstance in this case. It is not an excuse in this case, but it is a factor, a strong factor, which indicates that the appropriate punishment is life without the possibility of parole.

Like without the possibility of parole. Thinking back, I told you about that letter I wrote. The first question that popped out that I had was: Why would you want to be a lawyer? It was probably bad day and I was tired. And, I asked that question and, you know, I was thinking more about that this morning. Why would you want to do this? I have spent, what, seven days in Alex City, in a courthouse and I was thinking of the answer of why is that how important it is that inside this rail we are all protected by all the laws, everybody, even the least of us, even Tony Barksdale is. Right now I'm the only one in the courtroom with him.

I noted in this - - this in the State's exhibit also, apparently, that was the same situation there: Subject's parents are not present in court.

But, I have tried to do my best getting ready for this case and during this week to make sure that the law was followed. I have done the best I could to stand by him, to stand up for probably one of the least in our society, somebody who was eighteen. That under the law tells us that is a mitigating circumstance in your deliberations. Think about it: Eighteen years old at the time and the best he can come out with is life without the possibility of parole. Please consider this. Please consider the circumstances. Please consider the factor which I don't think is in dispute at all.

Think about an eighteen year old and the judgment of an eighteen year old. How young that really is. An eighteen year old doesn't think that, but you think back on it yourselves and I ask you when you think about this, to give it your deepest thought, to give it all the discussion you feel like you need, to give it your prayers, and I ask you to vote for life without the possibility of parole.

Thank you.
S.F. Trial, 12 SCR 1330-33.

[92] S.F. Trial, testimony of Sonny Riddle, 11 SCR 1254.

counsel admitted into evidence at the punishment phase of trial a certified copy of Petitioner's birth certificate.[93] Petitioner's accomplice testified without contradiction at the guilt-innocence phase of trial that he pleaded guilty to a charge of murder and received a sentence of life imprisonment with the possibility of parole for his involvement in Julie Rhodes's murder.[94] The prosecutor responded to Petitioner's trial counsel's closing argument by emphasizing, as Petitioner's own trial counsel had acknowledged, that Julie Rhodes was only nineteen years old at the time of her death but he did not challenge the factual accuracy of anything Petitioner's trial counsel had argued as the basis for a finding of a mitigating circumstance.[95] In fact, the prosecution's closing argument included no effort to challenge the factual accuracy of anything Petitioner's trial counsel argued at the punishment phase of trial.

Thus, there was no genuine factual dispute at the punishment phase of Petitioner's capital murder trial over the existence of mitigating circumstances showing that Petitioner was only eighteen years old at the time of the offense, others were involved in the same offense, and one of Petitioner's co-defendants had received a sentence of life imprisonment with the possibility of parole. The trial

---

[93] S.F. Trial, 12 SCR 1423.

[94] S.F. Trial, testimony of Jonathan David Garrison, 11 SCR 1257, 1285.

[95] S.F. Trial, 12 SCR 1433-35.

court instructed the jury it could consider each of those mitigating factors.[96]  Under these circumstances, the state trial court's erroneous use of the term "reasonably satisfied" in relation to "mitigating circumstances" in the punishment phase jury instructions did not render the punishment phase of Petitioner's capital murder trial fundamentally unfair.  Nor is there a reasonable likelihood that the jury applied the erroneous punishment phase jury instructions in a way that prevented the jury's consideration of constitutionally relevant evidence. *Boyde v. California*, 494 U. S. at 380.

### b.  Unanimity

The state trial court's instructions informing the jury that it could only consider those mitigating circumstances which it unanimously concluded had been established by the evidence were inconsistent with the Supreme Court's holding in *Mills v. Maryland*, 486 U. S. 367 (1988).  In *Mills*, the Supreme Court rejected a capital sentencing system in a weighing jurisdiction in which the jury was informed, both through the trial court's jury instructions as well as the verdict form, that it could not consider a mitigating circumstance or even particular mitigating evidence unless the jury unanimously agreed upon the existence of that particular mitigating circumstance:

---

[96] S.F. Trial, 12 SCR 1440-41.

there is a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance. Under our cases, the sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk.

*Mills v. Maryland*, 486 U. S. at 384. Had the trial court's punishment phase jury instructions not been corrected, a constitutional error would have occurred.

As explained above in Section IV.C.1., however, immediately after the trial court gave the erroneous instruction in question, Petitioner's trial counsel called the trial court's attention to the constitutional error and requested a corrective instruction consistent with the holding in *Mills*. The prosecutor agreed the trial court's instruction was inconsistent with the Supreme Court's holding in *Mills* and the underlying theme of Supreme Court opinions suggesting that, when it comes to mitigating evidence, "anything goes."[97] The trial court then informed the jury that the jury's consideration of mitigating circumstances need not be unanimous. When Petitioner's trial counsel requested further clarification, the trial court instructed the

---

[97] It is far from clear whether the state trial judge furnished counsel with an opportunity to examine and comment upon the content of the jury charge *before* the court actually instructed the jury. The practical need for such advance discussion of the proposed jury charge is especially relevant in the context of the unique Eighth Amendment issues that typically arise only in the context of capital sentencing proceedings. Most state trial judges do not confront those issues on a regular basis.

jury "Let me just make it clear: Mitigating doesn't have to be unanimous."[98] Petitioner's trial counsel requested no further clarification. Nothing in the prosecutor's closing punishment phase jury argument or the punishment phase verdict form suggested the jury could not consider a mitigating circumstance unless it concluded unanimously that the mitigating circumstance existed. Nor did the prosecutor argue Petitioner had failed to establish the factual predicate for any of the mitigating circumstances urged by Petitioner's trial counsel in his closing argument or identified by the trial court in its jury instructions.

Petitioner argues the trial court's attempts at correcting its erroneous statements regarding the need for a unanimous determination of the existence of mitigating circumstances were confusing and ambiguous. While admittedly less than pristine, the state trial court's remedial instructions were sufficient to alert the jury to the fact the jury need not unanimously agree upon a particular mitigating circumstance before weighing that mitigating circumstance against the aggravating circumstances established by the evidence. "In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would--with a 'commonsense

---

[98] S.F. Trial, 12 SCR 1448.

understanding of the instructions in the light of all that has taken place at the trial.'"
*Johnson v. Texas*, 509 U. S. at 368; *Boyde v. California*, 494 U. S. at 381.

As explained above, the three mitigating circumstances of Petitioner's age, the participation of others, and the sentence of a co-defendant were established by overwhelming, uncontroverted, uncontested evidence. Petitioner identifies no other mitigating circumstances properly before the jury at the punishment phase of his capital murder trial that he believes his jury was unable to consider adequately in light of the allegedly defective punishment phase jury instructions. Under such circumstances, there is no reasonable likelihood the jury applied the challenged instruction in a way that prevented the jury's consideration of constitutionally relevant evidence. *Boyde v. California*, 494 U. S. at 380.

### 4. Conclusions

After conducting an independent, *de novo* review, Petitioner's complaints about the defects in his punishment phase jury instructions do not warrant federal habeas corpus relief. Paragraphs 201 and 202 of Petitioner's federal habeas corpus petition do not warrant federal habeas relief.

## D. Finding Petitioner's Offense Especially Heinous, Atrocious, or Cruel

### 1. State Court Disposition

In its Sentencing Order issued January 14, 1997, the Circuit Court concluded Petitioner's capital offense was "especially heinous, atrocious or cruel compared to

other capital offenses," in part because (1) Petitioner had an apparent fascination with his weapon and stated he would use it to shoot someone, (2) Petitioner "had no moral compunction against killing a stranger to get his way, and prove to his companions that he could accomplish his stated goal, regardless of the consequences," (3) Petitioner committed the murder without conscience and without pity, (4) for a period of time, Petitioner appeared to be exhilarated by the crime, (5) one of the gunshots that struck Julie Rhodes struck her in the face, entered her neck, exited through the side of her shoulder, and still had enough force to make a bullet hole in the driver-side window, (6) Julie was also shot in the back, with that bullet penetrating her liver, exiting her abdomen, and lodging in her leg, (7) Julie's injuries were painful and caused profuse bleeding, (8) Petitioner dumped her in the street and left her there, (9) Julie experienced significant pain of which she was acutely aware, (10) she was acutely aware she had been assaulted by a deadly weapon, (11) she screamed for help, (12) at the scene and during her transport to the hospital, she knew and expressed the fear that she was about to die, (13) her torment lasted a significant amount of time, (14) while Petitioner may not have intentionally caused Julie's emotional suffering and mental distress, Petitioner deliberately did the acts which caused them as a natural and probable consequence of his actions, (15) this is not a case in which the victim was murdered swiftly without awareness of the circumstances that would lead to her death, (16) Petitioner acted without regard to

the consequences of his action to the victim, consciously and pitilessly, and (17) the

victim suffered torture, fear, and pain.[99]

In his third ground for relief on direct appeal, Petitioner argued the trial court

erred in finding at the punishment phase of trial that Petitioner's offense was

heinous, atrocious, or cruel.[100]  The Alabama Court of Criminal Appeals rejected

this claim on the merits:

> The facts of this case reveal that the victim suffered extreme
> physical and mental pain for approximately four and one-half hours
> before her death.  The victim begged the appellant not to shoot her.
> After being shot at close range in the face, the victim turned, and he
> shot her again in the back.[101]  The appellant then pushed the victim from

---

[99] Sentencing Order, 15 SCR 98-103; 23 SCR (Tab R-52) 792-96.

[100] In his third ground for relief in his appellant's brief, Petitioner argued his capital offense did not rise to the level of "heinous, atrocious, and cruel."  13 SCR (Tab R-31), at pp. 17-20. Petitioner's arguments on this point in his direct appeal brief were framed exclusively in terms of applicable state law, cited only state law authorities, and did not include any reference whatsoever to federal law.

[101] Contrary to the suggestion contained in the Alabama Court of Criminal Appeals' opinion, there was no evidence presented to the jury at Petitioner's trial definitively establishing the order of the two gunshots that struck Julie Rhodes.  Petitioner stated in his voluntary, audio-tape recorded, statement to police only that the gun went off twice as he was attempting to unload it, the girl screamed the first time the gun went off, and after the gun went off the second time, she looked back at Petitioner (who was still in the rear passenger seat) and he saw there was blood in her mouth.  S.F. Trial, testimony of Sonny Riddle, 11 SCR 1248-49.  Prosecution witness Antoine Harris testified the Petitioner told him that the gun went off while he was trying to unload it, and he did not know how he shot the victim twice.  S.F. Trial, Testimony of Antoine Harris, 9 SCR 841-43.  Prosecution witness Jason Scott Mitchell testified the Petitioner told him he was shaking the gun in her face and trying to scare her and get her out of the car when the gun went off, and the shooting had been accidental.  S.F. Trial, testimony of Jason Scott Mitchell, 10 SCR 975-76. Mitchell offered no testimony indicating Petitioner ever told him exactly where the first shot struck the victim or anything at all about the second shot.  *Id.*, testimony of Jason Scott Mitchell, 10 SCR 965-81.  The forensic pathologist who performed the autopsy of Julie Rhodes did not offer any opinion regarding the order of the gunshots that struck her.  S.F. Trial, testimony of Dr. Alfredo

her car and she managed to get to some nearby houses, she was screaming for help. She was discovered lying facedown in a crawling position, bleeding profusely, and covered in leaves. In her agony, the victim told medical personnel that she knew she was dying.

In *Ex parte Kyzer*, this Court held that the standard applicable to the "especially heinous, atrocious, or cruel" aggravating circumstance under § 13A-5-49(8), Ala. Code 1975, is that the crime must be one of "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." The appellant's assertion that the murder was not unnecessarily torturous to the victim because he did not intentionally inflict prolonged pain upon the victim is without merit. It is not, as the appellant argues, incumbent upon the State to prove that he inflicted savagery or brutality upon the victim, or that he took pleasure in having committed the murder. It is necessary that the State present evidence that the victim suffered some type of physical violence beyond that necessary or sufficient to cause death. Additionally, to support this aggravating factor, the time between at least some of the injurious acts must be an appreciable lapse of time, sufficient enough to cause prolonged suffering and the victim must be conscious or aware when at least some of the additional or repeated violence is inflicted.

*Barksdale v. State*, 788 So. 2d at 907-08 (Citations omitted and Footnote added).

The Alabama Supreme Court denied certiorari. *Ex parte Tony Barksdale*, 788 So. 2d at 915.

### 2. Clearly Established Federal Law

There is no "clearly established" federal constitutional authority mandating state appellate review of the evidentiary sufficiency underlying a capital sentencing jury's (or capital sentencing court's) consideration and weighing of aggravating

---

Paredes, 9 SCR 721-40. In all other respects, the Alabama Court of Criminal Appeals' opinion accurately summarized the relevant evidence presented at Petitioner's trial.

factors beyond the Supreme Court's holding in *Jackson v. Virginia*, 443 U. S. 307 (1979). *See Lewis v. Jeffers*, 497 U. S. 764, 781-84 (1990) ("in determining whether a state court's application of its constitutionally adequate aggravating circumstance was so erroneous as to raise an independent due process or Eighth Amendment violation, we think the more appropriate standard of review is the 'rational factfinder' standard established in *Jackson v. Virginia*." (Citation omitted)). In *Jackson*, the Supreme Court declared the proper standard for evaluating the sufficiency of the evidence to support a criminal conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Lewis v. Jeffers*, 497 U. S. at 781 (quoting *Jackson v. Virginia*, 443 U. S. at 319).

> These considerations apply with equal force to federal habeas review of a state court's finding of aggravating circumstances. Although aggravating circumstances are not "elements" of any offense, the standard of federal review for determining whether a state court has violated the Fourteenth Amendment's guarantee against wholly arbitrary deprivations of liberty is equally applicable in safeguarding the Eighth Amendment's bedrock guarantee against the arbitrary or capricious imposition of the death penalty. Like findings of fact, state court findings of aggravating circumstances often require a sentencer to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'

*Lewis v. Jeffers*, 497 U. S. at 782 (quoting *Jackson v. Virginia*, 443 U. S. at 319).

> Moreover, a federal court should adhere to the *Jackson* standard even when reviewing the decision of a state appellate court that has

independently reviewed the evidence, for the underlying question remains the same. If a State's aggravating circumstances adequately perform their constitutional function, then a state court's application of those circumstances raises, apart from due process and Eighth Amendment concerns, only a question of the proper application of state law. A state court's finding of an aggravating circumstance in a particular case-including a *de novo* finding by an appellate court that a particular offense is "especially heinous . . . or depraved" -- is arbitrary or capricious if and only if no reasonable sentencer could have so concluded.

*Id.*, at 783.

### 3. AEDPA Review

Insofar as Petitioner's claim attacks the state appellate court's application of state law, this claim fails to furnish a basis for federal habeas corpus relief. *See Estelle v. McGuire*, 502 U. S. at 67-68 (federal habeas relief does not lie for errors of state law and it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions). State court rulings on matters such as the requirements of state case law bind a federal court in habeas corpus proceedings. *See Bradshaw v. Richey*, 546 U. S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Loggins v. Thomas*, 654 F.3d at 1228 ("Alabama law is what the Alabama courts hold that it is."). Thus, insofar as Petitioner argues the state appellate court erroneously construed or applied state law in affirming the Circuit Court's Sentencing Order

finding that Petitioner's capital offense was especially heinous, atrocious, or cruel, Petitioner's argument furnishes no basis for federal habeas relief.

Viewed in the light most favorable to the prosecution, the evidence at Petitioner's capital murder trial established that (1) Petitioner convinced Julie Rhodes to give him and his two companions a ride on a December evening,[102] (2) Petitioner directed Julie to a relatively quiet neighborhood,[103] (3) Julie complied in all respects with Petitioner's directives,[104] (4) when Petitioner displayed the handgun he was carrying and called her "Bitch," Julie begged him not to shoot her,[105] (5) Petitioner never instructed, directed, or asked Julie to exit her vehicle before he shot her the first time,[106] (6) Petitioner never gave Julie a reasonable opportunity to exit

---

[102] S.F. Trial, testimony of Darrell Armour, 9 SCR 885-86; testimony of Angela Jones, 9 SCR 889-92; testimony of Ginny Jones, 9 SCR 896-98; testimony of Jonathan David Garrison, 11 SCR 1269-70. Petitioner's tape-recorded statement, played during the testimony of investigator Sonny Riddle, confirmed this fact. S.F. Trial, testimony of Sonny Riddle, 11 SCR 1248.

[103] S.F. Trial, testimony of Jonathan David Garrison, 11 SCR 1270-72.

[104] *Id.*

[105] *Id.*, 11 SCR 1272-73.

[106] Petitioner's accomplice testified that (1) he and Kevin Hilburn exited Julie's vehicle when she stopped it where Petitioner instructed her to do so, (2) he saw Petitioner pull out his gun, (3) he and Hilburn ran from the vehicle, (4) he heard Julie yell "Please don't, don't shoot me," (5) he heard Petitioner yell at Julie "Bitch, you ain't going to let me out right here," (6) Julie backed out of the driveway where she had been parked, (7) he heard two gunshots and could see flashes inside the vehicle, (8) he then heard the emergency brake being pulled and tires squealing, (9) only then did he see Julie get out of the car, and (10) he then saw Petitioner push her in the back. S.F. Trial, testimony of Jonathan David Garrison, 11 SCR 1272-74.

her vehicle before he shot her the second time,[107] (7) Petitioner fatally shot Julie Rhodes twice while she was inside her vehicle and while he was in the course of committing or attempting to commit the robbery of Julie's vehicle from her,[108] (8) one of the 9 mm bullets Petitioner fired broke Julie's jaw, broke her incisors, penetrated her neck (where it damaged her larynx and jugular vein and caused a hematoma), exited her neck, entered her shoulder, exited her shoulder, and broke the driver's side front window of her vehicle,[109] (9) the other 9 mm bullet Petitioner fired entered Julie's back, broke a rib, perforated and all but eviscerated her liver, exited her abdominal wall, passed through her left thigh, and lodged in her left calf,[110] (10) severely wounded, Julie exited her vehicle and Petitioner pushed her away from the vehicle,[111] (11) Julie made her way to nearby houses, screaming for help and pounding on the doors of multiple houses, leaving blood stains along her

---

[107] *Id.* Neither Garrison nor any other witness testified they heard Petitioner direct Julie to exit the vehicle before Petitioner fired the fatal shots. Petitioner made no claim in his tape-recorded statement to police that he ever gave Julie a clear directive to exit the vehicle or that he gave her a reasonable opportunity to do so before he fired the first shot. Likewise, when Petitioner told his friend that his gun accidentally went off while he was waiving it in Julie's face while trying to get her out of the car, Petitioner did not expressly state that he ever instructed or directed Julie to get out of the vehicle, or that he gave her a reasonable opportunity to do so, before he fired the first shot. S.F. Trial, testimony of Jason Scott Mitchell, 10 SCR 975.

[108] S.F. Trial, testimony pof Jonathan David Garrison, 11 SCR 1268-75.

[109] S.F. Trial, testimony of Dr. Alfredo Paredes, 9 SCR 724, 726-28, 733-36.

[110] *Id.*, testimony of Dr. Alfredo Paredes, 9 SCR 724-26, 733-36.

[111] S.F. Trial, testimony of Jonathan David Garrison, 11 SCR 1274.

path,[112] (12) the people who responded to her cries for help found Julie bleeding profusely and covered in leaves on the front porch of a house,[113] (13) Julie was still sufficiently conscious to advise those persons that she had been shot by a black man and to express her awareness that she was dying,[114] and (14) despite her blood loss and the onset of shock, Julie repeated her assessment that she was dying to the two paramedics who arrived to transport her to the hospital and to one of the surgeons who treated her at the hospital in Alexander City.[115]

Alabama law defines "especially heinous, atrocious, or cruel" as encompassing those "conscienceless or pitiless homicides which are unnecessarily torturous to the victim." *Ex parte Key*, 891 So. 2d 384, 389 (Ala.) (quoting *Ex parte Kyzer*, 399 So. 330, 334 (Ala. 1981)), *cert. denied*, 543 U. S. 1005 (2004).

Judged by any rational standard, Julie Rhodes's death was extremely painful physically (her injuries included a fractured jaw, broken teeth, a fractured rib, ruptured liver, damaged larynx and jugular vein, a neck hematoma, and bullet

---

[112] S.F. Trial, testimony of Billy Alexander, 8 SCR 535-38; testimony of Lynn Alexander, 8 SCR 541-46; testimony of Ricky Price, 8 SCR 572-75; testimony of Debra Price, 8 SCR 578-79.

[113] *Id.*

[114] S.F. Trial, testimony of Billy Alexander, 8 SCR 538; testimony of Lynn Alexander, 8 SCR 543; testimony of Debra Price, 8 SCR 579.

[115] S.F. Trial, testimony of Jeff Mosley, 8 SCR 585-86; testimony of Randall Wiggins, 8 SCR 591-92; testimony of Dr. Daniel Lowe, 8 SCR 637.

wounds in her jaw, neck, shoulder, back, abdomen, left thigh and left calf).[116] The injuries Petitioner inflicted upon her were equally traumatic emotionally: she was fully aware of her impending demise throughout the time it took emergency medical personnel to arrive at the scene and transport her to the hospital where, upon reaching the emergency room and prior to being intubated, she told one of her surgeons she knew she was dying.[117] The jury and trial judge could rationally have concluded the evidence established beyond a reasonable doubt that Julie's death was "unnecessarily torturous," *i.e.*, involved prolonged suffering, which took place while she was fully aware of her dire circumstances.

The circumstances of Petitioner's fatal shooting of Julie demonstrated his utter disregard for her life and the pain he inflicted upon her. While Petitioner told an acquaintance that his gun accidentally went off while he was shaking it in Julie's face in an effort to get her out of the vehicle, Petitioner did not tell the same friend that he ever gave Julie a reasonable opportunity to exit her vehicle before his gun

---

[116] In addition to the forensic pathologist who performed Julie's autopsy, *see* S.F. Trial, testimony of Dr. Alfredo Paredes, 9 SCR 721-40, one of the surgeons who operated on her at the hospital in Alexander City testified in graphic detail about the heroic efforts of his surgical team to cut down Julie's ankle to permit installation of an IV, tie off the bleeding veins in her neck, tie off what were essentially the ruptured fragments of her liver to slow the massive bleeding in her abdomen, and stabilize her sufficiently to allow her transport to Birmingham. S.F. Trial, testimony of Dr. Daniel Lowe, 8 SCR 636-40.

[117] *See* note 112.

went off the first time, possibly in her face.[118]  Nor did Petitioner offer his friend or the law enforcement officer to whom Petitioner later gave his tape-recorded statement any rational explanation as to why he fired a *second* shot at Julie from a completely different angle after the first, allegedly accidental, misfiring of his handgun.  A prosecution witness who heard a pair of shots fired in the relevant neighborhood on the evening in question testified the second shot did not immediately follow the first.[119]  Petitioner offered his acquaintances who questioned him after the shooting no rational explanation for his failure to either remove Julie from her vehicle without resort to shooting her or to take her to the hospital after he shot her.  Petitioner told another acquaintance he had shot a girl but did not know if he had killed her.[120]  Not until Petitioner and his companions returned to Guntersville did Petitioner first claim his shooting of Julie Rhodes was accidental.[121]  For these reasons, the state trial judge could reasonably have concluded the evidence

---

[118] S.F. Trial, testimony of Jason Scott Mitchell, 10 SCR 975-76.

[119] S.F. Trial, testimony of Jackie Mobley, 8 SCR 562 (describing the two shots she heard as "not real fast together.").  For this reason, the jury and sentencing court could reasonably have concluded Petitioner's self-serving statement in his audio-taped statement to police that his gun twice misfired in rapid succession "boom, boom," was not credible.  There was no evidence showing Petitioner instructed or directed Julie to exit her vehicle after he shot her the first time.  From Jonathan David Garrison's trial testimony, *see* S.F. Trial, testimony of Jonathan David Garrison, 11 SCR  1274, a rational factfinder could reasonably have inferred that Julie's vehicle was in motion at the time both shots were fired and that it came to a stop only after the second shot, when the parking brake was pulled.

[120] S.F. Trial, testimony of Jonathan David Garrison, 11 SCR 1277.

[121] *Id.*. 11 SCR 1282-83.

established beyond a reasonable doubt that Petitioner's fatal shooting of Julie Rhodes was "conscienceless and pitiless."

### 4. Conclusions

Viewed in the light most favorable to the prosecution, the evidence at Petitioner's trial fully supported the trial judge's conclusion that Petitioner's capital offense was "especially heinous, atrocious, or cruel compared to other capital offenses." The state appellate court's rejection on the merits of Petitioner's challenge to the trial judge's finding that Petitioner's capital offense was heinous, atrocious, or cruel was neither contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's trial. Paragraphs 203-05 in Petitioner's federal habeas corpus petition do not warrant federal habeas relief.

## E. Failing to Consider Petitioner's Age as a Mitigating Circumstance

### 1. State Court Disposition

The fact that Petitioner was eighteen years of age on the date of his capital offense is not subject to rational dispute. The state trial court instructed the jury at the punishment phase of trial that it could consider Petitioner's age as a mitigating

factor to be weighed against the aggravating factors identified by the prosecution.[122]

In his Sentencing Order, the trial judge addressed the Petitioner's age as a mitigating factor in the following manner:

> 7.  The age of the defendant at the time of the crime.  The defendant was nineteen [sic] years of age.  He was a wise and experienced nineteen [sic] year old person, who exhibited all the traits of a person who influenced others, had had some worldly experience, and had been out on his own.  There is nothing significant about his age that indicates that he had led a very sheltered life, or that he was not acquainted with the ways of the world.  A consideration of the acquaintances he made and the lifestyle he led, together with the fact that two years earlier he had been involved in a serious felony, convinces this Court that age is not a real factor.
>
> 8.  At the sentencing phase before the jury, the defendant offered nothing in particular regarding anything other than the available statutory factors.  At the pre-sentencing hearing before the Court, the defendant offered nothing other than these factors, including the pre-sentence investigation report.  Nevertheless, the Court has considered everything available to the Court in making this determination.  Defendant was reared by parents who were either divorced or separated, with the defendant living variously with one or the other.  When he was with his father, he moved from place to place.  He apparently had a good relationship with his family and reports no adverse events during his adolescent years.  He received some schooling, mostly in Virginia.  He has a GED equivalent.  There is nothing especially remarkable about his background.  There is nothing to indicate to this Court that he is not a person based on background and experience that would not know right from wrong at the age of nineteen [sic].  Age should not mitigate this crime.[123]

---

[122] 12 SCR 1440 ("Certainly, as the defense has suggested, you can take into consideration the age of the defendant.").  Insofar as Petitioner asserts the trial court "refused to instruct the jury that age was one of the attributes of a defendant that the State Legislature intended juries to take into account in determining an appropriate sentence for capital murder" (Doc. #1, at p. 57, ¶ 206), that assertion is factually inaccurate.

[123] 4 SCR 797-98; 23 SCR (Tab R-52) at 797-98.

In his fourth claim in his brief on direct appeal, citing only to § 13A-5-51 of the Alabama Code, Petitioner argued the trial court failed to give Petitioner's age sufficient consideration as a mitigating factor and erroneously found the aggravating circumstances substantially outweighed the mitigating circumstances.[124]    The Alabama Court of Criminal Appeals rejected these arguments on the merits and found (1) Petitioner failed to raise a timely objection on this basis at trial, (2) the record indicated the trial court fully considered all of the Petitioner's proffered mitigating evidence in determining the existence of statutory or non-statutory mitigating circumstances, (3) the trial court allowed Petitioner to introduce evidence of his age in mitigation and instructed the jury that it could consider age as a mitigating factor, and (4) the trial court "considered age as a mitigating factor and, in its discretion, properly found it was not a mitigating factor." *Barksdale v. State*, 788 So. 2d at 908 (quoting the language from the trial court's Sentencing Order set forth above).

Petitioner urged a slightly more elaborate version of the same claim as his eleventh ground for relief in his Rule 32 petition.[125]    In its Order issued January 6,

---

[124] 13 SCR (Tab R-31), at p. 21.

[125] 15 SCR 46-48 (arguing the trial court erroneously failed to give any consideration to Petitioner's age as a mitigating circumstance when weighing the aggravating circumstances against the mitigating circumstances).

2003, the Circuit Court summarily dismissed this claim on the basis it had been raised on appeal.[126]  In its Memorandum issued August 24, 2007 affirming the trial court's denial of Petitioner's Rule 32 petition, the Alabama Court of Criminal Appeals noted that while Petitioner raised this claim in his Rule 32 petition, he did not include the same argument in his brief on appeal and, thereby abandoned this claim.[127]

### 2.  Clearly Established Federal Law

A plurality of the Supreme Court held in *Lockett v. Ohio*, 438 U. S. 586, 604 (1978), that the Eighth and Fourteenth Amendments require that a capital sentencer ordinarily not be precluded from considering as a mitigating factor any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence of less than death.  In *Eddings v. Oklahoma*, 455 U. S. 104, 114-16 (1982), the Supreme Court applied its holding in *Lockett* to conclude that a sentencer may not refuse to consider, as a matter of law, any relevant mitigating evidence, including the defendant's youth at the time of the offense and the defendant's "violent background."

### 3.  AEDPA Review

---

[126] 15 SCR 190; 23 SCR (Tab R-23), at p. 190.

[127] 23 SCR (Tab R-58), at p. 69-70.

The Alabama capital sentencing statute identifies the age of a defendant as a statutory mitigating factor. *Ala. Code § 13A-5-51(7).* Contrary to the Petitioner's arguments in his Rule 32 petition, the state trial judge did instruct the jury on age as a mitigating factor and did not "refuse" or "fail" to consider Petitioner's youth as a mitigating circumstance in his sentencing decision. Rather, as the Alabama Court of Criminal Appeals correctly noted in its opinion affirming Petitioner's conviction and sentence on direct appeal, it is clear the trial court considered Petitioner's age as a mitigating circumstance but determined, in light of Petitioner's background and the aggravating circumstances in Petitioner's capital offense, that Petitioner's youth did not carry much weight as a mitigating factor and did not mandate the imposition of a life sentence.

The trial judge's Sentencing Order was the antithesis of a "refusal" or "failure" to consider the Petitioner's age as a mitigating circumstance. In his Sentencing Order, the trial judge took great pains to explain why, in view of the Petitioner's background (as set forth in Petitioner's pre-sentence report) and the context of Petitioner's capital offense, the Petitioner's youth did not carry much weight as a mitigating circumstance. The trial judge's Sentencing Order may have used in-artful language (*i.e.*, "age is not a real factor"). The Alabama Court of Criminal Appeals' opinion affirming Petitioner's sentence may have been equally ambiguous (*i.e.*, "the trial court considered age as a mitigating factor and, in its

discretion, properly found it was not a mitigating factor"). The word choices in the Sentencing Order and appellate opinion do not alter the fact the state trial court expressly considered Petitioner's youth as a mitigating factor but determined (in light of the evidence presented at trial and the information about Petitioner's background contained in Petitioner's pre-sentence report) that Petitioner's youth at the time of his capital offense did not justify a life sentence. Upon *de novo* review, the trial judge's Sentencing Order was wholly consistent with the Supreme Court's holdings in *Lockett* and *Eddings*.

## 4. Conclusions

Petitioner's argument that the state trial court failed to instruct the jury that it could consider Petitioner's age as a mitigating factor is factually inaccurate, conclusively refuted by the record, and potentially a violation of *Rule 11(b)(3), Fed.R.Civ.P.* The Alabama appellate court's rejection on the merits during Petitioner's direct appeal of Petitioner's complaint about the state trial court's alleged failure or refusal to consider Petitioner's age as a mitigating circumstance was neither contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and direct appeal

proceedings. Paragraphs 206-07 of Petitioner's federal habeas corpus petition do not warrant federal habeas corpus relief.

## F. Alabama's Method of Execution

### 1. State Court Disposition

On December 12, 1996, Petitioner filed a post-trial motion seeking to prohibit the imposition of a sentence of death in which he argued that the sentencing jury's recommendation was not binding on the trial court and Alabama's capital sentencing scheme, which permitted a trial court to override a jury's recommendation, violated equal protection principles.[128] Nothing in that motion attacked the method of execution then employed by the State of Alabama. Despite that fact, Petitioner's fifth ground for relief in his direct appeal brief cited the sentencing court's implicit denial of this motion and argued Alabama's method of execution (electrocution) violated the Eighth Amendment's prohibition against cruel and unusual punishment.[129] The Alabama Court of Criminal Appeals rejected this argument on the merits. *Barksdale v. State*, 788 So. 2d at 908-09.

### 2. Clearly Established Federal Law

In *In re Kemmler*, 136 U. S. 436, 446-49 (1890), the United States Supreme Court denied federal habeas corpus relief and upheld electrocution as a method of

---

[128] 4 SCR 776-79.

[129] 13 SCR (Tab R-31), at pp. 22-23.

execution in an Eighth Amendment challenge to the State of New York's adoption of electrocution as a means of executing an inmate convicted of murder in the first degree. In 2015, the United States Supreme Court upheld, against an Eighth Amendment challenge, the exact same three-drug lethal injection execution protocol authorized under current Alabama law. *See Glossip v. Gross*, 135 S. Ct. 2726, 2737-38 (2015) (holding a condemned prisoner challenging a lethal injection protocol must establish that "the State's lethal injection protocol creates a demonstrated risk of severe pain [and] must show that the risk is substantial when compared to the known and available alternatives" (quoting *Baze v. Rees*, 553 U. S. 35, 61 (2008).[130]

### 3. AEDPA Review

Petitioner identifies no Supreme Court opinion striking down as a violation of the Eighth Amendment's prohibition against cruel or unusual punishments any of the methods of execution currently authorized by Alabama law. This court's independent research has identified no such legal authority. Petitioner has alleged no specific facts showing that either any method of execution currently authorized by Alabama law creates a demonstrated risk of severe pain or the risk is substantial when compared to the known and available alternatives. Allegations in a federal habeas corpus petition must be factual and specific, not conclusory. *Harris v.*

---

[130] Alabama has since adopted nitrogen hypoxia as an elective method of execution. *Ala. Code § 15-18-82.1 (effective June 1, 2018).*

*Commn'r, Ala. Dep't of Corr.*, 874 F.3d 682, 691 (11th Cir. 2017), *cert. denied*, 2018 WL 1509511 (May 29, 2018); *Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011), *cert. denied*, 565 U. S. 1120 (2012).

### 4. Conclusions

The Alabama appellate court's rejection on the merits during Petitioner's direct appeal of Petitioner's Eighth Amendment challenge to the State of Alabama's method of execution was neither contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and direct appeal proceedings. Paragraph 208 of Petitioner's federal habeas corpus petition does not warrant habeas corpus relief.

## G. Equal Protection Challenges to Alabama's Capital Sentencing Scheme

### 1. State Court Disposition

Petitioner's post-trial motion seeking to prohibit the imposition of a sentence of death attacked the judicial override aspect of Alabama's capital sentencing

scheme as a violation of Equal Protection principles.[131]   On direct appeal, Petitioner's fifth ground for relief argued Alabama's judicial override provision effectively prevented uniform state appellate review of the imposition of death sentences.[132]  The Alabama Court of Criminal Appeals rejected this argument on the merits, finding Petitioner's Equal Protection argument unsubstantiated by any allegation of purposeful discrimination.  *Barksdale v. State*, 788 So. 2d at 909.

In his tenth claim for relief in his Rule 32 petition, Petitioner argued his conviction and death sentence were the products of racial bias because his two co-defendants were white and were offered deals by the state to testify against Petitioner, while Petitioner was never asked if he possessed information regarding the guilt of his co-defendants.[133]  The trial court held this complaint was procedurally barred because it could have been but was not raised on direct appeal.[134]   The Alabama Court of Criminal Appeals pointed out Petitioner failed to challenge on appeal the trial court's summary dismissal of this claim.[135]

## 2.  Clearly Established Federal Law

---

[131] 4 SCR 776-79.

[132] 13 SCR 23.

[133] 15 SCR 45-46.

[134] 15 SCR 190; 23 SCR (Tab R-56), at p. 44.

[135] 22 SCR (Tab R-51) Attachment B , at p. 69; 23 SCR (Tab R-58), at p. 69.

A defendant who alleges an equal protection violation has the burden of proving the existence of purposeful discrimination and that the purposeful discrimination had a discriminatory effect on him. *McCleskey v. Kemp*, 481 U. S. 279, 292 (1987). Thus, to prevail under the Equal Protection Clause, a criminal defendant must prove that the decision-makers in his case acted with discriminatory purpose. *Id.*

### 3. AEDPA & *De Novo* Review

"To demonstrate an equal protection claim, a prisoner must demonstrate that he is similarly situated to other prisoners who received more favorable treatment and the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis." *Sweet v. Sec'y, Dep't of Corr.*, 467 F.3d 1311, 1318-19 (11th Cir. 2006), *cert. denied*, 550 U. S. 922 (2007). Like Sweet, Petitioner's equal protection claim fails because he has not shown that he was treated differently from other, similarly situated prisoners.[136] Like McCleskey, Petitioner offers no evidence and no facts specific to his own case that would support an inference that racial considerations played a part in his

---

[136] Insofar as Petitioner complained in his Rule 32 petition that Petitioner was not offered a plea bargain while his two, white, co-defendants were offered the chance to plead guilty and receive life sentences in exchange for their testimony against Petitioner, this argument is unpersuasive. Petitioner was not similarly situated with either of his co-defendants. It is undisputed that neither of Petitioner's co-defendants fatally shot Julie Rhodes. The Petitioner's written and audio-recorded statements to law enforcement belie any claim that either of his co-defendants had any direct role (*i.e.*, other than as accessories) in causing the death of Julie Rhodes.

sentence. The fact that Petitioner is black and Julie Rhodes is white, standing alone, does not establish either purposeful discrimination by Petitioner's jury or sentencing judge or different treatment of Petitioner from other, similarly situated prisoners. The sentencing judge accepted the jury's 11-1 recommendation in favor of a sentence of death; thus, Petitioner's complaints about allegedly inconsistent application of the judicial override provision of Alabama's former capital sentencing statute have no application to his case.[137] Petitioner alleges no facts showing the existence of purposeful discrimination or that the purposeful discrimination had a discriminatory effect on him. Allegations in a federal habeas corpus petition must be factual and specific, not conclusory. *Harris v. Commn'r, Ala. Dep't of Corr.*, 874 F.3d at 691; *Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d at 1061.

### 4. Conclusions

The Alabama appellate court's rejection on the merits during Petitioner's direct appeal of Petitioner's conclusory Equal Protection challenge to the State of Alabama's capital sentencing scheme was neither contrary to, or involved an

---

[137] Petitioner alleged no facts and presented no evidence during his Rule 32 proceeding showing there has been any racial animus in the decisions of Alabama trial judges to override capital jury recommendations of sentences of life without parole and to impose sentences of death. Petitioner likewise presents this court with no specific facts and no evidence showing any racial bias exists in the application of judicial overrides in Alabama capital sentencing proceedings. Moreover, Petitioner alleges no facts showing there was any racial animus in connection with his trial judge's decision to accept the jury's capital sentencing recommendation.

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and direct appeal proceedings. Upon independent, *de novo*, review there is no arguable merit to the conclusory equal protection claim contained in Petitioner's tenth claim in his Rule 32 petition. Paragraphs 209-10 of Petitioner's federal habeas corpus petition are without arguable legal or factual support, do not warrant federal habeas corpus relief, and potentially violate *Rule 11(b)(1), (b)(2), & (b)(3), Fed.R.Civ.P.*

## H. Double Jeopardy Claim

### 1. State Court Disposition

In his sixth ground for relief on direct appeal, Petitioner argued his indictment was "fatally defective" because it was duplicitous, multiplicitous, and allowed the State to present different theories of capital murder when there was actually only one theory to sustain a capital murder verdict, in violation of the Double Jeopardy principles announced by the Supreme Court in *United States v. Dixon*, 509 U. S. 699 (1993), and *Blockburger v. United States*, 284 U. S. 299 (1932).[138] The Alabama Court of Criminal Appeals rejected this argument on the merits after concluding

---

[138] 13 SCR (Tab R-31), at pp. 24-26.

Petitioner had been convicted of two counts of capital murder that each charged him with the intentional killing of Julie Rhodes but under separate theories that contained elements not contained in the other. *Barksdale v. State*, 788 So. 2d at 910.

## 2. Clearly Established Federal Law

The Double Jeopardy Clause of the Fifth Amendment states that no person shall be "subject to the same offense to be twice put in jeopardy of life or limb"; it protects against successive prosecutions for the same offense after acquittal or conviction and against multiple criminal punishments for the same offense. *See Bravo-Fernandez v. United* States, 137 S. Ct. 352, 357-58, 363 (2016) (the Double Jeopardy Clause does not bar retrial after a jury returned irreconcilably inconsistent verdicts of conviction and acquittal and the convictions were later vacated for legal error unrelated to the inconsistency); *Monge v. California*, 524 U. S. 721, 727-28, 734 (1998) (the Double Jeopardy Clause does not preclude retrial on a prior conviction allegation in a noncapital sentencing context); *Hudson v. United States*, 522 U. S. 93, 99 (1997) (the Double Jeopardy Clause protects against multiple criminal punishments for the same offense); *Schiro v. Farley*, 510 U. S. 222, 229 (1994) (the Double Jeopardy Clause protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense). The Clause guarantees that the State shall not be permitted to make repeated attempts to convict the accused, thereby

subjecting him to the embarrassment, expense, and ordeal of multiple trials and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty. *Blueford v. Arkansas*, 566 U. S. 599, 605 (2012); *Schiro v. Farley*, 510 U. S. at 229-30. Where, however, there is no threat of either multiple punishment or successive prosecutions, the Double Jeopardy Clause is not offended. *Schiro v. Farley*, 510 U. S. at 230; *United States v. Wilson*, 420 U. S. 332, 344 (1975).

### 3. AEDPA Analysis

The short answers to Petitioner's Double Jeopardy argument are (1) Petitioner was subjected to neither multiple nor successive prosecutions for the same offense, *i.e.*, Petitioner was tried only once for the capital murder of Julie Rhodes, and (2) there was only one criminal punishment imposed upon him, *i.e,*, despite the wording of the Petitioner's Sentencing Order there is no allegation before this court that the State of Alabama plans to execute Petitioner more than once.[139] Petitioner's single trial for capital murder did not violate any of the principles underlying the Double

---

[139] The Petitioner's jury recommended by identical eleven-to-one margins that a sentence of death be imposed in connection with each of the two counts of capital murder the Circuit Court submitted at the punishment phase of Petitioner's capital murder trial. 12 SCR 1448-51; 4 SCR 690-91. The jury's consistent recommendations on both theories of capital murder thus did not create an inconsistency that might have undermined the validity of Petitioner's capital sentence. The Circuit Court's Sentencing Order provides that "the defendant be and he is sentenced to death by electrocution for each of two counts of capital murder previously described in this Order." 4 SCR 800. The very nature of the death penalty makes that criminal punishment incapable of repetition.

Jeopardy Clause discussed by the Supreme Court in *Blueford*. Thus, the prohibitions of the Double Jeopardy Clause simply have no application to Petitioner's capital murder trial, conviction, and sentence of death.[140]  Contrary to the arguments underlying Petitioner's Double Jeopardy Claim, the rule of statutory construction applied in *Blockburger* does not preclude the imposition of multiple punishments in a single trial where separate and distinct statutes authorize such multiple punishments. *See Missouri v. Hunter*, 459 U. S. 359, 368 (1983) ("[S]imply because two criminal statutes may be construed to proscribe the same conduct under the *Blockburger* test does not mean that the Double Jeopardy Clause precludes the imposition, in a single trial, of cumulative punishments pursuant to those statutes.").

In the course of Petitioner's direct appeal, both Petitioner and the Alabama Court of Criminal Appeals focused their respective arguments and analyses on the issue of whether Petitioner's indictment, trial, and convictions under multiple factual theories of capital murder violated the rule announced by the Supreme Court in *Blockburger v. United States*. The problem with Petitioner's *Blockburger* argument, and the Alabama Court of Criminal Appeals' *Blockburger* analysis, is that the Supreme Court's holding in *Blockburger* has no application to the facts of

---

[140] The sufficiency of a state indictment is an issue on federal habeas corpus review only if the indictment was so deficient the convicting court was deprived of jurisdiction. *DeBenedictis v. Wainwright*, 674 F.2d 841, 842 (11th Cir. 1982).  Petitioner alleges no facts showing his indictment was so defective as to deprive the circuit court of jurisdiction to try the capital murder charge against Petitioner.

Petitioner's capital murder trial.  *See Illinois v. Vitale*, 447 U. S. 410, 416 (1980) (holding the *Blockburger* standard is used to determine whether two offenses are the same for purposes of barring *successive* prosecutions).  Petitioner was not subjected to either successive trials or cumulative punishments.

In *Blockburger*, the Supreme Court addressed whether the constitutional rights of a criminal defendant charged with five counts of selling morphine hydrochloride (and convicted on three of those counts) were violated when he received consecutive sentences of up to five years imprisonment and separate fines of two thousand dollars on each count for which he was convicted.  Blockburger argued that he had made two of the sales for which he was convicted to the same person and, therefore, they should be considered a single offense under the applicable federal statute and two of the counts identified an identical sale.  The Supreme Court held the two sales to the same purchaser were distinct sales made at different times and the federal statute penalized *any* sale made in the absence of the requirements set forth in that statute.  *See Blockburger v. United States*, 284 U. S. at 301-02 ("Each of several successive sales constitutes a distinct offense, however closely they may follow each other.").  As to Blockburger's complaint that two of the counts of the indictment against him alleged multiple crimes arising from the same sale of narcotics, the Supreme Court noted the applicable federal statute separately penalized both selling any forbidden drug except in or from the original

stamped package and selling any of the forbidden drugs not in pursuance of a written order of the person to whom the drug is sold. *Id.*, 284 U. S. at 303-04. The Supreme Court held (1) the applicable rule for determining whether the same act or transaction constitutes a violation of two distinct statutory provisions is whether each provision requires proof of a fact which the other does not, (2) the two statutory prohibitions each required proof of a different element, (3) applying the relevant test, both sections of the statute were violated by the same sale, and (4) two separate offenses were committed. *Id.*, 284 U. S. at 304. Blockburger made multiple sales of illicit narcotics, some to the same purchaser. In contrast, the offense of murder with which the Petitioner was charged is not capable of repetition; nor did Petitioner's criminal conduct result in multiple deaths.

Petitioner's capital offense involved a single murder victim and, necessarily, constituted a single criminal offense.[141] Contrary to Petitioner's arguments on direct appeal, the indictment against Petitioner did not charge him with multiple criminal offenses.[142] Rather, what the indictment against Petitioner did charge was multiple

---

[141] Regardless of whether Petitioner was charged in three separate indictments, in three separate counts in the same indictment, or in three paragraphs within the same count of a single indictment, Julie Rhodes was murdered only once. This indisputable fact distinguishes Petitioner's capital offense from the multiple drug trafficking offenses with which Blockburger was charged. The Supreme Court's opinion in *Blockburger* addressed the statutory construction of the federal narcotics statute; it did not hold that multiple statutory theories of the same capital murder constitute separate and distinct criminal offenses for Double Jeopardy purposes. There is simply no United States Supreme Court authority for the latter principle.

[142] Even if Petitioner's indictment could be construed as somehow charging him under applicable state law with multiple criminal offenses arising from his fatal shooting of Julie Rhodes,

the fact that (1) Petitioner was tried in a single criminal proceeding, (2) the jury returned unanimous guilty verdicts as to each count of the indictment submitted to the jury at the guilt-innocence phase of trial, and (3) Petitioner received a sentence which by its very nature can be carried out only once, the prohibitions of the United States Constitution's Double Jeopardy Clause would still have no application to Petitioner's case. Because his jury returned unanimous guilty verdicts to each count against him, any error in the manner in which Petitioner's indictment was drawn did not rise above the level of harmless error under the standard set forth in *Brecht v. Abrahamson*, 507 U. S. 619, 623 (1993).

This court is well aware that, the United States Circuit Courts have uniformly adopted the rule that a federal indictment is "multiplicitous" if it charges a single offense in more than one count and that a multiplicitous federal indictment violates Double Jeopardy principles. *See, e.g., United States v. Davis*, 854 F.3d 1276, 1286 (11th Cir.) ("A multiplicitous indictment 'violates double jeopardy principles by giving the jury more than one opportunity to convict the defendant for the same offense.'"), *cert. denied*, 138 S. Ct. 379 (2017); *United States v. Gonzalez*, 834 F.3d 1206, 1219 (11th Cir. 2016) ("An indictment, therefore, violates the Double Jeopardy Clause if it is multiplicitous -- that is, 'if it charges a single offense in more than one count.'"); *United States v. Woerner*, 709 F.3d 527, 538-41 (5th Cir.) (recognizing two different species of "multiplicity," *i.e.*, first when a criminal defendant is charged with violating two different statutes, one of which is arguably the lesser included offense of the other (wherein the *Blockburger* test of whether each offense requires proof of an element that the other does not applies); and second charges for multiple violations of the same statute predicated on arguably the same criminal conduct (wherein the court must ask whether separate and distinct prohibited acts, made punishable by law, have been committed)), *cert. denied*, 571 U. S. 859 (2013); *United States v. Reagan*, 596 F.3d 251, 253 (5th Cir. 2010) ("An indictment is multiplicitous if it charges a single offense in multiple counts, thus raising the potential for multiple punishment for the same offense, implicating the Fifth Amendment double jeopardy clause."); *United States v. Chiaradio*, 684 F.3d 265, 272 (1st Cir.) (holding (1) a prosecution is multiplicitous when the government charges a defendant twice for what is essentially a single crime, (2) determining whether an indictment is multiplicitous requires examination of whether a particular course of illegal conduct constitutes one or multiple offenses; and (3) legislative intent is paramount in resolving this issue), *cert. denied*, 568 U. S. 1004 (2012); *United States v. Stefanidakis*, 678 F.3d 96, 100-01 (1st Cir. 2012) (holding the defendant's prosecution, conviction, and sentencing for both possession and transportation of child pornography did not violate the *Blockburger* rule); *United States v. Cacace*, 796 F.3d 176, 186 n.6 (2nd Cir. 2015) (holding (1) multiple punishments are the constitutional harm to be avoided by the prohibition against multiplicitous indictments, (2) for double jeopardy to be implicated, the multiplicity must occur in a fashion that rise to the possibility of multiple punishments, and (3) where the alleged multiplicity appears not in separate counts but in separate racketeering predicate acts that are components of a single overall count of racketeering conspiracy, the danger imposed is an improper conviction based on legally insufficient evidence), *cert. denied sub nom. Gioeli v. United States*, 136 S. Ct. 856 (2016); *United States v. Josephburg*, 459 F.3d 350, 355 (2nd Cir. 2006) ("Where there has been no prior conviction or acquittal, the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed."); *United States v. Hodge*, 870 F.3d 184, 193 (3rd Cir. 2017) ("multiplicity is the charging of a single offense in separate counts of the indictment. A multiplicitous indictment risks subjecting a defendant to multiple sentences for the same offense,

an obvious violation of the Double Jeopardy Clause's protection against cumulative punishment." (quoting *United States v. Kennedy*, 682 F.3d 244, 254-55 (3rd Cir. 20012)); *United States v. Pollen*, 978 F.2d 78, 83 (3rd Cir. 1992) ("A multiplicitous indictment charges the same offense in two or more counts and may lead to multiple sentences for a single violation, a result prohibited by the Double Jeopardy Clause."), *cert. denied*, 508 U. S. 906 (1993); *United States v. Shrader*, 675 F.3d 300, 313 (4th Cir.) ("The rule against multiplicity is rooted in the Double Jeopardy Clause of the Fifth Amendment, which serves both the familiar function of prohibiting 'successive prosecutions for the same offense' as well as 'the imposition of cumulative punishments for the same offense in a single criminal trial.'"), *cert. denied*, 568 U. S. 1049 (2012); *United States v. Goodine*, 400 F.3d 202, 207 (4th Cir. 2005) ("the 'signal danger' of a multiplicitous indictment is that a defendant might thereby receive multiple punishments for the same crime."); *United States v. Vichitvongsa*, 819 F.3d 260, 272-74 (6th Cir.) (reviewing and rejecting multiplicity claims that the evidence at trial showed but a single conspiracy to commit multiple violations of the Hobbs Act and drug trafficking offenses), *cert. denied*, 137 S. Ct. 79 (2016); *United States v. Richards*, 659 F.3d 527, 547 (6th Cir. 2011) ("'Generally, an indictment may not charge a single criminal offense in several counts without offending the rule against 'multiplicity' and implicating the double jeopardy clause.' Where an indictment includes more than one count charging the same statutory violation, the question is whether Congress intended the facts underlying each count to constitute a s separate unit of prosecution." (citations omitted)), *cert. denied*, 566 U. S. 1043 (2012); *United States v. Ajayi*, 808 F.3d 1113, 1123 (7th Cir. 2015) ("A multiplicitous indictment charges a single offense as separate counts. It exposes the 'defendant to the threat of receiving multiple punishments for the same offense in violation of the Double Jeopardy Clause of the Fifth Amendment.'" (citation omitted)); *United States v. Snyder*, 189 F.3d 640, 646-47 (7th Cir. 1999) ("It is well settled that the government may not charge a single offense in several counts. The purpose of this rule is to prevent multiple punishments for the same act, in violation of the Double Jeopardy Clause of the Fifth Amendment." (citation omitted)), *cert. denied*, 528 U. S. 1097 (2000); *United States v. Sandstrom*, 594 F.3d 634, 651 (8th Cir.) ("A multiplicitous indictment is impermissible because the jury can convict the defendant on both counts, subjecting the defendant to two punishments for the same crime in violation of the double-jeopardy clause . . . ."), *cert. denied*, 562 U. S. 878 (2010); *United States v. Hoover*, 543 F.3d 448, 455-46 (8th Cir. 2008) (holding indictment was not multiplicitous where two counts charged the defendant with using a firearm in connection with a drug trafficking offense, resulting in the deaths of two different individuals); *United States v. Teague*, 722 F.3d 1187, 1190 (9th Cir. 2013) (holding that while the government could indict and prosecute defendant for both receipt and possession of child pornography, multiple punishments for both counts were impermissible because possession is a lesser included offense of receipt); *United States v. Mancuso*, 718 F.3d 780, 791 (9th Cir. 2013) ("An indictment is multiplicitous when it charges multiple counts for a single offense, producing two penalties for one crime and thus raising double jeopardy questions."); *United States v. Benoit*, 713 F.3d 1, 16 (10th Cir. 2013) ("'Multiplicity refers to multiple counts of an indictment which cover the same criminal behavior." The doctrine has no application in cases in which two counts are based on 'two distinct sets of conduct.'"); *United States v. Barrett*, 496 F.3d 1079, 1095 (10th Cir. 2007) (although multiplicity is not fatal to an indictment, multiplicitous sentences violate the Double Jeopardy Clause), *cert. denied*, 552 U. S. 1260 (2008); *United States v. Cooper*, 886 F.3d 146, 149 (D.C. Cir. 2018) ("'Charging the same offense in more than one count' -- 'a problem known as multiplicity' -- is 'a defect in the indictment.'").

*theories* of a single capital offense, *i.e.*, allegations that Petitioner intentionally

fatally shot Julie Rhodes with a deadly weapon (1) during the course of robbing her,

(2) while Julie Rhodes was in a vehicle, and (3) while Petitioner was in a vehicle.

Under applicable Alabama statute, each of the three circumstances listed in

Petitioner's indictment was sufficient to raise the Petitioner's fatal shooting of Julie

Rhodes to a capital offense.  *See Ala. Code §13A-5-40(a)(2), (a)(17), & (a)(18).*[143]

Nothing in the Double Jeopardy Clause or any other provision in the

Constitution prevented or prohibited the State of Alabama from charging Petitioner

with multiple theories underlying a single offense of capital murder.  Where two

---

Petitioner does not identify any instance in which the United States Supreme Court has ever applied the rule against multiplicity in *federal* indictments to strike down a *state* capital murder conviction or death sentence where a capital murder defendant was charged with a single capital murder under multiple statutory theories.  This court's independent research has likewise disclosed no such legal authority.  As the authorities surveyed above make clear, the rule against multiplicity in federal indictments finds its genesis in the Double Jeopardy Clause's prohibition against multiple criminal *punishments* for the same offense.  Because of the nature of the death penalty, a state court judgment purporting to impose multiple death sentences for a single capital murder conviction is necessarily a *non sequitur*.  The constitutional principle underlying the rule against multiplicitous indictments has little efficacy in the context of capital sentencing.  If a capital sentencing jury determines that a criminal defendant's offense satisfies a statutory theory of capital murder available under applicable state law, the defendant can be subjected to only one criminal punishment -- either the application of a procedure ending in death or a term of life imprisonment.  Hence, the Double Jeopardy principle underlying the doctrine against multiplicity in federal criminal indictments has no application to capital sentencing.  As explained in detail below, nothing in the Fifth Amendment prohibits a state from prosecuting a criminal defendant under multiple theories of capital murder in a single trial.

[143] No opinion is expressed regarding the efficacy or legitimacy of the trial court's decision not to submit the third factual theory of capital murder to the jury at the guilt-innocence phase of trial despite the overwhelming evidence in the record showing Petitioner fired the fatal shots while he was inside Julie Rhodes's vehicle.  In any event, Petitioner was not prejudiced by the Circuit Court's decision not to submit the third count of Petitioner's indictment to the jury.

statutory sections operate independently of one another, as is the case with the Alabama capital murder statute's list of those criminal acts which elevate an ordinary murder to the level of capital murder, there is no bar to the Government's proceeding with prosecution simultaneously under the two statutes. *Ball v. United States*, 470 U. S. 856, 860 (1985). In such circumstances, the Double Jeopardy Clause imposes no prohibition to *simultaneous* prosecutions. *Id.*, 470 U. S. at 860 n.7. Even where the Double Jeopardy Clause bars cumulative punishment for a group of offenses, it does not prohibit the State from prosecuting the defendant for such multiple offenses in a single prosecution. *Ohio v. Johnson*, 467 U. S. 493, 500 (1984).

The Supreme Court discussed the application of this rule in the context of capital murder prosecutions in *Schad v. Arizona*, 501 U. S. 624, 631 (1991): "Our cases reflect a long-established rule of the criminal law that an indictment need not specify which overt act, among several named, was the means by which a crime was committed." The four-Justice plurality in *Schad* cited several of that court's prior opinions, as well as Rule 7(c)(1) of the *Federal Rules of Criminal Procedure*, for the rule that, in cases of murder, it is "immaterial whether death was caused by one means or the other." *Id.*[144] Concurring separately, Justice Scalia explained the

---

[144] The Supreme Court plurality in *Schad* explained the principle in question applied to both the manner in which an offense was charged in an indictment and the manner in which the jury was charged at the guilt-innocence phase of trial: "We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone." *Schad v. Arizona*, 501 U. S. at 631. "We see no reason, however, why the rule that the jury need not agree as to mere

rationale for this long-established rule: "As the plurality observes, it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission. That rule is not only constitutional, it is probably indispensable in a system that requires a unanimous jury verdict to convict." *Schad*, 501 U. S. 649-50 (Scalia concurring and citations omitted).[145]

That the Alabama Court of Criminal Appeals applied the *Blockburger* standard to analyze the multiple theories underlying the capital murder charge against Petitioner and reject Petitioner's Double Jeopardy claim on the merits does not mandate relief under the AEDPA. On the contrary, under the AEDPA, federal habeas corpus review of the state appellate court's decision rejecting Petitioner's Double Jeopardy claim on the merits must focus on the state appellate court's ultimate decision or ultimate conclusion and not the rationale for that decision set forth in the state appellate court's opinion. *See Harrington v. Richter*, 562 U. S. 86, 98-99 (2011) (holding § 2254(d) bars re-litigation of any claim adjudicated on the merits in state court subject only to statutory exceptions, the statute refers only to a

means of satisfying the *actus reus* element of an offense should not apply equally to alternative means of satisfying the element of *mens rea*." *Id.*, 501 U. S. at 632 (emphasis in original).

[145] Justice Scalia explained the practical application of the rule as follows: "When a woman's charred body has been found in a burned house, and there is ample evidence that the defendant set out to kill her, it would be absurd to set him free because six jurors believe he strangled her to death (and caused the fire accidentally in his hasty escape), while six others believe he left her unconscious and set the fire to kill her." *Id.*, 501 U. S. at 650.

"decision" which resulted in an "adjudication," and there is no requirement that a state court issue an opinion explaining its reasoning); *Gill v. Mecusker*, 633 F.3d 1272, 1291 (11th Cir.) (the precise question that must be answered under the AEDPA standard must focus on the state court's ultimate conclusion, not the reasoning set forth in the state court's opinion), *cert. denied*, 565 U. S. 1084 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U. S. at 101.

The state appellate court's rejection on the merits of Petitioner's Double Jeopardy claim was wholly consistent with the Supreme Court's holding in *Schad v. Arizona*, recognizing that when multiple methods of committing a single capital murder are available under applicable state law and supported by the evidence, the State is free to charge multiple theories underlying that criminal offense and the jury is not required to unanimously agree on which of the theories it believes support a finding of guilt beyond a reasonable doubt. *See Sims v. Singletary*, 155 F.3d 1297, 1313 (11th Cir. 1998) (holding that a Florida jury did not need to agree on the precise theory of first degree murder; that a general verdict was permissible (citing *Schad v. Arizona*, 501 U. S. at 644-45)), *cert. denied sub nom. Sims v. Moore*, 527 U. S. 1025 (1999). Petitioner has identified no Supreme Court authority holding that, where there is but a single victim, separate theories of capital murder authorized under state

statute must satisfy the *Blockburger* standard. *See Coe v. Bell*, 161 F.3d 320, 348 (6th Cir. 1998) ("Admittedly, it is acceptable for a first-degree murder conviction to be based on two alternative theories even if there is no basis to conclude which one (if only one) the jury used." (citing *Schad v. Arizona*, 501 U. S. at 636-37), *cert. denied*, 528 U. S. 842 (1999). This court's independent research has identified no such Supreme Court authority. Indeed, the Supreme Court's holding in *Schad* precludes such a rule. Nothing in clearly established Supreme Court precedent mandates the reversal of Petitioner's capital conviction or sentence based upon Double Jeopardy principles.[146]

### 4. Conclusions

The Alabama appellate court's rejection on the merits during Petitioner's direct appeal of Petitioner's Double Jeopardy claim was neither contrary to, or involved an unreasonable application of, clearly established Federal law, as

---

[146] Under the non-retroactivity rule adopted by the Supreme Court in *Teague v. Lane*, 489 U. S. 288, 310 (1989), a new constitutional rule of criminal procedure, such as that advocated by Petitioner in his federal habeas corpus petition and brief in support, will not be applicable to those cases which have become final before the new rules are announced unless one of two exceptions applies. Those two exceptions are for new rules which either place certain kinds of primary, private individual conduct beyond the power of criminal law-making authority to proscribe or require the observance of those procedures that are implicit in the concept of ordered liberty. *Teague v. Lane*, 489 U. S. at 307. The new Double Jeopardy rule advocated by Petitioner, *i.e.*, a prohibition on a State charging and trying a criminal defendant with multiple theories of capital murder underlying a single capital offense, does not fall within either of these two exceptions. To adopt the new Double Jeopardy principle advocated by Petitioner in this case would require this court to ignore the Supreme Court's holding in *Schad* and all those Supreme Court opinions cited by the *Schad* plurality. This court is not authorized to do so in the context of this federal habeas corpus proceeding.

determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and direct appeal proceedings. Paragraphs 211-12 of Petitioner's federal habeas corpus petition do not warrant habeas corpus relief.

## I. Improper Prosecutorial Jury Argument at Guilt-Innocence Phase

### 1. State Court Disposition

In his seventh ground for relief on direct appeal, Petitioner argued that the prosecutor's closing guilt-innocence phase jury argument improperly equated Petitioner with the Nazis and Hitler.[147] The Alabama Court of Criminal Appeals rejected this argument on the merits:

> An examination of the record does not indicate that the prosecutor's remark, in the context in which it was made was intended to inflame the passion of the jury, or to be a comment on the appellant's character, nor would the jury have considered it that way when the comment is viewed within the entire charge. It was not calculated to produce a wrongful conviction. The prosecutor was attempting to make a historical analogy to the evidence in the case. The comment was not a statement of fact, but merely an argument of the prosecutor in drawing an inference from the evidence.

---

[147] 13 SCR (Tab R-31), at pp. 27-29.

*Barksdale v. State*, 788 So. 2d at 911.   The state appellate court concluded the comment was not improper in the context of the entire argument.   *Id.*, 788 So. 2d at 912-13.

Petitioner's trial counsel argued the testimony showing there was pleasant conversation about music inside Julie's car prior to the shooting belied the prosecution's contention that Petitioner planned to rob Julie.[148]   In response, during the prosecutor's final closing argument, the following exchanges occurred:

> [MR. CLARK]:  When I was a kid -- you know, when I was a kid and I did something I shouldn't have done, if I managed to have done it without any witnesses, and i didn't get caught, and the evidence of what I had done later, you know, a broken lamp or broken window or whatever it was, was discovered later, and I knew nobody had the goods on me, if my daddy said "Rea, did you do this?"
>
> I might say, "No, Daddy, I didn't do it."
>
> Deny it.  You know, hope you get lucky.  Deny it.  But if you get caught, you get caught, somebody, you know, my little brother saw me do it, "Rea, did you do this?  Billy said did you."
>
> "Yes, Daddy, I did it.  It was an accident.  It was an accident." Whether it was or wasn't, you know.  That's sort of the way you go depending on how tough the pressure is on you, you know.  It was an accident.  It was accident.  And, that's all that happened in this case, ladies and gentlemen.  They got back up there among some of his running buddies, some of whom were female, word gets back up there that there's a girl killed in Alex City and they are driving around in her car, blood in it, bullet holes in the window, or a hole in the window. "What about it, Tony, did you kill this girl in Alex City?"
>
> "It was an accident.  It was an accident."
>
> It was an accident twice.  It was not an accident with the seconds between the shots.  It was not an accident with no holes in the back seat,

---

[148] 12 SCR 1350-51.

no holes in the back of the seat, no holes in the floor, no holes in the roof, no holes in him. There are aimed, cocked shots.

Now, friendly conversation in the car. Is that a reason to doubt or is that something that makes perfect sense to you based on everything else that you heard, considering where he was at the moment, in the back seat and looking for a place to pull this off. Heck, the Nazis used to have orchestras playing for the Jews . . . .

MR. GOGGANS: Objection, Your Honor.

THE COURT: Yes, that may be just a little extreme.

MR. CLARK: Well, the point is: Putting your victim at ease, you know. I am not saying he is a member of that group.

MR. GOGGANS: Your Honor, I object to this and move for a mistrial.

THE COURT: I'm going to deny it. He didn't say that. Don't infer it. Don't even talk about that.

MR. CLARK: I don't infer that at all. The point is putting your victim at ease for what purpose? For what purpose? For what purpose? To make them easy to handle until you are ready. Until you are ready. Keep them calm until you are ready. And, that is all he did. That was what the conversation was. That is what the conversation was.

Now, the friendly stranger. Antione Harris. Antione Harris told the police I think she may have known Josh. I think she may have known Tony. The only problem with that is that -- and, he said he thought he had seen her somewhere. Well, later, in a telephone conversation, he asked Barksadale, "Did you know her? Did you know her?"

And, he said "No." he said no.

And, Garrison -- Garrison told you that while she was still in the car with him, still in the car with him, he asked her what her name was -- what her name was. She happen [sic] to be the victim that presented the opportunity at the time they were looking for one.

Now, there's nothing about Charlotte Lane that is an unlikely scenario in that kind of crime. Nothing whatsoever. The shopping center, but not Charlotte Lane. Not Charlotte Lane.[149]

## 2. Clearly Established Federal Law

---

[149] 12 SCR 1367-69.

In reviewing the propriety of prosecutorial closing argument, the relevant question is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U. S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U. S. 637, 642 (1974)).

### 3. AEDPA Review

To find prosecutorial misconduct warranting a new trial, the Eleventh Circuit applies a two-pronged test: the remarks must be improper and the remarks must prejudicially affect the substantial rights of the defendant. *Conner v. GDCP Warden*, 784 F.3d 752, 769 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1246 (2017). To satisfy the second prong, the prosecutor's improper comments must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (quoting *Darden v. Wainwright*, 477 U. S. at 181). In determining whether prosecutorial arguments are sufficiently egregious to result in the denial of due process, the Eleventh Circuit considers the statements in the context of the entire proceeding, including factors such as (1) whether the remarks were isolated, ambiguous, or unintentional; (2) whether there was a contemporaneous objection by defense counsel; (3) the trial court's instructions; and (4) the weight of aggravating and mitigating factors. *Conner v. GDCP Warden*, 784 F.3d at 769 (quoting *Land v.*

*Allen*, 573 F.3d 1211, 1219-20 (11th Cir. 2009), *cert. denied*, 559 U. S. 1072 (2010)).[150]

Federal courts recognize as proper four areas for prosecutorial jury argument: (1) summation of the evidence; (2) reasonable inferences drawn from the evidence; (3) replies or answers to opposing counsel's argument; and (4) pleas for law enforcement and justice.[151]

---

[150] The same standard applies to allegedly improper prosecutorial arguments at the *sentencing* phase of a capital murder trial. *See Price v. Allen*, 679 F.3d 1315, 1326 (11th Cir. 2012) (holding a federal habeas corpus petitioner "must show that 'there has been a violation of due process,' which 'occurs if, but only if, the improper argument rendered the sentencing stage trial fundamentally unfair.'" (quoting *Romina v. Head*, 253 F.3d 1349, 1366 (11th Cir. 2001), *cert. denied*, 535 U. S. 1011 (2002)), *cert. denied*, 568 U. S. 1212 (2013). "An improper prosecutorial argument has rendered a capital sentencing proceeding fundamentally unfair if there is a reasonable probability that the argument changed the outcome, which is to say that absent the argument the defendant would not have received a death sentence." *Price v. Allen*, 679 F.3d at 1326 (quoting *Romina v. Head*, 253 F.3d at 1366).

[151] *See, e.g., Norris v. Davis*, 826 F.3d 821, 832 n.10 (5th Cir. 2016) (recognizing these four areas as permissible subjects for jury argument under Texas law), *cert. denied*, 137 S. Ct. 1203 (Feb. 27, 2017); *United States v. Rios-Morales*, 878 F.3d 978, 987 (10th Cir. 2017) (holding prosecutor's assertion during closing argument that the defendant was the moving force behind a drug conspiracy an accurate summation of the trial evidence); *United States v. Oscar*, 877 F.3d 1270, 1283-84 (11th Cir. 2017) (holding prosecutor's accusation that a defense witness had testified falsely was an inference supported by the evidence at trial where other evidence contradicted portions of the witness' testimony and the witness' testimony was inconsistent); *United States v. Kiekow*, 872 F.3d 236, 254-55 (5th Cir. 2017) (holding prosecutor's comments regarding the credibility of prosecution witnesses were an appropriate rebuttal to defense counsel's argument that the prosecution witnesses had lied, where prosecution merely questioned existence of a motive for the witnesses to testify falsely and did not refer to any evidence not in the record), *cert. filed* Jan. 31, 2018 (no. 17-7619); *United States v. Hodge*, 870 F.3d 184, 203 (3rd Cir. 2017) (holding (1) "It is fundamental that counsel presenting a summation is free to repeat the evidence and even 'argue reasonable inferences from the evidence,' as long as counsel refrains from misstating the evidence" and (2) prosecutor's reiteration of a witness' trial testimony during closing argument did not constitute a basis for reversal); *United States v. Melton*, 870 F.3d 830, 841 (8th Cir. 2017) (quoting *United States v. Robinson*, 110 F.3d 1320, 1327 (8th Cir.), *cert. denied*, 522 U. S. 975 (1997): "So long as prosecutors do not stray from the evidence and the reasonable inferences that may be drawn from it, they, no less than defense counsel, are free to use colorful and forceful language in their arguments to the jury" and holding prosecutor's comments

suggesting a defendant testified falsely at trial because they were based on the evidence and highlighted the reasons why the prosecutor believed the defendant's testimony was not credible); *United States v. Walker-Couvertier*, 860 F.3d 1, 12 (1st Cir. 2017) ( holding prosecutor's argument in drug conspiracy trial that defendant obtained a second weapon after another weapon had been seized was a reasonable inference from the evidence), *cert. filed* Feb. 6, 2018 (no. 17-7674); *United States v. Klemis*, 859 F.3d 436, 443 (7th Cir. 2017) (holding prosecutor's comments on the deleterious effects of heroin abuse encapsulated reasonable and commonsense inferences that arose from uncontroverted evidence, particularly a physician's testimony regarding how heroin affects the body and a prosecutor may properly comment on a witness's credibility if the comment reflects reasonable inferences from the evidence adduced at trial rather than personal opinion); *United States v. Ponzo*, 853 F.3d 558, 583 (1st Cir. 2017) (holding prosecutor's statements suggesting defendant would advance within a racketeering conspiracy if a particular person were killed a reasonable inference from the testimony in evidence), *cert. filed* Oct. 27, 2017 (no. 17-624); *United States v. Jackson*, 849 F.3d 540, 554 (3rd Cir. 2017) ("the role of the 'prosecutor is to argue in summation' what inferences to draw from the evidence"); *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 852 (6th Cir. 2017) (holding (1) prosecutors must be given leeway to argue reasonable inferences from the evidence and (2) a prosecutor has no less right to discuss a jury's duty to impose the death penalty if legally warranted than defense counsel has the right to discuss a jury's duty to acquit (or give a life sentence) if legally warranted); *United States v. Flournoy*, 842 F.3d 524, 528 (7th Cir. 2016) (holding it was appropriate for prosecutor to respond to defense counsel's argument about the government's failure to call a witness by pointing out the defendant had the power to subpoena witnesses); *United States v. Miller*, 799 F.3d 1097, 1106-07 (D.C. Cir. 2015) (holding the prosecutor's closing arguments about a witness's testimony amounted to proper summary of that testimony and the prosecutor's references to the defendant as a "con man" or "con artist" were permissibly tied to specific conduct charged in the indictment charging conspiracy to defraud), *cert. denied*, 137 S. Ct. 47 (2016); *United States v. Alcantrara-Castillo*, 788 F.3d 1186, 1195 (9th Cir. 2015) (prosecutor's argument that the testimony of a particular prosecution witness was "consistent, believable, and logical," a proper instance of the prosecutor drawing an inference from the evidence rather than offering an impermissible personal opinion on the witness' credibility); *United States v. Vazquez-Larrauri*, 778 F.3d 276, 283-84 (1st Cir. 2015) (while it is improper for the prosecutor to personally vouch for the credibility of a witness or to assert a personal belief in the defendant's guilt, it is permissible for the prosecution to offer specific reasons why a witness ought to be accepted as truthful by the jury -- such as fact cooperating witness's testimony put him and his family in danger or witness's plea bargain agreement required witness to testify truthfully); *United States v. Johnson*, 767 F.3d 815, 824-25 (9th Cir. 2014) (prosecution may not comment on the defendant's failure to testify but may properly call attention to the defendant's failure to present exculpatory evidence -- such as expert testimony rebutting prosecution's DNA evidence), *cert. denied*, 136 S. Ct. 688 (2015); *United States v. Woods*, 764 F.3d 1342, 1247 (10th Cir. 2014) (holding it was proper for prosecutor to argue the fact prosecution witnesses had pleaded guilty to conspiring to distribute methamphetamine rendered their trial testimony more credible in meth conspiracy trial), *cert. denied*, 135 S. Ct. 1866 (2015); *United States v. Garcia*, 758 F.3d 714, 724 (6th Cir.) (prosecutor's argument that prosecution witness accused by defense of testifying falsely would have spun a more persuasive yarn had the witness decided to lie was proper responsive jury argument and not an improper personal comment on witness's credibility), *cert. denied*, 135 S. Ct. 498 (2014);

Alabama law likewise recognizes as appropriate these same four areas of prosecutorial jury argument.[152]

---

*Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014) (prosecutor's jury argument which quoted trial testimony of victim (identifying the defendant as the assailant) and then asserted the defendant "did it" not an improper assertion of prosecutor's personal opinion as to defendant's guilt); *United States v. Adkins*, 743 F.3d 176, 187 (7th Cir.) (prosecutor may comment on veracity of a witness if that comment is immediately preceded by the prosecutor's argument that corroborating evidence showed the witness's testimony to be truthful), *cert. denied*, 134 S. Ct. 2864 (2014); *United States v. Poole*, 735 F.3d 269, 277 (5th Cir. 2013) (as long as a prosecutor's characterization of the testifying defendant "as a liar" is reasonably seen as drawing conclusions from, and is actually supported by, the evidence, the prosecutor does not commit error); *United States v. Runyon*, 707 F.3d 475, 513-14 (4th Cir. 2013) (prosecutor's opening and closing jury arguments contrasting the criminal justice system's treatment of criminal defendant with the defendant's treatment of his murder victim was proper; the prosecutor's argument that the jury should not grant the defendant mercy because the defendant showed no mercy to his victim or the victim's family was proper; "It is, of course, perfectly permissible for the prosecution to urge the jury not to show a capital defendant mercy."; and prosecutor's argument suggesting kidnaping, robbery, and murder victim suffered "mental torture" while being held at gunpoint by the defendant prior to victim's death a proper inference from the evidence presented), *cert. denied*, 135 S. Ct. 46 (2014); *Bryant v. Caldwell*, 484 F.2d 65, 66 (5th Cir. 1973) (prosecutor's reference to the defendant's character and his appeal to the jury to convict for the sake of the safety of the community were well within the permissible scope of jury argument for a Georgia prosecutor), *cert. denied*, 415 U. S. 981 (1984).

[152] *See Henderson v. State*, 248 So. 3d 992, 1036-38 (Ala. Crim. App. Feb. 10, 2017) (there is no impropriety in a prosecutor appealing to the jury for justice and to properly perform its duty -- such comments are nothing more than proper pleas for justice), *cert. filed* Jan. 25, 2018 (no. 17-7546); *Bohannon v. State*, 222 So. 3d 457, 500-05 (Ala. Crim. App. 2015) (holding (1) "The test of a prosecutor's legitimate argument is that whatever is based on facts and evidence is within the scope of proper comment and argument." (2) the prosecutor may present his impressions from the evidence, argue every legitimate inference from the evidence, and "examine, collate, sift, and treat the evidence in his own way," (3) the prosecutor may urge the jury to use common sense in determining the defendant's guilt, (4) the prosecutor is entitled to argue forcefully for the defendant's conviction, and (5) the prosecutor may reply in kind to the argument of defense counsel), *aff'd*, *Ex parte Bohannon*, 222 So. 3d 525 (Ala. 2016), *cert. denied*, 137 S. Ct. 831 (2017); *Bohannon v. State*, 222 So. 3d at 520-22 (holding prosecutor may properly argue to the jury that a death sentence is appropriate and respond in rebuttal to the arguments of defense counsel); *Shanklin v. State*, 187 So. 3d 734, 793 (Ala. Crim. App. 2014) (prosecutor properly argued that, based upon other evidence presented at trial, a witness was incorrect in some of the details of her trial testimony but correct about other details -- such argument was a reasonable inference from the totality of the evidence presented), *cert. denied*, (Ala. Aug. 28, 2015), *cert. denied*, 136 S. Ct. 1467 (2016); *Brown v. State*, 74 So. 3d 984, 1017 (Ala Crim. App. 2010) ("While it is never proper for the prosecutor to express his personal opinion as to the guilt of the

Contrary to Petitioner's assertion, nothing in the prosecutor's comment about the Nazis having an orchestra playing at their concentration camps amounted to a direct comparison of Petitioner with Hitler. In fact, the prosecutor never mentioned or alluded to Hitler by name or otherwise. Petitioner's own trial counsel urged the jury to consider the testimony showing Petitioner and Julie engaged in "pleasant conversation" prior to the fatal shooting and suggested this evidence negated the prosecution's theory that Petitioner was then planning to rob Julie. The thrust of the prosecutor's argument in rebuttal, *i.e.*, the prosecutor's suggestion that Petitioner engaged in pleasant conversation with Julie for the purpose of keeping Julie calm until Petitioner was ready to rob her, was an eminently reasonable and permissible inference drawn from the evidence then before the jury. The jury could reasonably have inferred from the testimony before it that Petitioner chose not to rob Julie near the shopping center where she picked up Petitioner, Garrison, and Hilburn (where many people were watching the Christmas parade) and Petitioner chose instead to

accused during closing argument, reversible error does not occur when the argument complained of constitutes mere expression of opinion concerning inferences, deductions and conclusions drawn from the evidence." (quoting *Allen v. State*, 659 So. 2d 135, 139 Ala. Crim. App. 1994)), *aff'd*, 74 So. 3d 1039 (Ala. 2011), *cert. denied*, 565 U. S. 1111 (2012); *Gobble v. State*, 104 So. 3d 920, 970 (Ala. Crim. App. 2010) (prosecutor's opening statement that defendant did not want her child back and that the child's injuries occurred one of two ways -- through abuse or an automobile accident -- were supported by evidence showing the defendant relinquished her parental rights and a medical expert opined at trial the child's injuries could have been caused either in an automobile accident or from child abuse), *cert. denied*, (Ala. Sept. 14, 2012), *cert. denied*, 569 U. S. 927 (2013); *Minor v. State*, 914 So. 2d 372, 421 (Ala. Crim. App. 2004) (holding pleas for justice appropriate), *cert. denied*, 914 So. 2d 372 (Ala. 2004), *cert. denied*, 548 U. S. 925 (2006).

wait until they were in a far more remote location to rob her. Thus, the gist of the prosecutor's argument was a proper rebuttal to the guilt-innocence phase jury argument first made by Petitioner's trial counsel and based upon reasonable inferences drawn from the evidence.

The prosecutor's allusion or "historical analogy" to the prisoner orchestras which played at Nazi concentration camps was hyperbolic and arguably improper. Nonetheless, in the context of the Petitioner's trial, the prosecutor's comment did not render the guilt-innocence phase of Petitioner's capital murder trial fundamentally unfair. The prosecutor's comment about the Nazis was isolated and drew a swift objection from Petitioner's trial counsel. The trial judge just as swiftly rebuked the prosecutor and instructed the prosecutor on the record not to complete the analogy the prosecutor was attempting to draw. The prosecutor abided by the trial judge's instructions and made no further reference to the Nazis.

Viewed in the light most favorable to the jury's verdict, the evidence of Petitioner's guilt was overwhelming. Petitioner admitted he was inside Julie Rhodes's vehicle when two shots from his gun struck her. Garrison and another witness each testified that, earlier that same day, the Petitioner expressed a desire to "jack" someone and a preference for robbing one person, rather than a couple of people. Garrison testified without rebuttal that Julie begged Petitioner not to shoot her but Petitioner did - twice. The uncontroverted testimony of the medical examiner

established Julie was shot once in the face and once in the back. The jury could reasonably have believed Garrison's testimony that, after shooting Julie, Petitioner exited the vehicle, pushed Julie away from the vehicle, and got behind the steering wheel. It was undisputed that, immediately after the shooting, Petitioner, Garrison, and Hilburn drove away from the scene of the shooting without making any effort to obtain or render assistance to Julie or to alert anyone else who might have been able to do so. Petitioner told one acquaintance that he had shot a girl but did not know if he had killed her. When Petitioner, Garrison, and Hilburn returned to the Guntersville area, Petitioner told numerous people that he had purchased Julie's vehicle and, for the first time, asserted his fatal shooting of Julie had been accidental.

Considering all the circumstances, the prosecutor's isolated remark about the Nazis did not prejudicially affect the substantial rights of the defendant. There is simply no reasonable probability that the prosecutor's reference to the Nazis playing music changed the outcome of the guilt-innocence phase of Petitioner's capital murder trial. The Alabama Court of Criminal Appeals could have reasonably concluded the prosecutor's isolated remark did not rise above the level of harmless error.

### 4. Conclusions

The Alabama appellate court's rejection on the merits during Petitioner's direct appeal of Petitioner's claim based upon the prosecution's alleged improper

guilt-innocence phase jury argument was neither contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and direct appeal proceedings. Paragraphs 213-15 of Petitioner's federal habeas corpus petition do not warrant habeas corpus relief.

## J. Consideration of All Aggravating Factors at Punishment Phase

### 1. State Court Disposition

At the punishment phase of Petitioner's capital murder trial, the trial judge instructed the jury that if it were convinced beyond a reasonable doubt of the existence of any of three, specific aggravating circumstances, the jury could consider and weigh those factors when making its sentencing recommendation; those factors were (1) the Petitioner was previously convicted of a felony involving the use or threat or violence to a person, (2) Petitioner committed this capital offense while he was engaged in or was an accomplice in the commission of or attempt to commit the crime of robbery, and (3) the offense was especially heinous, atrocious, or cruel compared to other capital offenses.[153]   In his Sentencing Order, the trial judge

---

[153] 12 SCR 1437-38.

concluded these same three aggravating circumstances had been established by the evidence.[154]

In his eighth ground for relief on direct appeal, Petitioner argued the sentencing court erred in considering as aggravating circumstances the facts, which the jury concluded at the guilt-innocence phase of trial had been established beyond a reasonable doubt, that the Petitioner intentionally shot Julie Rhodes both while he was engaged in the robbery or attempted robbery of Julie Rhodes and while she was inside a vehicle.[155] The Alabama Court of Criminal Appeals rejected these arguments on the merits:

> Moreover, our statutes allow "double-counting" or "overlap" and provide that the jury, by its verdict of guilty of the capital offense, finds the aggravating circumstances encompassed in the indictment to exist beyond a reasonable doubt. See §§13A-5-45(e) and (50). "The fact that a particular capital offense as defined in section 13A-5-4(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence. § 13A-5-50."

*Barksdale v. State*, 788 So. 2d at 913 (quoting *Coral v.* State, 628 So. 2d 954, 965-66 (Ala. Crim. App. 1992), *aff'd*, 628 So. 2d 1004 (Ala. 1993), *cert. denied*, 511 U. S. 1012 (1994)).

> Clearly, § 13A-5-50 provides that a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in § 13A-5-49. Further, this court has repeatedly held that the use of an element of capital murder in such a way does not, as the appellant

---

[154] 15 SCR 96-103; 23 SCR (Tab R-52), at pp. 790-96.

[155] 13 SCR (Tab R-31), at pp. 30-33.

argues, punish a defendant twice for the same offense. "A capital punishment scheme, under which the same felony may form the basis of an essential element of the crime and an aggravating circumstance for consideration by the jury in recommending a sentence does not constitute a denial of the guarantee against double jeopardy."

*Id.*, at 913-14 (quoting *Burton v.* State, 651 So. 2d 641, 657-58 (Ala. Crim. App. 1993), aff'd, 651 So. 2d 659 (Ala. 1994), *cert.* denied, 514 U. S. 1115 (1995)).

Petitioner presented a somewhat similar argument as his thirteenth claim for relief in his Rule 32 petition.[156] The state trial court concluded Petitioner had procedurally defaulted on this claim by failing to raise it at trial and because it was raised on direct appeal.[157] The Alabama Court of Criminal Appeals noted that Petitioner did not include any complaint about the trial court's disposition of this claim in Petitioner's appeal from the denial of his Rule 32 petition.[158]

## 2. Clearly Established Federal Law

In *Jones v. United States*, 527 U. S. 373, 398 (1999), the Supreme Court declined to adopt the rule underlying Petitioner's eighth claim before the Alabama Court of Criminal Appeals: "We have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the 'double counting' theory . . . . What we have said is that the weighing process

---

[156] 15 SCR 49-50.

[157] 15 SCR 191.

[158] 23 SCR (Tab R-58), at p. 69.

may be impermissibly skewed if the sentencing jury considers an invalid factor." *Jones*, 527 U. S. at 398 (citation omitted).

In their opinion dissenting from the denial of certiorari in *Wiley v. Mississippi*, 479 U. S. 906 (1986), Justices Marshall and Brennan argued, as had a dissenting Justice in the Mississippi Supreme Court, that a "single legally indivisible act of the defendant may rationally aggravate a murder but once." *Wiley v. Mississippi*, 479 U. S. at 305-06 (Marshall and Brennan dissenting).

### 3. AEDPA Review

At no point in the trial court's punishment phase jury instructions did the trial judge instruct the jury to consider as an aggravating circumstance the fact the Petitioner fatally shot Julie Rhodes while she was inside a vehicle. Nor did the trial court's Sentencing Order mention the evidence establishing this undisputed fact as supporting an independent aggravating circumstance. Thus, insofar as Petitioner argued before the Alabama Court of Criminal Appeals that the sentencing jury and sentencing court improperly considered as an aggravating circumstance the evidence showing the Petitioner fatally shot Julie Rhodes while she was inside a vehicle, Petitioner's argument was premised upon a factually inaccurate assertion. There is nothing in the record currently before this court even remotely suggesting, much less establishing, that either the Petitioner's sentencing jury or sentencing court actually considered the fact Petitioner shot Julie Rhodes while she was inside a vehicle as an

aggravating circumstance when weighing the aggravating and mitigating circumstances at the punishment phase of trial.

Insofar as Petitioner argues his sentencing jury and the sentencing court were constitutionally precluded from considering the evidence showing Petitioner fatally shot Julie Rhodes while in the course of robbing her, Petitioner argues for the adoption of a new rule of constitutional criminal procedure, a rule the Supreme Court has not yet adopted. The new rule advocated by Petitioner falls within neither of the two narrow categories of cases recognized by the Supreme Court in *Teague v. Lane* as exceptions to the general rule against applying new rules of criminal procedure within the context of a federal habeas corpus proceeding. Petitioner's proposed rule neither places certain kinds of primary, private individual conduct beyond the power of criminal law-making authority to proscribe nor requires the observance of those procedures that are implicit in the concept of ordered liberty. *Teague v. Lane*, 489 U. S. at 307. Therefore, this court is precluded from adopting this new rule in the context of this federal habeas corpus proceeding.

Moreover, the new rule advocated by Petitioner would warp the capital sentencing weighing process in jurisdictions such as Alabama by preventing the sentencing jury and sentencing judge from considering and giving weight to the very evidence which justified holding a capital sentencing proceeding in the first place.

In *Lowenfield v. Phelps*, 484 U. S. 231 (1988), the Supreme Court confronted

a Louisiana capital murder conviction premised upon the jury's conclusion at the guilt-innocence phase of trial that the defendant knowingly created a risk of death or great bodily harm to more than one person.  Lowenfield complained that the sole aggravating circumstance found by the jury at the sentencing phase of his trial and upheld by the Supreme Court of Louisiana merely duplicated this same element of his capital murder charge and, thereby, violated the Eighth Amendment.  The Supreme Court rejected this argument, explaining what it perceived to be the proper role of "aggravating circumstances":

> The use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrrowing the class of death-eligible persons and thereby channeling the jury's discretion.  We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase.

*Lowenfield v. Phelps*, 484 U. S. at 244-25.  After discussing its precedents addressing the nature of the constitutionally mandated narrowing function implicit in capital sentencing, the Supreme Court declared as follows:

> It seems clear to us from this discussion that the narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses, as Texas and Louisiana have done, so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase.
> Here, the "narrowing function" was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that "the offender had a specific intent to kill or to inflict great bodily harm upon more than one person."  The fact that the sentencing is also required to find the existence of an aggravating

circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm. There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion. The Constitution requires no more.

*Id.*, 484 U. S. at 246.

Unlike the Texas and Louisiana capital sentencing schemes the Supreme Court discussed in *Lowenfield*, the Alabama capital sentencing scheme performs the constitutionally mandated narrowing function at the punishment phase of trial by requiring a weighing of aggravating and mitigating factors. Petitioner's proposed new rule would distort the constitutionally mandated narrowing function by prohibiting both the judge and jury from considering (as part of the weighing process) the very evidence the jury unanimously concluded supported a finding that a capital murder, as defined by Alabama statute, had been established beyond a reasonable doubt. To adopt the new rule advocated by Petitioner, *i.e.*, to prohibit the sentencing jury and sentencing court from considering and weighing as an aggravating factor the evidence concerning the nature of the offense which the jury unanimously concluded at the guilt-innocence phase of trial had been established beyond a reasonable doubt, would skew the capital sentencing weighing process in a manner that is neither logical nor constitutionally mandated. The Supreme Court held in *Lowenfield* that such a rule was not required by the Eighth Amendment's

prohibition against cruel and unusual punishment.  Petitioner has cited no Supreme

Court opinion holding such a rule is mandated by either the Due Process or Double

Jeopardy Clauses of the Fifth Amendment or the Due Process or Equal Protection

Clauses of the Fourteenth Amendment.[159]  This court's independent research has

revealed no Supreme Court majority opinion prohibiting the "double counting" of

which Petitioner complains.  On the contrary, the Supreme Court majority's failure

to adopt such a rule in *Jones* and *Wiley* furnishes at least some indication that no

such rule of constitutional criminal procedure currently exists.[160]

---

[159] Petitioner's citations in his Rule 32 petition to the Supreme Court's opinions in *Gregg v. Georgia*, 428 U. S. 153, 197 (1976), *Zant v. Stephens*, 462 U. S. 862, 877 (1983), and *North Carolina v. Pearce*, 395 U. S. 711, 717 (1969), are unpersuasive.  None of these opinions prohibits a sentencing jury's consideration at the punishment phase of a capital murder trial of aggravating factors or circumstances the same jury unanimously concluded at the guilt-innocence phase of trial had been established under a reasonable doubt standard.

[160] Some United States Circuit Courts have adopted a rule prohibiting the double counting of aggravating factors in the course of a capital sentencing proceeding in a weighing jurisdiction. *See, e.g., Allen v. Woodford*, 395 F.3d 979, 1013 (9th Cir.) (reviewing a double-counting claim in California, a weighing jurisdiction, under a harmless error analysis), *cert. denied*, 546 U. S. 858 (2005); *Fields v. Gibson*, 277 F.3d 1203, 1218-19 (10th Cir.) (holding the applicable test for determining whether aggravating factors are duplicative is not whether certain evidence is relevant to both aggravating factors but, rather, whether one aggravating factor necessarily subsumes the other), *cert. denied*, 537 U. S. 1023 (2002); *Hale v. Gibson*, 227 F.3d 1298, 1325 (10th Cir. 2000) ("Double counting occurs when one aggravating circumstance for a crime found by the jury necessarily subsumes another aggravator found by the jury for the same crime."), *cert. denied*, 533 U. S. 957 (2001); *Hunter v. Bowersox*, 172 F.3d 1016, 1023 (8th Cir. 1999) (holding there was no improper double counting of aggravating factors where substantial evidence showed the defendant (1) had prior murder and assaultive convictions, (2) murdered one victim during a robbery, and (3) murdered the same victim during the course of murdering a second victim), *cert. denied*, 528 U. S. 1140 (2000).  The United States Circuit Courts, however, have failed to adopt a rule rigidly prohibiting consideration by a sentencing jury of the evidence supporting a finding on a factual issue that rendered the defendant eligible for the death penalty at the guilt-innocence phase of trial. *See, e.g., Patton v. Mullin*, 425 F.3d 788, 808-09 (10th Cir. 2005) (recognizing that *Jones* stands for the proposition that the Supreme Court had never held it is unconstitutional for an aggravating factor to mirror a factual finding made by the jury at the guilt-innocence phase of a capital murder

### 4. Conclusions

In the absence of any clearly established Supreme Court authority prohibiting the "double counting" about which Petitioner complains, the state appellate court's rejection on the merits of this claim during the course of Petitioner's direct appeal was neither contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and direct appeal proceedings. Paragraphs 216-17 of Petitioner's federal habeas corpus petition do not warrant habeas corpus relief.

## V. INEFFECTIVE ASSISTANCE BY TRIAL COUNSEL

### A. Overview of the Claims

In paragraphs 9 through 101 of his federal habeas corpus petition,[161] Petitioner argues that his trial counsel rendered ineffective assistance in violation of his Sixth Amendment right to counsel by failing to (1) investigate the case against Petitioner

---

trial), *cert. denied*, 547 U. S. 1166 (2006); *Coe v. Bell*, 161 F.3d 320, 350 (6th Cir. 1998) (holding there is nothing wrong with using felony murder as an aggravating circumstance), *cert. denied*, 528 U. S. 842 (1999).

[161] The next approximately 190 pages of this opinion deal with Petitioner's complaints of ineffective assistance by his state trial and appellate counsel -- complaints which Petitioner presented to the state court in such conclusory fashion the vast majority were summarily dismissed during his Rule 32 proceeding.

and present evidence showing the fatal shooting of Julie Rhodes was an accident, (2) adequately cross-examine prosecution witness Jonathan David Garrison, (3) move for a continuance and seek a new defense investigator after Garrison accepted a plea bargain on the eve of trial, (4) investigate Petitioner's background and present available mitigating evidence at the punishment phase of trial, (5) challenge the prosecution's argument (and the trial court's finding) that Petitioner's offense was "heinous, atrocious, and cruel," (6) undermine the aggravating evidence showing Petitioner had a prior conviction for armed robbery as a teenager, (7) raise a *Batson* challenge to the prosecution's use of its peremptory challenges to strike black members of the jury venire, *i.e.*, the prosecution's striking of two of the six black members of the jury venire, (8) raise a challenge to the prosecution's use of its peremptory challenges to strike female members of the jury venire, *i.e.*, the prosecution's use of sixteen of its twenty-one peremptory strikes against women, (9) raise a fair cross-section challenge to Tallapoosa County's method of choosing prospective jurors, *i.e.*, only eleven percent of Petitioner's jury venire was black while thirty-six percent of Tallapoosa County residents were black, (10) object to the prosecution's improper comparison of the Petitioner's age to the victim's age during closing jury argument at the punishment phase of trial, and (11) object to the trial court's erroneous jury instructions which failed to properly instruct the jury (a) on the burden of proof for establishing the existence of mitigating circumstances, (b)

on the jury's duty to recommend a life sentence if the mitigating and aggravating circumstances were equally balanced, (c) that it did not need to unanimously find the existence of a particular mitigating circumstances before weighing that mitigating circumstance against the aggravating factors, and (d) on the meaning of the term "life without parole," as used in the punishment phase jury instructions.[162]

## B. Overview of State Court Disposition

Petitioner presented highly conclusory versions of these same ineffective assistance claims, bereft of any fact-specific support, in his Rule 32 proceeding.[163] In an Order issued January 6, 2003, the state trial court concluded the vast majority (all but two) of Petitioner's ineffective assistance claims were not supported by any fact specific allegations and summarily dismissed them.[164]   On June 23-24, 2005, the state trial court held an evidentiary hearing on Petitioner's remaining ineffective assistance claims (*i.e.*, Petitioner's *Wiggins* claim and complaint about his trial

---

[162] As explained in detail below, the facts Petitioner asserts in support of his ineffective assistance claims are not the same facts that he asserted in support of his analogous claims in his Rule 32 proceeding.  For that reason, this court will undertake review of Petitioner's ineffective assistance claims under both the AEDPA's deferential standard of review (for the ineffective assistance claims fairly presented by Petitioner in his Rule 32 proceeding), as well as *de novo* review of the new factual theories underlying Petitioner's ineffective assistance claims asserted in this court.

[163] Petitioner's ineffective assistance claims contained in his Rule 32 petition appear at 15 SCR pp. 6-35, ⁋⁋ 8-77.

[164] Copies of the relevant portions of the circuit court's Order issued January 6, 2003 dismissing the majority of Petitioner's ineffective assistance claims appear at 15 SCR 150-85 and 23 SCR (Tab R-56) 150-85.

counsel's failure to object to the allegedly prejudicial behavior of the victim's relatives in the courtroom) and heard testimony from Petitioner's former trial counsel, Petitioner's mother, the father of a childhood friend of Petitioner, and a North Carolina attorney.[165] In an Order issued October 4, 2005, the state trial court denied the Petitioner's remaining ineffective assistance claims on the merits.[166] Petitioner appealed. In a Memorandum issued August 24, 2007, the Alabama Court of Criminal Appeals affirmed the state trial court's denial of Petitioner's Rule 32 petition.[167] On April 25, 2008, the Alabama Supreme Court denied Petitioner's petition for writ of certiorari.[168]

## C.  Clearly Established Federal Law

The Sixth Amendment entitles criminal defendants to "the effective assistance of counsel," *i.e.*, legal representation that does not (1) fall below an objective standard of reasonableness in light of prevailing professional norms and the circumstances of the defendant's case (*Wong v. Belmontes*, 558 U. S. 15, 16-17

---

[165] The testimony of Petitioner's former trial counsel, attorney Tommy Goggans, appears at 17 SCR 40-160. The testimony of Petitioner's mother, Mary Archie, appears at 17 SCR 161-233. The testimony of retired Colonel Maxwell Orin Johnson appears at 17 SCR 235-81. Finally the testimony of North Carolina attorney Ernest Lee Connor, Jr. appears at 17 SCR 284-413.

[166] The circuit court's Order issued October 4, 2005 appears at 23 SCR (Tab R-57).

[167] The Alabama Court of Criminal Appeals' Memorandum affirming the state trial court's denial of Petitioner's Rule 32 petition appears at 23 SCR (Tab R-58).

[168] 23 SCR (Tab R-59).

(2009); *Bobby v. Van Hook*, 558 U. S. 4, 7 (2009)); and (2) give rise to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (*Porter v. McCollum*, 558 U. S. 30, 38-40 (2009); *Wong v. Belmontes*, 558 U. S. at 19-20).

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U. S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, *i.e.*, establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U. S. 510, 521 (2003); *Williams v. Taylor*, 529 U. S. 362, 390-91 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.

S. at 687-91. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U. S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U. S. at 7; *Strickland v. Washington*, 466 U. S. at 688-89. It is strongly presumed that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U. S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U. S. at 534; *Strickland v. Washington*, 466 U. S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Strickland v. Washington*, 466 U. S. at 694.

In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test (such as those complaints the state courts summarily dismissed under the Texas writ-abuse statute or which petitioner failed to fairly present to the state courts), this court's review of the un-adjudicated prong is *de novo*. *See Porter v. McCollum*, 558 U. S. at 39 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005) (holding *de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U. S. at 534 (holding the same).

A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Ward v. Hall*, 592 F.3d 1144, 1163 (11th Cir.), *cert. denied*, 562 U.S. 1082 (2010); *Mills v. Singletary*, 63 F.3d 999, 1020 (11th Cir. 1995), *cert. denied*, 517 U. S. 1214 (1996); *Wiley v. Wainwright*, 709 F.2d 1412, 1413 (11th Cir. 1983). *See also Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) ("Petitioner continually bears the burden of persuasion on the constitutional issue of competence and further, (adding the prejudice element) on the issue of ineffective assistance of counsel."), *cert. denied*, 531 U. S. 1204 (2001). Under the well-settled *Strickland* standard, the

Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone*, 535 U. S. 685, 698 (2002); *Strickland v. Washington*, 466 U. S. at 690.

Under the AEDPA's deferential standard of review, claims of ineffective assistance adjudicated on the merits by a state court are entitled to a doubly deferential form of federal habeas review. The AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow,* 134 S. Ct. 10, 16 (2013). Under § 2254(d)(1), "'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *White v. Wheeler,* 136 S. Ct. 456, 460 (2015) (quoting *White v. Woodall,* 134 S. Ct. 1697, 1702 (2014)); *Harrington v. Richter,* 562 U. S. 86, 103 (2011).

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable*

application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."

*Harrington v. Richter*, 562 U. S. at 101 (citations omitted).

The state trial court's summary rejection of most of Petitioner's ineffective assistance claims in the course of Petitioner's Rule 32 proceeding constituted a ruling on the merits of those claims by the state court. Dismissal of a claim for failure to satisfy Alabama Rule of Criminal Procedure 32.6(b) constitutes a ruling on the merits, which does not give rise to a procedural default or foreclose federal habeas review of a federal constitutional claim. *See Frazier v. Bouchard*, 661 F.3d 519, 524-26 (11th Cir. 2011) (holding dismissal of ineffective assistance claim for failure to allege sufficient facts was a ruling on the merits of the *Strickland* claim and did not constitute a procedural default or otherwise bar federal habeas review of the claim), *cert. denied*, 568 U. S. 833 (2012); *Borden v. Allen*, 646 F.3d 785, 815-16 (11th Cir. 2011) ("an Alabama court's consideration of the sufficiency of the pleadings concerning a federal constitutional claim contained in a Rule 32 petition

necessarily entails a determination on the merits of the underlying claim; we cannot construe such a rule to be a state procedural bar that would preclude our review"), *cert. denied*, 566 U. S. 941 (2012); *Powell v. Allen*, 602 F.3d 1263, 1272-73 (11th Cir. 2010) (Alabama court's summary dismissal of federal constitutional claims under Rule 32.6(b) should be reviewed as a holding on the merits), *cert. denied*, 562 U. S. 1183 (2011). Thus, in evaluating Petitioner's complaints about the performance of his trial counsel which the state courts rejected on the merits in the course of Petitioner's Rule 32 proceeding, the issue before this court is whether the Alabama Court of Criminal Appeals could reasonably have concluded Petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. In making this determination, this court must consider the underlying *Strickland* standard.

## D. Failure to Present Accidental Discharge Defense

### 1. The Complaint

In paragraphs 3 and 10 through 21 of his federal habeas corpus petition, Petition argues his trial counsel rendered ineffective assistance by failing to present evidence showing that his fatal shooting of Julie Rhodes was the product of a pair of accidental shootings, *i.e.*, that the murder weapon jammed while he was trying to unload it, the gun fired while he was trying to unjam it, and the second shot was a "knee-jerk reaction to the first [shot]."

## 2. AEDPA Review of Claim in Rule 32 Petition

In paragraphs 27-29 of his Rule 32 petition, Petitioner argued in a conclusory manner that his trial counsel failed to adequately present a defense at the guilt innocence phase of trial showing the fatal shooting of Julie Rhodes was an accident.[169] Specifically, Petitioner complained in his Rule 32 petition that (1) the two witnesses called by Petitioner's trial counsel to testify as to the "accidental" nature of the fatal shooting (*i.e.*, "Joe Shirley" [sic] and Edward Peterman) failed to testify under oath that the murder weapon had ever accidentally discharged, (2) Petitioner's trial counsel failed to obtain the services of a better firearms expert, and (3) the previous owner of the gun called by Petitioner's trial counsel failed to testify the gun had ever misfired.[170]

---

[169] 15 SCR 14-15. In reviewing under the AEDPA a state court's denial of an ineffective assistance claim on the merits, a federal habeas court is limited to the factual allegations contained in the Petitioner's Rule 32 petition. *Powell v. Allen*, 602 F.3d 1263, 1273 (11th Cir. 2010), *cert. denied*, 562 U. S. 1183 (2011).

[170] There are several analytical problems with Petitioner's complaints in this portion of his Rule 32 petition. The first is that Petitioner's Rule 32 petition misidentified the firearms expert called to testify at trial on Petitioner's behalf. Petitioner's trial counsel actually called as a firearms expert a retired law enforcement officer and firearms instructor named Joe W. Shirey, not "Joe Shirley" as identified in Petitioner's Rule 32 petition. Mr. Shirey testified on direct examination by Petitioner's trial counsel that (1) he test-fired the murder weapon, (2) it was a poorly made Chinese weapon that was in bad condition and had been modified by unknown parties, (3) the gun jammed while being test-fired, and (4) when he attempted to unload the gun by cycling the slide, the gun again jammed. S.F. Trial, testimony of Joe W. Shirey, 11 SCR 1305-10. On cross-examination Mr. Shirey testified that during all testing, the murder weapon never once misfired and based upon the trajectory of the bullets that passed through Julie Rhodes' body, the murder weapon was likely higher than the points of entry into her body when it discharged. *Id.*, 11 SCR 1310-11. Petitioner's trial counsel did not object to this latter observation and Petitioner has not complained in either state court or this court about his trial counsel's failure to object to the latter observation based upon Mr. Shirey's lack of qualifications. There was no evidence showing that

The state trial court summarily rejected these ineffective assistance complaints, concluding Petitioner failed to "plead any facts which would establish prejudice."[171]  The state trial court noted that Petitioner had failed to suggest there was anyone who could have offered testimony showing the murder weapon had ever discharged accidentally.[172]  The state trial court also concluded that, while neither of the two witnesses in question testified the weapon had ever misfired, their testimony about the gun's "history of problems" and extremely poor quality generally did

---

Mr. Shirey qualified as an expert in forensic pathology.  More importantly, Petitioner alleged no facts and presented no affidavits or other evidence to the state trial court during his Rule 32 proceeding showing there was any witness (lay or expert) available at the time of Petitioner's capital murder trial who could have testified that the murder weapon could have misfired, rather than jammed, if Petitioner attempted to unload the weapon by working the slide in the manner suggested by Petitioner.

The second problem with this portion of Petitioner's complaints in his Rule 32 petition is that Edward Peterman was not called as a defense witness by Petitioner's trial counsel.  The prosecution called Mr. Peterman to testify and he stated under oath that (1) he purchased the murder weapon new from a gun dealer, (2) he had problems with the gun jamming the very first time he fired it, (3) the mechanism that pulls the bullet out of the chamber fell out of the weapon, (4) the clip that held the retainer on the side of the weapon would come loose and cause the weapon to jam, (5) the safety also had problems, *i.e.*, it would move back and forth when the gun was fired, (6) he had no idea what happened to the gun since he traded it in back in 1992, (7) he told police he had never experienced any type of accidental discharge when using the weapon, (8) the gun was a single-action semi-automatic weapon and it was necessary to cock the gun the first time to shoot it, and (9) to fire the weapon twice you have to pull the trigger twice.  S.F. Trial, Testimony of Edward Ross Peterman, 10 SCR 1091-1100.  Petitioner's trial counsel cannot reasonably be faulted for calling Mr. Peterman to testify when, in fact, Peterman was a prosecution witness.  Moreover, Petitioner alleged no facts and presented no evidence during his Rule 32 proceeding showing that Mr. Peterman could have offered any testimony beneficial to the defense had Petitioner's trial counsel asked different questions during cross-examination.

[171] 15 SCR 163.

[172] *Id.*

permit Petitioner's trial counsel to argue to the jury that the murder weapon was "a piece of junk" and it was not unthinkable that the gun could have misfired.[173]

Federal habeas corpus petitioners asserting claims of ineffective assistance based on counsel's failure to call a witness (either a lay witness or an expert witness) satisfy the prejudice prong of *Strickland* only by naming the witness, *demonstrating the witness was available to testify and would have done so*, setting out the content of the witness's proposed testimony, and showing the testimony would have been favorable to a particular defense. *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010); *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). *See also Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1262 (11th Cir. 2014) (federal habeas petitioner who failed to show an uncalled witness was available to testify at the time of trial failed to satisfy prejudice prong of *Strickland*), *cert. denied*, 135 S. Ct. 1563 (2015). Petitioner has neither identified, nor furnished an affidavit from, a firearms expert or any person possessing personal knowledge of the murder weapon who was *available* to testify at the time of Petitioner's capital murder trial, was *willing* and able to do so, and could have furnished any testimony that would have established it was possible the murder weapon accidentally discharged while Petitioner attempted to unload it by pulling the slide in the manner suggested by Petitioner.

---

[173] 15 SCR 164-65.

All three witnesses who actually did testify at Petitioner's trial with regard to the murder weapon's operation, *i.e.*, prosecution witnesses Edward Peterman and Joe Saloom, along with defense witness Joe W. Shirey, agreed the weapon jammed easily. None of them testified it was possible for the gun to discharge accidentally when being unloaded by pushing the slide. Petitioner alleged no facts before the state trial court in his Rule 32 proceeding identifying any person who was available at the time of Petitioner's capital murder trial and could have offered testimony, lay or expert, supporting Petitioner's theory that his gun accidentally discharged twice (striking Julie Rhodes in two entirely different parts of her body from two entirely different angles) while Petitioner sat in the back seat of her vehicle and attempted to unload the weapon by manipulating the slide.

It was objectively reasonable for the state trial court to conclude in the course of Petitioner's Rule 32 proceeding that Petitioner's conclusory complaints about the failure of his trial counsel to present unidentified evidence supporting Petitioner's accidental discharge theory failed to satisfy the prejudice prong of the *Strickland* analysis. It was also objectively reasonable for the state trial court to conclude there was nothing deficient in the performance of Petitioner's trial counsel with regard to cross-examination of prosecution witnesses Peterman and Saloom, the decision to present Joe Shirey as an expert witness to establish the poor quality and erratic operation of the murder weapon, or the argument to the jury that the murder weapon

was such a poorly constructed and maintained weapon that an accidental discharge was not unthinkable.

Furthermore, insofar as Petitioner argued that his trial counsel wholly failed to present an accidental discharge defense, Petitioner's ineffective assistance complaints in his Rule 32 proceeding were factually inaccurate. Petitioner's accidental discharge defense was presented to the jury at the guilt-innocence phase of trial when the prosecution presented and the trial court admitted into evidence the audiotaped recording of Petitioner's December 4, 1995 interview, in which Petitioner plainly asserted that his gun went off twice as he was trying to unload it.[174]

In light of the evidence presented at Petitioner's trial and the conclusory assertions contained in Petitioner's Rule 32 petition, the state court's denial on the merits of this portion of Petitioner's multifaceted ineffective assistance claim was neither contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's trial and Rule 32 proceeding. Because Petitioner failed to allege any facts showing there was any expert testimony available at the time of his trial to establish the gun misfired twice at the time Petitioner fatally

---

[174] S.F. Trial, testimony of Sonny Riddle, 11 SCR 1248 (Petitioner's audiotape recorded statement played in open court).

shot Julie Rhodes, this specific complaint of ineffective assistance is without arguable merit, lacks any factual support in the record, and potentially violates *Rule 11(b)(1), (b)(2), & (b)(3), Fed.R.Civ.P.*

### 3. *De Novo* Review of New Complaints in Federal Habeas Petition

The Supreme Court has emphasized that all judicial review of an attorney's performance under the *Strickland* standard must be conducted with a high degree of deference:

> Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.

*Harrington v. Richter*, 562 U. S. at 105 (citations omitted). The Eleventh Circuit of course applies this legal principle. *See Hittson v. GDCP Warden*, 759 F.3d 1210, 1248 (11th Cir. 2014) (holding that even under *de novo* review, the standard for judging counsel's representation is "a most deferential one"), *cert. denied*, 135 S. Ct. 2126 (2015).

In his federal habeas corpus petition, Petitioner argues that notes written by an unidentified person found in the files of both the District Attorney and Petitioner's trial counsel state "if the first round was an accidental discharge, the second round

could have been fired as a knee-jerk reaction to the first discharge."[175]  Petitioner

complains that his trial counsel failed to present the notes to either prosecution

witness Saloom or defense expert Shirey to authenticate the notes and failed to ask

either of these two witnesses whether the jamming of the magazine as it was being

unloaded could have caused an accidental firing.[176]  Petitioner also complains that

his trial counsel failed to call an unidentified "forensics expert who could testify that,

given the mechanical problems with the murder weapon, the shooting of Julie

Rhodes could have been accidental."[177]  Petitioner complains his trial counsel failed

to cross-examine prosecution witnesses Jason Scott Mitchell, Candace Talley, and

Brian Hampton, and failed to call as a defense witness Darryl Lynn Turner to testify

about exculpatory statements Petitioner allegedly made to them that his gun had

accidentally misfired.[178]  Petitioner complains that his trial counsel waived cross-

---

[175] Doc. # 1, at p. 6, ¶ 11.  Petitioner did not include any complaints in his Rule 32 petition about his trial counsel's failure to challenge the evidence supporting the aggravating circumstances relied upon by the prosecution at trial.  Instead, petitioner presented those ineffective assistance complaints for the first time in his brief challenging the denial of his Rule 32 petition.  20 SCR (Tab R-46), at pp. 42-53.  The Alabama Court of Criminal Appeals held in its Memorandum issued August 24, 2007 that "because Barksdale did not allege anywhere in his petition that his counsel was ineffective for not adequately investigating and arguing against the aggravating circumstances, this claim is not properly before this Court for review and will not be considered." 23 SCR (Tab R-57), at p. 31.  The Alabama Court of Criminal Appeals also noted that Petitioner failed to request permission to amend his petition to include this claim.  *Id.*, at p. 31, n.6.

[176] *Id.*, p. 6, ¶ 12.

[177] *Id.*, p. 6, ¶ 13.

[178] *Id.*, p. 7, ¶¶ 15-19.

examination of prosecution witness Randy Walters concerning an allegedly exculpatory statement Petitioner made to him.[179]  Petitioner complains that his trial counsel failed to cross-examine prosecution witness Jamie Lynn Lambert about two letters Petitioner allegedly wrote to Lambert in which Petitioner asserted the fatal shooting was an accident.[180]  Petitioner made none of these specific complaints during his Rule 32 proceeding.

Having independently reviewed *de novo* the entire record from Petitioner's trial, none of the foregoing complaints satisfy either prong of the *Strickland* standard.

Petitioner alleges no specific facts and presents this court with no affidavits or other evidence suggesting that Joe Shirey, Joe Saloom, or any other expert was available at the time of Petitioner's trial who could have testified that it was physically possible for the murder weapon to have misfired twice while being manipulated in the manner asserted by Petitioner, *i.e.*, while he was attempting to unload the weapon manually by pulling the slide.  Prosecution witness Edward Peterman, a former owner of the weapon in question, testified during cross-examination by Petitioner's trial counsel that it was necessary to pull the trigger twice to fire the gun twice.[181]  Peterman, Shirey, and Saloom all testified the murder

---

[179] *Id.*, pp. 7-8, ⁋ 19.

[180] *Id.*, p. 8, ⁋ 20.

[181] S.F. Trial, testimony of Edward Ross Peterman, 11 SCR 1099.

weapon jammed when fired.[182]  Defense expert Shirey testified the gun jammed

twice while he was testing it -- once when he fired it and once when he attempted to

unload it manually by pushing the slide.[183]  Petitioner has failed to allege any specific

facts showing that Peterman, Shirey, or Saloom would have offered any testimony

beneficial to Petitioner had they been cross-examined or examined more thoroughly

by Petitioner's trial counsel.  Petitioner does not even identify with specificity the

person whom Petitioner claims wrote the highly conclusory note suggesting that if

there was one accidental misfire, there may have been a second accidental misfire.

Petitioner has failed to allege any facts showing there is a reasonable probability the

outcome of the guilt-innocence phase of Petitioner's trial would have been different

had Petitioner's trial counsel asked Peterman, Shirey, Saloom, or any other expert

available at the time of Petitioner's capital trial to express an opinion regarding the

possibility or likelihood of the murder weapon misfiring twice while being unloaded

---

[182] S.F. Trial, testimony of Edward Ross Peterman, 11 SCR 1094-95; testimony of Joe Saloom, 11 SCR 1212-13; testimony of Joe W. Shirey, 11 SCR 1307-08, 1310.

Saloom testified during cross-examination by Petitioner's trial counsel that he was able to unload the weapon by repeatedly pulling back on the slide to eject shells.  S.F. Trial, testimony of Joe Saloom, 11 SCR 1214.  Saloom did not testify that the gun misfired while he was attempting to do so.  Petitioner alleged no facts and presents this court with no evidence in the form of affidavit from Saloom or any other expert or lay witness suggesting it was physically possible for the murder weapon to misfire, as opposed to jam, while being manually unloaded in the manner Saloom manually unloaded the weapon during his testing.

[183] S.F. Trial, testimony of Joe W. Shirey, 11 SCR, 1308, 1310.  Prosecution expert Joe Saloom corroborated Shirey's testimony on this point.  S.F. Trial, testimony of Joe Saloom, 11 SCR 1218.

manually.  Allegations in a federal habeas corpus petition must be factual and specific, not conclusory.  *Harris v. Commn'r, Ala. Dep't of Corr.*, 874 F.3d at 691; *Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d at 1061.

The jury concluded beyond a reasonable doubt that Petitioner intentionally fatally shot Julie Rhodes.  The medical examiner's uncontradicted testimony established Julie was shot once in the face and once in the back, from two entirely different angles.  There was no evidence presented showing there were any bullet holes in the seat of Julie's vehicle suggesting a gun had been fired or misfired while Petitioner was holding the gun while seated in the right rear passenger seat.[184]

Moreover, the jury was well aware of Petitioner's multiple *ex post facto* assertions that his gun discharged accidentally.  The jury heard Petitioner's audiotaped statement to law enforcement stating that his gun misfired while he was attempting to unload it.[185]  Prosecution witness Antione Harris testified on direct examination that Petitioner insisted he had not meant to fire his weapon, it was a mistake, he was trying to unload the gun when it went off, he did not know how he shot Julie Rhodes twice, he did not know why he, Garrison, and Hilburn had not simply pulled Julie Rhodes from her vehicle, and they did not take her to the hospital

---

[184] Joe Saloom testified that he examined the interior of Julie's vehicle and saw no bullet holes in the car's seat.  S.F. Trial, testimony of Joe Saloom, 11 SCR 1217.

[185] S.F. Trial, testimony of Sonny Riddle, 11 SCR 1248 (audiotape recording of Petitioner's interview of December 4, 1995 played in open court).

after the shooting because they were scared.[186]  On cross-examination, Petitioner's trial counsel elicited testimony from Harris that Petitioner said the shooting was an accident.[187]  Prosecution witness Jonathan David Garrison testified on direct examination that, when he and Petitioner were at Candace Talley's apartment, Petitioner told everyone present that he shot the girl by accident.[188]

Prosecution witness Jason Scott Mitchell testified on direct examination that Petitioner insisted he was shaking the gun in Julie's face in an effort to scare her into getting out of her vehicle when his gun went off accidentally.[189]  Petitioner does not suggest what additional questions his trial counsel should have asked Mitchell to elicit additional exculpatory evidence.  Petitioner does not allege any facts showing that Mitchell could have testified that he had any personal knowledge of (or that Petitioner explained to him) how Petitioner "accidentally" shot Julie Rhodes in the back after accidentally shooting her in the face.  Nor does Petitioner allege any facts suggesting Mitchell could have testified that Petitioner was attempting to unload the murder weapon manually when it went off accidentally -- twice.[190]

---

[186] S.F. Trial, testimony of Antione Harris, 9 SCR 841-45.

[187] *Id.*, 9 SCR 849.

[188] S.F. Trial, testimony of Jonathan David Garrison, 11 SCR 1282.

[189] S.F. Trial, testimony of Jason Scott Mitchell, 10 SCR 975-76.

[190] Petitioner's audio-recorded statement to police included his naked assertion that he accidentally shot Julie Rhodes.  The problem with this assertion is that Julie was shot twice -- once in the face and once in the back.  The uncontroverted testimony of the medical examiner who

Insofar as Petitioner argues that his trial counsel should have presented additional witnesses who would have repeated Petitioner's self-serving assertions to them that his fatal shooting of Julie Rhodes was accidental, this argument fails to satisfy either prong of the *Strickland* standard. There is no reasonable probability that cumulative testimony from additional witnesses merely parroting Petitioner's self-serving assertions of an accidental shooting would have altered the outcome of the guilt-innocence phase of Petitioner's capital murder trial. *See Morrow v. Warden*, 886 F.3d 1138, 1150-51 (11th Cir. 2018) (holding petitioner was not prejudiced within the meaning of *Strickland* by trial counsel's failure to present weak or cumulative mitigating evidence); *Ledford v. Warden, G.D.C.P.*, 818 F.3d 600, 649 (11th Cir. 2016) (a petitioner cannot satisfy the prejudice prong of the *Strickland* test with evidence that is merely cumulative of evidence already presented at trial; evidence is cumulative or duplicative when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes

---

performed her autopsy established the two shots entered her body from two entirely different angles. All of the testimony from the original owners of the murder weapon and the two experts who examined the murder weapon agreed the weapon was poorly made and jammed quite easily. None of them testified, however, that it had ever misfired -- either before or after it jammed. The Petitioner has failed to allege any facts showing there was any evidence available at the time of his trial establish even the possibility the murder weapon could have misfired while being unloaded in the manner described by Petitioner in his statement to police. In view of the complete lack of any evidence in the record establishing the availability at the time of Petitioner's trial of expert testimony showing the murder weapon could have fired while jammed in the manner Petitioner argues, faulting Petitioner's trial counsel for failure to present such expert testimony is more than disingenuous -- it potentially violates *Rule 11(b)(1), (b)(2), & (b)(3), Fed.R.Civ.P.*

presented to the jury), *cert. denied*, 137 S. Ct. 1432 (2017). Likewise, there was nothing objectively unreasonable with the decision by Petitioner's trial counsel to rely upon the Petitioner's own audiotape recorded statement and the trial testimony of Harris, Garrison, and Mitchell to support the defense's theory that Petitioner's weapon accidentally discharged while Petitioner was attempting to unload it manually. *See Reaves v. Sec'y, Fla. Dep't of Corr.*, 872 F.3d 1137, 1157 (11th Cir. 2017) ("counsel's failure to present cumulative evidence is not ineffective assistance"), *cert. denied*, 2018 WL 1718032 (Jun. 25, 2018). Petitioner offers no factual allegations, much less an affidavit, from any of the additional witnesses identified in Petitioner's federal habeas corpus petition showing that any of these witnesses could or would have testified to anything more than having heard more of Petitioner's *ex post facto* self-serving statements suggesting his fatal shooting of Julie Rhodes was accidental. Therefore, the additional witnesses and letters Petitioner now argues should have been introduced were merely cumulative of the testimony already before the jury at the guilt-innocence phase of Petitioner's capital murder trial. More importantly, Petitioner identifies no uncalled witness who could have testified from personal knowledge that the fatal shooting of Julie Rhodes was accidental.[191]

---

[191] Petitioner offers no factual allegations, much less any evidence, that his decision not to take the stand at either phase of his capital murder trial was anything other than voluntary.

## 4. Conclusions

The state habeas court reasonably concluded Petitioner's complaints in his Rule 32 petition about his trial counsel's allegedly deficient presentation of an accidental shooting defense fail to satisfy either prong of the *Strickland* standard. After *de novo* review, Petitioner's new complaints in his federal habeas corpus petition about his trial counsel's performance at the guilt-innocence phase of trial also fail to satisfy either prong of the *Strickland* standard. Moreover, it is far from clear whether this court can even entertain Petitioner's meritless and conclusory new factual allegations attacking the manner in which his trial counsel presented Petitioner's accidental shooting defense. *See Borden v. Allen*, 646 F.3d 785, 816-17 (11th Cir. 2011) (suggesting a federal habeas court is precluded from considering additional facts or claims presented for the first time in a federal habeas petition), *cert. denied*, 566 U. S. 941 (2012). What is clear, however, is that Petitioner's complaints about his trial counsel's presentation of evidence supporting an accidental discharge defense do not satisfy the prejudice prong of the *Strickland* standard. Paragraphs 3 and 10 through 21 of Petitioner's federal habeas corpus petition do not warrant federal habeas corpus relief and potentially violate *Rule 11(b)(1), (b)(2), & (b)(3), Fed.R.Civ.P.*

### E.  Failure to Adequately Cross-Examine Petitioner's Accomplice Garrison

#### 1.  The Complaint

In paragraphs 4 and 22 through 33 of his federal habeas corpus petition, Petitioner argues his trial counsel inadequately cross-examined Petitioner's accomplice, prosecution witness Jonathan David Garrison.

#### 2.  State Court Disposition

On direct examination, Garrison testified in part that (1) he fled Julie Rhodes' vehicle when he saw Petitioner reach for his gun, (2) he exited the vehicle, slammed the door, and ran behind a shed behind a house, (3) as he and Hilburn ran from the vehicle, they heard Julie yell "Please don't, don't shoot me," (4) he heard her press the gas pedal in the car, (5) she pulled the vehicle into a driveway and dogs ran up to the car barking, (6) he heard Petitioner yell "Bitch, you ain't going to let me out right here," (7) Julie backed her vehicle out of the driveway and into the road the opposite direction she had been driving, (8) he heard two gunshots while behind the shed and saw flashes of light through the vehicle's tinted windows, (9) the car was still rolling and he heard the emergency brake being pulled and the tires squealing, (10) he saw Julie Rhodes get out of the vehicle and Petitioner push her in the back, away from the car, (11) he saw Julie Rhodes run down the street and could hear her crying, and (12) Petitioner could see Garrison and Hilburn behind the shed, pointed

his gun at them, and told them to get back inside the car.[192] During cross-examination, Petitioner's trial counsel elicited admissions from Garrison that (1) he was originally charged with capital murder, (2) he pleaded guilty to a charge of murder, for which he received a life sentence with the possibility of release on parole, (3) he agreed to testify against Petitioner as part of his plea agreement, (4) he ran behind a shed and heard Petitioner and Julie Rhodes talking to each other, and (5) he later saw two flashes of light when the car was facing a stop sign.[193]

Petitioner did not present any complaint about the quality or scope of his trial counsel's cross-examination of Garrison in Petitioner's Rule 32 petition. Instead, Petitioner raised his complaint about the scope of his trial counsel's cross-examination of Garrison for the first time on direct appeal from the denial of his Rule 32 petition.[194] Petitioner complained that his trial counsel failed to challenge several aspects of Garrison's eyewitness testimony to the fatal shooting of Julie Rhodes, specifically Garrison's testimony suggesting that (1) Petitioner made Julie beg for her life, (2) Petitioner pushed, pulled, or kicked Julie out of her car, and (3)

---

[192] S.F. Trial, testimony of Jonathan David Garrison, 11 SCR 1272-75.

[193] S.F. Trial, testimony of Jonathan David Garrison, 11 SCR 1284-91.

[194] 20 SCR (Tab R-46), at pp. 45-47. Petitioner included a cryptic version of this same complaint in his petition for writ of certiorari filed in the Alabama Supreme Court. 22 SCR (Tab R-51), at pp. 15-16. The focus of Petitioner's argument in his certiorari petition was that his trial counsel should have attacked Garrison's testimony insofar as Garrison's testimony supported a finding that Petitioner's capital offense was especially heinous, atrocious, or cruel. *Id.*

she suffered unspeakably for four hours, knowing she was going to die.[195]  Petitioner

argued on appeal, without citation to authority or any evidence in the record, that it

was physically impossible for Garrison to have heard Julie Rhodes beg for her life

and seen Petitioner shove Julie away from her vehicle after shooting her because

Garrison was hiding with Kevin Hilburn behind an opaque shed a hundred feet away

and there was loud rap music playing inside Julie's vehicle.[196]  Petitioner did not

allege any specific facts showing what testimony Garrison would have given on

these subjects had Petitioner's trial counsel attempted to challenge Garrison on

cross-examination in such a manner.  Petitioner presented his complaints about the

scope of his trial counsel's cross-examination of Garrison as part of his broader

argument that his trial counsel failed to adequately challenge the aggravating factors

relied upon by the prosecution at the punishment phase of trial.[197]  The Alabama

Court of Criminal Appeals held this entire category of complaints (*i.e.*, about the

failure of Petitioner's trial counsel to challenge the aggravating factors) was not

properly before that appellate court because these specific complaints had not been

raised in Petitioner's Rule 32 petition.[198]

---

[195] *Id.*

[196] *Id.*

[197] 20 SCR (Tab R-46), at pp. 42-53.

[198] 23 SCR (Tab R-58), at pp. 29-31.  Copies of Garrison's statements to law enforcement officers appear at 2 SCR 215-16 and 2 SCR 219-23.

### 3. *De Novo* Review of Complaints in Federal Habeas Petition

In his federal habeas corpus petition, Petitioner argues that based upon Garrison's trial testimony and statements to police, it was "absolutely clear that he could not have heard the statements of the victim about which he testified, nor could he possibly have seen Barksdale push her from the car after the shooting."[199] Petitioner complains further that his trial counsel failed to cross-examine Garrison regarding (1) the alleged discrepancy between Garrison's statements to police that Julie Rhodes got out of the vehicle on her own and Garrison's trial testimony that Petitioner pushed her out of the vehicle, (2) how Garrison could have heard the alleged conversation between Julie Rhodes and Petitioner when Garrison was hiding behind a shed one hundred feet away from a vehicle while the vehicle's windows were rolled up and the vehicle's cassette recorder was playing loud rap music, (3) how Garrison could have seen the movements inside the vehicle on a dark December night, (4) statements made to police by Kevin Hilburn suggesting Petitioner attempted to get Julie Rhodes out of her vehicle without shooting her, (5) Hilburn's statement to police denying that Petitioner ever said he was prepared to shoot someone to get a ride back to Guntersville, (6) a statement Garrison allegedly made to Candace Talley in which Garrison said "something happened to the gun," and the

---

[199] Doc. # 1, at pp. 8-9, ¶ 23. As with his complaints about

"clip got stuck or something," (7) Garrison's alleged statement to police that Garrison gave Petitioner the murder weapon a few days before the murder, and (8) a law enforcement officer's statement that he recalled having previously arrested Garrison on an unspecified charge.[200] Petitioner presented none of these ineffective assistance complaints in his Rule 32 petition.

Petitioner does not allege any specific facts or furnish this court an affidavit from Garrison stating what testimony beneficial to the defense Garrison would have furnished had Petitioner's trial counsel attempted to cross-examine Garrison with regard to any of these subjects. Petitioner offers no photographs of the crime scene, expert testimony, or other evidence establishing it was physically impossible for Garrison to have heard or seen the things about which he testified on direct examination at Petitioner's capital murder trial.[201]

After independent, *de* novo, review, it is clear that attempting to employ Garrison's prior statements to law enforcement to impeach Garrison's trial testimony regarding the events at the crime scene would have been an exercise in futility.

---

[200] Doc. # 1, at pp. 9-12, ¶¶ 24-33.

[201] At the same time, Petitioner faults his trial counsel for failing to present testimony from the late Kevin Hilburn that (while Hilburn was apparently hiding behind the same shed as Garrison) Hilburn saw Petitioner try to remove Julie Rhodes from her vehicle without shooting her. Hilburn was unavailable to testify at Petitioner's trial. The late Hilburn's statements could not have been utilized to impeach Garrison's trial testimony. This aspect of Petitioner's multifaceted ineffective assistance complaint potentially violates *Rule 11(b)(1), (b)(2), & (b)(3), Fed.R.Civ.P.*

Garrison's cryptic, unsigned, handwritten first statement makes no mention of him or Hilburn hiding behind a shed at the time of the fatal shooting; in relevant part, it states only: "Then he stopped a girl in the car, got her to carry us to his friend [sic] house. Then he shot her, and we came back to Guntersville."[202] Petitioner offers this court no clue how that document or any other then-available evidence could have been used to impeach Garrison's trial testimony.

Garrison's second, signed, far more detailed, statement includes the following passage:

> Kevin said "we need to get back to Guntersville" And Tony said "IF I have to steal the car to back to Guntersville" I said If you steal the car their [sic] going to call the cops and were [sic] going to get caught." Tony said then I'll have to shoot them. I felt nervous but did not know if he would do that or not. About 10-15 min. later Silver Nissan Maxima with tinted windows turned into the parking lot and Tony Flagged it down (Tony flagged down because it just had one person in it and he had made the statement he did not want to shot [sic] two people and He wanted to make sure the car would make it back to Guntersville. The car stopped and she rolled down the passenger window and Tony asked her (WF blonde hair) she would give is a ride to his friend's house. She said "yes" Get in." Kevin and i got up and Tony said come on. Tony motioned for Kevin to get in the front and Tony got in the back passenger seat and I got in the back driver seat. I picked up some X-mas boxes and sat them in my lap. She drove forward into a parking place and then turned around. When we come out of the shopping center Tony wanted to go right but she told him she could not get out because of the parade and Tony said then go left. As we were driving Tony would say take a right here a left here this lasted about 3-5 min. Tony saw a house "that looked empty to me." He said stop right here this is where he lives. She stopped the car. As she stopped Tony

[202] 2 SCR 216.

opened his door and as he did this he pulled out his Gun 9mm. Kevin and I both opened the car doors and I took off running. We ran to the right side of the house and went behind a shed. As we were running you could hear her yell please dont [sic] please dont [sic]. I could hear the car take off and I could hear the door slam. I heard the car coming back and *I peeked around the corner of the shed* and the car was stopped at the stop sign. I could hear two gunshots and I could see through the window tint two Flashes. The car just barely started going forward and then I could hear the emergency brake being pulled up and the tires squelled [sic]. I saw Tony open the rear passenger door and run around the rear of the car to the drivers [sic] door. Tony opened up the door and the white female got out on her own. Tony gave her like a little shove on the back to move her out of the way and he jumped in the drivers [sic] seat. Kevin looked at me and said do you want to Run. I didn't say anything. Tony pulled Around the Corner And he started yelling come on bring your ass on. Kevin and I walked to the car and got in. We went [undecipherable] on the Road. I dont [sic] know which way we went but Tony was looking down the Road to see where the parade was and the parade wasn't. While we were driving I asked Tony were [sic] they went down the road. Tony said that the girl pulled into a driveway and the [sic] was a bunch of dogs. Tony said that he told her Bitch your [sic] not going to let me out with a bunch of dog [sic]. And she turned around and stopped at the Stop sign. We went back to the LT. blue house 2nd to 3rd on left on the road across the street from Koons II. There Tony got the boxes out and Tony told the big black woman that he had just shot a Girl to get her car to go back to Guntersville. The black female said Give me the stuff. Tony, Kevin and I got the boxes out and gave them to Her. The black female said be carful [sic]. We came back to Guntersville. After Getting back to Guntersville we were at Kevin [sic] Grandmothers [sic] and Tony Removed both tag and put a Big Bill Tag on it. Tony through [sic] the other tags into the lake. I talked [sic] Neysa Hampton about what happened. She told me to start staying away from Tony.[203]

---

[203] 2 SCR 221-23 (emphasis added).

Petitioner argues in his federal habeas corpus petition that Garrison's prior statements to police demonstrated it was impossible for Garrison to have seen and heard what happened at the crime scene. Garrison's signed handwritten statement plainly reveals something quite different. Garrison explained in his signed handwritten statement that he looked around the shed behind which he was hiding and saw "flashes" as Petitioner fired the fatal gunshots inside Julie Rhodes's vehicle and Petitioner exited the vehicle, ran around the rear of the vehicle, and then pushed Julie Rhodes in the back after she also had exited the vehicle.

Furthermore, Petitioner's complaints in his federal habeas petition assume facts not in evidence and misrepresent Garrison's actual testimony on direct examination. Garrison testified without contradiction that when Julie Rhodes brought her vehicle to a stop at a location Petitioner identified, Garrison, Hilburn, and Petitioner all opened their car doors as if they were getting out of the vehicle.[204] Garrison testified he saw Petitioner reach for his gun and he (Garrison) "slammed the door and ran behind the shed."[205] At no point did Garrison testify that Hilburn or Petitioner ever closed their car doors after they opened them.[206] Nor did Garrison

---

[204] S.F. Trial, testimony of Jonathan David Garrison, 11 SCR 1272.

[205] *Id.*

[206] In his signed handwritten statement, Garrison did claim that he heard a car door shut after he fled Julie Rhodes's vehicle but he did not testify to that fact at trial. Moreover, nothing in

or any other eyewitness testify that all of the windows in Julie Rhodes' vehicle were fully up at the time of the verbal exchanges between Petitioner and Julie or at the time of the fatal shooting. Likewise, Garrison described Julie Rhodes as "screaming" when she said to Petitioner "Please don't, don't shoot me."[207] Garrison also testified that he heard Petitioner "holler" at Julie "Bitch, you ain't going to let me out right here."[208]

Given the nature of Garrison's testimony on direct, Petitioner's trial counsel could reasonably have concluded it would be unwise to ask Garrison questions on cross-examination that might give Garrison an opportunity to explain how he was able to hear the things Julie Rhodes and Petitioner were yelling at each other. Petitioner's trial counsel could reasonably have concluded that asking Garrison on cross-examination how he heard what went on inside Julie's vehicle after Garrison exited that vehicle might have invited answers emphasizing the highly emotional

---

Garrison's handwritten statements to law enforcement or his trial testimony suggested that any of the windows in Julie Rhodes's vehicle were rolled up or closed at the time of the fatal shooting.

[207] *Id.*, 11 SCR 1273.

[208] *Id.*, 11 SCR 1273. In his second statement to law enforcement, Garrison failed to mention hearing Petitioner make this statement to Julie, Instead, Garrison reported that Petitioner related this part of his conversation with Julie Rhodes to Garrison and Hilburn after they got into Julie's car and drove away from the crime scene. 2 SCR 223. It is difficult to see how this discrepancy would have furnished much impeachment value had Petitioner's trial counsel confronted Garrison with this portion of his prior statement.

and loud nature of the verbal exchanges between Julie and the Petitioner immediately before the fatal shooting.[209]

Contrary to the suggestions underlying this portion of Petitioner's ineffective assistance claims, Garrison never testified that all the windows in Julie Rhodes' vehicle were up all the way, all the vehicle's doors were closed, or he was able to see the movements of Petitioner and Julie inside the vehicle immediately before the fatal shooting. Instead, Garrison testified that he heard gunshots and saw "a flash through the tinted windows."[210] Garrison testified that, after the gunshots, Petitioner "jumped out, ran around the car, and opened the driver's door."[211] Garrison testified further: "Julie was getting out and he pushed her in the back and pushed her away."[212] Garrison described Petitioner as having given Julie "a shove in the back."[213] Thus, Garrison did not testify he ever witnessed Petitioner push Julie out of the vehicle while Petitioner was still inside the vehicle. Petitioner presents this

---

[209] Absent an affidavit from Garrison or some other evidence (or fact-specific allegation) showing what testimony Garrison might have given at Petitioner's trial if asked about his ability to hear the things Julie Rhodes and Petitioner were yelling at each other, Petitioner's complaints are far too speculative and conjectural to support a finding of prejudice under the *Strickland* standard.

[210] *Id.*, 11 SCR 1274.

[211] *Id.*

[212] *Id.*

[213] *Id.*

court with no specific facts, much less any evidence, showing it was physically impossible for Garrison to have heard the things he claimed to have heard or to have seen the things he claimed to have seen during his testimony on direct at Petitioner's capital murder trial. Thus, Petitioner has failed to allege any specific facts, much less furnish any evidence, showing that any attempt by his trial counsel to cross-examine Garrison in the manner Petitioner now urges would have furnished any testimony favorable to the defense.

The only copy of Garrison's prior signed statement to the police currently in the record would not have furnished a basis for cross-examining (and impeaching) Garrison as to his account at trial of the circumstances leading up and immediately following the fatal shooting.[214] Garrison's signed prior statement would not have

---

[214] Under Alabama law, a witness's prior inconsistent statement is admissible to impeach the witness's credibility but is not admissible as substantive evidence of the matter asserted. *M.L.H. v. State*, 99 So. 3d 911, 913 (Ala. 2011). Alabama law requires that a prior inconsistent statement offered to impeach a witness at trial must have been given under oath subject to penalty of perjury. *See Hopper v. State*, 585 So. 2d 137, 140 (Ala. 1990) (adopting a new rule in Alabama equivalent to *Fed. R. Evid* 801(d)(1)(A)), *cert. denied*, 501 U.S. 1232 (1991). Garrison's statement appears at 2 SCR 219-23. Nothing on the face of that statement indicates it was given under oath subject to penalty of perjury. While Garrison signed each page of the statement, none of his signatures were notarized. Neither of the two law enforcement officers listed on the front page of Garrison's statement signed it, either. Thus, Petitioner has failed to present this court with any evidence showing Garrison's handwritten statement could have been utilized under Alabama evidentiary rules to impeach Garrison's testimony at Petitioner's trial. For those reasons, Petitioner's complaint about his trial counsel's failure to use Garruison's statement to impeach Garrison's testimony at Petitioner's trial potentially violates *Rule 11(b)(1), (b)(2), & (b)(3), Fed.R.Civ.P.* Unless there was some other statement given by Garrison to police available at the time of Petitioner's trial which satisfied Alabama evidentiary rules for use as impeachment (which statement is not currently before this court), Petitioner's complaint that his trial counsel failed to impeach Garrison through the use of Garrison's "prior statement" is an exercise in legal sophistry.

furnished much impeachment value with regard to Garrison's trial testimony about the fatal shooting. Moreover, Petitioner identifies no legal authority, and this court's independent research has disclosed none, that would have permitted Petitioner's trial counsel to cross-examine (and impeach) Garrison based upon either a statement made by Hilburn to police that allegedly differed from Garrison's trial testimony, a law enforcement officer's recollection of having previously arrested Garrison on an unidentified charge, or an unsworn, unverified, oral statement Garrison allegedly made to Candace Talley. Petitioner's trial counsel may not reasonably be faulted for attempting to do the impossible. "[T]he Sixth Amendment does not require that counsel do what is impossible or unethical." *United States v. Cronic*, 466 U. S. 648, 656 n.19 (1984).

Moreover, Petitioner has presented no fact-specific allegations and no evidence showing that prosecution witness Candace Talley was willing to testify at the time of Petitioner's capital murder trial that Garrison ever told her anything that was significantly different from the testimony Garrison furnished at Petitioner's trial. Ms. Talley testified at Petitioner's trial that, during a car ride with Petitioner the day after the fatal shooting, she and Petitioner discussed the need to get rid of Julie Rhodes' vehicle.[215] For the defense to recall Ms. Talley to the stand in an effort

---

[215] S.F. Trial, testimony of Candace Talley, 10 SCR 936-37.

to impeach Garrison might very well have furnished another opportunity for the prosecution to emphasize aspects of her earlier testimony harmful to Petitioner.

During his Rule 32 proceeding, however, Petitioner did not call Garrison to testify and did not present the state court with an affidavit from Garrison suggesting that Garrison would have furnished any testimony helpful to Petitioner had Garrison been cross-examined in November 1996 in the manner Petitioner now urges. Petitioner does not present this court with any fact-specific allegations or an affidavit from Garrison stating what answers Garrison would have given had Garrison been cross-examined in the manner now advocated by Petitioner.

After independent *de novo* review, Petitioner's complaints about the alleged failure of his trial counsel to adequately cross-examine prosecution witness Garrison fail to satisfy either prong of the *Strickland* standard. There is no reasonable probability that, but for the failure of Petitioner's trial counsel to cross-examine Garrison in the manner Petitioner now urges, the outcome of either phase of Petitioner's capital murder trial would have been any different. Even disregarding Garrison's testimony of what he heard and saw at the crime scene, the evidence of Petitioner's guilt was overwhelming. Garrison was not the only witnesses who testified at trial that, on the day of the fatal shooting, he heard Petitioner state he was prepared to rob and shoot someone to obtain a vehicle to return to the Guntersville

area.[216]  Petitioner admitted to multiple witnesses that he shot Julie Rhodes.[217]

Petitioner and his companions arrived back in the Guntersville area just hours after

the fatal shooting and falsely represented to numerous witnesses that Petitioner had

purchased Julie's vehicle.[218]  Just days after the fatal shooting, Petitioner pointed the

murder weapon at Brian Hampton and threatened to shoot Hampton unless he agreed

to dispose of the weapon.[219]  Attempting to impeach Garrison's testimony in the

---

[216] S.F. Trial, testimony of Charles Goodson, 8 SCR 990 (Goodson testified without contradiction that he overheard Petitioner say he was going to "jack" someone to get back to Guntersville).  Garrison testified that, on the day of the fatal shooting, Petitioner said that if he had to he would shoot someone to get a ride back to Guntersville but that he preferred to shoot one person rather than two.  S.F. Trial, testimony of Jonathan David Garrison, 11 SCR 1268-69.

[217] S.F. Trial, testimony of Antione Harris, 9 SCR 841-45. 849 (Harris testified without contradiction that, after Petitioner's arrest, Petitioner telephoned Harris and informed Harris that he shot Julie Rhodes but had not meant to do so); testimony of Jason Scott Mitchell, 10 SCR 975-76 (Mitchell testified that Petitioner admitted he shot the girl in Alexander City but claimed it was an accident); testimony of Sonny Riddle, 11 SCR 1248 (Riddle testified and played an audiotape recording in which Petitioner claimed that his gun twice went off in the car while he was trying to unload it).

[218] Numerous witnesses testified at Petitioner's trial that Petitioner and his companions represented to them that Petitioner had purchased Julie Rhodes's vehicle.  Jason Scott Mitchell testified Petitioner told Mitchell that he put a down payment down on the vehicle.  S.F. Trial, testimony of Jason Scott Mitchell, 10 SCR 969.  John Wesley Marks testified that Garrison informed Marks that Petitioner owned the vehicle and they had won money in Alexander City.  S.F. Trial, testimony of John Wesley Marks, 10 SCR 986.  Neysa Hampton Dobbs testified Petitioner told her that he had put a down payment on the vehicle.  S.F. Trial, testimony of Neysa Hampton Dobbs, 10 SCR 1002-03.  Willie Havis testified Petitioner told him that he had been making payments on the car.  S.F. Trial, testimony of Willie Havis, 10 SCR 1019.  Another witness testified the Petitioner told her that the Maxima with a shattered driver's side window and blood on the headrest was his.  S.F. Trial, testimony of Brooke Buchanan, 10 SCR 1040.  Brian Hampton testified Petitioner said he had made a down payment on the car earlier that day.  S.F. Trial, testimony of Brian Hampton, 10 SCR 1046.

[219] S.F. Trial, testimony of Willie Havis, 10 SCR 1028-32; testimony of Brian Hampton, 10 SCR 1054-55.

manner suggested by Petitioner would have done nothing to diminish the cumulative impact of the foregoing evidence of Petitioner's guilt.

Likewise, impeaching Garrison's testimony in the manner now urged by Petitioner would have done little to diminish the aggravating factors the jury and sentencing judge were required to consider at the punishment phase of trial. The jury concluded the evidence established beyond a reasonable doubt that Petitioner intentionally murdered Julie Rhodes while in the course of robbing or attempting to rob her and while she was inside a vehicle. Both of those determinations are not subject to legitimate dispute. Garrison's testimony, while far from complimentary toward Petitioner, was not what established the third aggravating factor, *i.e.*, the heinous, atrocious, and cruel nature of Petitioner's capital offense. As previously explained in Section IV.D., the evidence establishing the heinous, atrocious, and cruel nature of Petitioner's capital offense consisted of the testimony of the witnesses who saw and heard Julie Rhodes's pleas for help, the witnesses who heard Julie's statements that she was aware she was dying, the medical professionals who treated her injuries, and the medical examiner who performed her autopsy. Cross-examining Garrison more thoroughly concerning what he saw and heard at the crime scene would not, in all reasonable probability, have had any outcome-determinative impact upon the jury's verdict at either phase of Petitioner's capital murder trial.

### 4. Conclusions

Upon independent, *de* novo review, Petitioner's unexhausted, conclusory complaints about the failure of his trial counsel to more thoroughly cross-examine prosecution witness Garrison fail to satisfy either prong of the *Strickland* standard. Paragraphs 4 and 22 through 33 of Petitioner's federal habeas corpus petition do not warrant federal habeas corpus relief. Moreover, these baseless complaints potentially violate *Rule 11(b)(1), (b)(2), & (b)(3), Fed.R.Civ.P.*

## F. Failure to Move for Continuance/New Investigator

### 1. The Complaint

In paragraphs 34 through 37 of his federal habeas corpus petition, Petitioner argues his trial counsel should have moved for a continuance and appointment of a new investigator after Garrison accepted a plea bargain on the eve of trial.

### 2. State Court Disposition

Petitioner did not raise any complaint about his trial counsel's failure to request a continuance in his Rule 32 petition. Instead, Petitioner first complained about his trial counsel's failure to move for a continuance in his brief on appeal to the Alabama Court of Criminal Appeals from the state trial court's denial of his Rule 32 petition.[220] The Alabama Court of Criminal Appeals held that Petitioner's

---

[220] 20 SCR (Tab R-46), at pp. 55-56. Specifically, Petitioner complained that when Garrison accepted a plea bargain, Petitioner's trial counsel should have requested a continuance

complaint about his trial counsel's failure to request a continuance was not properly before that court because Petitioner had failed to include this claim in his Rule 32 petition.[221] Petitioner again complained about his trial counsel's failure to move for a continuance in his petition for writ of certiorari filed with the Alabama Supreme Court.[222]

### 3. *De Novo* Review of Complaints in Federal Habeas Petition

Petitioner argues that a conflict of interest existed after Garrison accepted the prosecution's plea bargain because their joint investigator could no longer serve two clients with divergent interests.[223] Petitioner faults his trial counsel for failing to move for a continuance and for appointment of a new, conflict-free, investigator. For the following reasons, and after an independent, *de novo* review, Petitioner's complaints about his trial counsel's failures to move for a continuance and

---

and appointment of a new investigator for Petitioner, because, until that point, Garrison and Petitioner had been sharing the services of a single court-appointed investigator.

[221] 23 SCR (Tab R-58), at p. 21.

[222] 22 SCR (Tab R-51), at pp. 16-17.

[223] Petitioner fails to allege any specific facts showing that the court-appointed investigator who had previously served both petitioner's and Garrison's trial counsel continued to work for Garrison in that same capacity after Garrison accepted the prosecution's plea offer. There is no allegation, much less any evidence, now before this court suggesting the court-appointed investigator in question was ever designated or considered by any party as a potential witness at trial.

appointment of a new investigator fail to satisfy either prong of the *Strickland* standard.

Petitioner identifies no matters he had requested his court-appointed investigator to investigate which had not already been fully explored and developed by the time Garrison entered into his plea bargain. Nor does Petitioner allege any facts showing that any aspect of the prosecution's case against Petitioner remained to be fully investigated by Petitioner's court-appointed investigator at the time Garrison accepted the prosecution's plea offer. Petitioner does not allege any facts showing that his trial counsel planned to call Petitioner's court-appointed investigator to testify at trial on any matter. Under these circumstances, Petitioner's trial counsel's failure to move for continuance and appointment of a new investigator on the eve of trial did not cause the performance of Petitioner's trial counsel to fall below an objective level of reasonableness. "The defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources." *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992), *cert. denied*, 510 U. S. 829 (1993).

Moreover, Petitioner has again failed to identify any additional exculpatory or mitigating evidence that could have been located and made available to Petitioner at trial had Petitioner's trial counsel moved for a continuance and appointment of a new investigator on the eve of trial. Petitioner alleges no facts showing that, but for

the failure of his trial counsel to request a continuance and appointment of a new investigator, any identified additional information beneficial to Petitioner would have been discovered and made available to Petitioner's defense team. In fact, Petitioner's pleadings in support of this portion of Petitioner's multi-faceted ineffective assistance claims fail to allege any facts sufficient to satisfy the prejudice prong of the *Strickland* standard. Allegations in a federal habeas corpus petition must be factual and specific, not conclusory. *Harris v. Commn'r, Ala. Dep't of Corr.*, 874 F.3d at 691; *Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d at 1061.

As discussed at length above in Section IV.E.3., the evidence of Petitioner's guilt was overwhelming, as was the evidence establishing the existence of the three aggravating factors relied upon by the sentencing judge. Petitioner has not identified any additional potentially mitigating evidence that he claims his defense team would have discovered had Petitioner's trial counsel moved for a continuance and appointment of a new investigator once Garrison accepted his plea offer. Under such circumstances, there is no reasonable probability that, but for the failure of Petitioner's trial counsel to move for continuance and appointment of a new investigator on the eve of trial, the outcome of either phase of Petitioner's capital murder trial would have been any different.

### 4. Conclusions

Upon independent, *de* novo review, Petitioner's complaints about the failure of his trial counsel to move for a continuance and for appointment of a new investigator on the eve of trial do not satisfy either prong of the *Strickland* standard. Paragraphs 34 through 37 of Petitioner's federal habeas corpus petition do not warrant federal habeas corpus relief.

## G. Failure to Adequately Investigate and Present Mitigating Evidence

### 1. Overview of the Complaints

In paragraphs 38 through 46 of his federal habeas corpus petition, Petitioner argues that his trial counsel failed to (1) adequately investigate Petitioner's background, (2) develop and present potentially mitigating evidence at trial, and (3) argue effectively in favor of a life sentence.[224]

---

[224] More specifically, in his federal habeas corpus petition, Petitioner complains his trial counsel (1) did not conduct any investigation for the purpose of obtaining evidence to present at the sentencing phase of trial, (2) called no witnesses and introduced but a single exhibit at the punishment phase of trial, (3) made a closing argument at the punishment phase of trial that lasted no more than five minutes and focused almost exclusively on Petitioner's age as a mitigating factor, (4) failed to make a naked appeal for mercy, (5) spent less than twenty minutes in telephone contact with Petitioner's parents and never spoke with either of Petitioner's parents in person, (6) never spoke with any other member of Petitioner's family, (7) never spoke with family friend Lt. Colonel Maxwell Johnson, (8) failed to investigate Petitioner's background, and (9) failed to discover, develop, and present mitigating evidence showing Petitioner (a) was exposed to toxic chemicals *in utero* at Camp Lejeune, (b) was exposed to his parents' drug abuse, (c) was exposed to his parents' domestic violence, and (d) was shuttled between his separated parents as a child. Doc. # 1, at pp. 13-16, ¶¶ 38-46. Petitioner presented an abridged version of most, but not all, of the same set of complaints in his Rule 32 petition. 15 SCR 16-22.

## 2. State Court Disposition

### a. Petitioner's Rule 32 Petition

In his Rule 32 petition, Petitioner argued that his trial counsel rendered ineffective assistance by (1) failing to obtain complete and accurate information regarding Petitioner's family and social history, educational history, medical history, mental health history, correctional history, and community and cultural influences, (2) failing to investigate to prepare for the penalty phase of trial, (3) failing to talk or meet with Petitioner's parents, (4) failing to create a family history, (5) failing to contact and talk with Max Johnson, Petitioner's "godfather" and father of Petitioner's best friend, (6) failing to investigate Petitioner's use of marijuana and alcohol, (7) failing to hire an expert to determine whether Petitioner had any neurological impairments, (8) failing to hire a mental health professional to determine whether Petitioner had any mental health problems, (9) failing to obtain Petitioner's educations records, including those showing Petitioner earned a GED and completed a course in small engine repair, (10) failing to make an opening argument at the punishment phase of trial, (11) failing to present any witnesses at the punishment phase of trial, (12) failing to articulate why Petitioner's relative youth made Petitioner less culpable or more deserving of mercy, and (13) referring to Petitioner during closing punishment phase jury argument as "one of the least in

our society."[225]  The specific factual allegations supporting this aspect of Petitioner's

ineffective assistance claims in his Rule 32 petition are critical because in a case

such as this one, where the state habeas court rejected an ineffective assistance claim

on the merits, this court's review under the AEDPA is limited to the facts presented

in the Petitioner's Rule 32 petition.  *Borden v. Allen*, 646 F.3d at 816-17; *Powell v.*

*Allen*, 602 F.3d at 1273.

### b.  Rule 32 Evidentiary Hearing

The state trial court held an evidentiary hearing to address this aspect of

Petitioner's ineffective assistance claims.  During the evidentiary hearing held June

23-24, 2005, Petitioner's former trial counsel (attorney Tommy Goggans) testified

on direct examination that he had his own firearms expert, Joe Shirey, test-fire the

murder weapon.  He was aware of Petitioner's prior conviction in Virginia and saw

documents showing Petitioner had been convicted of armed robbery.  He discussed

the prior conviction with Petitioner.  He spoke with the victim of that prior offense.

---

[225] 15 SCR 16-22.  In his federal habeas corpus petition, Petitioner does not re-urge his prior complaint about his trial counsel's decision to waive an opening statement at the punishment phase of trial.  In fact, both parties waived opening statement at the start of the punishment phase of Petitioner's trial.  12 SCR 1421.  Petitioner alleged no facts in his Rule 32 petition and alleges no facts in his federal habeas petition showing that he was "prejudiced" within the meaning of the *Strickland* standard by his trial counsel's waiver of an opening statement at the punishment phase of trial.  As attorney Goggans testified, without contradiction, at Petitioner's Rule 32 hearing, such statements are little more than summaries of the evidence counsel expect will be introduced.  S.F. Rule 32 Hearing, testimony of Tommy Goggans, 17 SCR 150.  At the punishment phase of Petitioner's capital murder trial, each party presented a single piece of documentary evidence - the prosecution a certified copy of the judgment from Petitioner's prior Virginia armed robbery conviction and the defense a copy of Petitioner's birth certificate.  12 SCR 1422-23.

He understood Petitioner was not the gunman in the prior case but, rather, Petitioner was the setup man. He spoke on the telephone with Petitioner's mother, Mary Archie, who was not cooperative. The information Ms. Archie provided was not helpful. It was difficult to get information from Petitioner's mother. He he was unable to get Ms. Archie to talk about much of anything. He was aware of Petitioner's behavior while incarcerated in Virginia. He knew Petitioner's parents had divorced. He did not recall Petitioner informing him that Petitioner had been the victim of domestic abuse. He spoke with Petitioner's father, who said Petitioner got involved with gangs and selling drugs and had a pattern of lying to get out of trouble. The last thing he wanted to come out in the courtroom were the things Petitioner's father told him about Petitioner. He was aware Petitioner dropped out of school but later earned a GED in prison. He did not recall talking with Petitioner's brother or with Maxwell Johnson. He was aware Petitioner had been born at Camp Lejeune. He made multiple attempts to contact each of Petitioner's parents, and he believed the strongest mitigating factor in Petitioner's favor was his youth.[226]

On cross-examination attorney Goggans testified the victim in Petitioner's prior offense recognized Petitioner. He preferred to stipulate to the admission of the judgment from Petitioner's prior offense rather than to have the victim of that offense

---

[226] S.F. Rule 32 Hearing, testimony of Tommy Goggans, 17 SCR 40-119.

take the stand as a live witness and identify Petitioner in front of the jury as one of his assailants and furnish the details of that offense. He believed Petitioner's prior offense involved some degree of planning. Because one of the aggravating factors in Petitioner's capital offense was that it involved a robbery, he did not want Petitioner's prior robbery victim to take the stand. Under Alabama law, one who is guilty as an aider and abetter is considered equally guilty with the principal offender. Petitioner's mother told him that Petitioner had gotten himself into trouble and it was Petitioner's trouble. It was difficult to keep Petitioner's mother on the phone. Petitioner's mother never mentioned to him that Petitioner had any problems with his father or any medical or mental health problems. Petitioner's mother did not mention to him any history of domestic violence in the family. Petitioner's father was straight-forward during their telephone conversations but said Petitioner tends to have a pattern of lying when he gets himself into trouble. He did not want to have Petitioner's father testify at either phase of trial in the same manner that he had described Petitioner in their telephone conversations. Petitioner never told him that he had any medical or mental health condition and denied any history of medical or mental problems. Petitioner informed him that he had a good relationship with his family. Petitioner said he could recall no significant adverse events that affected him during his adolescent years. Petitioner admitted daily abuse of marijuana and alcohol from age fourteen. He had no information suggesting Petitioner's alcohol

or marijuana abuse was to the extent it would be a mental disease or defect.  He believes evidence of drug or alcohol abuse does not impress most jurors unless it is extraordinarily severe.  He believed that evidence of Petitioner's marijuana abuse would have a negative impact on the jury.  Opening statements at the punishment phase of a capital murder trial merely summarize what the attorneys expect the evidence will show.  He presented all the mitigating evidence he had available, and he did not want to put on evidence showing Petitioner's gang affiliation or involvement in drug trafficking.[227]

On re-direct examination, attorney Goggans explained that he did not record every activity he undertook as Petitioner's counsel on his time sheets.  Petitioner's mother was hard to talk with, and the defense's theory at trial was that the shooting had not been intentional and that theory was supported by Petitioner's statement which the prosecution introduced into evidence.[228]

Petitioner's mother Mary Archie testified on direct examination that she had two sons with Petitioner's father - Tyrone Barksdale, Jr. and Petitioner.  The family was living at Camp LeJeune when Petitioner was born.  She separated from her husband when Petitioner was two years old.  Petitioner's father was in the Marines.  She has a history of drug abuse.  She abused drugs while pregnant with Petitioner,

---

[227] S.F. Rule 32 Hearing, testimony of Tommy Goggans, 17 SCR 121-53.

[228] *Id.*, 17 SCR 154-66.

specifically marijuana, PCP, and crack cocaine. Smoking PCP made her feel like a zombie. She used marijuana daily while pregnant with Petitioner.[229]

Ms. Archie testified Petitioner's father was abusive toward her prior to their divorce. She recalled one incident when she was pregnant with Petitioner in which Petitioner's father grabbed her by the hair, dragged her out the door, and punched her in the face. As a result, she fell into a bathtub and could not get out. Her relationship with Petitioner's father became more abusive after Petitioner's birth, both verbally and physically. At that time she went to the battered women's commission for assistance. Her children saw her being abused. Petitioner's father abused her physically more than ten times. She was afraid of Petitioner's father. On one occasion on her birthday, Petitioner's father assaulted her with a knife and slapped her. She managed to get the knife away from him and swung it at him. Petitioner's father was violent toward their sons, striking and punching them in the chest. Her sons would fall and cry when struck by their father. She witnessed Petitioner's father strike Petitioner at least four times, including at age six.[230]

Ms. Archie testified further that Petitioner was two years old when the family left Camp LeJeune. Petitioner suffered from poor circulation and headaches growing up. Petitioner was about four years old when she separated from

---

[229] S.F. Rule 32 Hearing, testimony of Mary Archie, 17 SCR 161-200; 18 SCR 201-16.

[230] *Id.*, testimony of Mary Archie, 17 SCR 161-200; 18 SCR 201-16.

Petitioner's father. She got custody of her sons when she divorced Petitioner's father. She was still using drugs at that point. Her children never saw her use drugs.[231]

Ms. Archie testified that when Petitioner was about six years old, her sons witnessed her "sell" a friend of hers (presumably in prostitution). Petitioner's father continued to be violent toward her following their divorce. Her sons witnessed a couple of incidents of violence between their parents. One incident, which occurred when Petitioner was about seven, involved Petitioner's father kicking in a door and yelling at the boys to go upstairs, after which he attempted to rape her with a broom stick. At age nine or ten, Petitioner went to live with his father. During that time, she managed to get clean and sober for about a year but then went back on drugs, specifically marijuana, crack cocaine, and Tylenol with codeine. She had very little contact with Petitioner after he went to live with his father.[232]

Ms. Archie testified she experienced a pair of nervous breakdowns while her sons lived with her. When she experienced her first nervous breakdown (when Petitioner was about six years old), her sons witnessed her being taken away by ambulance. She was later hospitalized for a second nervous breakdown.[233]

---

[231] *Id.*, testimony of Mary Archie, 17 SCR 161-200; 18 SCR 201-16.

[232] *Id.*, testimony of Mary Archie, 17 SCR 161-200; 18 SCR 201-16.

[233] *Id.*, testimony of Mary Archie, 17 SCR 161-200; 18 SCR 201-16.

Ms. Archie also testified Petitioner did well in school when he lived with her and went to church. Petitioner was on the basketball team after school and won many awards. Sports played a big role in Petitioner's life growing up. After her sons went to live with their father, her drug abuse grew worse and she saw very little of her sons. At some point, Petitioner's father forced Petitioner to quit playing sports so Petitioner could take care of his grandmother. Petitioner told her he was disgusted that he could no longer play like the other kids.[234]

Ms. Archie testified that Petitioner's father remarried and Petitioner's step-mother treated her own children better than Petitioner and his brother. On one occasion, their step-mother made Petitioner and his brother sit outside Ms. Archie's house for three or four hours to wait for their father. Petitioner was involved in an armed robbery while he was living with his father. Prior to that incident, Petitioner's only trouble with the law came around age seven or eight when he got into a fight with another boy. She did not go to any court proceedings involving Petitioner or visit him at the juvenile detention facility because she stayed high. She learned Petitioner was in jail for armed robbery when Petitioner's father told her. Petitioner was charged as an adult in the armed robbery case but it was Petitioner's brother who had the weapon. Petitioner had no role in the armed robbery. She recalled an

---

[234] *Id.*, testimony of Mary Archie, 17 SCR 161-200; 18 SCR 201-16.

incident in which Petitioner's father and older brother brandished guns during a dispute with a neighbor of Ms. Archie. Petitioner's father was arrested twice -- once while in the military and once for crack. She has been arrested once.[235]

Ms. Archie testified Petitioner never finished high school but earned a GED and took a course in small motors in prison. She did not visit Petitioner when he was in prison because she was high. After his release from prison, Petitioner remained in Virginia for a time. Sometime in 1994-95, Petitioner went to Alabama. He later visited her around Thanksgiving. Petitioner told her he was going to start school in Alabama. She learned of Petitioner's arrest for murder prior to his trial and was later told Petitioner had been convicted. She was financially unable to attend Petitioner's murder trial. She attended Petitioner's Rule 32 hearing only because Petitioner's attorneys helped her pay for everything. She recalled two telephone conversations with Petitioner's trial counsel, who informed her Petitioner was going to be convicted of capital murder and electrocuted. Attorney Goggans never asked her about Petitioner's background, childhood, school years, health history, or any history of drug abuse or violence by her or Petitioner's father. Petitioner wrote her at some point and told her attorney Goggans was not on Petitioner's side. Petitioner told her attorney Goggans would not visit him in jail

---

[235] *Id.*, testimony of Mary Archie, 17 SCR 161-200; 18 SCR 201-16.

and did not return Petitioner's telephone calls. Attorney Goggans never gave her any hope Petitioner could avoid the death penalty.[236]

On cross-examination, Ms. Archie testified that she could recall two instances of violence between her and Petitioner's father after they separated (when Petitioner was two years old). Petitioner had poor circulation, headaches, and amnesia as a child but she could not recall when that happened. She learned of Petitioner's armed robbery conviction after the fact. Petitioner's older brother was still in prison and unavailable to testify at the time Petitioner was tried for capital murder. Petitioner was eighteen years old when released from prison in Virgina. She did not stop using drugs until around the year 2000. Attorney Goggans informed her during their telephone calls that Petitioner would be convicted and get lethal injection. She was unable to attend Petitioner's capital murder trial due to her financial situation. Attorney Goggans was unable to furnish her the financial assistance she needed to attend the trial. Petitioner did not have drug, alcohol, or educational problems growing up. She never abused Petitioner, and she does not know Maxwell Johnson.[237]

Maxwell Orin Johnson, a retired Marine Lieutenant Colonel, testified on direct examination that his son and Petitioner were close in age, played basketball

---

[236] S.F. Rule 32 Hearing, testimony of Mary Archie, 17 SCR 161-200; 18 SCR 201-16.

[237] *Id.*, 18 SCR 216-32.

together, and were friends in junior high school in Virginia. His son told him that Petitioner had problems at home. Around age twelve to thirteen, Petitioner stayed at the Johnson home for several weeks to "a couple months" sometime in 1987-89 when things "got hot" at home. The only thing Lt. Col. Johnson knew about Petitioner's parents was that "they were trouble, I guess." Petitioner was mature, articulate, smart, a good athlete and got good grades in middle school. He knew Petitioner to be a "fine kid." He had no personal knowledge regarding Petitioner's background and only knew what others had told him. He had heard of physical as well as verbal abuse in Petitioner's home. He had heard Petitioner's older brother was bad. He heard Petitioner got arrested and went down to see Petitioner. Petitioner told him that Petitioner's brother Tyrone had robbed a pizza delivery guy and Petitioner took the fall for the crime. Lt. Col. Johnson was unable to get Petitioner into the Marines because of Petitioner's criminal record. He had never known Petitioner to lie. He was aware Petitioner had earned his GED and believed Petitioner could benefit from "distance learning." He never had any contact with Petitioner's parents until he met Petitioner's mother in Alabama, long after Petitioner's capital murder trial. He bought a bus ticket for Petitioner in November, 1995 because Petitioner said he had a job in Alabama. He he was traveling frequently during that time frame and did not hear from petitioner for another six-to-nine months. He heard Petitioner had been tried and convicted for murder in the

course of a carjacking. He contacted attorney Goggans in mid-1997 to early-1998 but got very little information about Petitioner's case. By that time, Petitioner's conviction was on appeal. He had his first post-trial telephone contact with Petitioner in mid-1998. He sent money to Petitioner monthly, sent baseball shoes annually, and writes to petitioner regularly. He feels that at some point he became Petitioner's surrogate father. He believes Petitioner has the potential to do good.[238]

On cross-examination, Lt. Col. Johnson testified that he first met Petitioner in 1987-89 when Petitioner was ten or eleven years old. Petitioner moved in with his family in 1989-90 when Petitioner was thirteen or fourteen years old. He did not know Petitioner's parents and never obtained a court order or guardianship authority when Petitioner moved in with his family. When Petitioner moved in with his family, he did not contact social services or the police to report allegations of abuse. He never personally heard any allegations of abuse from Petitioner. He never notified Petitioner's parents when Petitioner moved in and lived with his family. He was unaware that Petitioner had informed the probation officer who prepared Petitioner's presentence report that he regularly used marijuana and alcohol since age fourteen. He had noticed no mental or physical problems with Petitioner. He was not ordained as Petitioner's "godfather" in any type of church ceremony. He

---

[238] S.F. Rule 32 Hearing, testimony of Maxwell Orin Johnson, 18 SCR235-61.

lived at the same address from 1987 through the date of Petitioner's trial in November, 1996 but Petitioner never wrote or called him during that time frame. He never asked Petitioner about any of the rumors of abuse he had heard.[239]

North Carolina criminal defense attorney Ernest Lee Conner, Jr. testified on direct examination that he passed the bar in 1987, had tried several capital cases in North Carolina, had taught at national conferences, and was familiar with the Supreme Court's opinions in *Strickland v. Washington* and *Williams v. Taylor.* He had not spoken with Petitioner or attorney Goggans but did not believe he needed to do so to render an opinion regarding the performance of attorney Goggans. The testimony of Petitioner's mother was irrelevant to his opinion. He could tell from the record that there was 'tremendous mitigation evidence out there," including petitioner's school, juvenile, and medical records. He believed attorney Goggans had not been on the phone enough with Petitioner or Petitioner's mother. He believed attorney Goggans should have requested funding for a mitigation investigator who could have interviewed Petitioner's parents. In his opinion, attorney Goggans failed to adequately investigate "the case" and failed to meet often enough with and interview petitioner. He believed attorney Goggans failed to adequately investigate an accidental shooting defense. He believed the American

---

[239] *Id.*, 18 SCR 261-81.

Bar Association ("ABA") Guidelines establish the constitutional standard for criminal defense counsel. He advocates filing meritless motions in capital cases because the law may change. Attorney Goggans failed to get a signed release to obtain Petitioner's medical and educational records. He believed attorney Goggans should have filed a motion requesting appointment of a new investigator. He believed attorney Goggans should have pursued plea negotiations to take the death penalty off the table. He believed attorney Goggans should have gotten a release from petitioner and spoken with Petitioner's attorney in the Virginia armed robbery case.[240]

On cross-examination, attorney Conner testified that (1) when asked to do so by the state, Petitioner's Rule 32 counsel had identified no medical care providers or schools possessing documents containing mitigating evidence and (2) the ABA Guidelines are not the constitutional standard for ineffective assistance of counsel claims.[241] On redirect examination, attorney Conner identified the testimony of Petitioner's mother and Lt. Col. Johnson as containing additional mitigating evidence.[242]

---

[240] S.F. Rule 32 Hearing, testimony of Ernest Lee Conner, Jr., 18 SCR 284-376.

[241] *Id.*, 18 SCR 377-409.

[242] *Id.*, 18 SCR 409-13.

### c. Trial Court's Findings and Conclusions

In an Order issued October 4, 2005, the state trial court rejected Petitioner's remaining ineffective assistance claims, including his complaints that his trial counsel failed to adequately investigate Petitioner's background, or discover, develop, and present mitigating evidence.[243] In its findings of fact and conclusions of law, the state trial court concluded (1) it could not rely upon the opinions of attorney Conner, in part, because (a) Conner had not spoken with attorney Goggans, Petitioner, or to any witness whom Conner believed should have been called to testify at Petitioner's trial, (b) Conner's testimony distorted the content of the ABA Guidelines, and (c) Conner's advocacy of knowingly filing meritless pretrial motions undermined his professional credibility, (2) Petitioner failed to offer any school records at the hearing or any records showing Petitioner suffered from any mental disease or defect, (3) attorney Goggans did conduct an investigation for mitigating evidence prior to trial but discovered little that was helpful and much that was harmful, (4) attorney Goggans was aware of Petitioner's alleged marijuana and alcohol abuse but decided not to pursue that because, in his opinion, it would not impress the jury favorably unless it was "something extraordinarily severe," (5) attorney Goggans' investigation into Petitioner's background was not in any way

---

[243] Circuit Court Order of October 4, 2005, 16 SCR 323-57; 23 SCR (Tab R-57).

deficient, (6) Petitioner failed to identify or present any medical, mental health, or educational records that attorney Goggans failed to find or the contents of any such records, (7) Petitioner's own statements to the probation officer who prepared Petitioner's presentence report verified the factual accuracy of the information which attorney Goggans relied upon in determining not to pursue investigations into whether (a) Petitioner had suffered medical or mental health problems and (b) Petitioner or his mother had been the victims of domestic abuse, (8) Petitioner himself was apparently the only person who knew of Maxwell Johnson. (9) Petitioner did not inform attorney Goggans of Maxwell Johnson's existence, (10) Petitioner did not furnish any evidence showing any alternative means existed whereby attorney Goggans could have learned of Maxwell Johnson's existence, (11) the only major health problem specifically identified by Mary Archie as having impacted Petitioner as a child was a bout of anemia which was identified during a routine checkup and treated by the family doctor, (12) Maxwell Johnson's testimony furnished very little mitigating evidence because he admitted (a) he possessed very little personal knowledge regarding Petitioner's background and (b) he made no effort to contact responsible child welfare and law enforcement authorities when he heard rumors of abuse in petitioner's home, and (13) for the foregoing reasons,

Petitioner's ineffective assistance complaints failed to satisfy either prong of the *Strickland* standard.[244]

### d. Alabama Court of Criminal Appeals' Memorandum

In a Memorandum issued August 24, 2007, the Alabama Court of Criminal Appeals affirmed the circuit court's denial of Petitioner's Rule 32 petition, concluding the state trial court correctly rejected Petitioner's ineffective assistance claim premised on Petitioner's complaints about his trial counsel's alleged failures to investigate Petitioner's background and discover, develop and present available mitigating evidence.[245]

### 3. AEDPA Review of Complaints Raised in Rule 32 Petition

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness

---

[244] Circuit Court Order of October 4, 2005, 16 SCR 332-34, 340-42, 346-53, 355-56; 23 SCR (Tab R-57), at pp. 10-12, 18-20, 24-31, 33-34.

[245] 22 SCR (Attachment B to Tab R-51), at pp. 31-51; 23 SCR (Tab R-58), at pp. 31-51. The Alabama Court of Criminal Appeals concluded Petitioner's complaints about his trial counsel's alleged failure to adequately investigate Petitioner's background and to discover, develop, and present available mitigating evidence were so lacking in sufficiently specific factual support as to warrant summary dismissal. 22 SCR (Attachment B to Tab R-51), at p. 36; 23 SCR (Tab R-58), at p. 36. The state appellate court concluded further that, after the circuit court conducted an evidentiary hearing on this very claim, Petitioner failed to present any evidence showing that either (1) the performance of trial counsel Goggans fell below an objective level of reasonableness or (2) Petitioner was "prejudiced" thereby within the meaning of Strickland. 22 SCR (Attachment B to Tab R-51), at p. 51; 23 SCR (Tab R-58), at p. 51.

case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland v. Washington*, 466 U. S. at 690-91.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's litigation decisions.

*Id.*, 466 U. S. at 691.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington v. Richter*, 562 U. S. at 105 (citations omitted).

### a. Failure to Investigate and Present Witnesses

In paragraphs 38 through 44 of his federal habeas petition, Petitioner complains that his trial counsel (1) "did not conduct any investigation at all for the purpose of obtaining evidence to present at the sentencing phase of trial," (2) "offered no witnesses and but a single exhibit," (3) failed to adequately meet and communicate with Petitioner and his family in a search for mitigating evidence, (4) failed to speak with any person (like Lt. Col. Maxwell Johnson) who was important in Petitioner's upbringing or who might have known Petitioner from childhood, (5) never investigated any aspect of Petitioner's background or youth, (6) failed to discover Petitioner's parents were both drug abusers, and (7) failed to discover that Petitioner witnessed and was the victim of domestic violence.

### (1) No Deficient Performance

Petitioner presented the state trial court with no factual allegations and no evidence establishing what investigation, if any, Petitioner's court-appointed investigator Joe Shirey conducted into Petitioner's background.[246]   While Petitioner

---

[246] The "objective reasonableness" standard in the first prong of *Strickland* analysis applies with equal force to federal habeas review of (1) whether the scope of trial counsel's investigation into the defendant's background for mitigating evidence was objectively reasonable and (2) whether the decisions by trial counsel to present the mitigating evidence available to trial counsel at trial was objectively reasonable.  *See Wiggins v. Smith*, 539 U. S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time).

did call attorney Goggans to testify at the Rule 32 hearing, Petitioner made no effort to question this witness regarding any communications he may have had with Mr. Shirey regarding Petitioner's background or the defense team's search for mitigating evidence.[247]  As explained above, during Petitioner's Rule 32 hearing, attorney Goggans testified without contradiction that (1) Petitioner informed Goggans that (a) Petitioner and his mother had no history of domestic abuse (and failed to mention any history of domestic abuse involving either of his parents) and (b) no significant adverse events occurred in Petitioner's life during adolescence, (2) Petitioner informed Goggans that he had dropped out of school but earned a GED while in prison, (3) Petitioner informed Goggans that he had served time in a regular prison for a prior offense, (4) he was aware Petitioner's parents had divorced, (5) when he asked Petitioner about childhood health issues, Petitioner informed him that he (Petitioner) had no history of medical or mental health problems, (6) he was aware Petitioner had been born at Camp Lejeune, (7) Petitioner told the person who prepared Petitioner's presentence report that he had a good relationship with his family, (8) Petitioner admitted daily marijuana and alcohol abuse from age fourteen,

---

[247] During Petitioner's Rule 32 hearing, attorney Goggans testified without contradiction that (1) he interviewed Petitioner and petitioner's father to get background information on Petitioner and (2) court-appointed investigator Joe Shirey "interviewed some people as well." S.F. Rule 32 Hearing, testimony of Tommy Goggans, 17 SCR 99, 104. Petitioner asked attorney Goggans no questions concerning the identities of the persons investigator Shirey interviewed or what information, if any, relevant to Petitioner's background investigator Shirey obtained during those interviews.

(9) he obtained no information from Petitioner or anyone else suggesting Petitioner's alcohol or drug abuse was sufficiently severe as to rise to the level of a mental disease or defect, (10) he attempted to obtain information from Petitioner's mother but she was very uncooperative (and failed to mention any problems Petitioner had with his father or any history of domestic violence), (11) Petitioner's father informed him that Petitioner (a) had been involved with a gang, (b) had engaged in drug trafficking, and (c) tended to have a pattern of lying when he gets himself into trouble, (12) he did not want to present any testimony establishing Petitioner's gang involvement or history of drug trafficking, (13) he decided not to pursue further investigation of Petitioner's drug and alcohol abuse because he did not believe it was sufficiently severe to impress the jury, (14) he believed the jury would be favorably impressed by evidence of Petitioner's drug or alcohol abuse only if that evidence showed Petitioner's drug or alcohol abuse was severe or extraordinary, and (15) he saw nothing in Petitioner's demeanor or anything else that suggested to him that a mental health evaluation of Petitioner was necessary.[248] Attorney Goggans also testified he believed it would be very risky to put an uncooperative witness such as Petitioner's mother on the stand at trial.[249]

---

[248] S.F. Rule 32 Hearing, testimony of Tommy Goggans, 17 SCR 88-90, 92-97, 104-05, 137-49, 152-53, 156.

[249] *Id.,* 17 SCR 144.

Petitioner's mother testified at Petitioner's Rule 32 hearing about her own lengthy history of drug abuse and multiple instances of physical violence by Petitioner's father toward her and her sons.[250]  She did not testify, however, that she ever communicated any information about her drug abuse or those incidents of Petitioner's father's physical violence to attorney Goggans or to Petitioner's court-appointed investigator.  Nor did Petitioner's mother testify that she ever communicated any information to attorney Goggans or Petitioner's court-appointed investigator that might have suggested the need for additional investigation by Petitioner's defense team into Petitioner's family, educational, correctional, medical, or mental health background.  In fact, Ms. Archie testified that she never abused Petitioner, Petitioner never saw her abuse drugs, and Petitioner had no educational, alcohol, or drug problems growing up.[251]

---

[250] S.F. Rule 32 Hearing, testimony of Mary Archie, 17 SCR 166, 171-80, 184-85, 187, 189-92, 200; 18 SCR 203, 207, 209, 217-18, 227.   Ms. Archie testified that attorney Goggans never asked her about her own drug abuse, Petitioner's father's drug abuse, or Petitioner's education, health, childhood, or background.  *Id.*, 18 SCR 214.  Attorney Goggans testified he made multiple attempts to engage Ms. Archie in telephone conversations about petitioner's background but Ms. Archie never mentioned any problems Petitioner had with his father or any history of domestic violence.  S.F. Rule 32 Hearing, testimony of Tommy Goggans, 17 SCR 138-43.  Given Ms. Archie's candid testimony regarding the scope and duration of her marijuana and cocaine abuse during the time frame leading up to Petitioner's capital murder trial, the circuit court could reasonably have concluded, and apparently did implicitly conclude, that attorney Goggans' testimony about his difficulty getting Ms. Archie to communicate with him about Petitioner's background was more credible than her testimony on these points at Petitioner's Rule 32 hearing.

[251] S.F. Rule 32 Hearing, testimony of Mary Archie, 17 SCR 184, 199-200; 18 SCR  231.

Maxwell Orin Johnson testified during Petitioner's Rule 32 hearing that (1) he had never met Petitioner's parents prior to the date of Petitioner's capital murder trial, (2) he had no personal knowledge of any abuse within Petitioner's home, (3) he never questioned Petitioner when Petitioner informed him that he (Petitioner) had problems at home, (4) Petitioner resided with his (Johnson's) family for "several weeks" to "a couple months" when things were "hot" at Petitioner's home and Petitioner was twelve or thirteen years old, (5) he never contacted child welfare or law enforcement authorities with regard to Petitioner's situation, (6) "I never knew anything about his parents other than they were trouble, I guess," (7) he had no details on Petitioner's background, (8) "I have never had any contact with his parents at all," and (9) Petitioner was mature, articulate, smart, a good athlete, and got good grades in middle school, *i.e.*, "a fine kid."[252]  Petitioner alleged no facts and presented the state trial court with no evidence showing that Petitioner or anyone else ever alerted Petitioner's defense team to Maxwell Johnson's existence or suggested that contacting Maxwell Johnson might be beneficial to the defense at Petitioner's trial.  Nor did Petitioner furnish the state trial court with any specific facts or evidence showing that any information was reasonably available to Petitioner's defense team prior to Petitioner's November 1996 capital murder trial

---

[252] S.F. Rule 32 Hearing, Testimony of Maxwell Orin Johnson, 18 SCR 238-42, 248-49, 262-64.

suggesting that interviewing Maxwell Johnson might lead to the discovery of potentially mitigating evidence.

Given the information reasonably available to Petitioner's trial counsel at the time of Petitioner's November 1996 trial, the relevant questions are whether Petitioner's trial counsel conducted an objectively reasonable investigation into Petitioner's background and presented an objectively reasonable range of the available mitigating evidence. *See Sears v. Upton*, 561 U. S. 945, 953-54 (2010) (the proper focus of an evaluation of trial counsel's performance at the punishment phase of a capital murder trial is on whether counsel fulfilled their obligation to conduct a thorough investigation of the defendant's background; the objective reasonableness of trial counsel's tactical decisions must be viewed in the context of the objective reasonableness of counsel's investigation into the defendant's background). In the context of penalty phase mitigation in capital cases, the Supreme Court has held that it is unreasonable not to investigate further when counsel has information available to him that suggests additional mitigating evidence -- such as mental illness or a history of childhood abuse -- may be available. *See Porter v. McCollum*, 558 U. S. 30, 39-40 (2009) (trial counsel failed to interview any witnesses or to request any of the defendant's school, medical, or military records and ignored information in a report on the defendant's competency evaluation suggesting possible mitigating evidence -- including evidence of mental

illness -- could be gleaned from investigation into the defendant's family background and military service); *Wiggins v. Smith*, 539, U. S. 510, 524-26 (2003) (counsel failed to investigate the defendant's background beyond review of summary records from competency evaluation, presentence report, and records from the state foster care system, failed to compile a social history of the defendant, and presented no mitigating evidence concerning the defendant's background); *Williams v. Taylor*, 529 U. S. 362, 395-96 (2000) (counsel failed to conduct even a cursory investigation into the defendant's background which would have shown the defendant's parents had been imprisoned for the criminal neglect of the defendant and his siblings, the defendant had been severely beaten by his father, and had been returned to his parents' custody after they were released from prison).

Petitioner alleged no specific facts in his Rule 32 petition and presented the state trial court with no evidence showing (1) Petitioner ever communicated any information to his defense team prior to November 1996 indicating that (a) he had suffered abuse or neglect as a child, (b) he suffered from any medical, neurological, or mental health condition, or (c) he experienced any educational problems during his childhood, (2) there was any information reasonably available prior to Petitioner's capital murder trial suggesting that exploration of Petitioner's educational, medical, social, correctional, or mental health records might produce potentially mitigating evidence, (3) Petitioner ever informed his defense team that

Maxwell Johnson could furnish testimony regarding Petitioner's good character, or (4) any other evidence was reasonably available prior to Petitioner's November 1996 trial which would have alerted Petitioner's trial counsel to the possibility that further investigation into Petitioner's educational, family, social, correctional, medical, or mental health records could have produced potentially mitigating evidence. For these reasons, the state trial court and state appellate court reasonably concluded that it was objectively reasonable for Petitioner's trial counsel not to access Petitioner's educational, social, correctional, medical, or mental health records.

A defense attorney preparing for the sentencing phase of a capital trial is not required "to scour the globe on the off chance something will turn up." *Rompilla v. Beard*, 545 U. S. 374, 382-83 (2005); *Everett v. Sec., Fla. Dep't of Corr.*, 779 F.3d 1212, 1250 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 795 (2016). Rather, diligent counsel may draw the line when they have good reason to think that further investigation would be a waste. *Rompilla v. Beard*, 545 U. S. at 383; *Everett v. Sec., Fla. Dep't of Corr.*, 779 F.3d at 1250. The scope of the duty to investigate mitigation evidence is substantially affected by the defendant's actions, statements, and instructions. *Cummings v. Sec'y, Fla. Dep't of Corr.*, 588 F.3d 1331, 1357 (11th Cir. 2009), *cert. denied*, 562 U. S. 872 (2010). In this case, Petitioner failed to identify Maxwell Johnson to his defense team as a potential character witness. Petitioner and his mother both failed to inform Petitioner's defense team of any

information suggesting that additional investigation into Petitioner's educational, family, social, correctional, medical, or mental health history background might produce mitigating or beneficial evidence or otherwise lead to the discovery of such evidence.

Petitioner's trial counsel was well aware of Petitioner's alleged history of daily marijuana and alcohol abuse. Petitioner's trial counsel testified that he chose not to further investigate Petitioner's history of alcohol and marijuana abuse based on (1) his belief that such evidence could potentially be harmful to the defense, (2) his belief that evidence of Petitioner's drug and alcohol abuse would likely prove beneficial to the Petitioner only if the evidence showed Petitioner's abuse of drugs and alcohol was extreme or severe, and (3) the fact he found no evidence suggesting Petitioner's abuse of alcohol or drugs was severe or sufficient enough to rise to the level of a mental disease or defect.[253] The state trial court and Alabama Court of Criminal Appeals reasonably concluded this decision by Petitioner's trial counsel was itself objectively reasonable.

Petitioner's trial counsel was also well aware that Petitioner claimed to have earned his GED while incarcerated.[254] Petitioner presented the state court with no

---

[253] S.F. Rule 32 Hearing, testimony of Tommy Goggans, 17 SCR 148-49.

[254] Attorney Goggans testified without contradiction that he was aware Petitioner had dropped out of school but later earned a GED while incarcerated. S.F. Rule 32 Hearing, testimony of Tommy Goggans, 17 SCR 97.

properly authenticated documentary evidence during his Rule 32 proceeding that was available at the time of Petitioner's capital murder trial and which documented Petitioner's completion of a GED program. Likewise, Petitioner failed to present the state court with any witness who was available at the time of Petitioner's November 1996 trial who could have testified based on personal knowledge that Petitioner successfully completed a GED program or a small motor repair course while incarcerated. While Mary Archie testified to these facts in June 2005 during Petitioner's Rule 32 hearing, there was no evidence presented during that hearing showing that she possessed personal knowledge of those facts in November 1996.[255] Had she attempted to testify to those facts at Petitioner's capital murder trial, her testimony would have been properly subject to challenge. Moreover, she did not testify in June 2005 that she was available and willing to testify at Petitioner's November 1996 capital murder trial. Thus, Petitioner failed to present evidence during his Rule 32 proceeding showing there was evidence reasonably available at the time of Petitioner's capital murder trial (other than possibly through the

---

[255] Ms. Archie testified during Petitioner's Rule 32 hearing that she had very little contact with Petitioner after he left her home at age nine or ten, including while he was incarcerated in Virginia, because her drug abuse kept her high all the time. S.F. Rule 32 Hearing, testimony of Mary Archie, 17 SCR 191-92, 200, 18 SCR 205, 208-09, 221-23. By her own testimony. Ms. Archie established that she abused drugs extensively until 2000, long after the date of Petitioner's capital murder trial.

testimony of Petitioner himself -- a problematic option at best) showing Petitioner had successfully completed a GED course or a course in small engine repair.[256]

During Petitioner's capital murder trial the prosecution presented extensive testimony detailing Petitioner's activities on the date of the murder, beginning when Petitioner and his accomplices crashed a stolen car into the front yard of a residence in Talladega near Sylacauga and began seeking a series of rides, first into Alexander City and then back to Guntersville.[257] Numerous witnesses testified to virtually every action by Petitioner and his accomplices from that point on the rest of that day, leading up to and including Petitioner's fatal shooting of Julie Rhodes.[258] Despite

---

[256] Petitioner does not allege any facts showing that he ever requested to testify at the punishment phase of his capital murder trial or that he ever indicated to his trial counsel a desire to do so.

[257] An eyewitness testified that (1) he saw Petitioner and two other men run a car into his neighbor's yard on December 1, 1995, (2) the three men asked him for a ride to Sylacauga and later to Alexander City, and (3) when he dropped them off at a white house near a church, Petitioner told him if anyone asked, he should not tell them he had given the three men a ride. S.F. Trial, testimony of Daryl Davis, 9 SCR 742-51.

[258] Two witnesses testified about the efforts of Petitioner and his two companions to secure a ride from the home of Annie Pearl Gaddis back to Guntersville. S.F. Trial, testimony of Jamie Lambert, 9 SCR 752-67; testimony of Charles Goodson, 9 SCR 768-802.
    Other witnesses testified about the attempts of Petitioner and his companions to secure a ride back to Guntersville once they reached an apartment complex in Alexander City. *Id.*, testimony of Gretchen Young, 9 SCR 803-11; testimony of Randy Jackson, 9 SCR 812-20; testimony of Rodney Wyckoff, 9 SCR 820-29; testimony of Marcus Billups, 9 SCR 829-35.
    Still other witnesses testified they saw Petitioner and his companions attempting to flag down passing vehicles along the roadway to secure a ride, which efforts concluded when Petitioner and his companions entered Julie Rhodes' vehicle in a shopping center parking lot. S.F. Trial, testimony of Djuna K. Gates, 9 SCR 852-57; testimony of Christy Causey Meadows, 9 SCR 858-62; testimony of Laura Sharp, 9 SCR 863-65; testimony of Kelli Simpson, 9 SCR 866-72; testimony of Jason Sims, 9 SCR 872-77; testimony of Billy Tease, 9 SCR 877-82; testimony of Darrell Armour, 9 SCR 882-87; testimony of Angela Jones, 9 SCR 887-94; testimony of Ginny Jones, 9 SCR 894-99.

the large number of witnesses and amount of detailed testimony chronicling Petitioner's actions and movements on the date of the fatal shooting, there was no evidence presented at trial or during Petitioner's Rule 32 hearing suggesting Petitioner ingested any alcohol or drugs on December 1, 1995. Likewise, there was no evidence presented at trial or at Petitioner's Rule 32 hearing establishing that Petitioner was to any degree under the influence of alcohol or drugs at the time he fatally shot Julie Rhodes -- twice. Nor did Petitioner allege any facts in his Rule 32 petition suggesting he was intoxicated or otherwise under the influence (to any degree) of drugs or alcohol at the time he fatally shot Julie Rhodes -- twice.

Given the absence of any evidence showing that either Petitioner actually abused drugs or alcohol on the date of his capital offense or Petitioner's history of abusing alcohol or drugs had any impact on his actions on December 1, 1995, the

---

One of the eyewitnesses who saw Petitioner and his companions enter Julie's vehicle testified that Julie looked like something was wrong. S.F. Trial, testimony of Ginny Jones, 9 SCR 898.

Petitioner's accomplice Jonathan David Garrison testified without contradiction (1) that he, Petitioner, and Kevin Hilburn broke into and stole a car then drove toward Alexander City, (2) they totaled the stolen car near Sylacauga, (3) they then got a ride to the home of a person Petitioner knew where they unsuccessfully sought a ride, (4) they then walked to a store and bought Cokes, (5) they next got a ride into Alexander City from a black guy, (6) they then went to some guy's apartment, (7) later they got a ride to some road where they unsuccessfully attempted to flag down another ride, (8) finally a white couple in a black truck picked them up and took them to the Alexander City shopping center, where they watched the Christmas parade, (9) while they were looking for another ride, a gray Maxima drove up and petitioner spoke to the driver, (10) the female driver said she would give them a ride, (11) Petitioner instructed her to drive them to a residential neighborhood and told her to stop, and (12) Petitioner then pulled out his gun. S.F. Trial, testimony of Jonathan David Garrison, 11 SCR 1258-72.

state trial court and state appellate court reasonably concluded that it was objectively reasonable for Petitioner's trial counsel to choose not to investigate further Petitioner's assertions that he had used alcohol and marijuana daily since age fourteen. Absent some evidence linking Petitioner's alleged alcohol or drug abuse to Petitioner's capital offense (such as evidence showing that, at the time of his capital offense, Petitioner was intoxicated, impaired, or suffering either from an intense craving for drugs or alcohol or from withdrawal symptoms), Petitioner's trial counsel could reasonably have believed that further investigation into Petitioner's history of long term marijuana and alcohol abuse was unlikely to produce compelling mitigating or exculpatory evidence.

Contrary to the suggestions implicit in attorney Conner's testimony at Petitioner's Rule 32 hearing, "[t]he defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources." *Smith v. Collins*, 977 F.2d at 960. Likewise, attorney Conner's contention that the ABA Guidelines establish the proper standard for evaluating ineffective assistance claims is unpersuasive. *See Bobby v. Van Hook*, 558 U. S. 4, 8-9 (2009) (holding the ABA Guidelines are only "guides" to what reasonableness means, not its definition); *Daniel v. Commn'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1262-63 & n.10 (11th Cir. 2016) (recognizing the ABA Guidelines furnish guides, not "inexorable commands"). Because attorney

Conner did not interview attorney Goggans, had no familiarity with Alabama substantive or procedural criminal law, had no personal knowledge of the information about his background that Petitioner shared with attorney Goggans, had no knowledge of the information Petitioner's defense team discovered (from Petitioner's parents and other sources) while preparing for trial, and had virtually no knowledge of the nature and scope of the potentially mitigating evidence actually available at the time of Petitioner's capital murder trial (including any possible double-edged evidence), the state trial court and state appellate court reasonably chose not to rely on the conclusory opinions of attorney Conner proffered during Petitioner's Rule 32 hearing.

To be effective a lawyer is not required to pursue every path until it bears fruit or until all hope withers. *Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d at 649; *Puiatti v. Sec., Fla. Dep't of Corr.*, 732 F.3d 1255, 1280 (11th Cir. 2013), *cert. denied*, 135 S. Ct. 68 (2014). "[C]ounsel is not required to present all mitigating evidence, even if the additional mitigating evidence would not have been incompatible with counsel's strategy. Counsel must be permitted to weed out some arguments to stress others and advocate effectively." *Tanzi v. Sec., Fla. Dep't of Corr.*, 772 F.3d 644. 659 (11th Cir. 2014) (quoting *Halliburton v. Sec'y for Dep't of Corr.*, 342 F.3d 1233, 1243-44 (11th Cir. 2003), *cert. denied*, 541 U. S. 1087 (2004)), *cert. denied*, 136 S. Ct. 155 (2015). *Accord Debruce v. Commn'r,*

*Ala. Dep't of Corr.*, 758 F.3d 1263, 1299 (11th Cir. 2014) ("Counsel is not required to present every nonfrivolous defense, nor is counsel required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy."), *cert. denied*, 135 S. Ct. 2854 (2015).

It is strongly presumed that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U. S. at 690. Petitioner presented no evidence to the state trial court or state appellate court showing the extent or product of the investigation, if any, Petitioner's court-appointed investigator undertook into Petitioner's background. Petitioner did not testify at his Rule 32 hearing or offer any other evidence controverting attorney Goggans' detailed account of the information (about Petitioner's background) which Petitioner communicated to attorney Goggans prior to trial. Petitioner presented the state trial court and state appellate court with no evidence showing it was objectively unreasonable for Petitioner's defense team to believe, based upon the information furnished to his defense team by Petitioner and his parents, that it was unlikely any potentially mitigating evidence would be produced by (1) further investigation into Petitioner's history of drug and alcohol abuse, (2) the acquisition and review of Petitioner's medical, mental health, social, educational, and correctional records, (3) interviewing Petitioner's imprisoned older brother, (4) subjecting Petitioner to mental health or

neuropsychological evaluations, or (5) searching for persons such as Maxwell Johnson who could testify as character witnesses based almost exclusively upon their knowledge of Petitioner as a child.

Attorney Goggans testified without contradiction at Petitioner's Rule 32 hearing that Petitioner's own father disclosed that Petitioner had been involved with a gang and engaged in drug trafficking and Petitioner had a pattern of lying to get out of trouble.[259] Attorney Goggans testified that he did not want any testimony admitted into evidence showing Petitioner was a gang member or had dealt drugs.[260] Even if not directly relevant to the statutory aggravating factors, evidence of Petitioner's gang involvement and history of drug trafficking could have proven extremely problematic for Petitioner. The prosecution might have used such information to impeach any of petitioner's family members the defense called to testify at the punishment phase of trial on Petitioner's behalf. Attorney Goggans could reasonably have believed that calling Petitioner's family members or friends from the Washington, D.C. area (who might have had knowledge of Petitioner's gang affiliation or history of drug trafficking) to testify at the punishment phase of

---

[259] *See* S.F. Rule 32 Hearing, testimony of Tommy Goggans, 17 SCR 96-97:
And a significant thing that stuck out with me was that he said that Tony had a pattern of when he got in trouble that he would try to lie his way out of it. Which in my view, that's about the last thing you want coming out in the courtroom. A jury will forgive a lot of things, but not that.

[260] *Id.*, 17 SCR 152-53.

trial could open the door to potentially devastating cross-examination addressing the witness's knowledge of those subjects.

To satisfy the first prong of *Strickland*, *i.e.*, establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U. S. 521; *Williams v. Taylor*, 529 U. S. 390-91. In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U. S. at 687-91. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U. S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U. S. at 7; *Strickland v. Washington*, 466 U. S. at 688-89.

The state trial court and state appellate court rejected Petitioner's ineffective assistance claims on the merits following an evidentiary hearing. In so doing, the state court implicitly concluded attorney Goggans' testimony was more credible than that of petitioner's mother and reasonably concluded Petitioner's complaints about the failure of his trial counsel to investigate Petitioner's background for mitigating evidence and present witnesses at the punishment phase of trial failed to overcome the presumption of reasonableness afforded the decisions of trial counsel.[261]

In light of the evidence presented during Petitioner's Rule 32 hearing (especially the information Petitioner's father gave to attorney Goggans concerning Petitioner's history of gang involvement and drug trafficking -- the accuracy of which information Petitioner did not challenge in the state court and has not challenged in this court), the state trial and appellate courts reasonably concluded that attorney Goggans' decision not to interview other, unidentified persons who had personal knowledge of Petitioner's background was objectively reasonable.[262] In

---

[261] Attorney Goggans testified without contradiction at Petitioner's Rule 32 hearing that he could not recall Petitioner saying anything during their conversations suggesting a history of domestic violence with either Petitioner's father or mother, and Petitioner denied any history of medical or mental problems. S.F. Rule 32 Hearing, testimony of Tommy Goggans, 17 SCR 146-48.

[262] As explained above, Petitioner presented no testimony or other evidence during his Rule 32 hearing establishing the full scope of the investigation undertaken by Petitioner's defense team. Petitioner did not present any testimony from Petitioner's court-appointed investigator reflecting the persons the Petitioner's court-appointed investigator interviewed or any of the information Petitioner's defense gleaned during those interviews.

light of the evidence presented at Petitioner's Rule 32 hearing showing that Petitioner denied to his trial counsel that he or his mother had been the victims of domestic abuse and Petitioner's family members would also likely have been subject to cross-examination based on their knowledge of Petitioner's gang affiliation and history of drug trafficking, the state trial and appellate courts could reasonably have concluded the decision by Petitioner's trial counsel not to call Petitioner's family members or acquaintances from the metropolitan Washington, D.C. area to testify at trial was likewise objectively reasonable.

### (2) No Prejudice

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, 558 U. S. at 20; *Wiggins v. Smith*, 539 U. S. at 534. The *Strickland* standard does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a trial would have been different. *Wong v. Belmontes*, 558 U. S. at 27. The prejudice inquiry under *Strickland* requires evaluating whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U. S. at 694. The likelihood of a

different result must be substantial, not just conceivable. *Cullen v. Pinholster*, 563 U. S. 170, 189 (2011); *Harrington v. Richter*, 562 U. S. at 112.

Federal habeas corpus petitioners asserting claims of ineffective assistance based on counsel's failure to call a witness (either a lay witness or an expert witness) satisfy the prejudice prong of *Strickland* only by naming the witness, *demonstrating the witness was available to testify and would have done so*, setting out the content of the witness's proposed testimony, and showing the testimony would have been favorable to a particular defense. *Woodfox v. Cain*, 609 F.3d at 808; *Day v. Quarterman*, 566 F.3d at 538. *See also Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d at 1262 (federal habeas petitioner who failed to show an uncalled witness was available to testify at the time of trial failed to satisfy prejudice prong of *Strickland*).

Petitioner presented the state court with no evidence at his Rule 32 hearing showing either (1) what potentially mitigating evidence or otherwise helpful information, if any, was contained in any of the Petitioner's medical, mental health, educational, correctional, or social history records that existed and was reasonably available to the defense at the time of Petitioner's November 1996 capital murder trial,[263] (2) Maxwell Johnson (a) possessed any personal knowledge of any abuse or

---

[263] Petitioner complains that his trial counsel failed to obtain and present at trial unidentified records relating to Petitioner's medical, educational, correctional, mental health, and family backgrounds. Ironically, Petitioner presented the state trial court with no such records and no testimony establishing what such records contained in terms of potentially mitigating evidence. For instance, Petitioner alleges that records from his incarceration for armed robbery in Virginia would show that he behaved well during his previous incarceration. Petitioner did not present the

neglect Petitioner allegedly suffered while growing up or (b) had any significant contact with Petitioner between the times Petitioner reached age fourteen and was arrested for armed robbery in Virginia, (3) what mitigating evidence Petitioner's father could have furnished had he been called to testify at Petitioner's capital murder trial,[264] or (4) Petitioner's mother, father, or older brother were available to testify at Petitioner's capital murder trial in Alabama in November 1996.

Petitioner did not call his father or brother to testify at his Rule 32 hearing. Petitioner did not testify at his Rule 32 hearing or offer any other testimony or evidence contradicting attorney Goggans' testimony regarding the very harmful information about Petitioner's background that Petitioner and his father gave attorney Goggans prior to trial. Importantly, Petitioner offered the state court no

---

state court with copies of any such records during his Rule 32 proceeding. Nor did Petitioner present the state trial court with any records showing that he suffered from any medical or mental health condition relevant in any manner to his capital offense or his medical or mental health records reflected that he suffered from a history of childhood abuse or neglect. Likewise, Petitioner presented no documents to the state trial court during his Rule 32 proceeding establishing that Petitioner earned a GED or completed a course in small engine repair while incarcerated. Both Petitioner's mother and Maxwell Johnson testified at Petitioner's Rule 32 hearing that Petitioner was a good student and did well in school. S.F. Rule 32 Hearing, testimony of Mary Archie, 17 SCR 199-200; 18 SCR 231; testimony of Maxwell Orin Johnson, 18 SCR 241. Petitioner did not present the state trial court with any fact-specific allegations or evidence showing that his academic records reflected or suggested he suffered from a history of childhood neglect or abuse or experienced a learning disability. During his Rule 32 proceeding, Petitioner presented the state trial court with no documents relating to Petitioner's academic or educational background.

[264] Petitioner offered no testimony of other evidence to the state trial court during Petitioner's Rule 32 proceeding suggesting Petitioner's father or older brother could have testified in any manner favorable to Petitioner had they been called to testify at the punishment phase of Petitioner's November 1996 capital murder trial.

evidence at the Rule 32 hearing suggesting the potentially harmful information Petitioner's father gave to attorney Goggans about Petitioner's gang involvement and drug trafficking was factually inaccurate.

Petitioner did present his mother's testimony about her long history of drug abuse and several instances of physical violence by Petitioner's father directed toward her and her sons.[265] As the state trial and appellate courts noted, however, the incidents of alleged physical violence between his parents which Ms. Archie testified Petitioner witnessed were relatively few in number. There was no factual allegation or evidence presented to the state trial court during Petitioner's Rule 32 proceeding showing that Petitioner sustained any significant or long-term physical injury as a result of the instances of physical violence allegedly directed toward Petitioner by his father. Nor did Petitioner allege any facts or present the state court with any evidence showing Petitioner sustained any significant or long-term emotional or psychological harm as a result of his having sustained physical injury at the hands of his father or witnessed any of the alleged instances of violence between his parents described by his mother in her testimony. Ms. Archie testified

---

[265] S.F. Rule 32 Hearing, testimony of Mary Archie, 17 SCR 166, 171-80, 184-85, 187, 189-92, 200; 18 SCR 203, 207, 209, 217-18, 227.

her sons never saw her abuse drugs, despite her testimony that her drug abuse was severe and of long duration.[266]

Petitioner presented no evidence showing that his mother was available to testify in Alabama at the time of Petitioner's November 1996 capital murder trial. By her own admission, at the time of Petitioner's capital murder trial, Mary Archie was a long-term crack and PCP abuser who did not get clean and sober until several years after Petitioner's capital murder trial, *i.e.*, circa the year 2000.[267] She admitted she failed to attend any of Petitioner's criminal proceedings in Virginia because she was stoned or high.[268] She testified she lacked the financial resources to travel to Alabama to attend Petitioner's November 1996 capital murder trial.[269] She also admitted she had very little contact with Petitioner after he left her home (around age 9 or 10) and she did not visit Petitioner while he was in prison in Virginia because her drug abuse left her unable to do so.[270] Finally, Ms. Archie never testified she was available and willing to testify at the time of Petitioner's November 1996 capital murder trial.

---

[266] *Id.*, 17 SCR 184.

[267] *Id.*, 17 SCR 166, 171-72, 184-85, 187-88, 191, 200; 18 SCR 209, 223, 227.

[268] *Id.*, 18 SCR 223.

[269] *Id.*, 18 SCR 211, 230.

[270] S.F. Rule 32 Hearing, testimony of Mary Archie, 17 SCR 191-92, 200; 18 SCR 208-09.

Even when viewed in the light most favorable to Petitioner, the record from Petitioner's Rule 32 hearing shows Petitioner presented the state court with very little truly "new" or "additional" mitigating evidence, *i.e.*, evidence that was unknown to Petitioner's defense team at the time of Petitioner's November 1996 capital murder trial.[271] The only truly "new" evidence presented during Petitioner's Rule 32 hearing consisted of testimony from Petitioner's mother and Maxwell Johnson that (1) Lt. Col. Johnson, who coached Petitioner in youth basketball, considered Petitioner to be smart, mature, articulate, a good athlete, a good student, and a good kid, (2) Petitioner's mother was a long-term abuser of drugs, (3)

---

[271] Attorney Goggans testified without contradiction at the Rule 32 hearing that he was aware (because Petitioner told him) that Petitioner was born at Camp Lejeune, Petitioner's parents divorced when Petitioner was young, and Petitioner dropped out of school but had earned a GED while serving a prison sentence. S.F. Rule 32 Hearing, testimony of Tommy Goggans, 17 SCR 95, 97, 104. Attorney Goggans also testified without contradiction that he was aware, because he asked Petitioner, of Petitioner's behavioral record during the time Petitioner was incarcerated in Virginia. *Id.*, 17 SCR 94. Petitioner did not question attorney Goggans at the Rule 32 hearing regarding why he chose not to introduce evidence addressing those subjects at the punishment phase of Petitioner's capital murder trial. During his Rule 32 proceeding, Petitioner presented the state court with no documents or other evidence showing Petitioner suffered from any medical, physical, neurological, emotional, or mental health condition as a result of spending his early years at Camp Lejeune or his behavioral record while incarcerated in Virginia was significantly different from the behavioral records of other inmates at the same facility where he was incarcerated. Petitioner also presented the state trial court with no evidence showing that any beneficial evidence or information would have been discovered had Petitioner's trial counsel asked for a professional mental health or neurological examination of Petitioner.

Whatever the meager mitigating value the evidence Petitioner could have presented at the punishment phase of his November 1996 capital murder trial showing Petitioner earned a GED and had a record of (presumptively) good behavior in prison, that evidence would necessarily have been juxtaposed with the fact that such evidence would also have reminded the jury that, prior to his capital offense, Petitioner had been sentenced to prison for a serious criminal offense and spent enough time incarcerated to earn a GED. Thus, the evidence showing Petitioner had earned a GED and behaved well *while incarcerated* was clearly double-edged in nature.

Petitioner's father was a drug-abuser who divorced Petitioner's mother when Petitioner was young, and (4) Petitioner's father occasionally directed physical violence toward Petitioner's mother, Petitioner, and Petitioner's older brother, which included striking Petitioner and his older brother in the chest with sufficient force to knock them down.

As explained at length above in Section V.E.3., there was overwhelming evidence before Petitioner's capital sentencing jury and judge showing Petitioner intentionally and fatally shot Julie Rhodes -- twice -- while she was inside her vehicle and while Petitioner was in the course robbing or attempting to rob her.[272] The evidence showing the horrific nature of Julie's Rhodes' injuries and the physical and emotional pain and suffering she endured after the shooting and prior to her death, *i.e.*, the evidence showing the heinous, atrocious, and cruel nature of Petitioner's capital offense, was likewise overwhelming.[273] Petitioner's jury also heard

_____

[272] There was also overwhelming evidence showing Petitioner was inside a vehicle when he fired the fatal shots but the state trial court inexplicably withdrew that theory of capital murder from the jury at the conclusion of the guilt-innocence phase of trial.

[273] *See* Section IV.D. As explained above in Section IV.D., Alabama law defines the term "heinous, atrocious, or cruel" in terms that compel a jury and sentencing court's consideration of whether the victim of a capital offense suffered intentionally inflicted, prolonged pain and whether the defendant's actions were conscienceless and pitiless. Petitioner argues at several points in his federal habeas corpus petition and briefs in support that it was impermissible for his jury and sentencing judge to consider evidence showing the nature and extent of Julie Rhodes's pain and suffering *after* Petitioner fled the crime scene in determining whether Petitioner's capital offense was "heinous, atrocious, or cruel." Not surprisingly, Petitioner cites no authority to support this new rule. The new rule Petitioner proposes in his pleadings and briefs in this court would preclude consideration (for the purpose of determining whether a capital offense was "heinous, atrocious, or cruel") of any evidence showing the scope or nature of a capital murder victim's suffering *after*

testimony that Petitioner announced prior to the fatal shooting that he intended to "jack" someone to get a ride back to Guntersville,[274] he was prepared to shoot someone to get a ride,[275] and he preferred to shoot one person rather than two.[276] Other witnesses testified that, after fatally shooting Julie Rhodes -- twice -- Petitioner represented to multiple persons that he had purchased Julie Rhodes's vehicle,[277] refused requests to stop playing with his pistol while inside a crowded apartment,[278] and threatened to shoot Brian Hampton unless Hampton agreed to dispose of the murder weapon.[279]

---

a capital defendant fled the crime scene following an intentional shooting, stabbing, or bludgeoning which left the victim still conscious but in great physical pain. Such a rule is illogical and at odds with the nature of the "heinous, atrocious, or cruel" analysis mandated by Alabama law. Furthermore, this court's independent legal research has identified no existing state or federal legal authority supporting such a rule. Moreover, a district court is precluded from adopting such a new rule in the context of this federal habeas corpus proceeding by the Supreme Court's non-retroactivity doctrine announced in *Teague v. Lane*, 489 U. S. at 310.

[274] S.F. Trial, testimony of Charles Goodson, 8 SCR 790.

[275] S.F. Trial, testimony of Jonathan David Garrison, 11 SCR 1268-69.

[276] *Id.*

[277] S.F. Trial, testimony of Jason Scott Mitchell, 10 SCR 969; testimony of Neysa Hampton Dobbs, 10 SCR 1002-03; testimony of Willie Havis, 10 SCR 1019; testimony of Brian Hampton, 10 SCR 1046.

[278] Nikisha Pieborn testified without contradiction that the Saturday after the fatal shooting she told petitioner she was pregnant, she asked Petitioner to put his gun away and stop pointing it at people in the apartment she shared with Candace Talley, but Petitioner ignored her. S.F. Trial, testimony of Nikisha Pieborn, 10 SCR 950-52.

[279] S.F. Trial, testimony of Willie Havis, 10 SCR 1031; testimony of Brian Hampton, 10 SCR 1054-55.

During his Rule 32 proceeding, Petitioner presented the state courts with additional purportedly mitigating evidence (*i.e.*, evidence not presented during trial) showing that (1) prior to his capital offense, Petitioner earned a GED and completed a small motor repair course while incarcerated for armed robbery in Virginia,[280] (2) Petitioner admitted to daily abuse of alcohol and marijuana from age fourteen,[281] (3) Lt. Col. Johnson believed Petitioner was honest, redeemable, and had many good character traits,[282] (4) Petitioner's parents were both drug abusers who occasionally fought violently in the presence of their sons,[283] and (5) Petitioner's father occasionally struck his school-age sons in the chest with sufficient force to knock them down and make them cry.[284] The foregoing additional mitigating evidence,

---

[280] S.F. Rule 32 Hearing, testimony of Tommy Goggans, 17 SCR 97; testimony of Mary Archie, 18 SCR 209; testimony of Maxwell Orin Johnson, 18 SCR 248.

[281] S.F. Rule 32 Hearing, testimony of Tommy Goggans, 17 SCR 148. This testimony must be viewed in proper context. Both Petitioner's mother and Lt. Col. Johnson denied any knowledge of drug use by Petitioner. S.F. Rule 32 Hearing, testimony of Mary Archie, 18 SCR 231; testimony of Maxwell Orin Johnson, 18 SCR 267.

[282] S.F. Rule 32 Hearing, testimony of Maxwell Orin Johnson, 18 SCR 238, 241, 247, 260-62. Lt. Col. Johnson also admitted that, other than visiting Petitioner in jail following Petitioner's arrest for robbery and buying Petitioner a bus ticket to go to Alabama, he had very little contact with Petitioner after Petitioner reached high school age, until he learned Petitioner had been convicted of murder. *Id.*, 18 SCR 245-48, 262-64, 275-76.

[283] S.F. Rule 32 Hearing, testimony of Mary Archie, 17 SCR 166, 171-78, 184-92; 18 SCR 217-18, 227. She testified further that, because of her extensive drug abuse, she had very little contact with Petitioner after he left her home at age nine or ten and went to live with his father. *Id.*, 17 SCR 191-92.

[284] S.F. Rule 32 Hearing, testimony of Mary Archie, 17 SCR 178-80. She offered no testimony that she ever reported Petitioner's father to responsible child welfare or law enforcement officials for investigation of child abuse.

much of which is double-edged in nature, pales in comparison to the factual horror and moral force of the overwhelming evidence supporting all three of the aggravating factors properly before Petitioner's jury and sentencing judge at the punishment phase of trial. Moreover, Petitioner failed to present the state courts with evidence showing the first and last two of these five categories of additional mitigating evidence were reasonably available at the time of his November 1996 capital murder trial.

Likewise, Petitioner offered no evidence at his Rule 32 hearing showing his capital offense was in any way related to his drug or alcohol abuse. There was no evidence at his trial or Rule 32 hearing suggesting Petitioner was under the influence of drugs or alcohol at the time of his capital offense. There was no evidence at his trial or Rule 32 hearing suggesting Petitioner was suffering from withdrawal symptoms or an intense craving for drugs or alcohol at the time of his capital offense. There was no evidence presented at his trial or Rule 32 hearing showing Petitioner was addicted to alcohol or drugs at the time of his capital offense. Thus, in the context of Petitioner's November 1996 capital murder trial, Petitioner's naked assertion to his trial counsel that he had abused alcohol and marijuana on a daily basis since age fourteen had very little potential mitigating value.

The state trial and appellate courts reasonably concluded there was no reasonable probability that, but for the failure of Petitioner's trial counsel to more

fully investigate Petitioner's background and to present any of the evidence admitted during Petitioner's Rule 32 hearing, the outcome of the punishment phase of Petitioner's capital murder trial would have been any different.

### b. Punishment Phase Closing Jury Argument

Petitioner complains that, during closing jury argument at the punishment phase of trial, his trial counsel presented only a very brief closing argument which focused almost exclusively on Petitioner's youth as a mitigating factor (a factor Petitioner deems inappropriate given the similar age of the victim), failed to adequately mention Petitioner's childhood, family background, or character, and failed to adequately explain why Petitioner was deserving of mercy.[285]

The initial portion of the prosecution's closing argument at the punishment phase of Petitioner's November 1996 capital murder trial consisted of a brief discussion (filling only five pages of the trial transcript) in which the prosecutor (1) defined aggravating and mitigating factors, (2) reminded the jury that weighing aggravating and mitigating factors was not a mathematical process, (3) identified three aggravating circumstances (*i.e.*, the fact Petitioner stood convicted of a murder committed during a robbery, the fact Petitioner had previously been convicted of a crime of violence, and the heinous, atrocious, and cruel nature of petitioner's capital

---

[285] Doc. # 1, at pp. 13-14, ¶¶ 39-40. Petitioner presented an abridged version of these same complaints in his Rule 32 petition. 15 SCR 20 (¶ 20).

offense), (4) reminded the jury it took ten votes to recommend a sentence of death, (5) argued the evidence showed Julie Rhodes begged the Petitioner not to shoot her, (6) argued the evidence showed Petitioner shoved her out of the way and then abandoned her after shooting her, and (7) argued the Petitioner took away all of the tomorrows Julie Rhodes and her family would otherwise have enjoyed together.[286]

Petitioner's trial counsel then (1) argued to the jury that a sentence of life imprisonment without the possibility of parole was not an inviting proposition, (2) pointed out Petitioner was only eighteen years old on the date of his capital offense and only nineteen years old at the time of trial, (3) acknowledged that Julie Rhodes was also young and her death tragic, (4) argued the jury was legally obligated to consider Petitioner's youth, not as an excuse but as a mitigating factor, (5) argued that everyone, even the least of us, is protected by the law, (6) pointed out Petitioner's parents were not present in the courtroom, (7) pointed out the best Petitioner could hope for was a sentence of life without parole, and (8) asked the jury to vote for life without parole.[287]

The prosecution then swiftly concluded its closing jury argument (filling less than three pages in the trial transcript) by (1) arguing that, while Petitioner was facing, at best, life without parole, Julie Rhodes was only nineteen and "she's left

---

[286] S.F. Trial, 12 SCR 1426-30.

[287] S.F. Trial, 12 SCR 1430-33.

with no life at all," (2) arguing the death penalty is an expression of society's right to self-defense, (3) emphasized the state did not lightly ask the jury to consider the death penalty in this case, (3) arguing Julie Rhodes deserved better than to lose her time on this earth as a result of a decision made by the petitioner, (4) arguing Petitioner had a choice whether to take her car and leave her alive and instead chose to murder the unarmed, defenseless, nineteen year witness to his robbery, (5) urging the jury to bring their personal experiences as citizens of this country to bear when weighing the aggravating and mitigating circumstances, and (6) asking the jury to return a verdict recommending the maximum punishment for Julie's killer.[288]

### (1) No Deficient Performance

While Petitioner now faults the length of his trial counsel's punishment phase closing jury argument, that argument must be viewed in proper context.[289]  At the punishment phase of Petitioner's capital murder trial each party introduced a single exhibit and rested: the prosecution presented a certified copy of the judgment from Petitioner's prior conviction in Virginia for armed robbery; the defense presented a

---

[288] S.F. Trial, 12 SCR 1433-35.

[289] Attorney Goggans testified during Petitioner's Rule 32 hearing that (1) he believed the strongest mitigating factor available at Petitioner's trial was Petitioner's youth (age eighteen at the time of his capital offense), (2) he argued in his closing argument at the punishment phase of trial that Petitioner's youth was a mitigating factor the jury should weigh when assessing punishment, (3) he also mentioned that Petitioner's parents had not been present at Petitioner's earlier criminal proceeding in Virginia and were not present at his capital murder trial, and (4) he quoted Jesus, hoping it would resonate with the jury.  S.F. Trial, 12 SCR 1433-35.

certified copy of Petitioner's birth certificate.[290]   As explained above, the prosecution's closing jury argument at the punishment phase of Petitioner's trial filled less than eight full pages of the trial record; Petitioner's trial counsel's closing argument filled almost five pages.

In his closing argument at the punishment phase of Petitioner's capital murder trial, Petitioner's trial counsel argued the jury was obligated to consider Petitioner's youth as a mitigating factor, urged the jury to view a sentence of life without parole as a severe form of punishment, acknowledged that Julie Rhodes died far too young, pointed out that Petitioner apparently did not have support of his own family, and described Petitioner with a Biblical allusion as "one of the least of us" for whom the law afforded protection.  The state trial court and state appellate court reasonably concluded the scope and content of Petitioner's trial counsel's closing jury argument at the punishment phase of trial fell within the broad range of professionally reasonable assistance.  Petitioner's trial counsel reasonably identified the lone statutory mitigating factor applicable to Petitioner and urged the jury to give great weight to that factor.  Petitioner's trial counsel cannot reasonably be faulted for failing to discuss evidence of Petitioner's background that was not in evidence and

---

[290] S.F. Trial, 12 SCR 1421-23.

not properly before the jury at the punishment phase of trial. Counsel's Rule 32 testimony was completely consistent with the record.

Nor can Petitioner's trial counsel reasonably be faulted for urging the jury to show compassion on Petitioner, as follows: "I have spent what, seven days in Alex City, in a courthouse and I was thinking of the answer of why is that how important it is that inside this rail we are all protected by all the laws, everybody, even the least of us, even Tony Barksdale is. Right now I'm the only one in the courtroom with him. I noted in this -- this in the State's exhibit also, apparently, that was the same situation there: Subject's parents are not present in court."[291] The state trial court and state appellate court could reasonably have believed Petitioner's allusion to the passage in the Gospel of Matthew in which Jesus described what will occur at his Second Coming was objectively reasonable. The passage in question describes how judgment will be made at the time of the Christ's return and emphasizes the need for all believers to care for "the least of these brothers and sisters of mine."[292]

---

[291] S.F. Trial, 12 SCR 1432.

[292] The Biblical passage to which Petitioner's trial counsel alluded in his closing jury argument at the punishment phase of Petitioner's November 1996 capital murder trial appears in the 25th Chapter of the Gospel of Matthew. The Gospel writer quotes Jesus as follows:
He will put the sheep on his right and the goats on his left. "Then the King will say to those on his right, 'Come, you who are blessed by my Father, take your inheritance, the kingdom prepared for you since the creation of the world. For I was hungry and you gave me something to eat, I was thirsty and you gave me something to drink. I was a stranger and you invited me in. I needed clothes and you clothed me, I was sick and you looked after me, I was in prison and you came to visit me.' "Then the righteous will answer him, 'Lord, when did we see you hungry and feed you, or thirsty and give you something to drink? When did we see

Petitioner's trial counsel could reasonably have believed the jury would understand his reference to Petitioner as "the least of us" in precisely the manner he intended it, *i.e.*, as a reminder that Christians are charged by the founder of their faith with caring for the depressed, downtrodden, and rejected members of society, including presumably those abandoned by their own families.[293]

### (2) No Prejudice

For reasons similar to those discussed at length above in Section V.G.3.a.(2), the state trial court and state appellate court reasonably concluded the Petitioner's complaints about the scope and content of Petitioner's trial counsel's closing jury argument at the punishment phase of Petitioner's capital murder trial failed to satisfy either prong of the *Strickland* analysis. Likewise, for the reasons discussed above in Section V.G.3.b.(1), the state trial and appellate courts reasonably concluded the decisions by Petitioner's trial counsel to emphasize Petitioner's youth at the time of

---

you a stranger and invite you in, or needing clothes and clothe you? When did we see you sick or in prison and go to visit you?' "The King will reply, 'Truly I tell you, whatever you did for one of the least of these brothers and sisters of mine, you did for me.'"

*Matthew 25:33-40 (New International Version).*

[293] Thus, contrary to the argument contained in paragraph 40 of Petitioner's federal habeas corpus petition (Doc. # 1, at pp. 13-14), Petitioner's trial counsel did make an argument in his closing punishment phase jury argument that rose above the level of a naked plea for mercy. In fact, Petitioner's trial counsel made an argument for mercy premised upon Christian values and a passage of scripture most likely familiar to at least some, if not most, members of Petitioner's Alabama jury.

his capital offense and refer to Petitioner as among "the least of us" were both objectively reasonable.

### c. Conclusions

The state courts could reasonably have concluded, based on the evidence presented during Petitioner's Rule 32 proceeding, that (1) Petitioner failed to establish that his mother was available and willing to testify at Petitioner's November 1996 capital murder trial, (2) there was no compelling mitigating evidence reasonably available at the time of Petitioner's November 1996 capital murder trial in the form of documents relating to Petitioner's educational, medical, mental health, social, correctional, or familial backgrounds, (3) additional investigation into Petitioner's background would not have produced any other compelling mitigating evidence reasonably available at the time of Petitioner's capital murder trial, (4) the decision by Petitioner's trial counsel not to call Petitioner's parents to testify at Petitioner's capital murder trial was objectively reasonable, (5) the decision by Petitioner's defense team not to seek inspection of Petitioner's educational, medical, mental health, social, correctional, or familial records was objectively reasonable, and (6) the decision by Petitioner's defense team not to present any witnesses who could be cross-examined about Petitioner's gang affiliation or history of drug trafficking was objectively reasonable. The state trial court and state appellate court reasonably concluded that Petitioner's complaints

about his trial counsel's alleged failure to adequately investigate Petitioner's background and present available mitigating evidence failed to satisfy either prong of the *Strickland* standard. The state trial court and state appellate court reasonably concluded that Petitioner's complaints about his trial counsel's punishment phase closing jury argument failed to satisfy either prong of the *Strickland* standard. The state trial court's and state appellate court's rejections on the merits in the course of Petitioner's Rule 32 proceeding of the ineffective assistance complaints contained in paragraphs 38 through 44 of Petitioner's federal habeas corpus petition were neither contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's trial and Rule 32 proceeding.

Finally, in the alternative and after *de novo* review, the alleged deficiencies in the performance of Petitioner's trial counsel set forth in paragraphs 33 through 46 of Petitioner's federal habeas corpus petition all fail to satisfy the prejudice prong of the *Strickland* standard. There is simply no reasonable probability that, but for the failure of Petitioner's trial counsel to present and argue any or all of the evidence Petitioner actually introduced during his Rule 32 hearing that the outcome of the punishment phase of Petitioner's capital murder would have been any different.

Petitioner's *Wiggins* claim does not satisfy the prejudice prong of the *Strickland* standard.

### 4. *De Novo* Review of New Complaints

In paragraphs 45 and 46 of his federal habeas corpus petition for the first time, Petitioner argues his trial counsel rendered ineffective assistance by failing to (1) request the assistance of an expert to (a) investigate the possibility that Petitioner was exposed to toxic chemicals *in utero* in the water supply at Camp Lejeune and (b) furnish testimony linking Petitioner's exposure to such chemicals with unidentified developmental problems and Petitioner's subsequent actions and (2) request the assistance of an expert to investigate and furnish testimony addressing (a) the fact Petitioner was shuttled as a young boy between two dysfunctional parents and was, at times functionally abandoned by both parents and (b) the effects of those experiences on Petitioner. Petitioner alleges no specific facts showing what potentially mitigating or otherwise beneficial evidence could have been discovered (and presented to the jury) at the time of Petitioner's November 1996 capital trial had his defense team made requests for the assistance of experts on the effects of *in utero* exposure or exposure as an infant to toxic chemicals in drinking water at Camp Lejeune or growing up in an unstable family environment.

### a. No Prejudice

As explained above, complaints about uncalled witnesses are disfavored because they tend to be highly speculative in nature. *See Price v. Allen*, 679 F.3d at 1325 (holding conclusory assertion that a mental health expert could have testified to a connection between the abuse the defendant suffered as a child and his subsequent actions failed to satisfy prejudice prong of the *Strickland* standard). Petitioner does not allege any specific facts showing that any evidence was reasonably available to Petitioner's trial counsel in November 1996 showing that Petitioner suffered any deleterious effects from exposure to alleged toxic chemicals in the drinking water at Camp Lejeune during the two years he resided there. Petitioner's mother testified at Petitioner's Rule 32 hearing that he grew up without exhibiting any drug, alcohol, or educational problems.[294]  Petitioner presented the

---

[294] S.F. Rule 32 Hearing, testimony of Mary Archie, 18 SCR 231.  Ms. Archie did testify that Petitioner experienced headaches, poor circulation, and anemia but she could not recall when that happened. *Id.*, 18 SCR 183, 219.  More significantly, she did not testify that any of those health problems required Petitioner to be hospitalized or treated with anything beyond a brief period of prescription medication.  Even more significantly, Ms. Archie did not identify any developmental deficits Petitioner exhibited while growing up.  Instead, she emphasized that Petitioner did well in school and in his athletic endeavors. *Id.*, 17 SCR 199-200, 209, 231.  Lt. Col. Johnson likewise described Petitioner (whom he met when Petitioner was age nine or ten), as a mature, smart, articulate young man who was both a good student and a good athlete.  S.F. Rule 32 Hearing, testimony of Maxwell Orin Johnson, 18 SCR 241.  Ms. Archie also testified that (1) she separated or divorced Petitioner's father when Petitioner was around age two to four, (2) she had custody of Petitioner until he was nine or ten, (3) at that point, Petitioner went to live with his father and stepmother, and (4) thereafter she had very little contact with Petitioner.  S.F. Rule 32 Hearing, testimony of Mary Archie, 17 SCR 163-65, 184, 191, 200; 18 SCR 218, 231.  In short, neither Ms. Archie nor Lt. Col. Johnson offered any testimony that would have supported the theory that Petitioner was negatively impacted - physically, emotionally or mentally - by either

state trial court with no medical records documenting any medical issues Petitioner experienced or any developmental deficits Petitioner displayed during childhood. Petitioner presents this court with no documentation, nor any fact-specific allegations, suggesting that any records or other information existed in November 1996 showing Petitioner had ever experienced any developmental, medical, emotional, psychological, or mental health problems that could be traced to either his exposure to toxic chemicals (*in utero* or otherwise) at Camp Lejeune or his parents' divorce, his transition at age two to his mother's sole custody, and then his transfer to his father's sole custody around age nine or ten.[295]

---

exposure to toxic chemicals at Camp Lejeune or virtue of his parents' divorce and his living from about age two to age nine or ten with his mother and then going to live with his father.

Ms. Archie also testified that she abused drugs while pregnant with Petitioner. *Id.*, 17 SCR 171-72. She did not testify, however, that she ever observed any behavior on the part of Petitioner suggesting that he suffered from fetal alcohol syndrome or fetal alcohol effects. Nor has Petitioner alleged any facts in this or any other court showing that he suffered from fetal alcohol syndrome or fetal alcohol effects.

[295] Thus, Petitioner has alleged no specific facts in this court showing that, at the time of his November 1996 capital trial, any evidence was reasonably available showing Petitioner suffered from any deleterious effects of (1) his parents' divorce, (2) his movement to his mother's sole custody when Petitioner was around age two, or (3) his movement to his father's home when Petitioner was around age nine or ten. Moreover, Petitioner has failed to allege any facts showing that, at the time of his November 1996 capital murder trial, any evidence was reasonably available showing he "had been shuttled between two dysfunctional parents" who at times functionally abandoned him. Petitioner does not allege that he was ready and willing to testify about those matters at the punishment phase of his November 1996 trial or that either of his parents were reasonably available in November 1996 to testify that Petitioner suffered any negative impact as a result of his two custodial transfers between his parents identified by his mother, *i.e.*, at age two and then at age nine or ten.

In short, Petitioner fails to clothe his naked assertion with any facts whatsoever, by now a familiar pattern. After independent, *de novo* review, there is no reasonable probability that, but for the failure of Petitioner's trial counsel to obtain expert investigations into either Petitioner's exposure to toxic chemicals at Camp Lejeune or the potentially negative impact on Petitioner of his parents' divorce and his subsequent transfers of custody between them, the outcome of the punishment phase of Petitioner's November 1996 capital murder trial would have been any different.

### b. No Deficient Performance

Attorney Goggans testified without contradiction during Petitioner's Rule 32 hearing that he was aware through his conversations with Petitioner that Petitioner was born at Camp Lejeune and his parents divorced not long after Petitioner's birth.[296] Petitioner alleges no facts, however, showing that this information, standing alone, should have alerted attorney Goggans to the need for exploration through experts of the possibility of the deleterious effects of Petitioner's exposure to toxic chemicals at Camp Lejeune or growing up as a child of divorce. As explained above, clairvoyance is not a required attribute of effective representation. *Smith v. Singletary*, 170 F.3d at 1054. "The defense of a criminal case is not an undertaking

---

[296] S.F. Rule 32 Hearing, testimony of Tommy Goggans, 17 SCR 95, 104.

in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources." *Smith v. Collins*, 977 F.2d at 960. Petitioner has failed to allege any specific facts showing that, based upon the information reasonably available to Petitioner's trial counsel at the time of trial (through attorney Goggans' interviews of Petitioner and Petitioner's parents), it was objectively unreasonable for Petitioner's trial counsel not to pursue expert investigation into either the deleterious effects of Petitioner's exposure to toxic chemicals at Camp Lejeune or growing up as a child of divorce.

On the contrary, Petitioner has identified no information reasonably available to Petitioner's defense team at the time of Petitioner's 1996 capital murder trial suggesting that investigation into either of these two subjects might reasonably have led to the discovery of mitigating or otherwise beneficial evidence or information. All the evidence presented during Petitioner's Rule 32 hearing suggests that Petitioner's defense team was never alerted to any childhood medical, mental health, developmental, psychological, or other problems that might have been caused by Petitioner's exposure to toxic chemicals at Camp Lejeune or Petitioner's allegedly dysfunctional family. It is undisputed that Petitioner denied any history of medical or mental health problems.

Under these circumstances, and after *de novo* review of the entire record, Petitioner's complaints about his trial counsel's failure to seek expert investigations

into Petitioner's exposure to toxic chemicals at Camp Lejeune and possible negative reaction to his parents' divorce (and his subsequent transfers of custody between his parents at ages two and nine or ten) fail to satisfy the first prong of the *Strickland* standard.

### c. Conclusions

Upon independent, *de novo* review, Petitioner's complaints in paragraphs 45 and 46 about the performance of his trial counsel fail to satisfy either prong of the *Strickland* standard and do not warrant federal habeas corpus relief.

## H. Failure to Challenge the Heinous, Atrocious, or Cruel Aggravating Factor

### 1. Overview of the Complaints

Petitioner argues in paragraphs 47 through 50 of his federal habeas corpus petition that his trial counsel (1) should have intensely cross-examined Garrison at trial regarding his account of the events at the crime scene on December 1, 1995, (2) argued that Garrison's trial testimony describing events at the crime scene were inaccurate, (3) mounted a "solid argument to exclude the evidence" of Julie Rhodes's suffering after Petitioner shot her -- twice, and (4) sought a limiting jury instruction forbidding the jury from speculating on the level of her suffering.[297]

---

[297] Doc. # 1, at pp. 16-17, ¶¶ 47-50. In his Rule 32 petition, Petitioner presented a claim that the state trial court erred when it found Petitioner's capital offense was heinous, atrocious, and cruel. 15 SCR 48-49. This claim, however, focused on the trial court's conduct and did not "fairly present" the state trial court with an ineffective assistance claim. Petitioner complained for the first time about his trial counsel's failure to challenge the "especially heinous, atrocious, or cruel" aggravating factor in his brief on appeal from the denial of his Rule 32 petition. 20 SCR (Tab R-

## 2. *De Novo* Review

This court addressed at great length the first of these four complaints in Section V.E. above. For the same reasons discussed at length above in Sections IV.D. and V.E., Petitioner's complaint that his trial counsel failed to adequately cross-examine prosecution witness Garrison fails to satisfy either prong of the *Strickland* standard. Petitioner's complaint that his trial counsel failed to argue adequately against Garrison's credibility fails for virtually identical reasons. For the reasons discussed in Section V.E. above, there is no reasonable probability that, but for the failure of Petitioner's trial counsel to argue against Garrison's credibility, the outcome of either phase of Petitioner's capital murder trial would have been any different.

Not previously addressed is Petitioner's argument that his trial counsel should have presented a "solid argument to exclude the evidence" of Julie Rhodes's suffering or requested a jury instruction limiting the jury's consideration of the evidence in the record showing she was conscious and aware of her impending

---

46), at pp. 47-49. The Alabama Court of Criminal Appeals held that "because Barksdale did not allege anywhere in his petition that his counsel was ineffective for not adequately investigating and arguing against the aggravating circumstances, this claim is not properly before this Court for review and will not be considered." 23 SCR (Tab R-58), at p. 31. Thus, the complaints contained in paragraphs 47-50 of Petitioner's federal habeas corpus petition are unexhausted and, therefore, will be reviewed under a *de novo* standard of review. Title 28 U.S.C. § 2254(b)(2) authorizes this court to deny relief on an unexhausted but meritless claim. *Bell v. Cone*, 543 U. S. 447, 451 n.3 (2005); *Loggins v. Thomas*, 654 F.3d 1204, 1215 (11th Cir. 2011).

fatality. Petitioner does not identify any legal authority to support his positions that

the evidence showing Julie's suffering (such as the eyewitness testimony to her

statements about her own condition shortly after the shooting, the heroic efforts

taken by medical professionals to attempt to preserve her life, and the medical

examiner's testimony concerning the scope of her injuries) was properly subject to

an objection seeking to exclude same from evidence or a motion requesting an

instruction limiting the jury's consideration of such evidence. As explained in

Sections IV.D. and V.E. above, this court is aware of no legal authority supporting

Petitioner's contentions.[298] Petitioner's trial counsel cannot reasonably be faulted

---

[298] On the contrary, as explained in Sections IV.D. and V.E. above, Alabama's definition of "especially heinous, atrocious, or cruel" focuses a capital sentencing jury's attention, in part, on the intensity, duration, and conscious awareness of the pain (both physical and mental) suffered by a capital murder victim prior to their demise. Excluding evidence of these very matters, or limiting the jury's consideration of such evidence, flies in the face of Alabama's definition of this statutory aggravating factor. Thus, the new rule advocated by Petitioner runs directly contrary to the legal definition of "especially heinous, atrocious, or cruel" as that term has been defined by Alabama's courts:

> In *Ex parte Kyzer*, this Court held that the standard applicable to the "especially heinous, atrocious, or cruel" aggravating circumstance under § 13A-5-49(8), Ala. Code 1975, is that the crime must be one of "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." The appellant's assertion that the murder was not unnecessarily torturous to the victim because he did not intentionally inflict prolonged pain upon the victim is without merit. It is not, as the appellant argues, incumbent upon the State to prove that he inflicted savagery or brutality upon the victim, or that he took pleasure in having committed the murder. *It is necessary that the State present evidence that the victim suffered some type of physical violence beyond that necessary or sufficient to cause death. Additionally, to support this aggravating factor, the time between at least some of the injurious acts must be an appreciable lapse of time, sufficient enough to cause prolonged suffering and the victim must be conscious or aware when at least some of the additional or repeated violence is inflicted.*

for failing to urge a motion to exclude or to request a limiting jury instruction that found no basis in existing state or federal law; trial counsel is not required to urge a meritless argument or to make a futile motion. *See Knowles v. Mirzayance*, 556 U. S. 111, 125 (2009) (defense counsel is not required to assert a defense he is almost certain will lose); *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("an attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief"), *cert. filed May 18, 2018 (no. 17-9566)*; *Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d 1278, 1299 (11th Cir. 2014) (holding "a lawyer is not ineffective for failing to raise a meritless argument" (quoting *Diaz v. Sec'y, Dep't of Corr.*, 402 F.3d 1136, 1142 (11th Cir.), *cert. denied*, 546 U. S. 1064 (2005))), *cert. denied*, 136 S. Ct. 68 (2015).

There is no reasonable probability that but for the failures of Petitioner's trial counsel to attempt either to exclude the evidence of Julie's suffering or to seek an instruction limiting the jury's consideration of such evidence, the outcome of the

---

*Barksdale v. State*, 788 So. 2d at 907-08 (citations omitted and emphasis added). Moreover, Petitioner's proposed new rule (which would make consideration of such evidence dependent upon the defendant's physical presence (or absence) from the victim's side) is a bizarre proposition.

As explained above, a state court's determination of a matter of state law binds a federal habeas court. *See Bradshaw v. Richey*, 546 U.S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). The Alabama Court of Criminal Appeals' conclusion in Petitioner's direct appeal regarding the nature and scope of the definition of "especially heinous, atrocious, or cruel" under Alabama law binds this court in this federal habeas corpus proceeding.

punishment phase of Petitioner's capital murder trial would have been any different. Any such motion to exclude or request for a limiting jury instruction would have been futile and meritless. *See Butts v. GDCP Warden*, 850 F.3d 1201, 1204 (11th Cir. 2017) (failure of appellate counsel to raise a meritless claim did not prejudice defendant), *cert. denied*, 138 S. Ct. 925 (2018);  As explained in Sections IV.D. and V.E. above, the evidence establishing the severe pain and anguish Julie Rhodes suffered in the hours immediately after Petitioner shot her -- twice -- was overwhelming and compelling.  It was also clearly admissible and subject to full consideration by the jury at the punishment phase of Petitioner's capital murder trial in connection with the "especially heinous, atrocious, or cruel" aggravating factor. Petitioner has identified no legal basis for excluding this evidence or limiting the jury's consideration of this evidence when deliberating at the punishment phase of Petitioner's trial.  Petitioner did not suffer "prejudice" within the meaning of the second prong of the *Strickland* standard by virtue of his trial counsel's failure to move to exclude (or to request an instruction limiting the jury's consideration of) evidence of Julie's Rhodes's suffering.

### 3. Conclusions

Upon *de* novo review, Petitioner's complaints in paragraphs 47 through 50 of his federal habeas corpus petition fail to satisfy either prong of the *Strickland* standard and do not warrant federal habeas corpus relief.

## I. Failure to Challenge Prior Conviction as an Aggravating Factor

### 1. Overview of the Complaints

In paragraphs 51 through 57 of his federal habeas corpus petition, Petitioner argues that his trial counsel rendered ineffective assistance by (1) failing to object on unspecified grounds to the admission of a certified copy of a judgment reflecting Petitioner's Virginia armed robbery conviction, (2) encouraging the jury to believe Petitioner had been armed and committed the Virginia robbery, (3) failing to conduct any investigation into the circumstances of that offense, (4) failing to contact petitioner's former counsel in Virginia, (5) failing to read the witness statement of the Virginia robbery victim, Oscar Cervantes, (6) failing to seek and read the records from Petitioner's robbery, trial, and confession, (7) failing to question anyone about whether Petitioner had been the gunman during the robbery, (8) failing to present evidence showing petitioner was a mere "decoy" or "lure" for a robbery actually committed by Petitioner's older brother and another older individual, (9) failing to ask about the facts of the Virginia robbery case before agreeing to stipulate to Cervantes' testimony, (10) failing to call and cross-examine Cervantes regarding Petitioner's "minor role" in the Virginia robbery, (11) failing to examine "the

Virginia files," and (12) failing to present expert testimony regarding the malfunction of the murder weapon.[299]

## 2. *De Novo* Review

As above, *de novo* review of the record from Petitioner's Rule 32 hearing is required. Upon such review, it is painfully obvious that Petitioner's arguments are naive at best and disingenuous at worst. Here are the reasons -- repetitious, but repeated for purposes of *de novo* review -- in admittedly agonizing detail:

### a. No Deficient Performance

The uncontradicted, sworn testimony of attorney Goggans establishes that attorney Goggans interviewed Petitioner and examined documents reflecting that Petitioner confessed, and pleaded guilty, to a charge of armed robbery in Virginia. Petitioner has failed to allege any facts showing there was any arguable legal basis to exclude evidence of Petitioner's Virginia conviction from the jury's consideration at the punishment phase of Petitioner's capital murder trial. Attorney Goggans also testified, again without contradiction, that he was well aware that Petitioner had not

---

[299] Doc. # 1, at pp. 17-19, ¶¶ 51-57. As was true with regard to Petitioner's other complaints about his trial counsel's failures to challenge the other aggravating circumstances relied upon by the prosecution, Petitioner failed to present any of these complaints in his Rule 32 petition. Instead, after failing to seek leave to amend his Rule 32 petition, Petitioner asserted these ineffective assistance complaints for the first time in his brief on appeal challenging the denial of his Rule 32 petition. 20 SCR (Tab R-46), at pp. 49-52. The Alabama Court of Criminal Appeals concluded that "because Barksdale did not allege anywhere in his petition that his counsel was ineffective for not adequately investigating and arguing against the aggravating circumstances, this claim is not properly before this Court for review and will not be considered." 23 SCR (Tab R-57), at p. 31.

been the gunman during the robbery in Virginia. Attorney Goggans did not view that fact, standing alone as significantly diminishing Petitioner's moral blameworthiness because, under Alabama law, one who aids and abets is as guilty as a principal. Attorney Goggans also testified without contradiction that, after interviewing the victim of the Virginia armed robbery, he did not want the victim to testify in front of Petitioner's jury because the victim was prepared to identify Petitioner as a participant in a robbery that attorney Goggans believed had involved some degree of planning, and testimony highlighting the frightening circumstances the victim experienced during the Virginia robbery would only serve to remind the jury that Petitioner's fatal shooting of Julie Rhodes had taken place during a robbery. For these reasons, attorney Goggans testified that he preferred to have a copy of the judgment of conviction admitted into evidence, rather than to have the jury watch a live witness identify Petitioner as one of the men who robbed him.

After careful *de novo* review, there is no fault in attorney Goggans' strategic decision-making, including his decision to stipulate to the admission of Petitioner's judgment of conviction from Virginia, rather than to have the prosecution call Oscar Cervantes to testify live before the jury; that decision was objectively reasonable. Petitioner alleges no specific facts, much less presents any affidavits or properly authenticated documents, showing there was any information contained in any of the records reasonably available to Petitioner's trial counsel in November 1996 showing

that the victim of Petitioner's Virginia robbery could furnish any mitigating testimony beyond the fact that Petitioner had not actually held a gun during the Virginia robbery.

For a number of reasons, this court independently concludes that it was objectively reasonable for Petitioner's trial counsel to avoid presenting testimony and argument emphasizing the fact Petitioner had not held a gun during the Virginia robbery. First, the efficacy of Petitioner's proposed argument at Petitioner's November 1996 capital murder trial was dubious at best. An argument by Petitioner's trial counsel suggesting Petitioner was somehow less morally culpable than his accomplices in the Virginia robbery (because Petitioner did not hold a gun during that robbery) would not logically have reduced Petitioner's moral blameworthiness or culpability in connection with Petitioner's subsequent fatal shooting of Julie Rhodes.

Second, after discussing the Virginia robbery with Petitioner, reading documentation concerning the offense, and talking with the victim of the Petitioner's prior offense, attorney Goggans concluded the Virginia robbery had involved a degree of planning. Thus, attorney Goggans could have reasonably believed that, regardless of whether Petitioner held a gun during the Virginia robbery, presenting the jury with the details of the Virginia robbery would show that Petitioner's prior offense in Virginia involved a degree of planning and Petitioner's involvement in

the Virginia robbery went beyond that of a typical accomplice in other types of robberies, *i.e.*, that Petitioner's role as "lure" or "decoy" in the Virginia robbery was substantial and significant. Attorney Goggans could reasonably have believed that evidence showing Petitioner served as the "lure" or "decoy" in the Virginia robbery could have been viewed by the jury as indicating a level of deviousness on Petitioner's part.

Third, Petitioner's trial counsel could reasonably have foreseen that advancing a jury argument premised upon a showing that Petitioner did not carry a gun during the Virginia robbery could prove harmful to Petitioner. The prosecution could have responded by pointing out that Petitioner did not carry a gun during the Virginia robbery (where the victim walked away from the robbery alive) and contrasting the outcome of that offense with the Petitioner's capital offense (in which Petitioner carried a gun and the victim died a torturous, painful death). The prosecution could have responded to Petitioner's evidence showing that he did not carry a gun during his Virginia robbery by arguing this fact permitted a reasonable inference that Petitioner fatally shot Julie Rhodes -- twice -- for the very purpose of preventing her from ever testifying against Petitioner.[300] In fact, the prosecution did

---

[300] It is not difficult to imagine the type of devastating counter-argument an aggressive prosecutor could have made at the punishment phase of Petitioner's capital murder trial had Petitioner's trial counsel attempted to present evidence and argue that Petitioner's moral culpability in connection with his Virginia armed robbery offense was somehow less than that of Petitioner's co-defendants because Petitioner had not carried a gun during the Virginia robbery. Petitioner's prosecutor could legitimately have argued that such evidence permitted reasonable

make a somewhat similar argument in its closing punishment phase jury argument at Petitioner's capital murder trial.[301]  Pointing out the fact Petitioner did not carry a weapon during his Virginia robbery would have furnished an even stronger prosecutorial argument that Petitioner murdered Julie Rhodes to prevent her from ever being a witness against him (as Oscar Cervantes had been in connection with Petitioner's Virginia robbery case).  It was objectively reasonable for Petitioner's

---

inferences that Oscar Cervantes (the victim in the Virginia armed robbery) would not have been alive to testify at Petitioner's 1996 capital murder trial if Petitioner, rather than Petitioner's older brother, had held the gun during the Virginia armed robbery.

Had Petitioner's trial counsel insisted on having Mr. Cervantes testify as to the details of the Virginia armed robbery, the prosecution could legitimately have (1) asked him to describe in detail for the jury exactly what it felt like to be robbed at gunpoint by Petitioner's older brother, (2) argued that Cervantes' testimony showed it was the Petitioner who lured Mr. Cervantes to the isolated location where the robbery occurred, and (3) argued Petitioner did the exact same thing to Julie Rhodes, *i.e.*, directed her to a relatively isolated location where Petitioner robbed and fatally shot her.  Furthermore, evidence showing that Oscar Cervantes had lived to testify against Petitioner and Petitioner's older brother would have permitted the prosecution to argue at Petitioner's capital murder trial (as a reasonable inference from the evidence) that Petitioner fatally shot Julie Rhodes because he did not want her to live to testify against him.

The foregoing hypothetical jury arguments would have been permissible inferences, reasonably drawn from the evidence actually introduced during Petitioner's capital murder trial; the information concerning the details of Petitioner's Virginia robbery given to attorney Goggans by Mr. Cervenates (about which attorney Goggans testified without contradiction during Petitioner's Rule 32 hearing); and the evidence showing Petitioner had not carried a gun during the Virginia robbery.  Most of the foregoing hypothetical prosecutorial arguments paraphrase the arguments the prosecution actually made at the close of the punishment phase of Petitioner's capital murder trial.  Petitioner's trial counsel could reasonably have concluded that emphasizing the similarities and critical distinctions between the facts of Petitioner's Virginia robbery and Petitioner's robbery/murder of Julie Rhodes could prove harmful to Petitioner at the punishment phase of trial by inviting prosecutorial counter-arguments arguments similar to those set forth above.

[301] 12 SCR 1434-35 (arguing Petitioner murdered Julie Rhodes because she was "the witness to his robbery" and pointing out the Petitioner could have let her go and taken her vehicle but chose not to do so).

trial counsel to avoid walking into the potential minefield now urged by Petitioner's

federal habeas counsel.[302]  The decision by Petitioner's trial counsel not to present

evidence focusing the jury's attention on the fact Petitioner did not carry a weapon

during the Virginia robbery, which decision attorney Goggans made after

interviewing Petitioner, reviewing relevant documents, and speaking face-to-face

with the victim of the Virginia robbery, was precisely the type of strategic decision

this court may not second-guess in a federal habeas corpus proceeding.  *See Marshall*

*v. Sec'y, Fla. Dep't of Corr.*, 828 F.3d 1277, 1290 (11th Cir. 2016) ("Strategic

---

[302] Additionally, the record now before this court, which includes attorney Goggans' uncontradicted, sworn testimony explaining his strategic reasons for not introducing evidence detailing the circumstances of Petitioner's Virginia offense, refutes Petitioner's naked assertions in his federal habeas corpus petition that attorney Goggans made no effort to investigate the circumstances of Petitioner's Virginia offense.  Attorney Goggans testified without contradiction during Petitioner's Rule 32 hearing that he discussed with Petitioner the Virginia robbery. Attorney Goggans testified in the same proceeding that he reviewed documents addressing Petitioner's Virginia conviction.  Attorney Goggans also testified that he spoke with the victim of Petitioner's Virginia robbery and decided he did not want this witness to testify before Petitioner's jury.  Attorney Goggans testified that he was well aware of the fact the Petitioner had not carried a gun during the Virginia robbery but, instead, had acted merely to lure the robbery victim to the place where Petitioner's older brother committed the actual robbery.  Petitioner does not deny any of these portions of attorney Goggans' testimony.

Petitioner does not allege any facts, or offer an affidavit or properly authenticated records, showing Petitioner told attorney Goggans anything during their pretrial conversations that would have suggested to attorney Goggans that contacting Petitioner's criminal defense counsel from Virginia or reviewing any of the records from Petitioner's Virginia criminal proceeding would have furnished any helpful  information in addition to, or different from, the information about the Virginia robbery that Petitioner actually conveyed to attorney Goggans or which attorney Goggans gained from interviewing the victim of the Virginia robbery.  Attorney Goggans could have reasonably relied upon the information about the Virginia robbery conveyed to him by Petitioner and the information he learned through review of the documents in the prosecution's file concerning Petitioner's Virginia offense.  Likewise, Petitioner alleges no facts showing it was unreasonable for attorney Goggans to rely upon the information related to attorney Goggans by the victim of the Virginia robbery.

choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" (quoting *Strickland v. Washington*, 466 U. S. at 690)).

### b. No Prejudice

Furthermore, and after independent *de novo* review, Petitioner's complaints in paragraphs 51 through 57 fail to satisfy the prejudice prong of the *Strickland* standard. The burden to prove prejudice requires the petitioner to show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U. S. at 694. Petitioner complains that attorney Goggans failed to (1) contact Petitioner's Virginia defense counsel, (2) read all of the available documentation concerning Petitioner's confession, trial, and conviction, (3) read Oscar Cervantes' witness statement, and (4) examine unidentified information in "the Virginia files." Yet Petitioner alleges no specific facts showing what potentially helpful information attorney Goggans would have gleaned from these sources above and beyond the information about Petitioner's Virginia offense that he had already actually obtained from interviewing Petitioner, interviewing Oscar Cervantes face-to-face, and reviewing the records concerning Petitioner's Virginia offense found in the prosecution's case file. Petitioner presented the state court and presents this court with no affidavit from Petitioner's former Virginia defense counsel (detailing any undiscovered

information about Petitioner's Virginia offense); no affidavit from Oscar Cervantes (explaining what testimony helpful to Petitioner he could have given at Petitioner's November 1996 capital murder trial); or no properly authenticated documents reasonably available in November 1996 showing that attorney Goggans could have discovered any new or different information concerning Petitioner's Virginia offense through additional investigation.

Conclusory and speculative assertions such as those contained in paragraphs 51 through 57 of Petitioner's federal habeas corpus petition do not satisfy the prejudice prong of the *Strickland* standard. *See Price v. Allen*, 679 F.3d at 1325 (holding conclusory assertion that a mental health expert could have testified to a connection between the abuse the defendant suffered as a child and his subsequent actions failed to satisfy prejudice prong of the *Strickland* standard). *Cf. Bennett v. Fortner*, 863 F.2d 804, 809 (11th Cir. 1989) (holding petitioner who attempted to circumvent a finding of procedural default with a showing that his trial counsel was ineffective in failing to procure a psychiatric examination of the defendant failed to show "actual prejudice" where Petitioner did not present the federal habeas court with copies of the medical records the petitioner claimed would have justified the psychiatric examination). There is no reasonable probability that, but for the failure of Petitioner's trial counsel to call Oscar Cervantes to testify at trial or to cross-

examine Cervantes if called by the prosecution, the outcome of the punishment phase of Petitioner's capital murder trial would have been any different.

For the reasons discussed at length above in Section V.D., Petitioner's complaint in paragraph 57 of his federal habeas corpus petition about his trial counsel's failure to present evidence showing the murder weapon malfunctioned at the time Petitioner fatally shot Julie Rhodes -- twice -- fails to satisfy either prong of the *Strickland* standard.[303] Petitioner has failed to allege any facts showing there was any identifiable witness (lay or expert) available at the time of Petitioner's November 1996 capital murder trial who was willing to testify that the murder weapon misfired -- twice -- while being manually unloaded by Petitioner. Petitioner's speculative assertions that such a witness could have been procured and

---

[303] Only an episode of *The Twilight Zone* would postulate a robbery scene in which the perp pulls a gun on a robbery victim with the intent of "unloading" it in the victim's presence, whereupon said gun accidentally discharges -- twice, no less -- from two different positions above the hapless victim, followed by days of the Petitioner's fascinated gunplay with the same defective weapon allegedly in the presence of, and to the discomfort and consternation of, numerous witnesses. Add to the mix a suggested ingestion of toxic water at Camp Lejeune as an infant and the jury has the recipe to give the Petitioner a pass. Not so. Petitioner presents ineffective assistance allegations that test the limits of not just credulity but rationality. Worse, these spurious allegations wasted the court's time and resources.

Petitioner presented the Rule 32 court and presents this court with no evidence establishing (1) Petitioner was ever exposed to toxic chemicals at Camp Lejeune, (2) the murder weapon could misfire while being unloaded in the manner described by Petitioner, (3) the murder weapon could misfire a second time in the manner described by Petitioner, or (4) any potential defense witness identified by Petitioner to his defense team was reasonably available at the time of trial who could have testified about Petitioner's background without being subject to cross-examination about Petitioner's gang affiliation and history of drug trafficking.

testified in a manner beneficial to the defense are insufficient to satisfy the prejudice prong of the *Strickland* standard. *See Harris v. Commn'r, Ala. Dep't of Corr.*, 874 F.3d at 691 (allegations in a habeas petition must be factual and specific, not conclusory); *Price v. Allen*, 679 F.3d at 1325 (holding conclusory assertion that a mental health expert could have testified to a connection between the abuse the defendant suffered as a child and his subsequent actions failed to satisfy prejudice prong of the *Strickland* standard).

### 3. Conclusions

Upon *de* novo review, Petitioner's complaints in paragraphs 51 through 57 of his federal habeas corpus petition fail to satisfy either prong of the *Strickland* standard and do not warrant federal habeas corpus relief.

## J. Failure to Timely Raise *Batson* Objection

### 1. The Complaint

Petitioner argues in paragraphs 58 through 63 of his federal habeas petition that his trial counsel rendered ineffective assistance by failing to raise a timely *Batson* challenge to the prosecution's use of peremptory strikes against two of the three black *males* in the jury venire.[304]  In contrast, in his Rule 32 petition, he argued his trial counsel rendered ineffective assistance by failing to raise a *Batson* challenge

---

[304] Doc. # 1, at p. 19-20, ¶¶ 58-63.  The facts Petitioner alleges in support of this claim of ineffective assistance are vastly different from the facts Petitioner alleged in support of his cryptic analogous claim in his Rule 32 petition.

after the state used its peremptory challenges to strike two of the six black members of the jury venire (with no differentiation between the genders of those venire members).[305]

## 2. State Court Disposition

The state trial court summarily dismissed this claim in its Order issued January 6, 2003, holding that Petitioner's ineffective assistance claim failed to allege sufficient facts to entitle him to relief and Petitioner's recitation of the number of black members of the jury venire struck by the prosecution, without more, was insufficient to establish a *prima facie* case of racial discrimination in violation of the Supreme Court's holding in *Batson*.[306] On appeal from the denial of Petitioner's Rule 32 petition, the Alabama Court of Criminal Appeals affirmed, holding (as did the trial court) that a mere recitation of the number of black venire members struck by the prosecution was insufficient to establish a *prima facie* case of racial discrimination in jury selection and insufficient to establish ineffective assistance by Petitioner's trial counsel.[307]

---

[305] 15 SCR 12, ⁋ 24.

[306] 15 SCR 159-61; 23 SCR (Tab R-56), at pp. 159-61.

[307] 22 SCR (Attachment B to Tab R-51), at pp. 11-14; 23 SCR (Tab R-58), at pp. 11-14.

### 3. Clearly Established Federal Law

In *Batson v. Kentucky*, 476 U. S. 79 (1986), the United States Supreme Court extended the equal protection principle barring the purposeful exclusion of Blacks from criminal jury service to the prosecution's use of peremptory challenges during petit jury selection. *See Batson v. Kentucky*, 476 U. S. at 89 ("the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."). *Batson* provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race: first, the defendant must make out a *prima facie* case of discriminatory jury selection by the totality of the relevant facts concerning a prosecutor's conduct during the defendant's own trial; second, once the defendant makes the *prima facie* showing, the burden shifts to the State to come forward with a race-neutral explanation for challenging jurors within the arguably targeted class; finally, the trial court must determine if the defendant established purposeful discrimination by the prosecution. *Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016); *Snyder v. Louisiana*, 552 U. S. 472, 476-77 (2008); *Miller-El v. Dretke*, 545 U. S. 231, 239 (2005); *Batson v. Kentucky*, 476 U. S. at 94-98.

### 4. AEDPA Review of Claim Fairly Presented in Rule 32 Petition

The state trial court's and state appellate court's summary dismissal of this ineffective assistance claim (as inadequately pleaded) in the course of Petitioner's Rule 32 proceeding constituted a rejection of that claim on the merits. Dismissal of a claim for failure to satisfy Alabama Rule of Criminal Procedure 32.6(b) constitutes a ruling on the merits, which does not give rise to a procedural default or foreclose federal habeas review of a federal constitutional claim. *See Frazier v. Bouchard*, 661 F.3d at 524-26 (holding dismissal of ineffective assistance claim for failure to allege sufficient facts was a ruling on the merits of the *Strickland* claim and did not procedurally default or otherwise bar federal habeas review of the claim); *Borden v. Allen*, 646 F.3d at 815-16 ("an Alabama court's consideration of the sufficiency of the pleadings concerning a federal constitutional claim contained in a Rule 32 petition necessarily entails a determination on the merits of the underlying claim; we cannot construe such a rule to be a state procedural bar that would preclude our review"); *Powell v. Allen*, 602 F.3d at 1272-73 (Alabama court's summary dismissal of federal constitutional claims under Rule 32.6(b) should be reviewed as a holding on the merits).

### a. No Deficient Performance

The only fact alleged in Petitioner's Rule 32 petition in support of his ineffective assistance claim premised upon a potential *Batson* violation was that the

prosecution struck two of six black members of Petitioner's jury venire.[308]  When considering whether an objector has made a *prima facie* case as a first step in the *Batson* analysis, a court must consider all relevant circumstances which include, but are not limited to: (1) a prosecutor's pattern of strikes against black jurors included in the venire; (2) the prosecutor's questions and statements during voir dire examination; (3) the failure of the prosecutor to ask meaningful questions to the struck jurors; (4) the subject matter of the case, *i.e.*, whether it is racially or ethnically sensitive; and (5) evidence of past discrimination in jury selection.[309]  *Madison v.*

---

[308] The record establishes that the prosecution exercised peremptory challenges against twenty-one members of the jury venire, two of whom were black males (venire members 72, 134), sixteen of whom were white females (venire members 48, 61, 89, 92, 103, 112, 113, 116, 155, 172, 173, 174, 197, 205, 210, 212), and three of whom were white males (venire members 128, 149, 168).  4 SCR 685-89.  The defense peremptorily struck twenty-one venire members, one of whom was a black male (venire member 66), eight of whom were white females (venire members 54, 77, 85, 87, 90, 114, 179, 203), and twelve of whom were white males (venire members 86, 118, 126, 129, 141, 147, 176, 184, 191, 198, 208, 215).  Petitioner's jury consisted of three black females (venire member 139, 170, 206), two white females (venire members 185, 195), and seven white males (venire members 57, 99, 125, 148, 163, 181, 187).

Petitioner alleged no additional facts showing a *prima facie* case of racially discriminatory intent by the prosecution.  This case is easily distinguishable from *Madison v. Commn'r, Ala. Dep't of Corr.*, 677 F.3d 1333 (11th Cir.), *cert. denied*, 568 U. S. 1019 (2012).  In *Madison*, the defendant pointed out that, in addition to the prosecution striking six of the thirteen black members of the jury venire, there was evidence in the record showing (1) the prosecution failed to ask any questions to three of the challenged jurors, (2) the case involved racially sensitive subject matter, and (3) the district attorney's office in question had previously been found to have engaged in discriminatory jury selection, including a prior criminal trial of the same defendant.  *Id.*, 677 F.3d at 1339.

[309] Among the other considerations a trial court may examine in determining whether an objector has satisfied the burden of establishing a *prima facie* case of racial discrimination in jury selection is whether the defendants are the same race or ethnicity as the jurors whom the prosecution allegedly struck for improper, race-based, reasons.  *United States v. Hill*, 643 F.3d 807, 840 (11th Cir. 2011), *cert. denied*, 566 U. S. 970 (2012).

*Commn'r, Ala. Dep't of Corr.*, 677 F.3d 1333, 1337 (11th Cir.), *cert. denied*, 568 U. S. 1019 (2012). Petitioner alleged no facts in his Rule 32 petition addressing any of these considerations, and presented no evidence of such in the hearing.

It is well settled that numbers alone are insufficient to establish a *prima facie* case of racial discrimination in jury selection; the defendant must make a *prima facie* case by showing the totality of the relevant facts gives rise to an inference of discriminatory purpose. *See, e.g.*, *United States v. Hill*, 643 F.3d 807, 838-40 (11th Cir. 2011) (the *prima facie* case determination is not to be based on numbers but is to be made in light of the totality of the circumstances (citing *Johnson v. California*, 545 U. S. 162, 168 (2005)), *cert. denied*, 566 U. S. 970 (2012). "[A] defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U. S. at 170.

Among the factors the Eleventh Circuit has instructed reviewing courts to consider in determining whether a *prima facie Batson* claim has been established are (1) whether members of the relevant racial or ethnic group served unchallenged on the jury, (2) whether the striker struck all of the relevant racial or ethnic group from the venire, or at least as many as the striker had strikes, (3) whether there is a substantial disparity between the percentage of jurors of a particular race or ethnicity struck and the percentage of their representation on the venire, and (4) whether there

is a substantial disparity between the percentage of jurors of one race or ethnicity struck and the percentage of their representation on the jury. *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1044-47 (11th Cir. 2005), *cert. denied*, 549 U. S. 952 (2006). Consideration of these purely statistical factors does not support a finding of a *prima facie Batson* claim here. First, three of the six black members of the Petitioner's jury venire actually served on his jury. Second, the prosecution struck only two of the six black members of the jury venire despite exercising twenty-one peremptory strikes. Third, the percentage of black jurors (3/12 or 25%) was actually higher than the percentage of black venire members on the panel (6/54 or 11%). Finally, the percentage of black jurors (3/12 or 25%) was higher than the percentage of the black venire members struck peremptorily (3/42 or 7%).

In view of the foregoing discussion and legal authorities, Petitioner's trial counsel could reasonably have concluded that asserting a *Batson* challenge based on the prosecution's use of only two of its twenty-one peremptory strikes against black members of the jury venire would, in light of the manner in which the prosecutor conducted himself during voir dire, likely be insufficient to establish a *prima facie* case under *Batson*. Petitioner alleged no facts in his Rule 32 petition showing there was anything suspicious or racially insensitive about the manner in which the prosecutor questioned the panels of the jury venire the parties examined during voir dire. Petitioner alleged no facts in his Rule 32 petition suggesting the district

attorney's office prosecuting Petitioner's capital murder charge had a demonstrated history of racial discrimination in jury selection. Likewise, there was no allegation in Petitioner's Rule 32 petition that Petitioner's offense was in any way racially motivated or tinged with any hint of racially discriminatory motive that would have made the offense racially sensitive.

The prosecution had the means (twenty-one available peremptory strikes) to strike all or a majority of the black venire members from the Petitioner's petit jury but chose instead to exercise only two of its peremptory strikes against any of the six black venire members. Petitioner's trial counsel could reasonably have believed the prosecutor's exercise of just two of the prosecution's twenty-one peremptory strikes against the six black members of the jury venire, in the absence of any other demonstrated indication of racially discriminatory motivation on the part of the prosecution, would be insufficient to establish a *prima facie* case under *Batson*. Trial counsel are not required to make futile or meritless objections or motions. *See Knowles v. Mirzayance*, 556 U. S. at 125 (defense counsel is not required to assert a defense he is almost certain will lose); *Pinkney v. Sec'y, DOC*, 876 F.3d at 1297 ("an attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief"); *Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d at 1299 (holding "a lawyer is not ineffective for failing to raise a meritless argument"); *United States v. Curbelo*, 726 F.3d 1260, 1267 (11th Cir.

2013) ("it goes without saying that counsel is not ineffective for failing to file a meritless suppression motion"), *cert. denied*, 571 U.S. 1150 (2014).

Given the dearth of factual allegations suggesting the prosecution behaved in a racially discriminatory manner during jury selection, the state trial court and state appellate court reasonably concluded during Petitioner's Rule 32 proceeding that Petitioner's conclusory complaint about his trial counsel's failure to raise a timely *Batson* objection failed to satisfy the first prong of the *Strickland* standard.

### b. No Prejudice

For similar reasons, the state trial court and state appellate court reasonably concluded Petitioner's complaint about his trial counsel's failure to raise a timely *Batson* challenge failed to satisfy the prejudice prong of the *Strickland* standard. The state trial and appellate courts reasonably concluded there was no reasonable probability that, but for the failure of Petitioner's trial counsel to assert a timely *Batson* challenge, the outcome of either phase of Petitioner's capital murder trial would have been any different, because there was no such failure. *See Green v. Georgia*, 882 F.3d 978, 987 (11th Cir. 2018) (counsel's failure to make a futile objection did not prejudice defendant within the meaning of *Strickland*). Petitioner's bare assertion in his Rule 32 petition that the prosecution used two of its peremptory strikes against six of the black members of his jury venire was unaccompanied by

any other factual allegations suggesting a racially discriminatory motivation on the part of the prosecution during jury selection.

The state trial and appellate courts reasonably concluded Petitioner's conclusory complaint about the prosecution striking two unidentified black venire members failed to establish a *prima facie* case under *Batson*. More importantly, in so holding, the state trial court and state appellate court also reasonably concluded Petitioner's ineffective assistance complaint failed to satisfy the prejudice prong of the *Strickland* standard.

### c. Conclusions

The state trial and state appellate courts' rejection on the merits during Petitioner's Rule 32 proceeding of Petitioner's conclusory ineffective assistance complaint about his trial counsel's failure to raise a timely *Batson* objection was neither contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and Rule 32 proceedings.

### 5. *De Novo* Review of New Factual Allegations

In his federal habeas corpus petition, for the very first time, Petitioner argues additional facts he failed to present to the state courts in support of his complaint about his trial counsel's failure to raise a timely *Batson* challenge. Specifically,

Petitioner alleges that (1) two venire members the prosecution struck peremptorily were black males who had demographic characteristics (age and occupation) similar to three unidentified white male venire members against whom the prosecution did not exercise peremptory strikes, (2) these three unidentified white males later served on Petitioner's jury,[310] and (3) these facts demonstrate a *prima facie* case of purposeful discrimination.[311]  As another verse of the same song, Petitioner offers not a clue as to which three of these white males had the same or similar characteristics as the two black males struck by the state.  As explained above, after the state trial court reviewed and ruled on all requests for excuses and the parties' challenges for cause, the percentage of black venire members remaining on Petitioner's jury venire was about eleven percent (6/54).  This percentage was significantly less than the twenty-five percent (3/12) of the jury at Petitioner's trial that was black.  No rational inference can be drawn that the record now before this court to show the prosecution's actions during voir dire and jury selection evidenced a desire to discriminate against the black members of Petitioner's jury venire.

---

[310] As explained above, Petitioner's jury consisted of seven white males, two white females, and three black females.  Petitioner offers this court no clue as to which three white male members of his jury he claims had similar demographic characteristics to the two black male venire members the prosecution struck with peremptory challenges.

[311] Doc. # 1, at p. 20, ¶¶ 62-63.

For reasons similar to those discussed at length above in Section V.J.4.a., after *de novo* review, even in light of Petitioner's new factual allegations, it was objectively reasonable for Petitioner's trial counsel not to raise a *Batson* challenge to the prosecution's use of two of its twenty-one available peremptory strikes against black members of the Petitioner's jury venire.[312]

Petitioner's conclusory allegations of alleged similarities between the demographic characteristics of three unidentified white members of his jury and the two black members of the jury venire whom the prosecution struck peremptorily might arguably have had some relevance to the third step in the *Batson* analysis, *i.e.*, determining the credibility of a prosecutor's proffered race-neutral justification for exercising a peremptory strike against a particular venire member. But a prima facie case has to be made first and here, there is none.

Upon *de novo* review, there is no reasonable probability that, but for the failure of Petitioner's trial counsel to raise a timely *Batson* challenge, the outcome of either phase of Petitioner's capital murder trial would have been any different. As

---

[312] The list of venire members that follows the parties' strike lists at 6 SCR 686-89 indicate the race of the venire members. This list contains the birthdate and race of each venire member but is blank with regard to their occupations. Initially, the trial court reviewed requests by venire members to be excused and screened the entire jury venire for individuals who had personal knowledge of the circumstances of Petitioner's offense or who personally knew the victim, the Petitioner, or any of the potential trial witnesses and who might, therefore, have a disqualifying bias. S.F. Trial, 6 SCR 254-92. The trial judge then instructed the remaining venire members to identify themselves by stating their name, place of residence, and occupation and their marital status, their spouse's name, their spouse's occupation. S.F. Trial, 6 SCR 299-316; 7 SCR 317.

were true of Petitioner's factual allegations in his Rule 32 petition, Petitioner has failed to allege any specific facts in this court showing a reasonable probability that, even if Petitioner's trial counsel had raised a timely *Batson* challenge, Petitioner's trial counsel could have established a *prima facie* case of racial discrimination by the prosecution in the use of peremptory challenges. Under these circumstances, Petitioner's cryptic new factual allegations in his federal habeas corpus petition supporting his complaint about his trial counsel's failure to assert a timely *Batson* challenge fail to satisfy either prong of the *Strickland* standard. Paragraphs 58 through 63 of Petitioner's federal habeas corpus petition do not warrant federal habeas corpus relief and potentially violate *Rule 11(b)(1), (b)(2), & (b)(3), Fed.R.Civ.P.*

## K. Failure to Timely Raise *J.E.B.* Objection

### 1. The Complaint

Petitioner argues in paragraphs 64 through 67 of his federal habeas corpus petition that his trial counsel should have raised a timely objection pursuant to the Supreme Court's holding in *J.E.B. v. Alabama*, 511 U. S. 127 (1994), to the prosecutor's exercise of sixteen of the prosecution's peremptory challenges against female members of the jury venire.[313]

---

[313] Doc. # 1, at pp. 21-22, ¶¶ 64-67.

## 2. State Court Disposition

Petitioner argued in his Rule 32 petition that his trial counsel rendered ineffective assistance by failing to object to the prosecution's gender discrimination in its use of peremptory challenges, and failing to argue the prosecution's use of sixteen of its twenty-one (and twelve of its first thirteen) peremptory challenges against women constituted a *prima facie* case of gender discrimination.[314] The state trial court summarily dismissed this ineffective assistance complaint in its Order issued January 6, 2003, concluding Petitioner had failed to allege sufficient facts to make out a *prima facie* case of gender discrimination by the prosecution.[315] On appeal from the denial of Petitioner's Rule 32 petition, the Alabama Court of Criminal Appeals agreed, holding Petitioner's recitation of mere statistics reflecting the number of female jury venire members peremptorily struck by the prosecution, without more, failed to establish a *prima facie* case of gender discrimination.[316]

## 3. Clearly Established Federal Law

In *J.E.B. v. Alabama,* a case arising from an Alabama paternity and child support lawsuit, the Supreme Court extended its holding in *Batson* to forbid gender

---

[314] 15 SCR 12-13.  Later in his Rule 32 petition, the Petitioner also argued a cryptic claim asserting a substantive violation of his rights under the Supreme Court's holding in *J.E.B. v. Alabama*, 511 U. S. 127 (1994).  15 SCR 35.

[315] 15 SCR 161; 23 SCR (Tab R-56), at p. 15.

[316] 23 SCR (Tab R-58), at pp. 12-14.

discrimination in the exercise of peremptory challenges by a state actor. *See J.E.B.*

*v. Alabama*, 511 U. S. at 130-31 ("Intentional discrimination on the basis of gender

by state actors violates the Equal Protection Clause, particularly where, as here, the

discrimination serves to ratify and perpetuate invidious, archaic, and overbroad

stereotypes about the relative abilities of men and women.").

> Discrimination in jury selection, whether based on race or on gender,
> causes harm to the litigants, the community, and the individual jurors
> who are wrongfully excluded from participation in the judicial process.
> The litigants are harmed by the risk that the prejudice that motivated
> the discriminatory selection of the jury will infect the entire
> proceedings. The community is harmed by the State's participation in
> the perpetuation of invidious group stereotypes and the inevitable loss
> of confidence in our judicial system that state-sanctioned
> discrimination in the courtroom engenders.

*J.E.B. v. Alabama*, 511 U. S. at 139 (citation omitted). "As with race-based *Batson*

claims, a party alleging gender discrimination must make a prima facie showing of

intentional discrimination before the party exercising the challenge is required to

explain the basis for the strike." *Id.*, 511 U. S. at 144-45.

### 4. AEDPA Review of Claim Fairly Presented in Rule 32 Petition

A party making a *J.E.B.* challenge bears the burden of proving a *prima facie*

case of gender discrimination by showing that the totality of the relevant facts gives

rise to an inference of discriminatory purpose. *Trawick v. Allen*, 520 F.3d 1264,

1266 (11th Cir.), *cert. denied*, 555 U. S. 1033 (2008). When a federal habeas petition

asserts a claim of ineffective assistance of counsel, AEDPA review is "doubly

deferential," because counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016); *Burt v. Titlow*, 571 U. S. 12, 22 (2013) (quoting *Strickland v. Washington*, 466 U. S. at 690).

### a. No Deficient Performance

For reasons similar to those discussed in detail above in Section V.J.4.a., Petitioner's trial counsel could have reasonably concluded that a timely objection to alleged prosecutorial gender discrimination in connection with the use of peremptory challenges would be a futile act. Petitioner did not allege any facts in his Rule 32 petition showing (1) a suspicious pattern of prosecution strikes against female members of the jury venire,[317] (2) the prosecution treated female members of the

---

[317] While the prosecutor did exercise sixteen of the prosecution's twenty-one peremptory challenges against female members of Petitioner's jury venire (venire members 48, 61, 89, 92, 103, 112, 113, 116, 155, 172, 173, 174, 197, 205, 210, 212), the prosecution also peremptorily struck two black males (venire members 72, 134), and three white males (venire members 128, 149, 168). The prosecution did not exercise peremptory challenges against any of the three black females who served on Petitioner's jury (venire members 139, 170, 206), the two white females who served on Petitioner's jury (venire members 185, 195), or the eight white females peremptorily stricken by the defense (venire members 54, 77, 85, 87, 90, 114, 179, 203). Thus, while the prosecution used sixteen of its twenty-one peremptory challenges to strike female members of the jury venire, the prosecution failed to exercise peremptory challenges against thirteen other female members of the jury venire, including three black females and two white females who eventually served as jurors at Petitioner's capital murder trial.

Moreover, the victim of Petitioner's capital offense was a white female. The only female venire members the prosecution peremptorily struck were also white females. Petitioner's trial counsel could reasonably have concluded that, for the prosecution to strike female venire members simply *because* they were female would have been counterintuitive. Petitioner's trial counsel could reasonably have believed the prosecution would expect female jurors to be more empathetic and sympathetic to the plight of a female victim murdered by a male assailant than male jurors. Petitioner's trial counsel could reasonably have anticipated the trial judge would be skeptical of a defense complaint of alleged prosecutorial gender discrimination against female venire members

256

jury venire differently from male members of the venire during voir dire questioning,[318] (3) Petitioner's offense was gender sensitive,[319] or (4) there was any

(*i.e.*, the prosecution's use of peremptory challenges to strike white female venire members) in a criminal murder case in which the victim was a white female. Petitioner's trial counsel could reasonably have concluded the foregoing statistics would be insufficient, standing alone and in light of the circumstances of Petitioner's trial, to establish a *prima facie* case of gender discrimination by the prosecution.

[318] As was true for the prosecution's questioning of black members of petitioner's jury venire, this court independently reviewed the record from Petitioner's voir dire proceedings and finds no evidence of any difference in the way the prosecution questioned female, as opposed to male, members of the jury venire. Likewise, as explained above, the prosecution (1) directed the vast majority of its questions to panels or subgroups of the panels of the jury venire, not to individual members of each twelve-person panel examined by the trial court, prosecution, and defense counsel and (2) the vast majority of questions the prosecution asked addressed the venire members addressed their views on the death penalty, their familiarity with the facts of the Petitioner's case, or their familiarity with potential trial witnesses. 7 SCR 365-490. This court was unable to discern even a single instance in which the prosecution questioned any female venire member differently than the way the prosecution questioned male venire members about the same or similar subjects.

Petitioner did not allege any facts in his Rule 32 petition suggesting the prosecutor questioned female members of the jury venire any differently than the prosecutor questioned other members of the jury venire. Nor did Petitioner allege any facts showing the prosecution failed to direct questions to female members of the jury venire whom the prosecution later struck peremptorily. On the contrary, the manner in which the trial judge structured voir dire and the manner in which the prosecutor questioned the panels of venire members belies any contention the prosecution engaged in discriminatory questioning of the venire. In most cases, the prosecutor's questions were addressed to the entire panel of twelve venire members or to subgroups of each panel that included multiple venire members of both genders. Thus, there was very little opportunity for discriminatory questioning during voir dire at Petitioner's capital murder trial.

[319] While Petitioner is a male and his victim was female, Petitioner alleged no facts in his Rule 32 petition suggesting Petitioner chose his victim based upon her gender or that there was any gender-based animus displayed by either Petitioner or his victim during the brief time they were in contact prior to the fatal shooting. Neither Petitioner nor Julie Rhodes were alleged by any witness to have made any sexist or gender-insensitive remarks in each other's presence. On the contrary, prosecution witness Garrison testified without contradiction at trial that (1) Petitioner stated that he was willing to shot someone to get a car to drive back to Guntersville and (2) he preferred to shoot only one person, rather than two. S.F. Trial, testimony of Jonathan David Garrison, 11 SCR 1267-69. The testimony at Petitioner's capital murder trial also showed Petitioner and his companions received a ride from (but did not attempt to rob) a pair of individuals shortly before getting a ride from Julie Rhodes. *Id.*, testimony of Jonathan David Garrison, 11 SCR 1267; testimony of Kelli Simpson, 9 SCR 866-72; testimony of Jason Sims, 9 SCR 872-77.

evidence the same district attorney's office that prosecuted Petitioner had a history of gender discrimination during jury selection. The state trial court and state appellate court both reasonably concluded Petitioner's complaint about his trial counsel's failure to raise a timely *J.E.B.* challenge to the prosecution's use of sixteen peremptory challenges to strike female members of the Petitioner's jury venire did not rise to the level of objectively unreasonable representation. *See United States v. Hill,* 643 F.3d at 838-40 (holding a *prima facie Batson* claim must be supported by something more than statistics; it must also be premised on facts showing a reasonable inference of racial discrimination in the use of peremptory challenges).

Examination of the matters identified by the Eleventh Circuit in *United States v. Ochoa-Vasquez*, discussed above, is far from compelling. Five females actually served on Petitioner's jury, including three black females. The prosecution used sixteen of its twenty-one peremptory strikes against female members of Petitioner's jury venire but did not strike any of the five female jury venire members who later served on Petitioner's jury (*i.e.*, venire members 139, 170, 185, 195, 206) or any of the eight female members of the jury venire peremptorily struck by the defense (*i.e.*, venire members 54, 77, 85, 87, 90, 114, 179, 203). The percentage of females on

---

Thus, it was reasonable for the jury and trial court to infer that the reason Petitioner chose to rob Julie Rhodes was not that she was female but the fact she happened to be alone in her vehicle when she agreed to give Petitioner and his companions a ride. Petitioner alleged no facts in his Rule 32 petition suggesting his fatal shooting of Julie Rhodes was in any way a product of any gender animus or otherwise related to Julie Rhodes's gender.

Petitioner's jury venire (29/54 or about 54%) was higher than the percentage of females on Petitioner's jury (5/12 or about 43%) but not significantly so. Sixty nine percent of the total peremptory strikes used by both parties (29/42) removed female members of the jury venire and only forty-three percent of the Petitioner's jury (5/12) was female. Ultimately, however, Petitioner's jury was only one female shy of being equally balanced between male and female. More importantly, Petitioner alleged no facts in his Rule 32 petition suggesting there was any basis other than statistics to urge a claim of gender discrimination by the prosecution during jury selection. Statistical evidence is merely one factor which the court examines in evaluating a *Batson* claim and it is not necessarily dispositive. *Cochran v. Herring*, 43 F.3d 1404, 1412 (11th Cir. 1995), *modified on denial of rehearing*, 61 F.3d 20 (11th Cir. 1995), *cert. denied*, 516 U. S. 1073 (1996).

The state courts reasonably concluded Petitioner's trial counsel could have believed a timely *J.E.B.* challenge based solely upon statistical information would be insufficient to establish a *prima facie* case of gender discrimination by the prosecution in jury selection. Counsel are not required to undertake actions they reasonably believe would be futile. *See Knowles v. Mirzayance*, 556 U. S. at 125 (defense counsel is not required to assert a defense he is almost certain will lose); *Pinkney v. Sec'y, DOC*, 876 F.3d at 1297 ("an attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have

gotten his client any relief"); *Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d at 1299 (holding "a lawyer is not ineffective for failing to raise a meritless argument"); *United States v. Curbelo*, 726 F.3d at 1267 ("it goes without saying that counsel is not ineffective for failing to file a meritless suppression motion"). The state trial and appellate courts reasonably concluded Petitioner's complaint about his trial counsel's failure to assert a timely *J.E.B.* objection to the prosecution's use of its peremptory challenges to strike female members of the jury venire failed to satisfy the deficient performance prong of the *Strickland* standard.

### b. No Prejudice

For reasons similar to those discussed above in Section V.J.3.b., the state trial court and state appellate court reasonably concluded the Petitioner's complaint about his trial counsel's failure to assert a timely *J.E.B.* objection to the prosecution's use of peremptory challenges to strike female members of Petitioner's jury venire failed to satisfy the prejudice prong of the *Strickland* standard. In his Rule 32 proceeding Petitioner presented the state trial court and state appellate court with no facts to support his *J.E.B.*-based ineffective assistance complaint, beyond the number of female venire members peremptorily struck by the prosecution. As explained above, purely statistical arguments complaining a party's use of peremptory challenges disproportionately impacted venire members of one race or gender are problematic, at best. The state trial court and state appellate court reasonably concluded there

was no reasonable probability that, but for the failure of Petitioner's trial counsel to make a timely *J.E.B.* objection to the prosecution's use of its peremptory strikes to remove sixteen white females (the same race and gender as Julie Rhodes) from the jury pool, the outcome of either phase of Petitioner's capital murder trial would have been any different.

### c. Conclusions

The state trial and state appellate courts' rejection on the merits during Petitioner's Rule 32 proceeding of Petitioner's conclusory ineffective assistance complaint about his trial counsel's failure to raise a timely *J.E.B.* objection was neither contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and Rule 32 proceedings.

### 5. *De Novo* Review of New Factual Allegations

In his federal habeas corpus petition, for the very first time Petitioner argues additional facts he failed to present to the state courts in support of his complaint about his trial counsel's failure to raise a timely *J.E.B.* objection. More specifically, Petitioner alleges (1) the prosecution used 76% (16/21) of its peremptory challenges against female members of the jury venire, (2) most of the female venire members struck by the prosecution were demographically indistinguishable (except for their

gender) from the men in the jury venire, (3) four of the female venire members struck by the prosecution worked or had worked for the same employer as eleven of the men in the jury venire,[320] and (4) four of the women struck by the prosecution gave answers during voir dire suggesting that they would be inclined to impose the death penalty if they determined a defendant committed an intentional killing.[321] The last three of these conclusory allegations may have had relevance to the third prong of *Batson/J.E.B.* analysis but offer little of substance in support of a *prima facie* case.

For very practical reasons, even under a *de novo* standard of review, this court's evaluation of the performance of Petitioner's trial counsel must be deferential. Like the trial judge, Petitioner's trial counsel had the opportunity to observe first-hand the demeanor exhibited by the prosecutor while he questioned Petitioner's jury venire and to see how the prosecutor interacted with both female and male members of the jury venire during jury selection. This court's review of the dry record from Petitioner's voir dire furnishes little guidance as to the many subtle nuances of interpersonal communication, such as the prosecutor's facial

---

[320] Petitioner does not identify which four of the sixteen female venire members struck by the prosecution he claims worked for the same employer as eleven of the men in the jury venire. Nor does Petitioner allege any specific facts showing whether the prosecution exercised peremptory strikes against any of those eleven unidentified male members of the jury venire.

[321] Petitioner does not identify which four of the sixteen female venire members struck by the prosecution he claims gave answers during voir dire suggesting they would be inclined to impose a death sentence if they concluded a defendant committed an intentional killing.

expression, body language, and tone of voice, to which Petitioner's trial counsel was a witness. Thus, in evaluating the objective reasonableness of the decision by Petitioner's trial counsel not to raise a timely *J.E.B.* objection, this court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Woods v. Daniel*, 135 S. Ct. 1372, 1375 (2015) (quoting *Strickland v. Washington*, 466 U. S. at 689). The burden to show counsel's performance was deficient rests squarely on the Petitioner. *Burt v. Titlow*, 571 U. S. 12, 22-23 (2013) (citing *Strickland v. Washington*, 466 U. S. at 687).

The prosecution used sixteen of its twenty-one peremptory strikes to remove approximately fifty-five percent (16/29) of the female venire members. Still, five women served as jurors at Petitioner's capital murder trial. The unchallenged presence of jurors of a particular gender on a jury substantially weakens the basis for a *prima facie* case of discrimination in the peremptory striking of jurors of that gender. *Trawick v. Allen*, 520 F.3d at 1269; *Central Alabama Fair Housing Center, Inc. v. Lowder Realty Co., Inc.*, 236 F.3d 629, 638 (11th Cir. 2000). While the ultimate composition of the jury does not nullify the possibility of gender discrimination, it is a significant factor in the highly deferential review federal appellate courts afford federal district courts that have addressed Equal Protection challenges to the use of peremptory challenges. *United States v. Tokars*, 95 F.3d 1520, 1534 (11th Cir. 1996), *cert. denied*, 520 U. S. 1151 (1997).

Petitioner has alleged no facts suggesting the prosecution questioned female members of the jury venire in a manner different from the way the prosecution questioned males on the jury venire. Nor has Petitioner alleged any facts showing a history of racial or gender discrimination within the office of the district attorney that prosecuted Petitioner. Petitioner's jury was only one female shy of being equally balanced between men and women. The difference between the percentage of women on Petitioner's jury venire (54%) and the percentage of women on Petitioner's jury (43%) was not a substantial disparity. Not every petit jury will identically reflect the gender composition of the jury venire from which it was selected. All sixteen of the prosecution's peremptory challenges against female members of Petitioner's jury venire removed potential jurors who shared their gender and race with the victim of Petitioner's capital offense.

For the foregoing reasons, as well as the reasons set forth above in Section V.K.4., this court independently concludes after *de novo* review that Petitioner's ineffective assistance complaint about his trial counsel's failure to assert a timely *J.E.B.* objection fails to satisfy either prong of the *Strickland* standard. Petitioner's trial counsel could have reasonably concluded a timely *J.E.B.* objection supported by only the conclusory facts contained in Petitioner's federal habeas corpus petition was unlikely to prevail or even satisfy the requirements for a *prima facie* showing of discriminatory intent by the prosecution. There was nothing objectively

unreasonable with the decision by Petitioner's trial counsel not to raise a timely *J.E.B.* objection. Furthermore, this court concludes there is no reasonable probability that, but for the failure of Petitioner's trial counsel to make a timely *J.E.B.* objection, the outcome of either phase of Petitioner's capital murder trial would have been any different.

Petitioner's additional factual allegations in his federal habeas corpus petition do not warrant a different result than that reached by the state trial and appellate courts that reviewed Petitioner's abridged version of this same ineffective assistance claim in the course of Petitioner's Rule 32 proceeding. Paragraphs 64 through 67 of Petitioner's federal habeas corpus petition do not warrant federal habeas corpus relief.

## L. Failure to Raise Fair Cross-Section Challenge to Jury Venire

### 1. The Complaint

Petitioner argues in paragraphs 68 through 69 of his federal habeas corpus petition that his jury venire failed to adequately represent a "fair cross-section of the community," *i.e.*, that the fifty-four venire members remaining after the trial court granted the venire members' requests for excuses from jury service and ruled on the

parties' challenges for cause "did not reflect the demographic realities of Tallapoosa County."[322]

## 2. State Court Disposition

Petitioner argued in his Rule 32 petition that his trial counsel rendered ineffective assistance by failing to (1) challenge the racial composition of the 54-member jury pool from which his petit jury was selected (11% black) as under-representative of the black population of Tallapoosa County (36% black) and (2) move the trial court to examine the jury selection process to determine if there existed a *prima facie* case for race discrimination in the Tallapoosa County jury pool selection process.[323]   The state trial court summarily dismissed his ineffective assistance complaint in its Order issued January 6, 2003 because Petitioner's trial counsel could reasonably have concluded that attacking the system used in Tallapoosa County to randomly draw potential jurors from State driver's license lists would likely be futile, and Petitioner failed to allege specific facts sufficient to support a finding of a violation of the constitutional right to have his jury selected from a fair cross-section of the community or a violation of Petitioner's Equal Protection rights.[324]   On appeal from the denial of Petitioner's Rule 32 petition,

---

[322] Doc. # 1, at p. 22, ¶¶ 68-69.

[323] 15 SCR 10-12.

[324] 15 SCR 158-59; 23 SCR (Tab R-56), at pp. 158-59.

Petitioner once more relied exclusively on the disparity between the percentage of the black population of Tallapoosa County (alleged to be 36%) and the percentage of black venire members (6/54 or about 11%) in the jury venire from which his petit jury was selected (after the trial court ruled on requests by potential jurors to be excused).[325]  The Alabama Court of Criminal Appeals upheld the state trial court's summary dismissal of this ineffective assistance complaint, holding Petitioner failed to allege any facts showing a systemic under-representation of blacks on Tallapoosa County jury pools generally, or a violation of either his Sixth Amendment right to have his jury selected from a fair cross-section of the community or his Equal Protection rights.[326]

### 3. Clearly Established Federal Law

"The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross-section of the community."  *Berghuis v. Smith*, 559 U. S. 314, 319 (2010) (citing *Taylor v. Louisiana*, 419 U. S. 522, 527-28 (1974)).  To make out a *prima facie* violation of the Sixth Amendment's fair cross-section requirement, a criminal defendant must show that (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in venires from which the juries are

---

[325] 20 SCR (Tab R-46), at pp. 74-75.

[326] 22 SCR (Attachment B to Tab R-51), at pp. 14-17; 23 SCR (Tab R-58), at pp. 14-17.

selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this under-representation is due to systematic exclusion of the group in the jury-selection process. *Berghuis v. Smith*, 559 U. S. at 319 (citing *Duren v. Missouri*, 439 U. S. 357, 364 (1979).[327]

The Supreme Court has also long held that the Equal Protection Clause of the Fourteenth Amendment prohibits racial discrimination by the State in jury selection. *Miller-El v. Dretke*, 545 U. S. 231, 238 (2005); *Strauder v. West Virginia*, 100 U. S. 303, 308-09 (1880). In order to establish a *prima facie* case for an equal protection violation in the context of jury selection, the defendant must show (1) an identifiable group constituting a recognizable, distinct class, has been singled out for different

---

[327] Contrary to Petitioner's arguments in his federal habeas corpus petition, this analysis necessarily applies to the composition of the entire jury pool from which a jury is drawn (*i.e.,*, the qualified jury wheel), not to the composition of a particular jury venire *after* requests for discharge, deferral, or other grounds for disqualification have been addressed by the trial court. *See, e.g., United States v. Carmichael*, 560 F.3d 1270, 1280 (11th Cir. 2009) ("The percentage of the distinct group of the population in the appropriately challenged portion of the jury selection process was, in this case, the percentage of African Americans summoned from the 2001 wheel."), *cert. denied*, 558 U. S. 1128 (2010); *United States v. Grisham*, 63 F.3d 1074, 1078-79 (11th Cir. 1995) (holding that, to examine the second element of a fair cross-section claim, the court must compare the difference between the percentage of the distinctive group among the population eligible for jury service and the percentage of the distinctive group on the qualified jury wheel), *cert. denied*, 516 U. S. 1084 (1996); *United States v. Rodriguez*, 776 F.2d 1509, 1511 (11th Cir. 1985) ("Assessing the fairness and reasonableness of a group's representation requires a comparison between the percentage of the 'distinctive group' on the qualified jury wheel and the percentage of the group among the population eligible for jury service in the division."); *United States v. Tuttle*, 729 F.2d 1325, 1327 (11th Cir. 1984) (comparing the percentage of blacks in the general population of those counties comprising the Atlanta division of the northern district of Georgia with the percentage of blacks on the master wheel of jurors for that division), *cert. denied*, 469 U. S. 1192 (1985).

treatment under the laws, as written or as applied; (2) the group has been substantially under-represented on jury venires over a significant period of time; and (3) there has been purposeful discrimination against the under-represented group, which is established by a showing that the selection procedure for jurors is susceptible of abuse or not racially neutral. *Castaneda v. Partida*, 430 U. S. 482, 494 (1977).

### 4. AEDPA Review

The state trial court and state appellate court both reasonably concluded Petitioner's ineffective assistance claim failed to satisfy either prong of the *Strickland* standard. Both state courts correctly ruled that Petitioner alleged no facts showing that there has ever been under-representation of black venire members in Tallapoosa County in any case other than his own, any systematic exclusion of black citizens from Tallapoosa County jury venires was responsible for the under-representation of black citizens on his jury venire, or the system employed in Tallapoosa County to draw potential jurors into jury pools was not race-neutral or was susceptible to abuse as a tool of discrimination. *See United States v. Davis*, 854 F.3d 1276, 1295-96 (11th Cir.) (recognizing the *prima facie* tests for fair cross-section and equal protection claims are "virtually identical," and holding, in the context of jury selection, that a fair cross-section claim must be supported by a showing of systemic exclusion of the under-represented group, and an equal

protection claim must be supported by a showing the jury venire was selected under a practice providing an opportunity for discrimination), *cert. denied*, 138 S. Ct. 379 (2017). Petitioner alleged no facts before the state courts in his Rule 32 proceeding showing the under-representation of black citizens on his jury venire was the product of systemic exclusion of black citizens from Tallapoosa County jury venires, or the system employed in Tallapoosa County to select potential jurors for jury pools was either susceptible to abuse as a tool of discrimination or otherwise not race-neutral.

Petitioner also failed to allege any specific facts showing there has ever been any under-representation of black citizens on Tallapoosa County jury venires other than his own. Thus, Petitioner failed to allege any facts in his Rule 32 proceeding showing there has been a substantial under-representation of black citizens on Tallapoosa County jury wheels over a significant period of time. *See Castaneda v. Partida*, 430 U. S. at 494-95 (evidence showed significant under-representation of Mexican-Americans on jury venires over an eleven-year period). Where a defendant relies exclusively on under-representation of an identifiable group on his own jury venire, the defendant must also identify something about the jury selection wheel that was subject to abuse.[328] Petitioner alleged no facts in his Rule 32 proceeding

---

[328] The Supreme Court's holdings in *Batson*, *J.E.B.*, and their progeny effectively circumscribe the discretion of prosecutors and defense counsel with regard to how they employ their peremptory challenges. The use of peremptory challenges in a manner that is either racially or gender discriminatory is no longer allowed by any party, period.

suggesting Tallapoosa County's method for selecting potential jurors (identified by the state trial court as random selection from the State's driver's license list) was in any way susceptible to abuse in furtherance of discrimination.

Finally, Petitioner alleged no facts showing there was anything erroneous or discriminatory (much less systemically exclusionary) in the way the state trial court ruled on the requests by members of Petitioner's 215-member initial jury venire to be excused from jury service or in the way the trial court ruled on the parties' respective challenges for cause. Under those circumstances, the proper focus of any fair cross-section or equal protection challenge to Petitioner's jury venire should have been on the entire jury pool of 215 venire members called to serve as potential jurors at Petitioner's trial (the qualified jury wheel), not just the 54 venire members who remained after the exercise of challenges for cause and the trial court's rulings on requests to be excused.[329] Petitioner alleged no facts showing any under-representation of any identifiable group existed within the 215-member jury wheel prior to the trial court's rulings on the potential jurors' requests to be excused or the parties' challenges for cause.

Petitioner's trial counsel could reasonably have concluded that there was no basis for arguing that a substantial under-representation of black citizens on jury

---

[329] *See* note 327.

venires had taken place in Tallapoosa County over a significant period of time; that there was nothing about Tallapoosa County's system for calling potential jurors that was subject to abuse or discriminatory manipulation; and that there had been no systemic exclusion of black citizens from Tallapoosa County jury venires. Likewise, the state trial court and state appellate court reasonably concluded during Petitioner's Rule 32 proceeding that Petitioner had failed to allege any facts showing a reasonable probability that, but for Petitioner's trial counsel's failure to assert fair cross-section or equal protection challenges to the composition of Petitioner's jury venire, the outcome of either phase of Petitioner's capital murder trial would have been any different. Simply put, the state trial and appellate courts both reasonably concluded any fair cross-section or equal protection challenge to the racial composition of Petitioner's jury venire would be futile. *See Green v. Georgia*, 882 F.3d at 987 (counsel's failure to raise futile challenge to state criminal statute did not prejudice the defendant). Accordingly, the state trial and appellate courts reasonably concluded Petitioner's complaints about his trial counsel's failure to assert fair cross-section or equal protection challenges to the composition of Petitioner's jury venire failed to satisfy either prong of the *Strickland* standard.

### 5. Conclusions

The state trial and state appellate courts' rejection on the merits during Petitioner's Rule 32 proceeding of Petitioner's ineffective assistance complaint

about his trial counsel's failure to raise fair-cross-section and equal protection challenges to the racial composition of Petitioner's jury venire was not contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and Rule 32 proceedings. Paragraphs 68-69 of Petitioner's federal habeas corpus petition do not warrant federal habeas relief.

## M. Failure to Object to Prosecutorial Jury Argument at Punishment Phase

### 1. The Complaint

Petitioner argues in paragraphs 70 through 73 of his federal habeas corpus petition that his trial counsel rendered ineffective assistance by failing to present any mitigating evidence at the punishment phase of trial other than Petitioner's birth certificate, arguing that Petitioner's age (18) at the time of the capital offense was a mitigating circumstance (thereby inviting the prosecution to reply by pointing out Julie Rhodes was only nineteen years old when she was murdered), failing to object when the prosecution argued in reply that, while Petitioner was only eighteen and facing, at best, the prospect of a sentence of life without parole, Julie Rhodes was

only nineteen years old when she died and had no chance to live beyond that age, and failing to object to the prosecution's argument calling Petitioner "a bad guy."[330]

## 2. State Court Disposition

As explained at length above in Section V.G.3.b., Petitioner's trial counsel pointed to an enlarged copy of Petitioner's birth certificate and argued at the punishment phase of trial that the jury should consider Petitioner's relative youth (age eighteen at the time of his crime) as a mitigating factors when weighing the mitigating and aggravating factors and making its sentencing recommendation (which he urged should be life without parole).[331]  In response, the prosecution began his rebuttal argument as follows:

> There's a certificate for Julie on file now, too, and it is a death certificate.  Barksdale is eighteen and best he's looking at, as Mr. Goggans said, is life without patrol [sic].  Julie was nineteen and she's left with no life at all.[332]

Petitioner complained in his Rule 32 petition about his trial counsel's failure to object when the prosecution noted, in response to Petitioner's closing argument, that Julie Rhodes was only nineteen when she was murdered.[333]  The state trial court

---

[330] Doc. # 1, at pp. 22-23, ¶¶ 70-73.

[331] The full text of Petitioner's trial counsel's closing punishment phase jury argument appears at S.F. Trial, 12 SCR 1430-33.

[332] S.F. Trial, 12 SCR 1433.

[333] 15 SCR 29-30.

summarily dismissed this ineffective assistance claim in its Order issued January 6, 2003, concluding the prosecutor's argument noting Julie Rhodes's age was a proper rebuttal to the defense's argument concerning Petitioner's age.[334]  On appeal from the denial of Petitioner's Rule 32 petition, the Alabama Court of Criminal Appeals held that the failure of Petitioner's trial counsel to object to the prosecution's argument did not prejudice Petitioner because the comments were not so prejudicial as to warrant a reversal.[335]

Petitioner also complained in his Rule 32 petition about his trial counsel's failure to object when the prosecution allegedly "mocked" Petitioner and "essentially fabricated evidence" by suggesting Petitioner was a "bad guy."[336]  The state trial court summarily dismissed this complaint in its Order issued January 6, 2003, concluding this complaint of ineffective assistance lacked merit because the prosecutor's jury argument consisted of permissible inferences from the evidence.[337] The Alabama Court of Criminal Appeals subsequently held the prosecutor's remarks

---

[334] 15 SCR 177-78; 23 SCR (Tab R-56), at pp. 31-32.

[335] 22 SCR (Attachment B to Tab R-51), at pp. 26-29; 23 SCR (Tab R-58), at pp. 26-29.

[336] 15 SCR 30-31.

[337] 15 SCR 179-80; 23 SCR (Tab R-56), at pp. 33-34.

in question were wholly proper summations of the evidence or inferences reasonably drawn from the evidence and not subject to objection under state law.[338]

### 3. Clearly Established Federal Law

As explained at length above in Section IV.I.3., both Alabama and federal courts generally recognize four areas of jury argument as proper: (1) summation of the evidence; (2) inferences reasonably drawn from the evidence; (3) replies or answers to opposing counsel's argument; and (4) pleas for law enforcement and justice.

### 4. AEDPA Review of Claims Fairly Presented in Rule 32 Petition

#### a. Comparing Julie's Age With Petitioner's

The state trial and appellate courts reasonably concluded the decision by Petitioner's trial counsel not to object to the prosecution's rebuttal argument that Julie Rhodes was only nineteen at the time of her murder was objectively reasonable because the prosecution's rebuttal argument was proper under state law and did not prejudice Petitioner.[339]  The state courts' conclusion that the prosecution's rebuttal argument was proper under state law binds this court's federal habeas corpus analysis. *See Bradshaw v. Richey*, 546 U.S. at 76 ("We have repeatedly held that a

---

[338] 22 SCR (Attachment B to Tab R-51), at pp. 23-26; 23 SCR (Tab R-58), at pp. 23-26.

[339] Alternatively, this court independently concludes after *de novo* review that this ineffective assistance complaint fails to satisfy either prong of the *Strickland* standard.

state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Loggins v. Thomas*, 654 F.3d at 1228 ("Alabama law is what the Alabama courts hold that it is.").

There was nothing objectively unreasonable in the decision by Petitioner's trial counsel not to object to the prosecution's rebuttal argument. Petitioner's trial counsel clearly invited this reply by emphasizing in his own punishment phase closing argument Petitioner's age at the time of the capital offense. The prosecution's rebuttal argument was a wholly appropriate response to Petitioner's trial counsel's closing punishment phase jury argument.

Likewise, the state appellate court reasonably concluded Petitioner was not "prejudiced" within the meaning of *Strickland* by the failure of Petitioner's trial counsel to object to the prosecution's rebuttal jury argument. The Alabama Court of Criminal Appeals' conclusion that the prosecution's rebuttal argument did not rise to the level of reversible error under state law also binds this federal habeas court. *Bradshaw v. Richey*, 546 U.S. at 76; *Loggins v. Thomas*, 654 F.3d at 1228. Because the prosecution's rebuttal argument did not constitute reversible error under applicable state law, the failure of Petitioner's trial counsel to object did not "prejudice" Petitioner within the meaning of the *Strickland* standard. *See Pinkney v. Sec'y, DOC*, 876 F.3d at 1297 ("an attorney will not be held to have performed

deficiently for failing to perform a futile act, one that would not have gotten his client any relief"); *Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d at 1299 (holding "a lawyer is not ineffective for failing to raise a meritless argument").

The state trial and state appellate courts' rejection on the merits during Petitioner's Rule 32 proceeding of Petitioner's ineffective assistance complaint about his trial counsel's failure to object to the prosecution's rebuttal jury argument at the punishment phase of trial noting Julie Rhodes's age at the time of her murder (and comparing same to Petitioner's age) was neither contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and Rule 32 proceedings. Paragraphs 70 through 73 of Petitioner's federal habeas corpus petition do not warrant federal habeas corpus relief.

### b. Suggestion Petitioner was a "Bad Guy"

Petitioner also complained in his Rule 32 petition about his trial counsel's failure to object to the prosecution's jury argument suggesting the Petitioner carried and brandished a weapon and behaved in a manner intended to create the impression he was "a bad guy." Petitioner repeats this cryptic complaint in a footnote in his

federal habeas corpus petition.[340]  The initial problem with this ineffective assistance

complaint is that the complained of prosecutorial jury argument actually took place

at the guilt-innocence phase of trial, not during the punishment phase of trial.[341]  The

---

[340] Doc. # 1, at p. 23 n.3.

[341] During closing jury argument at the guilt-innocence phase of trial, after discussing the extensive testimony of multiple witnesses establishing the Petitioner's and his companions' desire to gain access to a car to return to Guntersville, the prosecution argued as follows, without objection:

> The point of all of that is this.  It is clear, it is clear, I submit to you, crystal clear, it is clear beyond a reasonable doubt that their goal from the moment they became carless in Sylacauga was to get another car and get back to Guntersville. Now, I don't contend nor do I have to prove that from the moment they wrecked the car in Sylacauga he decided right then to rob somebody and go back to Guntersville.  But, as the day wore on, Mr. Barksdale's situation became, in his mind, a little more earnest, a little more desperate, and he was willing to do whatever it took when it came down to it.  And, you heard the statements of the various witnesses.  With Lambert he goes to Gretchen Young's apartment over near the college, he askes several other people, looking for rides back to Guntersville.

> Now, in this whole time, and I think it is clear at this point, I might as well point it out now, that the leader of this trio from Guntersville is Tony Barksdale. That's clear from the evidence that Garrison and Hillburn [sic], these two guys, that had only known Barksdale a few days when this occurred, other people were involved in this case, in this is [sic] rogues gallery from Guntersville, that had known Hillburn [sic] and Garrison for years, some of them, but not him, not him, but for some reason get with him, and they are running around, up to no good on a Friday night, and they ended up here stranded, no place to go, no place to stay, no way home with a gun, a bad attitude, and two guys for his audience.  They go right along with him.  I'm bad guy.  I'm bad guy.  Yes.  I drive around Alabama in the middle of the night in stolen cars.  I wreck cars.  I lie about whose car I have wrecked.  I persuade people to take me hither and yon, all over everywhere, and I wear a nine millimeter semi-automatic weapon with two clips.  The gun on one side, the clip on the other in a shoulder holster, shoulder holster, now.  I'm a bad guy.  And I'm playing with the weapon, and I'm showing this weapon, and I'm dropping the clips, and I am chambering rounds, and I'm putting the clip back in and I am wiping the weapon off, and I even wipe the bullets off.  And, I show it to this person, and I point it at that person, and I can't wait to use it.  I'm itching to use it.  Now, isn't that clear from the evidence, ladies and gentlemen, that we have in this case.  All of those factors coupled with a person, who, for whatever reason, harbors the willingness to do it and the kind of conscience, or lack of conscience, that permits him, when he crosses paths completely fortuitously, sadly, for Julie

state trial court and state appellate court both concluded the prosecutorial argument in question was wholly proper, as it constituted either a summation of the evidence or reasonable inferences drawn from the evidence. The state trial and appellate courts' conclusions that the prosecutor's jury arguments in question were proper under state law binds this federal habeas court. *Bradshaw v. Richey*, 546 U.S. at 76; *Loggins v. Thomas*, 654 F.3d at 1228.

Furthermore, having independently reviewed the entire record from the guilt-innocence phase of Petitioner's capital murder trial, the state trial court and state appellate court both reasonably concluded there was no legitimate basis for an objection to the prosecutorial argument in question. All of the prosecutorial jury argument identified by Petitioner in his Rule 32 petition as allegedly objectionable consisted of little more than either accurate summations of, or reasonable inferences drawn from, the evidence presented at the guilt innocence phase of Petitioner's capital murder trial. The state trial and appellate courts reasonably concluded that this ineffective assistance complaint failed to satisfy either prong of the *Strickland* standard. *See Pinkney v. Sec'y, DOC*, 876 F.3d at 1297 ("an attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief"); *Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d

---

Rhodes, somebody like Julie Rhodes, and he pumps two slugs in her with no more thought than if he were swatting a fly.
S.F. Trial, 12 SCR 1336-37.

at 1299 (holding "a lawyer is not ineffective for failing to raise a meritless argument"). The evidence of Petitioner's guilt was overwhelming. The prosecutorial jury argument in question merely summarized or drew reasonable inferences from the extensive evidence of Petitioner's conduct on December 1, 1995 and the days that followed.

The state trial and state appellate courts' rejection on the merits during Petitioner's Rule 32 proceeding of Petitioner's ineffective assistance complaint about his trial counsel's failure to object to the prosecution's guilt-innocence phase jury argument suggesting Petitioner was "a bad guy" was neither contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and Rule 32 proceedings. Paragraphs 70 through 73 of Petitioner's federal habeas corpus petition do not warrant federal habeas corpus relief.

### 5. *De Novo* Review of New Complaint

Petitioner argues in his federal habeas corpus petition for the first time that his trial counsel rendered ineffective assistance by emphasizing at the punishment phase of trial Petitioner's age as a mitigating circumstance: "Why he thought that such an

approach might win their sympathy when the victim was his nearly exact contemporary is not known."[342]

During Petitioner's Rule 32 hearing, attorney Goggans testified without contradiction that he believed Petitioner's youth was the biggest mitigating factor in Petitioner's favor and he argued in his closing punishment phase jury argument that the jury should consider Petitioner's youth and lack of life experience, and resulting lack of judgment, when recommending sentence.[343] Petitioner's trial counsel argued as follows at the punishment phase of trial:

> As you can see from this enlargement of this exhibit, Tony Barksdale was born on May 2, 1977. He was eighteen years when this happened. He was young. So was Julie Rhodes. She was young, too. Too young to die. No one should be murdered. It is even more tragic when it is someone that is young.
>
> Tony Barksdale's age is not an excuse. It is not an excuse. I'm not offering it to you as an excuse. But, what I am offering is that under the law, it is a mitigating factor for what you folks see as appropriate punishment: Death or life in prison without the possibility of parole.
>
> On the street sometimes the law doesn't protect us. We all know that. But inside the bar here, inside this bar, the law rules. Inside that bar the protection of the law must be applied. For an ordered society the laws must be applied equally to everyone regardless of race, color, creed, national origin, or age. The law must be applied to everyone.
>
> Now, I urge you to consider all the things that Mr. Clark suggested you consider also. But, I also ask you to also consider this right here on May 2, 1977. Tony Barksdale is only eighteen years old. He is only nineteen as he sits here right now. Now at the age of forty-one -- at the age of eighteen, I was thinking I had control of the whole world. I knew everything. But when you hit forty-one, and you have

---

[342] Doc. # 1, at pp. 22-23, ❡ 71.

[343] S.F. Rule 32 Hearing, testimony of Tommy Goggans, 17 SCR 108-09, 136-37.

had some more experience, you kind of wish you had half the judgment and sense that you thought you had back then. And I ask you to consider this under the law, which is under the law, a mitigating circumstance in this case. It is not an excuse in this case, but it is a factor, a strong factor, which indicates that the appropriate punishment is life without the possibility of parole.[344]

Having independently reviewed the entire record from Petitioner's capital murder trial, it was objectively reasonable for Petitioner's trial counsel to present evidence of Petitioner's age and to make the foregoing closing jury argument at the punishment phase of Petitioner's trial. It was objectively reasonable for Petitioner's trial counsel to present evidence and argument in support of a statutory mitigating circumstance applicable to his client. The jury could have reasonably concluded the Petitioner's capital offense reflected an extremely poor level of judgment, a level of judgment understandable in a person barely old enough to be legally an adult. Moreover, after *de novo* review, there is no reasonable probability that, but for Petitioner's trial counsel presenting evidence of Petitioner's age and arguing Petitioner's youth must be considered as a mitigating circumstance, the outcome of the punishment phase of Petitioner's capital murder trial would have been any different.

Petitioner's trial counsel reasonably concluded that emphasizing Petitioner's youth, and accompanying lack of experience and good judgment, was the strongest

---

[344] S.F. Trial, 12 SCR 1430-32.

approach available likely to secure a life sentence for Petitioner. When viewed in the light of the evidence of Petitioner's gang involvement and history of drug trafficking that Petitioner's own father and others knowledgeable of Petitioner's background could have furnished the jury, the strategic decision by Petitioner's trial counsel to rely on Petitioner's youth in mitigation of Petitioner's moral blameworthiness was objectively reasonable and did not "prejudice" Petitioner within the meaning of the *Strickland* standard. The argument contained in paragraph 71 of Petitioner's federal habeas corpus petition does not warrant federal habeas corpus relief.

## N. Failure to Object to Erroneous Punishment Phase Jury Instructions

### 1. Overview of the Complaints

Petitioner complains in paragraphs 74 through 101 of his federal habeas corpus petition that his trial counsel rendered ineffective assistance by failing to object to erroneous punishment-phase jury instructions, specifically to: the trial court's erroneous instruction that the jury could not consider a mitigating circumstance unless it was "reasonably satisfied" the circumstance had been established;[345] the trial court's failure to instruct the jury that it could recommend a sentence of death only if the aggravating circumstances outweighed the mitigating

---

[345] Doc. # 1, at pp. 24-25, ¶¶ 75-81.

circumstances;[346] the trial court's erroneous instruction that it had to unanimously agree on the existence of a mitigating circumstance;[347] and the trial court's failure to define the term "life without parole."[348]

## 2. Clearly Established Federal Law

As explained above in Section IV.C.2., the standard for reviewing the propriety of jury instructions at the punishment phase of a capital murder trial is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U. S. at 380.

## 3. Burden of Proof on Mitigating Circumstances

### a. State Court Disposition

During its instructions to the jury at the punishment phase of trial, the state trial court advised the jury without objection at various points as follows:

> Let me just simply tell you that the burden of proof is on the State to prove the aggravating circumstances beyond a reasonable doubt. And, that's the same definition of reasonable doubt that I gave you during the guilt phase.
> Now, the defendant does not have the burden of proving mitigating circumstances beyond a reasonable doubt. The defendant,

---

[346] Doc. # 1, at pp. 25-26, ¶¶ 82-85.

[347] Doc. # 1, at pp. 26-28, ¶¶ 86-95.

[348] Doc. # 1, at pp. 28-29, ¶¶ 96-101.

for you to accept them and consider, only has to offer mitigating circumstances which reasonably satisfy you of the truth of it.[349]

\* \* \*

Our law, and I'm rather proud of it, has set some standards that have to be met. And so, in effect, I'm going to ask you to follow those standards. Your judgment and determination is up to you. So, I'm going to try to instruct you a little bit further about the issues here of aggravating circumstances and mitigating circumstances and weighing them to decide what your recommendation is going to be. And, I have already told you before that the burden of proof is on the State to prove the aggravating circumstances beyond a reasonable doubt. Any that they don't prove beyond a reasonable doubt, you don't consider. If you are not reasonably satisfied of the existence of mitigating circumstances, you won't consider that either. But, after you have decided what aggravating circumstances exist under those standards, then you have to weigh them as they impact on your recommendation.[350]

\* \* \*

Now, let's look over on the other side of the ledger. Most anything, most anything really, should be taken in consideration when it comes to the question of imposing the death penalty. We just do not do it lightly. Death is different.

Certainly, as the defense has suggested, you can take into consideration the age of the defendant. You can also take into consideration the fact, for whatever weight you wish to give it, that he was not the only one involved, if that be a fact and you heard them. You could also, of course, take into consideration the fact of any punishment which the evidence has shown any of the rest of them received. So, most anything could be used or considered by you, if you are reasonably satisfied it is true, with regard to the mitigation.[351]

---

[349] S.F. Trial, 12 SCR 1423-24.

[350] S.F. Trial, 12 SCR 1436-37.

[351] S.F. Trial, 12 SCR 1440-41.

Petitioner argued in his Rule 32 petition that his trial counsel rendered ineffective assistance by failing to object when the trial court instructed the jury at the punishment phase of trial that it should only consider those mitigating circumstances which the jury was "reasonably satisfied" had been established by the evidence.[352]  Petitioner argued the trial court's instruction that the jury had to be "reasonably satisfied" of the existence of a particular mitigating circumstances before weighing that circumstance against the aggravating circumstances was inconsistent with *Ala. Code §13A-5-45(g).*[353]

During Petitioner's Rule 32 proceeding, the state trial court concluded in its Order issued January 6, 2003 that the punishment phase jury instructions were erroneous insofar as they suggested the defendant bore the burden of proof on establishing the existence of any mitigating circumstance but that the error was harmless, in part because the prosecution proved two aggravating factors, *i.e.*, the fact Petitioner's capital offense occurred during the course of a robbery and the heinous, atrocious, or cruel nature of Petitioner's offense, while the mitigating

---

[352] 15 SCR 22-24.

[353] Section 13A-5-45(g) of the Alabama Code provides as follows:
The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51 and 13A-5-52.  When the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence.

evidence put forth by the defense was "minimal."[354]  The Alabama Court of Criminal Appeals likewise recognized the trial court's punishment phase jury instructions were erroneous under state law but held, as did the trial court in Petitioner's Rule 32 proceeding, that any such error was harmless because (1) the evidence supported three aggravating circumstances and the evidence in mitigation was "minimal and weak"; (2) the trial court's sentencing order showed it gave the mitigating evidence proper consideration; and (3) therefore, the failure of Petitioner's trial counsel to raise a timely objection did not "prejudice' Petitioner within the meaning of the *Strickland* standard.[355]

### b.  AEDPA Review

As explained at length above in Section IV.C.3.a., there was no genuine factual dispute at the punishment phase of Petitioner's capital murder trial over the existence of mitigating circumstances showing that Petitioner was only eighteen years old at the time of the offense, others were involved in the same offense, and one of Petitioner's co-defendants had received a sentence of life imprisonment with the possibility of parole.  The trial court expressly instructed the jury it could consider each of those mitigating factors.[356]  The prosecution made no effort to

---

[354] 15 SCR 171-72; 23 SCR (Tab R-56), at pp. 25-26.

[355] 22 SCR (Attachment B to Tab R-51), at pp. 51-55; 23 SCR (Tab R-58), at pp. 51-55.

[356] S.F. Trial, 12 SCR 1440-41.

challenge the factual accuracy of either the evidence Petitioner's trial counsel presented at the punishment phase of trial or anything Petitioner's trial counsel argued during closing jury argument at the punishment phase of trial.

Despite its erroneous description of the burden of proof applicable to mitigating circumstances, the trial court's punishment phase jury instructions correctly advised the jury to consider anything the defense presented in mitigation and to weigh the mitigating circumstances against the aggravating circumstances the prosecution had established beyond a reasonable doubt. Under these circumstances, there is no reasonable likelihood that the jury applied the erroneous punishment phase jury instructions in a way that prevented the jury's consideration of constitutionally relevant evidence. *Boyde v. California*, 494 U. S. at 380. For the reasons discussed at length above in Section IV.C.3.a., the state trial and appellate courts both reasonably concluded this ineffective assistance complaint failed to satisfy the "prejudice" prong of the *Strickland* standard.

### c. Conclusions

The state trial and state appellate courts' rejection on the merits during Petitioner's Rule 32 proceeding of Petitioner's ineffective assistance complaint about his trial counsel's failure to object to the trial court's erroneous punishment phase jury instructions regarding the burden of proof applicable to mitigating circumstances was neither contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and Rule 32 proceedings. Paragraphs 75 through 81 of Petitioner's federal habeas corpus petition do not warrant federal habeas corpus relief.

### 4. Failure to Instruct on What to do if Evidence Equally Balanced

#### a. State Court Disposition

At the punishment phase of Petitioner's capital murder trial, the trial court instructed the jury without objection as follows:

> Once you unanimously agree to consider this aggravating factor or this mitigating factor, then it is your duty to weigh them, weigh them, with a view to determining do the aggravating factors outweigh the mitigating factors? And, if ten of you agree, then you could recommend the death penalty. Unless ten of you agree, you can't. And, then you weigh them and you look at them and say way, well, in my view the mitigating factors might outweigh the aggravating factors. If seven of you feel that way, then your recommendation ought to be life without parole. Obviously, there could be disagreement. And, I'm going to tell you that you should attempt to resolve it, talk about it, vote on it, and discuss it. You have got the same foreperson that you always had.[357]

Petitioner argued in his Rule 32 petition that the trial court's punishment phase jury instructions failed to advise the jury that the applicable Alabama statute[358]

---

[357] S.F. Trial, 12 S CR 1424-25.

[358] Section 13A-5-46(e) of the Alabama Code provides as follows:
After deliberation, the jury shall return a verdict as follows:
(1) If the jury determines that no aggravating circumstances as defined in Section 13A-5-49 exist, it shall return a verdict of life imprisonment without parole;

requires the jury to recommend a sentence of life without parole if the mitigating and aggravating circumstances are equally balanced.[359] The state trial court concluded this ineffective assistance complaint satisfied neither prong of the *Strickland* standard because the trial court's punishment phase jury instructions correctly advised the jury it could return a recommendation of death only if it concluded the aggravating circumstances outweighed the mitigating circumstances, and this implicitly meant an equal balance of those circumstances required a recommendation of life without parole.[360] The Alabama Court of Criminal Appeals affirmed, concluding there was nothing erroneous with the trial court's jury instructions in this regard, that any objection raised to the instructions on this ground would have been baseless, and that Petitioner's trial counsel did not render deficient performance by failing to make such a baseless objection.[361]

---

(2) If the jury determines that one or more aggravating circumstances as definied in Section 13A-5-49 exist but do not outweigh the mitigating circumstances, it shall return a verdict of life imprisonment without parole;

(3) If the jury determines that one or more aggravating circumstances as defined in Section 13A-5-49 exist and that they outweigh the mitigating circumstances, if any, it shall return a verdict of death.

[359] 15 SCR 24-25.

[360] 15 SCR 172-74; 23 SCR (Tab R-56), at pp. 26-28.

[361] 22 SCR (Attachment B to Tab R-51), at pp. 55-57; 23 SCR (Tab R-58), at pp. 55-57.

### b. AEDPA Review

The state trial court's and state appellate court's determination during Petitioner's Rule 32 proceeding that the trial court's punishment phase jury instructions were not erroneous under applicable state law (for failing to instruct the jury expressly on what to do if the mitigating and aggravating circumstances were equally balanced) binds this federal habeas court. *Bradshaw v. Richey*, 546 U. S. at 76; *Loggins v. Thomas*, 654 F.3d at 1228. Given the absence of any error in this aspect of the Petitioner's punishment phase jury instructions, the failure of Petitioner's trial counsel to make an objection of the type now urged by Petitioner does not satisfy either prong of the *Strickland* standard. *See Green v. Georgia*, 882 F.3d at 987 (counsel's failure to make a futile objection did not prejudice defendant within the meaning of *Strickland*); *Pinkney v. Sec'y, DOC*, 876 F.3d at 1297 ("an attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief"); *Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d at 1299 (holding "a lawyer is not ineffective for failing to raise a meritless argument").

### c. Conclusions

The state trial and state appellate courts' rejection on the merits during Petitioner's Rule 32 proceeding of Petitioner's ineffective assistance complaint about his trial counsel's failure to object to the trial court's failure to instruct the jury

expressly on what to do if the mitigating and aggravating circumstances were equally balanced was neither contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and Rule 32 proceedings. Paragraphs 82 through 85 of Petitioner's federal habeas corpus petition do not warrant federal habeas corpus relief.

### 5. Failure to Correctly Cure Erroneous Instruction on Unanimity

### a. Absence of State Court Disposition

As explained at length above in Section IV.C.1, the trial court erroneously instructed the jury at the punishment phase of trial that it had to unanimously agree on what mitigating circumstances existed before it could consider particular mitigating circumstances. Petitioner's trial counsel timely objected to the error and requested the trial court issue a corrective instruction. The prosecutor agreed with Petitioner's trial counsel on the need to correct the trial court's erroneous instruction. The trial court attempted to correct its earlier instruction but Petitioner's trial counsel requested additional clarification. The trial court concluded its instructions to the jury by informing them "Mitigating doesn't have to be unanimous."[362]

---

[362] S.F. Trial, 12 SCR 1436-48.

Petitioner complained in his Rule 32 petition that the trial court's punishment phase jury instruction erroneously required the jury to unanimously agree on particular mitigating circumstances before considering and weighing those circumstances against the aggravating circumstances.[363] Petitioner did not, however, frame this complaint as one of ineffective assistance by his trial counsel. In fact, Petitioner's Rule 32 petition did not criticize his trial counsel's performance in timely objecting to the trial court's *Mills* error and in requesting multiple curative instructions. Thus, this ineffective assistance claim is unexhausted and subject to *de novo* review in this court. *See Porter v. McCollum*, 558 U. S. at 39 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts failed to address this prong of the *Strickland* analysis); *Rompilla v. Beard*, 545 U. S. at 390 (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice).

### b. *De Novo* Review

As explained at length above in Section IV.C.1., Petitioner's trial counsel timely objected to the trial court's erroneous punishment phase jury instruction

---

[363] 15 SCR 40-42.

advising the jury that it had to unanimously agree on what particular evidence constituted mitigating circumstances before it could weigh those mitigating circumstances against the aggravating circumstances. The prosecution agreed with defense counsel that the trial court's instruction was erroneous and joined in the request for a curative jury instruction. When the trial court's ensuing instruction failed to properly cure the earlier error, Petitioner's trial counsel requested an even more specific curative instruction and the trial court informed the jury "Let me just make it clear: Mitigating doesn't have to be unanimous."[364]

Petitioner complains for the first time in his federal habeas corpus petition that his trial counsel rendered ineffective assistance by failing to request even further curative instructions from the trial court, arguing the trial court's curative instructions were ambiguous and insufficient to cure the *Mills* error. Petitioner does not, however, explain in any rational manner what additional curative instructions his trial counsel should have requested.

As this court explained at length above in Section IV.C.3.b., while admittedly less than pristine, the state trial court's remedial instructions were sufficient to alert the jury to the fact the jury need not unanimously agree upon a particular mitigating circumstance before weighing that mitigating circumstance against the aggravating

---

[364] S.F. Trial, 12 SCR 1447-48.

circumstances established by the evidence. "In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would--with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" *Johnson v. Texas*, 509 U. S. at 368; *Boyde v. California*, 494 U. S. at 381. Viewed in the context of the entire trial, the failure of Petitioner's trial counsel to request even further curative instructions was objectively reasonable.

Petitioner identifies no other mitigating circumstances properly before the jury at the punishment phase of his capital murder trial that he believes his jury was unable to consider adequately in light of the allegedly defective punishment phase jury instructions. Nor is there a reasonable likelihood the jury applied the challenged instruction in a way that prevented the jury's consideration of constitutionally relevant evidence. *Boyde v. California*, 494 U. S. at 380. Under these circumstances, there is no reasonable probability that, but for the failure of Petitioner's trial counsel to request an unspecified additional curative instruction addressing the trial court's *Mills* error, the outcome of the punishment phase of Petitioner's capital murder trial would have been any different.

### c. Conclusions

After independent, *de novo* review, Petitioner's conclusory complaint about his trial counsel's failure to request unspecified additional curative instructions to

correct the trial court's *Mills* error satisfies neither prong of the *Strickland* standard.

Paragraphs 86 through 95 of Petitioner's federal habeas corpus petition do not warrant federal habeas corpus relief.

### 6. Failure to Define "Life Without Parole"

#### a. State Court Disposition

During the charge conference at the punishment phase of Petitioner's capital murder trial, the following exchanges took place:

> MR. GOGGANS: This is a somewhat different subject, but while we are here on the record. You mentioned just now my proposed requested charge in the penalty phase of life without parole means that he won't get out. The Court might be willing to charge life without parole under presently existing law. I just started thinking about that. I think I'm right the way I proposed it. Rather than saying presently existing law, which could possibly lead some jurors to think that next week it might get changed and he'd get out, I rather you not give it at all that way.
> THE COURT: You don't want it? You withdraw it?
> MR. GOGGANS: I would rather you give it as I submitted it.
> THE COURT: I'm not going to give it as submitted because I think there is always the possibility the State may change this law. I have always thought that.
> MR. GOGGANS: I would rather nothing than as proposed by the Court, with all respect to the Court.
> THE COURT: I'm going to refuse it without that. If you want to withdraw it, I won't give it at all.
> MR. GOGGANS: I don't want to withdraw it as I did it, it is just I would rather you tell them nothing than as you said you would amend it.
> THE COURT: Well, I'm going to tell them what I said I was going to tell them, unless you don't want me to tell them anything regarding that.
> MR. GOGGANS: I would rather have nothing.

THE COURT: You'd rather have nothing at all. Okay. Then, we will consider that charge, requested charge twelve, is withdrawn. There will be no reference to it whatsoever.[365]

Petitioner complained in his Rule 32 petition about his trial counsel's failure to object to the trial court's insistence on amending the defense's proposed jury charge defining life without parole and argued his trial counsel should have accepted the trial court's proposed additional language rather than to withdraw the definition entirely.[366] The state trial court summarily dismissed this ineffective assistance claim in its Order issued January 6, 2003, concluding it was objectively reasonable for the Petitioner's trial counsel to withdraw the requested definition of "life without parole" because the trial court's punishment phase jury charge referred to life without parole as simply "life without parole."[367]

On appeal from the denial of Petitioner's Rule 32 petition, the Alabama Court of Criminal Appeals concluded that (1) both the proposed definition of "life without parole" requested by the Petitioner and the modified version of that definition proposed by the trial court were erroneous under applicable state law; (2) Petitioner's trial counsel was not ineffective for failing to object to the trial court's refusal to give a legally erroneous definition of "life without parole"; and (3) because both

---

[365] S.F. Trial, 12 SCR 1416-18.

[366] 15 SCR 25-26.

[367] 15 SCR 174; 23 SCR (Tab R-56), at p. 28.

Petitioner's trial counsel and the trial court emphasized during the punishment phase of trial that a term of life imprisonment without the possibility of parole meant life without parole, it was objectively reasonable for Petitioner's trial counsel not to request a legally erroneous version of the definition of "life without parole."[368]

### b. AEDPA Review

Petitioner's reliance on the Supreme Court's holding in *Simmons v. South Carolina*, 512 U. S. 154 (1994), in support of his contention that his trial counsel's proposed definition of "life without parole" was constitutionally mandated, is misplaced. In *Simmons*, a plurality of the Supreme Court, with three judges concurring separately, held that a defendant had been unconstitutionally sentenced to death in a trial in which the capital sentencing jury was not informed that, under applicable state law, a term of life imprisonment meant a term of life imprisonment without the possibility of parole:

> Three times petitioner asked to inform the jury that in fact he was ineligible for parole under state law; three times his request was denied. The State thus succeeded in securing a death sentence on the ground, at least in part, of petitioner's future dangerousness, while at the same time concealing from the sentencing jury the true meaning of its noncapital sentencing alternative, namely, that life imprisonment meant life without parole. We think it is clear that the State denied petitioner due process.

*Simmons v. South Carolina*, 512 U. S. at 162 (footnote omitted).

---

[368] 22 SCR (Attachment B to Tab R-51), at pp. 57-60; 23 SCR (Tab R-58), at pp. 57-60.

In sharp contrast to the facts in *Simmons*, the Petitioner's trial court in its punishment phase jury instructions repeatedly made clear that the sentencing options available to Petitioner's jurors were death and a term of life imprisonment without the possibility of parole.[369]   The prosecutor also explained during closing jury argument that the jury's sentencing options were death and life without parole.[370] Petitioner's trial counsel repeatedly emphasized during closing punishment phase jury argument that the jury had to choose between recommending death and life without the possibility of parole.[371]   Under these circumstances, the holding in *Simmons* has no application to Petitioner's capital murder trial.

The state appellate court's holding in Petitioner's Rule 32 proceeding that *both* of the definitions of "life without parole" requested by Petitioner's trial counsel and proposed by the state trial court were legally erroneous under applicable Alabama law binds this court in this federal habeas corpus proceeding.  *Bradshaw v. Richey*, 546 U.S. at 76; *Loggins v. Thomas*, 654 F.3d at 1228.  The failure of Petitioner's trial counsel to object to the trial court's refusal to give a legally erroneous definition of "life without parole" and the failure of Petitioner's trial counsel to agree to the state trial court's equally legally erroneous definition of "life

---

[369] S.F. Trial, 12 SCR 1425, 1442.

[370] S.F. Trial, 12 SCR 1433.

[371] S.F. Trial, 12 SCR 1430-33.

without parole" did not cause the performance of Petitioner's trial counsel to fall below an objective level of reasonableness and did not "prejudice" Petitioner within the meaning of the *Strickland* standard.  *See Green v. Georgia*, 882 F.3d at 987 (counsel's failure to make a futile objection did not prejudice defendant within the meaning of *Strickland*); *Pinkney v. Sec'y, DOC*, 876 F.3d at 1297 ("an attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief"); *Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d at 1299 (holding "a lawyer is not ineffective for failing to raise a meritless argument").

The state appellate court reasonably concluded in the course of Petitioner's Rule 32 proceeding that Petitioner's complaints about his trial court's conduct vis-a-vis both the defense's proposed definition of "life without parole" and the state trial court's proposed definition of "life without parole" failed to satisfy either prong of the *Strickland* standard.  Petitioner's trial counsel cannot reasonably be faulted for either failing to continue to urge a legally erroneous definition of "life without parole" or refusing to agree to the state trial court's submission of an equally legally erroneous definition of the same term.  The state appellate court reasonably concluded there was no reasonable probability that, but for the failure of Petitioner's trial counsel to insist on the submission of a legally erroneous definition of "life

without parole," the outcome of the punishment phase of Petitioner's capital murder trial would have been any different.

### c. Conclusions

The state trial and state appellate courts' rejection on the merits during Petitioner's Rule 32 proceeding of Petitioner's ineffective assistance complaint about his trial counsel's failures to object to the trial court's refusal to give Petitioner's proposed definition of "life without parole" and to agree to the trial court's proposed definition of "life without parole" was neither contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and Rule 32 proceedings. Paragraphs 96 through 101 of Petitioner's federal habeas corpus petition do not warrant federal habeas corpus relief.

## VI. INEFFECTIVE ASSISTANCE BY APPELLATE COUNSEL

## A. The Claim

Petitioner argues in paragraphs 102-03 of his federal habeas corpus petition that his state appellate counsel rendered ineffective assistance in violation of his Sixth Amendment right to counsel by failing to raise grounds for relief on direct

appeal challenging the prosecution's improper use of its peremptory challenges to discriminate against members of the jury venire based upon their race and gender.[372]

## B.  State Court Disposition

Petitioner argued in his Rule 32 petition that his state appellate counsel rendered ineffective assistance by failing to present grounds for relief on direct appeal complaining about a host of alleged errors committed by the trial court, as well as the prosecution's abuse of its peremptory challenges to discriminate against both black and female members of the Petitioner's jury venire.[373]  The state trial court summarily dismissed this ineffective assistance complaint in its Order issued January 6, 2003, concluding that (1) appellate counsel are not constitutionally required to advance all possible grounds for relief on appeal; (2) Petitioner's complaints about alleged gender and racial discrimination by the prosecution during jury selection were supported by mere statistics insufficient to establish a *prima facie* claim under either *Batson* or *J.E.B.;* and (3) Petitioner's state appellate counsel acted in an objectively reasonable manner in selecting the issues actually included in Petitioner's brief on direct appeal.[374]  On appeal from the denial of Petitioner's Rule 32 petition, the Alabama Court of Criminal Appeals affirmed the dismissal of this

---

[372] Doc. # 1, at p. 30, ¶¶ 102-03.

[373] 15 SCR 56-58.

[374] 15 SCR 192-96.

ineffective assistance complaint, concluding the trial court correctly held Petitioner failed to allege sufficient facts in his Rule 32 petition in support of his claim of ineffective appellate counsel to avoid summary dismissal, and Petitioner failed to allege sufficient facts in support of his *Batson* and *J.E.B.* claims to establish a *prima facie* case of racial or gender discrimination by the prosecution during jury selection.[375]

## C.  The Clearly Established Constitutional Standard

The same two-pronged standard for evaluating ineffective assistance claims against trial counsel announced in *Strickland* applies to complaints about the performance of counsel on appeal. *See Smith v. Robbins*, 528 U. S. 259, 285 (2000) (holding a petitioner arguing ineffective assistance by his appellate counsel must establish both his appellate counsel's performance was objectively unreasonable and there is a reasonable probability that, but for appellate counsel's objectively unreasonable conduct, the petitioner would have prevailed on appeal); *Raleigh v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 938, 957 (11th Cir. 2016) ("The *Strickland* standard for ineffective assistance of counsel governs claims of ineffective assistance of appellate counsel."), *cert. denied*, 137 S. Ct. 2160 (2017).  Thus, the standard for evaluating the performance of counsel on appeal requires inquiry into

---

[375] 22 SCR (Attachment B to Tab R-51), at pp. 63-67; 23 SCR (Tab R-58), at pp. 63-67.

whether appellate counsel's performance was deficient, *i.e.*, whether appellate counsel's conduct was objectively unreasonable under then-current legal standards, and whether appellate counsel's allegedly deficient performance "prejudiced" petitioner, *i.e.*, whether there is a reasonable probability that, but for appellate counsel's deficient performance, the outcome of petitioner's appeal would have been different. *Smith v. Robbins*, 528 U. S. at 285; *Hittson v. GDCP Warden*, 759 F.3d 1210, 1262 (11th Cir. 2014), *cert. denied*, 135 S. Ct. 2126 (2015). Appellate counsel who files a merits brief need not and should not raise every non-frivolous claim but, rather, may select from among them in order to maximize the likelihood of success on appeal. *Smith v. Robbins*, 528 U. S. at 288; *Jones v. Barnes*, 463 U. S. 745, 751 (1983). The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v. Murray*, 477 U. S. 527, 536 (1986); *Jones v. Barnes*, 463 U. S. at 751-52.

Where, as in Petitioner's case, appellate counsel presented, briefed, and argued, albeit unsuccessfully, one or more non-frivolous grounds for relief on appeal and did not seek to withdraw from representation without filing an adequate *Anders* brief, the defendant must satisfy *both* prongs of the *Strickland* test in connection with his claims of ineffective assistance by his appellate counsel. *See Roe v. Flores-Ortega*, 528 U. S. 470, 477, 482 (2000) (holding the dual prongs of *Strickland* apply to complaints of ineffective appellate counsel and recognizing, in cases involving

"attorney error," the defendant must show prejudice); *Smith v. Robbins*, 528 U. S. at 287-89 (holding petitioner who argued his appellate counsel rendered ineffective assistance by failing to file a merits brief must satisfy both prongs of *Strickland*).

## D. AEDPA Review of Complaint Asserted in State Habeas Court

For the reasons discussed at length above in Sections V.J. and V.K., the state trial court and state appellate court reasonably concluded it was objectively reasonable for Petitioner's state appellate counsel not to include *Batson* and *J.E.B.* claims as part of Petitioner's direct appeal from his capital murder conviction and sentence of death. To reiterate, this court concludes, just as did the state trial and appellate courts in the course of Petitioner's Rule 32 proceeding, that Petitioner's state appellate counsel, just like Petitioner's trial counsel, could reasonably have believed there was insufficient evidence to satisfy the requirements for *prima facie* showings of racial and gender discrimination by the prosecutor during jury selection. Appellate counsel are not required to present every non-frivolous claim available. *See Overstreet v. Warden*, 811 F.3d 1283, 1287 (11th Cir. 2016) ("Appellate counsel has no duty to raise every non-frivolous issue and may reasonably weed out weaker (albeit meritorious) arguments."); *Brown v. United States*, 720 F.3d 1316, 1335 (11th Cir. 2013) ("An attorney is not required under the Constitution or the *Strickland* standards to raise even non-frivolous issue on appeal." (citing *Jones v. Barnes*, 463 U. S. at 754)), *cert. denied*, 135 S. Ct. 48 (2014).

Moreover, because Petitioner's trial counsel chose not to raise timely objections predicated on *Batson* or *J.E.B.*, the state appellate court's standard of review of those claims would necessarily have been circumscribed. *See Ex parte Bohannon*, 222 So. 3d 525, 535 (Ala. 2016) (Because no objection was made at trial to trial court's failure to limit prosecution's questioning of defense character witness, review of the issue was for plain error and holding "plain error" means "error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings - the plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant), *cert. denied*, 137 S. Ct. 831 (2017); *Gaddy v. State*, 698 So. 2d 1100, 1130 (Ala. Crim. App. 1995) (holding in the absence of any objection, a defendant's complaint that he was absent during a post-trial hearing must be analyzed under the plain error rule), *aff'd*, 698 So. 2d 1150 (Ala. 1997), *cert. denied*, 522 U. S. 1032 (1997). Petitioner's state appellate counsel could reasonably have concluded that asserting *Batson* or *J.E.B.* claims on direct appeal was unlikely to garner success because the state appellate courts would necessarily review those claims under the deferential plain error standard.

Likewise, for the reasons discussed at length above in Sections V.J. and V.K., the state trial and appellate courts reasonably concluded these same ineffective assistance complaints about the performance of Petitioner's state appellate counsel

failed to satisfy the prejudice prong of the *Strickland* standard: Petitioner alleged insufficient facts in his Rule 32 petition to establish a *prima facie* case of racial or gender discrimination. The state trial and appellate courts reasonably concluded during Petitioner's Rule 32 proceeding there was no reasonable probability that, but for the failure of Petitioner's state appellate counsel to assert *Batson* or *J.E.B.* claims on direct appeal, the outcome of Petitioner's direct appeal would have been any different.

## E. Conclusions

The state trial and state appellate courts' rejection on the merits during Petitioner's Rule 32 proceeding of Petitioner's ineffective assistance complaints about his state appellate counsel's failure to present on direct appeal claims of racial and gender discrimination by the prosecution during jury selection was neither contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and Rule 32 proceedings. Paragraphs 102 through 103 of Petitioner's federal habeas corpus petition do not warrant federal habeas corpus relief.

# VII. REQUEST FOR EVIDENTIARY HEARING

Petitioner requests an evidentiary hearing.[376]  Insofar as Petitioner's claims in this federal habeas corpus proceeding were disposed of on the merits during the course of Petitioner's direct appeal or Rule 32 proceeding, Petitioner is not entitled to a federal evidentiary hearing to develop new evidence attacking the state appellate or state habeas court's resolution of Petitioner's claims.  Under the AEDPA, the proper place for development of the facts supporting a claim is the state court.  *See Harrington v. Richter*, 562 U. S. 86, 103 (2011) ("Section 2254(d) thus complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding."); *Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir.) (holding the AEDPA clearly places the burden on a petitioner to raise and litigate as fully as possible his federal claims in state court), *cert. denied*, 522 U. S. 984 (1997).

Where a petitioner's claims have been rejected on the merits, further factual development in federal court is effectively precluded by virtue of the Supreme Court's holding in *Cullen v. Pinholster*, 563 U. S. 170  181-82 (2011):

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law.  This backward-looking

---

[376] Doc. # 1, at p. 60, ⁋ 224((d).

> language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.,* the record before the state court.

Thus, petitioner is not entitled to a federal evidentiary hearing on any of his claims which were rejected on the merits by the state courts, either on direct appeal or during Petitioner's Rule 32 proceeding.

With regard to the new factual allegations and new legal arguments Petitioner failed to fairly present to the state courts, and for which this court has undertaken *de novo* review, Petitioner is likewise not entitled to an evidentiary hearing. In the course of conducting *de novo* review, this court has assumed the factual accuracy of all the specific facts alleged by Petitioner in support of his claims for relief, including the factual accuracy of all the new potentially mitigating information Petitioner identified in his pleadings in this court in support of his multi-faceted ineffective assistance claims. As explained at length above in Section V, even when the truth of all of Petitioner's new factual allegations supporting his ineffective assistance claims is assumed, Petitioner's ineffective assistance claims still do not satisfy the prejudice prong of the *Strickland* standard.

Furthermore, as explained above, even assuming the truth of all the new factual allegations Petitioner presents in support of his federal habeas claims, after *de novo* review, none of Petitioner's claims warrant federal habeas corpus relief. In light of these assumptions, Petitioner is not entitled to an evidentiary hearing. *See*

*Schriro v. Landrigan*, 550 U. S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."); *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1318-19 (11th Cir. 2016) ("We emphasize that the burden is on the petitioner in a habeas corpus proceeding to allege sufficient facts to support the grant of an evidentiary hearing and that a federal court will not blindly accept speculative and inconcrete claims as the basis upon which a hearing will be ordered.") (quoting *Dickson v. Wainwright*, 683 F.2d 348, 351 (11th Cir. 1982)); *Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1060 (11th Cir. 2011) (the burden is on the petitioner to establish the need for an evidentiary hearing), *cert. denied*, 565 U. S. 1120 (2012). If a habeas petition does not allege enough specific facts that, if they were true, would warrant relief, the petitioner is not entitled to an evidentiary hearing. *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d at 1319; *Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d at 1060. Where a petitioner fails to allege sufficient facts to satisfy the prejudice prong of the *Strickland* standard, it is unnecessary to hold an evidentiary hearing to resolve disputed facts relating to the allegedly deficient performance of trial counsel. *Bester v. Warden*, 836 F.3d 1331, 1339-40 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 819 (2017). For the reasons discussed at length above, Petitioner has failed to satisfy this standard.

While Petitioner does allege many new *facts* in support of his unexhausted ineffective assistance claims, Petitioner did not proffer any new *evidence* supporting those unexhausted claims. There is no need for an evidentiary hearing in federal court where a federal habeas petitioner fails to proffer any evidence he would seek to introduce at a hearing. *See Chandler v. McDonough*, 471 F.3d 1360, 1363 (11th Cir. 2006) (holding no evidentiary hearing necessary in federal habeas proceeding where the district court took as true the factual assertions underlying the ineffective assistance claim and the petitioner failed to proffer any additional evidence), *cert. denied*, 550 U. S. 943 (2007). "[I]f a habeas petition does not allege enough specific facts that, if they were true, would warrant relief, the petitioner is not entitled to an evidentiary hearing." *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d at 1319. "The allegations must be factual and specific; conclusory allegations are simply not enough to warrant a hearing." *Id.* "Moreover, a petitioner seeking an evidentiary hearing must make a 'proffer to the district court of any evidence that he would seek to introduce at a hearing.'" *Id.* "A §2254 petitioner is not entitled to an evidentiary hearing if he fails to 'proffer evidence that, if true, would entitle him to relief.' " *Hamilton v. Sec'y, Fla. Dep't of Corr.*, 793 F.3d 1261, 1266 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1661 (2016). Because Petitioner failed to make a valid proffer of any new evidence in support of his unexhausted claims, he is not entitled to an evidentiary hearing to develop that evidence in this court.

# VIII. CERTIFICATE OF APPEALABILITY

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a Certificate of Appealability ("CoA"). *Miller-El v. Johnson*, 537 U. S. 322, 335-36 (2003); 28 U.S.C. §2253(c) (2). A CoA is granted or denied on an issue-by-issue basis. *Jones v. Sec'y, Fla. Dep't of Corr.*, 607 F.3d 1346, 1354 (11th Cir.) (no court may issue a CoA unless the applicant has made a substantial showing of the denial of a constitutional right and the CoA itself "shall indicate which specific issue or issues satisfy" that standard), *cert. denied*, 562 U. S. 1012 (2010); 28 U.S.C. §2253(c)(3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U. S. 274, 282 (2004); *Miller-El v. Johnson*, 537 U. S. at 336; *Slack v. McDaniel*, 529 U. S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U. S. 880, 893 (1983). To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U. S. at 282; *Miller-El v. Johnson*, 537 U. S. at 336. This court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas

petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U. S. at 338 (quoting *Slack v. McDaniel*, 529 U. S. at 484). In a case in which the petitioner wishes to challenge on appeal this court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U. S. at 484 (when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether the claim is a valid assertion of the denial of a constitutional right, and the district court's procedural ruling was correct).

Reasonable minds could not disagree with the conclusions that (1) during the course of Petitioner's Rule 32 proceeding the state courts reasonably rejected on the merits all of Petitioner's conclusory complaints about the performance of his trial counsel and state appellate counsel; (2) when reviewed under a *de novo* standard of review, all of Petitioner's new factual allegations supporting his ineffective assistance claims fail to satisfy the prejudice prong of the *Strickland* standard;[377] (3) the state appellate and state habeas courts reasonably rejected on the merits (a) Petitioner's Double Jeopardy claims, (b) Petitioner's complaints about the trial court's jury instructions, (c) Petitioner's complaints about the prosecution's jury

---

[377] Petitioner pleaded one set of facts in support of his ineffective assistance claims in his Rule 32 petition. Then, in his brief appealing the denial of his Rule 32 petition, Petitioner raised a host of completely new ineffective assistance claims, as well as a plethora of new facts supporting the ineffective assistance claims the state trial court denied in the course of summarily dismissing Petitioner's Rule 32 petition. Finally, when Petitioner reached this court, he once again asserted a number of wholly unexhausted ineffective assistance claims, as well as alleged a host of new facts supporting his previously asserted (but perhaps not completely exhausted) ineffective assistance claims. Faced with a record containing shifting factual allegations and myriad potential procedural default issues, for the reasons discussed at length above in note 89, this court undertook AEDPA review of those claims the state courts denied on the merits and *de novo* review of those claims (and new factual allegations) which Petitioner failed to fairly present to the state courts on direct appeal or in the course of his Rule 32 proceeding. *See*, *e.g.*, Sections V.D., V.G., V.J., V.K., V.M. above. This court also undertook *de novo* review of claims Petitioner failed to fairly present to the state courts during his Rule 32 proceeding, *i.e.*, claims Petitioner presented for the first time in his appellate brief challenging the denial of his Rule 32 petition. *See*, *e.g.*, Sections V.E., V.F., V.H., V.I. above. This court did so, rather than expend scarce judicial resources resolving myriad, complex, multi-layered procedural default issues because it was more analytically straight-forward (and easier) to deny on the merits Petitioner's meritless ineffective assistance claims, and as Justice Alito suggested in *Smith v. Texas*, 550 U. S. at 324 (Alito, J., dissenting), the parties and the public are more likely to be better served if the decision to deny Petitioner's federal habeas corpus petition is based on the merits instead of what may be viewed as a legal technicality.

arguments at both phases of trial, and (d) Petitioner's complaints about the manner in which the state trial court considered Petitioner's mitigating evidence of his youth; (4) Petitioner's complaints about allegedly erroneous procedural, evidentiary and substantive law rulings during Petitioner's Rule 32 proceeding do not furnish independent bases for federal habeas corpus relief; and (5) Petitioner's new factual allegations and new legal theories asserted in this court in support of his claims do not warrant federal habeas relief under a *de novo* standard of review and do not warrant a federal evidentiary hearing. Petitioner is not entitled to a CoA on any of his claims for federal habeas corpus relief.

## IX. ORDER

Accordingly, it is hereby **ORDERED** that:

1. All relief requested in Petitioner's original federal habeas corpus petition (Doc. # 1), as supplemented by his briefs in support (Docs. # 45, 50, 57, 59), is **DENIED.**

2. Petitioner's request for an evidentiary hearing[378] is **DENIED.**

3. All other pending motions are **DISMISSED** AS MOOT.

4. Petitioner is **DENIED** a Certificate of Appealability on all of his claims.

---

[378] Doc. # 1, at p. 60, ¶ 224(d).

5.  By separate Show Cause Order, Petitioner's counsel will be directed to explain why sanctions should not be imposed in light of the potential violations of *Rule 11, Fed.R.Civ.P.*, identified above in Petitioner's original petition.

DONE this 21st day of December, 2018.

/s/ W. Keith Watkins
CHIEF DISTRICT JUDGE